## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| YAZZAN QAWASMI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN AIRLINES GROUP INC., ROBERT D. ISOM, DEVON E. MAY, and VASU S. RAJA<br><br>Defendants. | Case No. 4:24-cv-673<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>Demand for Jury Trial |

Plaintiff Yazzan Qawasmi ("Plaintiff"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by his counsel, which included, inter alia: (a) review and analysis of relevant filings made by American Airlines Group Inc. ("American" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of American's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.       This is a federal securities class action on behalf of all investors who purchased or otherwise acquired American securities between January 25, 2024 to May 28, 2024, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.       Defendants provided investors with material information concerning American's expected revenue for the fiscal year 2024. Defendants' statements included, among other things, confidence in the Company's new sales and distribution strategy to reduce internal expenses while simultaneously driving a significant demand increase for the Company's airline services.

3.       Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of American; notably, that the Company's sales and distribution strategy was not driving the revenue projected.  Instead, it was actually driving customers away from American as the strategy and its attested poor execution made it more difficult for customers to access the Company's services.  Such statements absent these material facts caused Plaintiff and other shareholders to purchase American's securities at artificially inflated prices.

4.       The truth emerged after-market on May 28, 2024 when American reported the prompt termination of its Executive Vice President and Chief Commercial Officer, Vasu S. Raja, along with an abrupt reduction in its short-term guidance. During a conference presentation on May 29, 2024, the Company attributed its lowered guidance to a softness in consumer bookings, a domestic supply and demand imbalance, and a reduction in capacity growth.  In pertinent part, Defendants announced that the reduced consumer bookings were significantly due to the changes

American made to their sales and distribution strategy, that they did not execute their strategy properly, and that they will now be modifying their strategy in an attempt to recapture the customers their strategy drove away. As a result, Defendants reduced their second quarter fiscal year 2024 projections, notably cutting their projections for the Company's operating margin by a full percentage point and adjusted earnings per share for the quarter by more than 17%.

5.      Investors and analysts reacted immediately to American's revelations.  The price of American's common stock declined dramatically. From a closing market price of $13.44 per share on May 28, 2024, American's stock price fell to $11.62 per share on May 29, 2024, a decline of more than 13.5% in the span of a single day.

## JURISDICTION AND VENUE

6.      Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant American is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11.     Plaintiff purchased American common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in American is attached hereto.

12.     American Airlines Group Inc. is a Texas corporation with its principal executive offices located at 1 Skyview Drive, Fort Worth, TX 76155. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "AAL."

13.     Defendant Robert D. Isom ("Isom") was, at all relevant times, the Chief Executive Officer, President, and Director of American.

14.     Defendant Devon E. May ("May") was, at all relevant times, the Executive Vice President and Chief Financial Officer of American.

15.     Defendant Vasu S. Raja ("Raja") was, at all relevant times, the Executive Vice President & Chief Commercial Officer of American.

16.     Defendants Isom, May, and Raja are sometimes referred to herein as the "Individual Defendants." American together with the Individual Defendants are referred to herein as the "Defendants."

17.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of American's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports

and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

18.     American is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

19.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to American under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

20.     American, through wholly-owned subsidiaries and third-party regional carriers under the American Eagle banner, operates as a network air carrier, providing scheduled air transportation passenger and cargo services throughout the US and in various other countries around the world.

21.     As of December 31, 2023, American had more than 1,500 aircraft under its umbrella.

***The Defendants Materially Misled Investors Concerning American's Revenue Outlook for***

***Fiscal Year 2024***

*<u>January 25, 2024</u>*

22.     On January 25, 2024, Defendants held an earnings call where CEO, President, and

Director Robert D. Isom provided the following outlook for fiscal year 2024:

> This year, we expect our system capacity growth to be balanced between domestic and international. More than ever, our revenue growth is fueled by a growing number of AAdvantage customers who acquired our co-brand credit cards in record numbers in 2023. AAdvantage customers represent both our greatest source of value and greatest opportunity going forward. In 2023, 2/3 of our revenue came from AAdvantage customers. These customers also account for 70% of our upsell, loyalty and partnership revenue.
>
> ***Over the past year, we have made changes to our distribution strategy to give customers direct improved access to our best products and enable American to provide better customer service to the individual traveler. We're very encouraged by the results***. Customers who shop directly with us have a more enjoyable experience and are 11 points more likely to recommend American than those shopping in traditional outlets. They are purchasing more valuable content and doing so at lower expense. In 2023, our revenue was 15% higher than 2019, while our selling expenses were 10% lower. Our fleet, network and travel rewards program will continue to drive significant value moving forward. Our limited near-term capital requirements will position us to continue to generate free cash flow.

23.     Executive VP and CFO Devon E. May went on to provide the following financial

details for the Company's fiscal year 2024 projected outlook:

> Our focus this year will be to continue to deliver industry-leading reliability and to reengineer our business to ensure we run the airline as efficiently as possible while enhancing the customer experience.
>
> . . .
>
> In 2024, we expect aircraft utilization to be up 2% to 4%, and we expect to deliver approximately $400 million in cost savings through the use of digital solutions, reengineering processes and transforming procurement. We have spent the last 18 months sizing the opportunity and developing plans to reengineer our business to be more productive while improving the customer and team member experience. We are excited about the early results, and we will spend more time discussing these opportunities in greater detail at our upcoming Investor Day.

***This year, we expect to produce adjusted earnings per diluted share of between $2.25 and $3.25.*** Using the midpoint of that guidance, we are forecasting free cash flow production of over $2 billion. Looking at the first quarter, we expect TRASM to be down approximately 3.5% to 5.5% on 6.5% to 8.5% more capacity year-over-year. We expect first quarter CASMx to be up approximately 2% to 4% year-over-year. Recall that we did not have the cost impact of our new pilot agreement accrued in the first quarter of 2023. Our year-over-year CASMx performance improved throughout the year as we lap the pilot agreement increases.

Our current forecast for the first quarter assumes a fuel price of between $2.65 and $2.85 per gallon.

(Emphasis added).

24.     The question-and-answer portion of the call followed where the Individual Defendants elaborated on their forecast, pertinently pointing to the Company's changes to their distribution strategy as follows:

<Q: Jamie Nathaniel Baker – JPMorgan Chase & Co – Equity Analyst> Perfect. And then on corporate recovery, in the past, you and I -- I mean, we've all spoken about blended travel and the network and pricing changes that you've made to take advantage of that phenomenon. When we think about what you're seeing today in terms of corporate recovery, though, is it robust enough that you need to make further adjustments? Or is it simply incremental yield without any cost or effort?

<A: Vasu S. Raja> Jamie, it's a great question. ***And maybe one that speaks at large to our distribution strategy***. And so let me speak at large to that first, and I'll hit that. ***First, all of our changes, whether it's with corporate travel management or travel agencies or what have you are this simple. We sell our product through the Internet.*** That's what our customers demand. That's how we can give them the best content at the lowest expenses to them and the best servicing. And we see that. ***We see that we're producing revenue more efficiently, more strategically, more to the liking of our customers***. I'll echo what Robert said. We're up 15% in revenue, we're down 8% to 9% in selling expenses, our likelihood to recommend scores are higher. But as we look at it, what has really been a change is 65% of our revenue comes from AAdvantage customers, but [Technical Difficulty] that more.

About 45% of our revenue is coming from AAdvantage customers who are buying premium content, a better seat, more of fundability, more flexibility for miles, and that's up 3 points year-over-year. So that's all to say that -- any which way we double-click on that, it's meaningful, right? We too exit Q4 with a 90% business recovery. Within that unmanaged business versus managed businesses almost a 3:1

ratio with unmanaged business 100% plus covered, managed business down further. The impact on managed business is really flat from traffic on higher yields.

*So as we go forward, actually, we're going to lean further into this. What we have realized through this is, first and foremost, we need to make it easy for our customers to consume our content through the Internet. So we're going to offer more mileage for customers who shop through the Internet. We're going to roll out better servicing capabilities for Internet distribution. And we are going to start restricting the amount of selling and servicing that we do through non Internet-based channels*.

And we invite all the travel managers and all of the travel agencies of the world to join us in this because this is great for customers, and it should be great for them too. All of our financial incentives targeted to that audience are really around helping them ship. So we've actually been very encouraged by what we've seen. I think clearly, our relative rousing performance is similar to what it was in the exit on pandemic period. And now in the year ahead, we have the opportunity to optimize.

. . .

<Q: David Scott Vernon – Sanford C. Bernstein & Co., LLC – Senior Analyst> On the topic of sort of premium and how the [indiscernible] are affecting the business right now. Can you give us some sort of color around how the premium product sales or movements up and down the fare ladder happening growth and basic growth in premium? Just give us some sense of kind of where you are in that process of tapping into what is a more lucrative segment of revenue?

<A: Vasu S. Raja> Thanks, David. This is Vasu and I'll pick it up right where I left it off. I think I can probably give you a fact point that makes it easier to understand just why we are so focused around selling -- creating more content for AAdvantage customers. So if you look at our system right now, about 7% of what we sell is base economy and indeed, that is up 20% year-over-year. But that's up 20% year-over-year because we changed its product.

Last year, we included it in commission dealings and corporate travel management programs. We just took it out last year. We reintroduced it here this year. It's actually not the critical thing. *What's been more interesting to us is 10% of our revenue is coming from customers who actually shop basic, but then buy something higher. And within that, that number is up 25% year-over-year, and almost all of its growth is coming through dot-com and app. And we see more and more ways where customers actually who are coming for a basic product want more than that and we can go and deliver that to them, which is why so many of our distribution strategies far from being risky, we see as a great opportunity*.

<Q: David Scott Vernon – Sanford C. Bernstein & Co., LLC – Senior Analyst>
Okay. And then maybe just as a quick follow-up. As you think about some of the
rationalization of the negative margin or lower margin capacity that's being
contemplated out in the industry, how do we -- how should we be thinking about
the impact of, let's say, an unbundled operator pulling in capacity on your fare
ladder? Does that -- is that sort of uniform impact up and down the different fare
classes? Or is it more concentrated in something like a basic product? Anything
you could tell us for -- help us to understand how some of the capacity changes in
the market might impact American would be really helpful.

<A: Vasu S. Raja> Well, look, at large, and I think Robert mentioned it earlier. I
mean, if there's -- it is all business supply-demand driven businesses. And if there's
less supply, that's going to have a clear impact on demand. ***But for us, with things
like basic, that for all of our fare products, we do not make products that are so
odious no one will buy it. The whole point of them is to actually have customers
experience travel and joint AAdvantage. And for us, base economy is not about a
competitive product. It's our entry-level product that gets customers in the door
and signed up for AAdvantage.***

(Emphasis added).

<u>*April 25, 2024*</u>

25.     On April 25, 2024, the Defendants held an earnings call to report their results for

the first quarter of fiscal year 2024 as well as update their projections for the second quarter going

forward, stating, in pertinent part:

We remain on track to deliver our full year EPS guidance, and we continue to expect
to produce approximately $2 billion of free cash flow this year.

. . .

Additionally, our focus on delivering premium content that our customers desire is
paying off. In the first quarter, upsell, loyalty and partnership revenue what we
define as premium content made up 61% of our revenue and increased 17% year-
over-year. As we have outlined in the past, our revenue growth is increasingly
fueled by Advantage customers who continued to acquire our co-branded credit
cards at historically high levels. Advantage customers account for 72% of our
premium content revenue. And in the first quarter, our premium cabin saw a 10%
increase in revenue versus 2023.

We expect these trends to continue, which is why we're investing in our product
and premium customer experience.

. . .

We see meaningful opportunities to improve upon our results much of which will be captured as we progress through the year. ***First, we continue to believe in the value that our distribution strategy provides to our customers and to American. Engaging directly with our customers through modern Internet-based technology is where the industry is headed, and we're leading the way.*** That being said, there are near-term actions we can take to optimize our efforts in advance of hitting a steady state on this long-term strategic initiative, and those are underway.

. . .

***And finally, our team is laser-focused on executing well on these and all of our commercial initiatives day in and day out.***

. . .

Through investments in technology, we have made significant progress in our digital servicing capabilities. American is now able to sell and digitally service approximately 95% of transactions, which greatly simplifies and enhances the experience of our customers and team members

. . .

We produced record first quarter revenue of $12.6 billion, up 3.1% year-over-year. Our adjusted EBITDAR margin was 7.6%, and we produced an adjusted operating margin of 0.6%.

. . .

***Based on our current demand assumptions and fuel price forecast, we expect to produce an adjusted operating margin of between 9.5% and 11.5% in the second quarter, and adjusted earnings per diluted share of between $1.15 and $1.45.*** The American Airlines team is focused on delivering results to unlock value in 2024 and beyond. We remain on track to deliver full year adjusted earnings per diluted share of between $2.25 and $3.25, and we continue to anticipate producing approximately $2 billion of free cash flow in 2024.

(Emphasis added).

26.    During the question-and-answer portion of the call that followed, Defendant Raja spoke at length about their demand assumptions and, more specifically, the impact of the Company's revamped sales and distribution strategy on the projections:

<Q: David Scott Vernon – Sanford C. Bernstein & Co., LLC – Senior Analyst> So maybe to you or Robert, when you look at the 2Q RASM guide, it's a little bit better, I think, than people were expecting but it's not quite sort of flat and level with peers. There's also a pretty big sequential ramp from sort of 1Q into 2Q when you look at the TRASM number. Can you guys kind of help us understand kind of what's embedded underneath that? What's driving the big sequential acceleration on top of capacity growth? And maybe why that unit revenue metric is not performing at the same rate as peers?

<A: Vasu S. Raja> Absolutely. Absolutely. It's an excellent question, one I suspect it's on many people's minds. Look, and actually, the tail of our year, the quarterly progression of TRASM really starts in the first quarter. And as we saw in the first quarter, there are 3 things that impacted us in the first quarter, which changed materially as the year progresses. The first is in first quarter, competitive capacity grew the most in our markets and strength in the domestic and short-haul network.

Two, in our first quarter, we flew too much. When you look at what we did, about 60% of our growth ASMs were in off-peak times a day or days of week, which is about 10 to 15 points higher than our next competitor. And the third thing, and related to Robert's marks at the top of this is **Q1 marks the end of really a year of transition of our distribution strategies in which we were really focused on actually creating the right long-term customer proposition, reducing a lot of the unnecessary expenses that went along with it.**

**All 3 of those conditions start to change as we go forward, which is not just us guessing, you actually start to see it.** On Q1, refer to my first point, we see industry capacity starting to change as we go into the summer and certainly into the fall. That reduction is coming most heavily in the narrow-body system, which uniquely favors us. Two, as we go in the third quarter, you've already seen this in our published schedules, and you'll see more of it in the days ahead.

We are also taking a much more careful look at our off-peak or off-time channel flying, so we'll produce less flying in the trough too, which also pretty benefit to TRASM. **And now having gone through a year of transition with our distribution strategy, we get to do optimization. And we see a lot of ways to be able to do that, which is great for our customers.**

**Frankly, can really bring in a lot of our travel agency and corporate partners. But very critically, can drive revenue and profit for the airline. And so you see that in our sequential build as we go quarter-to-quarter through the year.**

. . .

<Q: Jamie Nathaniel Baker – JPMorgan Chase & Co – Equity Analyst> … Vasu, as you approach the date at which certain agency bookings will no longer accrue advantaged credit, I guess 2 questions. First, what percentage of revenue currently

comes through those affected channels that you're going to cut off -- or not cut off, modify? And second, what are your sort of underlying assumptions as to how that plays out?

So do you assume that your change will drive passengers one-on-one from an OTA to american.com, or do you model for some type of net loss in total bookings? Does ancillary upsell offset that? Just wondering what you're modeling in terms of the consumer behavior.

<A: Vasu S. Raja> Absolutely, Jamie. I'm extremely happy that you asked that question. To give you the best answer is it worth it to understand where we've been to understand where we're going and how -- as we call it the preferred agency program fits into it. So if you look at it for a long time, we endeavor to go and do things like maximize share -- agency share or corporate share, but that isn't necessarily optimizing revenue per se.

And we were in a world and certainly as we came out of the pandemic, where a lot of the agency are corporate-related bookings that we were doing, we're coming at relatively low revenue values but sitting in the premium cabin. *And so a lot of what our strategy is to reframe around how do we go and create more value for the end customer who's choosing travel. And how do we go do it in a really economical way?* And what we planned over and over again is they want a great product, they want it delivered well, they want to be rewarded, and they want to be able to shop and service digitally and be able to compare products.

*So a lot of our transition has been undoing so many things that we've done, which we're not really creating value for the customer nor creating profit for American Airlines. And we've done that over the course of the last year. We've reduced a lot of it. And interestingly, as you see it today, if -- maybe there were more junior and maybe [indiscernible] version of all of us, Jamie, we would have thought when we embarked on this thing that it would come at a real risk to business revenues.*

But if you just look at what we've reported today, our business revenues are growing at a greater rate than capacity. Unmanaged is on the higher end of that contract in corporates which would presumably be the most affected are just slightly on the lower end of that. But we're doing it at 7% less in distribution expense. 60% of customers are Advantage customers, and they produce 2/3 of our revenue. *So what we've seen happen is a lot of those customers are actually leading the agency and coming to us directly on their own*.

And this is a really important thing because this is where we are, but where we go is a very different thing. And there's really 3 things that we're focused on as we go and optimize our distribution strategy. The first is exactly what you pointed out with preferred agencies. And we actually pushed the release rightly because we were all pleasantly surprised how many people are taking it. The vast majority of

our agencies are currently in an NDC transition, roughly about, the agencies that constitute about 30% to 40% of our revenue are already doing more than 30% of their bookings through NDC and are on a path to be, in some cases, close to 100 by the end of the year.

And there's even more agencies, a lot of big agencies who are signing on for it because they realize the customer utility and having a digital selling and servicing experience and frankly, they see there's an opportunity to go compete against other agencies, which is great for customers. So we've pushed our preferred agency program to bring more people into it because we see -- pleasantly see the amount of take rate. But we can do other things in the near term, which even as we speak we are doing.

The second thing is we can do a lot to simply go and create more products on the shelves for contracted business customers that are there. And we see more ways to do it through the booking tools that are there right now, and we have the ability to go and offer a direct connect any corporate traveler that's there, including JPMorgan Chase, should they be interested.

And the last thing that's very critical for us is what we have learned through this is we have a number of ways to go generate volume and the top on that list is being able to create more redemption for Advantage customers. But by no means do we have to go back into a world where we endeavor to raise expenses without creating value for the customer.

Our expenses rise, it should turn into something where there's real incremental revenue. And so now I'll very directly state your question. ***So with our preferred agency program, we actually anticipate that the majority of our agencies will be in it by the time we roll it out***.

(Emphasis added).

27.     The above statements in Paragraphs 22 to 26 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also minimizing risk from seasonality and macroeconomic fluctuations. In truth, American's optimistic reports of growth relied far too heavily on inflated demand assumptions allegedly stemming from the implemented changes to their sale and distribution strategy which had downsized the Company's sales and distribution channels to redirect consumers solely to their online platform.

28.     Some analysts further called American projected outlook into speculation.   An analyst from J.P.Morgan, for example, noted that, while "on the surface, American's guide doesn't exactly jump out. The issue is sequential.  Looking at revenue, American's revenue is expected to exceed that of 1Q by 18%, which comfortably exceeds the 2010-19 average by six points, and the prior sequential peak improvement by three points."  The analyst went on to note that "other airlines aren't guiding to this level of sequential assent." Notwithstanding, investors relied on Defendants' statements, who claimed that American's unique distribution strategy was yielding significant results.

***The Truth Emerges during American's conference presentation at***

***Bernstein's 40th Annual Strategic Decisions Conference***

<u>*May 28, 2024*</u>

29.     On the evening of May 28, 2024, after the market closed, Defendants issued an announcement indicating both the prompt termination of the Company's Chief Commercial Officer, Vasu Raja, and a significant reduction in American projected outlook for the second quarter:

> Vasu Raja, Chief Commercial Officer of the Company, will depart the Company in June 2024. Effective immediately, Stephen Johnson, Vice Chair and Chief Strategy Officer, will assume leadership of the commercial organization and help lead the search for a new Chief Commercial Officer.
>
> . . .
>
> Additionally, the Company is providing investors an update regarding its financial and operational guidance for the second quarter of 2024.  The Company is lowering its guidance for adjusted operating margin by 1 percentage point, to between approximately 8.5% to 10.5%. The Company now expects second-quarter adjusted earnings per diluted share to be between approximately $1.00 and $1.15. Second-quarter TRASM is now expected to be down approximately 5% to 6% versus the second quarter of 2023. CASM-ex in the second quarter is now expected to be approximately flat to up 1% year over year. Second-quarter average fuel price is

now expected to be approximately $2.70 to $2.80 per gallon of jet fuel (including taxes).

30.     On the morning of May 29, 2024, American conducted its conference presentation at Bernstein's 40th Annual Strategic Decisions Conference, regarding the announcements American made the day prior. In pertinent part, Isom stated as follows:

Our expectation for domestic performance has worsened materially since we provided guidance in April for a few reasons.

First, we're seeing softness in customer bookings relative to our expectations that we believe is in part *due to the changes that we have made to our sales and distribution strategy.* To address this, we're evaluating our strategy holistically and piece by piece. We spent a lot of time listening to our agencies and our corporate customers, and we're hearing and we hear their feedback. We're taking some immediate actions to respond and adapt, and over the coming weeks, we'll be working to ensure that we're optimizing for our customers and American as we move forward. And just more on that in just a minute.

Second, the domestic supply and demand imbalance has led to a weaker domestic pricing environment than we had forecast.  There's more discounting activity than we saw a year ago. Now industry capacity is expected to come down in the second half of the year, and that should help.

And finally, we expect that our own capacity growth would have been better absorbed as we moved into the higher demand summer months in the second quarter. *But we haven't performed as we thought*. And given this performance, we're taking a closer look at our own growth plans in the back half of the year and are making adjustments to bring our capacity down versus our prior plans. At this point, we expect to slow our rate of growth from just over 8% in the first half of the year to approximately 3.5% in the second half of the year.

Against this backdrop, American is taking action to address our capacity and adjust our distribution strategy, and we're going to be very attentive to the marketplace as time goes forward. We're adapting our distribution strategy. While we all know that NDC, modern retailing, internet-based channels for selling our product is the future of airline distribution. *But we move faster than we should and we didn't execute well*.

We regret that and the difficulties that it created for our agency and corporate communities. *So we are going to modify our distribution strategy*. Specifically, we need to work closely with our agencies and partners to ensure that the transition that we're making is not disruptive to our end customers.

. . .

***We need to make it easier to participate in our programs and the easier to do business with American Airlines. For our end customers, that fly every day, we want to make sure that no customer that's out there traveling is made worse off from the changes that we make.***

. . .

***To a degree our approach is driving customers away from American***, we're unequivocally committed in getting those customers back.

(Emphasis added).

31.     Before fielding questions, CEO Isom went on to discuss CCO Vasu Raja's termination:

So yesterday, we announced that Vasu Raja will be leaving the company in June. And I've known Vasu for a long time.

He's admirers, creative thinking, his passion. He's been an innovator, a disruptor. He is a good friend, ***but sometimes we need to reset. And in this case, we do.*** We have to be better at executing those long-range plans. We have to be more attentive to the marketplace. ***We have to be more detail oriented, and we have to go forward as a team and really make it easy for American to do business with***.

(Emphasis added).

32.     A discussion then followed with David Scott Vernon of Sanford C. Bernstein & Co., LLC, a senior analyst who was hosting this conference, during which CEO Isom shed more light on the issues resulting from changes to the Company's sales and distribution strategy and execution thereof, stating, in pertinent part:

<Q: David Scott Vernon> All right. So maybe let's spend a little bit of time on some of the near-term stuff just because I think it is important to help investors understand kind of the state of the market and how much of this is consumer weakness versus how this is sort of self-inflicted pain and then we get into some of the strategic stuff. So you mentioned long term -- the full year guidance that was not noted in the call the update. So where does that stand at that table or?

<A: Robert D. Isom> Look, where we stand right now. ***We know we've dug ourselves a hole in the second quarter***. Our operating earnings are going to be up

by a couple of hundred million dollars. We've got a lot of work to do to recoup that. There is absolutely marketplace dynamics that are involved as well. As I take a look at the work that we have ahead of us. I believe that second quarter this hold down is partially related to how we -- it's partially related to the industry dynamics, more capacity than the demand is out there and softer pricing environment.

***The other piece is how we've executed in that, and I think that that's something that, that we can recover. We've got work to do. We'll talk more in second quarter as we produce those results. We've got some work to do on build them back from the hole we've created for ourselves*** . . .

<Q: David Scott Vernon> And as we think about that -- the magnitude of the unit revenue is kind of in the second quarter from April to [ here ]. Things seemingly got a lot worse, right? So as you think about that step down, was that some of the things we noticed in the first quarter in terms of managed corporate bookings being a little bit weaker, accelerating and getting worse? Or like is there any way you can help us understand how much of it is really just Southwest [ out there ] with $39 fares versus kind of shot ourselves in the foot and not got even worse.

<A: Robert D. Isom> Well, I'd just say this, ***we should have performed much more in line with our network peers in the first quarte***r. And so I know that, that's an opportunity for us to recapture. But the marketplace has definitely gotten much more competitive and sale activity increased considerably after we produced -- we put forward our guidance and talked about our first quarter results. ***I don't know if it's 50-50, 60-40.***

Okay. But I'd tell you that a portion of this is marketplace. And I think that the dynamics in the industry get better from a capacity perspective as we move through the year. And then I think the other large portion is how we've reacted in that marketplace. ***And the weakness that you've seen in American is I do believe something that speaks to close-in bookings, the highest premium customers that, unfortunately, we haven't made ourselves as available and easy to work with as we can.***

. . .

<Q: David Scott Vernon> Okay. So then -- last question on the sort of the near term and then we can [indiscernible] some of the bigger picture issues around the industry dynamic. You've made the decision to part ways with [indiscernible]. Can you just talk about your goals, expectations kind of mandate the new person is going to have to come in. Someone that you want to come in and sort of redesign everything. Is there somebody wanted to implement what you've already -- adjust which you've already [ won ] like how do we think about the mandate that you're going to be giving whoever. [indiscernible] you want to commit to take that job and what's the mandate.

<A: Robert D. Isom> Okay. Let me just start with this. First off, our strategy is the company strategy. Those are my strategies, okay? And so I'll leave any individuals aside from that. And I do believe that the strategy that we're pursuing that we laid out in Investor Day are the absolutely right ones. ***Now one of the things that is very clear is that we've driven some customers away. We restricted some customers from actually [indiscernible] our product. Those are kind of things that we have to be attentive to. It's one thing to have a plan and that plan can be the greatest plan in the world. You can have the best people operating it, but execution is critical*** . . .

(Emphasis added).

33.    The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the January 25 and April 25, 2024 earnings calls.  On those calls, Defendants continually praised and de-risked their decision to revamp the Company's sales and distribution strategy, dismantling the previous system to drastically reducing sale and distribution expenses while allegedly resulting in a significant increase in consumer demand.

34.    Investors and analysts reacted immediately to American's revelations.  The price of American's common stock declined dramatically. From a closing market price of $13.44 per share on May 28, 2024, American's stock price fell to $11.62 per share on May 29, 2024, a decline of more than 13.5% in the span of just a single day.

35.    A number of well-known analysts who had been following American lowered their price targets in response to the Company's disclosures. For example, J.P.Morgan, while reiterating their overweight rating on the evening of May 28, noted "that American's diminished guide speaks far more to its flawed initial forecast than any broad-based shift in passenger demand."   The analyst went on to note that they have "long pondered whether American's retreat from traditional corporate relationships might create revenue headwinds that would overwhelm the material savings driven by the near-elimination of its sales department."

36.     The next day, following American's conference presentation, J.P.Morgan issued a follow-up analyst report reducing their model "for the second time in 24 hours."  The analyst highlighted "American's public capitulation regarding its corporate distribution strategy, a phenomenon we've long cited as a potential risk, and one that may prove time-consuming and costly to reverse course from."  The analyst further suggested that "[w]ith the benefit of hindsight, this forecast might have been a bit of a Hail Mary by its CCO, Vasu Raja, who is leaving the company in coming weeks."

37.     Similarly, Susquehanna, while considerably reducing their price target, cautioned that WBA is "given the obvious challenges with AAL's revised distribution strategy (i.e., NDC), and a domestic network plan that (still) does *not* seem compelling . . . it's clear that AAL needs to evaluate its LT operating plan."  The analyst, while noting demand appearing healthy through the summer, concluded that "AAL's comments (in our view) [present] more of an internal forecasting issue than a signal demand is slowing," and further reiterated the remarks of other analysts that re-engineering AAL's distribution strategy (and hopefully, network plan as well) will not be easy."

38.     The fact that these analysts, and others, discussed American's shortfall and below-expectation projections suggests the public placed significant weight on American's prior revenue and sales estimates. The frequent, in-depth discussion of American's guidance confirms that Defendants' statements during the Class Period were material.

### *Loss Causation and Economic Loss*

39.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of American's common stock and operated as a fraud or deceit on Class Period purchasers of American's common stock by materially misleading the investing

public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of American's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of American's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

40.     American's stock price fell in response to the corrective event on May 28, 2024, as alleged *supra*. On May 28, 2024, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning American's forecasting processes and growth guidance.

41.     In particular, on May 28, 2024, American announced significantly below-market growth expectations, reducing their own prior earnings per share guidance for the second quarter of fiscal year 2024 by more than 17% and further announcing the termination of its Executive Vice President and Chief Commercial Officer, Vasu S. Raja.

### *Presumption of Reliance; Fraud-On-The-Market*

42.     At all relevant times, the market for American's common stock was an efficient market for the following reasons, among others:

(a)     American's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)     American communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging

public disclosures, such as communications with the financial press and other similar reporting services;

(c)     American was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about American was reflected in and incorporated into the Company's stock price during the Class Period.

43.     As a result of the foregoing, the market for American's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in American's stock price. Under these circumstances, all purchasers of American's common stock during the Class Period suffered similar injury through their purchase of American's common stock at artificially inflated prices, and a presumption of reliance applies.

44.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

45.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

46.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

47.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of American who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

48.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired American's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

49.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, American's common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by American or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of April 19, 2024, there were 656 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

50.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

51.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

52.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of American;

(c)     whether the Individual Defendants caused American to issue false and misleading financial statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     whether the prices of American's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

53.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

***Against All Defendants for Violations of
Section 10(b) and Rule 10b-5 Promulgated Thereunder***

54.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

56.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of American common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire American's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

57.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described

25

above, including statements made to securities analysts and the media that were designed to influence the market for American's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

58.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

59.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of American's internal affairs.

60.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to American's businesses, operations, future financial condition and future prospects. As a result of the

dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of American's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired American's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

61.     During the Class Period, American's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of American's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of American's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of American's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

62.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

63.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*
### *for Violations of Section 20(a) of the Exchange Act*

64.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

65.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about American's misstatements.

66.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by American which had become materially false or misleading.

67.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which American disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause American to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning

of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of American's common stock.

68.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause American to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

69.     By reason of the above conduct, the Individual Defendants and/or American are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 18, 2024

Respectfully submitted,

**CONDON TOBIN SLADEK
THORNTON NERENBERG PLLC**

 /s/ Stuart L. Cochran
Stuart L. Cochran
Texas Bar No.: 24027936
8080 Park Lane, Suite 700
Dallas, Texas 75231
Telephone: 214-265-3804
Facsimile: 214-691-6311
Email: scochran@condontobin.com

*Liaison Counsel for Plaintiff*

**LEVI & KORSINSKY, LLP**
Adam M. Apton (*pro hac vice* forthcoming)
33 Whitehall Street, 17th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*

# CERTIFICATION OF NAMED PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

I, Yazzan Qawasmi , duly certify and say, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My transaction(s) in American Airlines Group Inc. which are the subject of this litigation during the class period set forth in the complaint are set forth in the chart attached hereto.

5. Within the last 3 years, I have not sought to serve nor have I served as a class representative in any federal securities fraud case.

6. I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I certify under penalty of perjury that the foregoing is true and correct. Executed this:

Date : 7/16/2024

Name : Yazzan Qawasmi

Signature :



| Case Name | American Airlines Group Inc. |
|---|---|
| Ticker | AAL |
| Class Period | 01-25-2024 to 05-28-2024 |

| Client Name |
|---|
| Yazzan Qawasmi |

| Date of Transaction | Transaction Type | Quantity | Price per Share |
|---|---|---|---|
| 05-15-2024 | P | 0.383 | $ 14.9600 |
| 05-15-2024 | P | 401 | $ 14.9500 |
| 05-20-2024 | P | 49 | $ 14.5400 |