**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| YAZZAN QAWASMI, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> AMERICAN AIRLINES GROUP INC., ROBERT D. ISOM, DEVON E. MAY, and VASU S. RAJA, <br><br> Defendants. | Case No. 4:24-cv-00673-Y <br><br> CLASS ACTION <br><br> **ROBERT FERRINO'S APPENDIX ACCOMPANYING HIS MOTION FOR CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF AND APPROVING HIS SELECTION OF COUNSEL** |

Attached are true and correct copies of the following exhibits:

| EXHIBIT | DOCUMENT TITLE | PAGE NO. |
|---------|----------------|----------|
| A | PSLRA notice issued for *Qawasmi* Action on July 18, 2024 | APP 1-4 |
| B | PSLRA notice issued for *Thornburg* Action on August 28, 2024 | APP 5-7 |
| C | PSLRA Certification of Robert Ferrino | APP 8-10 |
| D | Declaration of Robert Ferrino in Support of His Motion for Appointment of Lead Plaintiff and Approval of His Selection of Lead Counsel | APP 11-14 |
| E | Loss Chart of Robert Ferrino | APP 15-16 |
| F | Firm resume of Kahn Swick & Foti, LLC | APP 17-58 |
| G | Unpublished Cases: <br><br> *Mullins v. AZZ, Inc.*, 2018 U.S. Dist. LEXIS 222090 (N.D. Tex. 2018) (Means, J.) <br><br> *Shaffer v. Dig. Generation, Inc.*, 2013 U.S. Dist. LEXIS 204461 (N.D. Tex. 2013) <br><br> *Town of Davie Police Pension Plan v. Pier 1 Imps., Inc.*, 2016 U.S. Dist. LEXIS  54627 (N.D. Tex. 2016) | APP 59-126 |

1

<table>
<tr><td>

*Bayati v. GWG Holdings, Inc.*, 2023 U.S. Dist. LEXIS 161080, at *7 (N.D. Tex.  2023)

*Kakkar v. Bellicum Pharms., Inc.*, 2019 U.S. Dist. LEXIS 50704, at *4 (S.D. Tex. 2019)

*In re Am. Serv. Grp., Inc.*, 2006 U.S. Dist. LEXIS 61779, at *12 (M.D. Tenn. 2006)

*Laborers Loc. 1298 Pension Fund v. Campbell Soup Co.*, 2000 U.S. Dist. LEXIS 5481 (D.N.J. 2000)

*Brown v. Bilek*, 401 F. App'x 889 (5th Cir. 2010)
*Bangzheng Chen v. CytRx Corp.*, 2014 U.S. Dist. LEXIS 194696 (C.D. Cal. 2014)

*Dougherty v. Esperion Therapeutics*, 2020 U.S. Dist. LEXIS 216515 (E.D. Mich. 2020)

*Kasper v. AAC Holdings, Inc.*, 2017 U.S. Dist. LEXIS 109608 (M.D. Tenn. 2017)

</td><td></td></tr>
</table>

Dated: September 16, 2024

Respectfully submitted,

**HOLMES FIRM PC**

By: ___/s/ J.D. Reed_____
John David "JD" Reed
Texas Bar No. 24075423
Holmes Firm PC
International Plaza III
14241 Dallas Parkway, Suite 800
Dallas, Texas 75254
Telephone: (469) 317-3424
Fax: (469) 916-7705
Jd@theholmesfirm.com

**KAHN SWICK & FOTI, LLP**
Ramzi Abadou
(to be admitted *pro hac vice*)
KAHN SWICK & FOTI, LLP
580 California Street, Suite 1200
San Francisco, California 94104
Telephone: (415) 459-6900
Facsimile: (504) 455-1498

ramzi.abadou@ksfcounsel.com

-and-

**KAHN SWICK & FOTI, LLC**
Lewis S. Kahn
(to be admitted *pro hac vice*)
James T. Fetter
(to be admitted *pro hac vice*)
Alexandra Pratt
(to be admitted *pro hac vice*)
1100 Poydras Street, Suite 960
New Orleans, Louisiana 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
lewis.kahn@ksfcounsel.com
james.fetter@ksfcounsel.com
alexandra.pratt@ksfcounsel.com

*Counsel for Movant, Robert Ferrino*

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2024, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ J.D. Reed*
John David "JD" Reed

APP 1

# EXHIBIT A

APP 1



# SHAREHOLDER ALERT: Levi & Korsinsky, LLP Notifies Investors It Has Filed a Complaint to Recover Losses Suffered by Purchasers of American Airlines Group Inc. Securities and Sets a Lead Plaintiff Deadline of September 16, 2024

July 18, 2024 17:50 ET| Source: **Levi & Korsinsky, LLP**    **Follow**

**Share**







NEW YORK, July 18, 2024 (GLOBE NEWSWIRE) -- The following statement is being issued by Levi & Korsinsky, LLP:

**To: All persons or entities who purchased or otherwise acquired securities of American Airlines Group Inc. ("American" or the "Company") (NASDAQ: AAL) between January 25, 2024 to May 28, 2024, both dates inclusive. You are hereby notified** that the class action lawsuit *Yazzan Qawasmi v. American Airlines Group Inc., et al.* (Case No. 4:24-cv-00673-Y) has been commenced in the United States District Court for the Northern District of Texas. To get more information **go to:**

https://zlk.com/pslra-1/american-airlines-lawsuit-submission-form

or contact Joseph E. Levi, Esq. either via email at jlevi@levikorsinsky.com or by telephone at (212) 363-7500. **There is no cost or obligation to you.**

During the class period, defendants made overwhelmingly positive statements to investors regarding American's new sales and distribution strategy to reduce internal expenses while simultaneously driving a significant demand increase for the Company's airline services. The complaint alleges that these statements misrepresented the true state

**Company Profile**

Levi & Korsinsky, LLP

**Industry:** Specialized Consumer Services

**Website:**
https://zlk.com

**Press Release Actions**

Print
Download PDF
Subscribe via RSS
Subscribe via ATOM
Javascript

**APP 2**



APP 3

distribution strategy was not driving the revenue projected.

Following the May 28, 2024 announcement of an abrupt reduction in the Company's short-term guidance and the termination of its Executive Vice President and Chief Commercial Officer, Vasu S. Raja, the price of American's common stock declined dramatically. From a closing market price of $13.44 per share on May 28, 2024, American's stock price fell to $11.62 per share on May 29, 2024, a decline of more than 13.5% in the span of a single day.

**If you suffered a loss in AAL securities, you have until September 16, 2024** to request that the Court appoint you as lead plaintiff. Your ability to share in any recovery doesn't require that you serve as a lead plaintiff.

**WHY LEVI & KORSINSKY:** Over the past 20 years, the team at Levi & Korsinsky has secured hundreds of millions of dollars for aggrieved shareholders and built a track record of winning high-stakes cases. Our firm has extensive expertise representing investors in complex securities litigation and a team of over 70 employees to serve our clients. For seven years in a row, Levi & Korsinsky has ranked in ISS Securities Class Action Services' Top 50 Report as one of the top securities litigation firms in the United States.

**CONTACT:**

Levi & Korsinsky, LLP

Joseph E. Levi, Esq.

Ed Korsinsky, Esq.

33 Whitehall Street, 17th Floor

New York, NY 10004

jlevi@levikorsinsky.com

Tel: (212) 363-7500

Fax: (212) 363-7171

www.zlk.com

---

**Tags**

Class Action

**Recommended Reading**

Source: Levi & Korsinsky, LLP



**Shareholders of Endava plc Should Contact Levi & Korsinsky Before October 25, 2024 to Discuss Your Rights – DAVA**

NEW YORK, Aug. 29, 2024 (GLOBE NEWSWIRE) -- Levi & Korsinsky, LLP notifies investors in Endava plc ("Endava" or the "Company") (NYSE: DAVA) of a class action securities lawsuit. CLASS...

Source: Levi & Korsinsky, LLP



**SHAREHOLDER ALERT: Levi & Korsinsky, LLP Notifies Investors It Has Filed a Complaint to Recover Losses Suffered by Purchasers of Starbucks...**

NEW YORK, Aug. 28, 2024 (GLOBE NEWSWIRE) -- The following statement is being issued by Levi & Korsinsky, LLP: To: All persons or entities who purchased or otherwise acquired securities of...

# Explore



**U.S. Data Center Cooling Market 2024-2029: Rising ...**

August 30, 2024 11:39 ET



**Lendmark Financial Services Expands Georgia Presen...**

August 30, 2024 11:30 ET



**Multimodal Imaging Outlook & Forecast R...**

August 30, 2024 11:25 ET



**About Us**

GlobeNewswire is one of the world's largest newswire distribution networks, specializing in the delivery of corporate press releases, financial disclosures and multimedia content to media, investors, and consumers worldwide.

Follow us on social media:

**Global News**

· English

· Français

· Deutsch

**Newswire Distribution Network & Management**

· Home

· Newsroom

· RSS Feeds

· Notified

· Legal

· Contact us

· Resources

**APP 4**

APP 5

# EXHIBIT B

APP 5

**EXTENDED CLASS PERIOD: Robbins Geller Rudman & Dowd LLP Files Class Action Lawsuit Against American Airlines Group Inc. and Announces Opportunity for Investors with Substantial Losses to Lead the *American Airlines* Class Action Lawsuit – AAL**

August 28, 2024 08:15 PM Eastern Daylight Time

SAN DIEGO--(BUSINESS WIRE)--**Robbins Geller Rudman & Dowd LLP** announces that it has filed a class action lawsuit seeking to represent purchasers of American Airlines Group Inc. (NASDAQ: AAL) common stock between July 20, 2023 and May 28, 2024, inclusive (the "Class Period"). Captioned *Thornburg v. American Airlines Group Inc.*, No. 24-cv-00823 (N.D. Tex.), the *American Airlines* class action lawsuit charges American Airlines and certain of American Airlines' top current and former executives with violations of the Securities Exchange Act of 1934. A previously filed complaint is captioned *Qawasmi v. American Airlines Group Inc.*, No. 24-cv-00673 (N.D. Tex.).

**If you suffered substantial losses and wish to serve as lead plaintiff of the *American Airlines* class action lawsuit, please provide your information here:**

https://www.rgrdlaw.com/cases-american-airlines-group-inc-class-action-lawsuit-aal.html

You can also contact attorneys J.C. Sanchez or Jennifer N. Caringal of Robbins Geller by calling 800/449-4900 or via e-mail at info@rgrdlaw.com. Lead plaintiff motions for the *American Airlines* class action lawsuit must be filed with the court no later than September 16, 2024.

**CASE ALLEGATIONS**: American Airlines operates as a network air carrier, which provides scheduled air transportation services for passengers and cargo through its hubs.

The *American Airlines* class action lawsuit alleges that defendants throughout the Class Period made false and/or misleading statements and/or failed to disclose that: (i) the new distribution capability sales strategies that American Airlines adopted were not sustainable because they alienated travel agencies and the corporate customers who were among the airlines' highest spending customers, drove away lucrative corporate customers, and ultimately diminished American Airlines' revenues; and (ii) as a result, American Airlines' business metrics and financial prospects were not as strong as indicated in its Class Period statements.

On May 28, 2024, American Airlines reported that it was parting ways with its Senior Vice President and Chief Commercial Officer, defendant Vasu S. Raja, the executive behind American Airlines' efforts to revamp American Airlines' sales approaches in order to increase profitability to address the massive debt American Airlines had taken on during the Covid-19 pandemic. American Airlines also reported its first quarter 2024 financial results, disclosing that it had swung to a huge loss, despite having achieved record-breaking revenues, and further revealed that American Airlines was slashing its second quarter 2024 financial guidance, stating that it only expected adjusted earnings of $1.00 to $1.15 per share, down from its previous range of $1.15 to $1.45 per share. American Airlines also announced that its second quarter 2024 operating margin would come in approximately 1 percentage point lower than it had previously promised, as revenue per available seat mile was then tracking well below American Airlines' previous outlook. On this news, the price of American Airlines common stock fell more than 13%, damaging investors.

The plaintiff is represented by Robbins Geller, which has **extensive experience** in prosecuting investor class actions including actions involving financial fraud. You can view a copy of the complaint **by clicking here**.

**THE LEAD PLAINTIFF PROCESS**: The Private Securities Litigation Reform Act of 1995 permits any investor who purchased American Airlines common stock during the Class Period to seek appointment as lead plaintiff in the *American Airlines* class action lawsuit. A lead plaintiff is generally the movant with the greatest financial interest in the relief sought by the putative class who is also typical and adequate of the putative class. A lead plaintiff acts on behalf of all other class members in directing the *American Airlines* class action lawsuit. The lead plaintiff can select a law firm of its choice to litigate the *American Airlines* class action lawsuit. An investor's ability to share in any potential future recovery is not dependent upon serving as lead plaintiff of the *American Airlines* class action lawsuit.

**ABOUT ROBBINS GELLER**: Robbins Geller Rudman & Dowd LLP is one of the world's leading law firms representing investors in securities fraud cases. Our Firm has been #1 in the ISS Securities Class Action Services rankings for six out of the last ten years for securing the most monetary relief for investors. We recovered $6.6 billion for investors in securities-related class action cases – over $2.2 billion more than any other law firm in the last four years. With 200 lawyers in 10 offices, Robbins Geller is one of the largest plaintiffs' firms in the world and the Firm's attorneys have obtained many of the largest securities class action recoveries in history, including the largest securities class action recovery ever – $7.2 billion – in *In re Enron Corp. Sec. Litig.* Please visit the following page for more information:

https://www.rgrdlaw.com/services-litigation-securities-fraud.html

Attorney advertising.
Past results do not guarantee future outcomes.
Services may be performed by attorneys in any of our offices.

**APP 6**

Contacts
Robbins Geller Rudman & Dowd LLP
J.C. Sanchez, Jennifer N. Caringal
655 W. Broadway, Suite 1900, San Diego, CA 92101
800-449-4900
**info@rgrdlaw.com**

Social Media Profiles

RGRD Facebook

RGRD Twitter

RGRD LinkedIn

APP 8

# EXHIBIT C

APP 8

# CERTIFICATION PURSUANT TO SECURITIES LAWS

Robert Ferrino ("Plaintiff") declares, as to the claims asserted under the federal securities law, that:

1. Plaintiff has fully reviewed the facts of the complaint(s) filed in this action alleging violations of the securities laws, and retains the firm of Kahn Swick and Foti, LLC to pursue such action on a contingent fee basis.

2. Plaintiff did not purchase securities of American Airlines Group Inc. at the direction of Plaintiff's counsel or in order to participate in a private action under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. During the Class Period, Plaintiff has executed transactions in the securities of American Airlines Group Inc. The transactions in the attached Schedule set forth all of the transactions of Plaintiff in American Airlines Group Inc. securities during the Class Period specified in the complaint(s).

5. In the last three years, Plaintiff has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws, except as indicated herein.

6. Plaintiff will not accept payment for serving as a representative beyond his/her/its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 8/21/2024

DocuSigned by:

Robert Ferrino
66854B7E33F74CD...
Signature

Robert Ferrino
Printed Name

Robert Ferrino
Plaintiff

**APP 9**

| SCHEDULE A: Account No. 1 | | | |
|---|---|---|---|
| **DATE** | **TRANSACTION** | **QUANTITY** | **PRICE** |
| 5/29/2024 | Purchase | 6,655 | $ 13.89 |

| SCHEDULE A: Account No. 2 | | | |
|---|---|---|---|
| **DATE** | **TRANSACTION** | **QUANTITY** | **PRICE** |
| 8/4/2023 | Purchase | 10,000 | $ 15.94 |
| 8/10/2023 | Purchase | 7,525 | $ 15.69 |
| 8/10/2023 | Purchase | 2,475 | $ 15.68 |
| 8/14/2023 | Purchase | 10,000 | $ 15.53 |
| 8/18/2023 | Purchase | 5,000 | $ 14.85 |
| 8/22/2023 | Purchase | 9,000 | $ 14.88 |
| 8/25/2023 | Purchase | 6,000 | $ 14.50 |
| 9/1/2023 | Purchase | 3,500 | $ 14.65 |
| 12/11/2023 | Purchase | 2,000 | $ 13.87 |
| 1/18/2024 | Purchase | 7,000 | $ 12.95 |
| 2/23/2024 | Sale | (10,000) | $ 14.76 |
| 2/27/2024 | Sale | (10,000) | $ 15.17 |
| 3/4/2024 | Sale | (10,000) | $ 15.55 |
| 3/6/2024 | Sale | (10,000) | $ 15.92 |
| 3/6/2024 | Purchase | 10,000 | $ 14.97 |
| 3/7/2024 | Purchase | 10,000 | $ 14.82 |
| 3/7/2024 | Purchase | 4,500 | $ 14.41 |
| 3/14/2024 | Purchase | 7,500 | $ 13.87 |
| 4/5/2024 | Purchase | 17,000 | $ 14.19 |
| 4/10/2024 | Purchase | 23,000 | $ 13.90 |
| 4/15/2024 | Purchase | 12,000 | $ 13.38 |
| 5/13/2024 | Sale | (10,000) | $ 14.56 |
| 5/23/2024 | Purchase | 10,000 | $ 14.30 |

**APP 10**

APP 11

# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| YAZZAN QAWASMI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>AMERICAN AIRLINES GROUP INC., ROBERT D. ISOM, DEVON E. MAY, and VASU S. RAJA,<br><br>Defendants. | Case No. 4:24-cv-00673-Y<br><br>CLASS ACTION<br><br>**DECLARATION OF ROBERT FERRINO IN SUPPORT OF HIS MOTION FOR APPOINTMENT OF LEAD PLAINTIFF AND APPROVAL HIS SELECTION OF LEAD COUNSEL** |
| JOHN A. THORNBURG, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>AMERICAN AIRLINES GROUP INC., ROBERT D. ISOM JR., DEVON E. MAY, DAVID G. SEYMOUR, GANESH JAYARAM, COLE BROWN and VASU S. RAJA,<br><br>Defendants. | Case No. 4:24-cv-00823-O |

I, Robert Ferrino, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I respectfully submit this Declaration in support of my Motion for Appointment as Lead Plaintiff and for Approval of Lead Counsel on behalf of investors in American Airlines Group Inc. ("American Airlines," "American," or the "Company") securities pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"). I am informed of and understand the requirements and duties imposed by the PSLRA.

1

**APP 12**

2.    I am a resident of Hammond, Indiana and am retired. Before retiring, my entire career was in construction and development. I launched my own company in 2000 but closed the business due to the Covid-19 pandemic.

3.    I graduated from the University of Buffalo with a B.S. in mechanical engineering and was the first member of my family to graduate from college.

4.    I have over 25 years of experience investing in the stock market.

5.    I believe the securities class action against American Airlines is meritorious and should be led by an investor, like myself, who is committed to maximizing the recovery on behalf of the Class.

6.    I suffered a substantial loss on my investment in American Airlines securities. For this reason, I decided to seek appointment as Lead Plaintiff in this action. I understand the responsibilities and duties of serving as a Lead Plaintiff.

7.    I understand and appreciate that a Lead Plaintiff's obligation under the PSLRA is to act as a fiduciary for the class, and that an important decision in this role is the selection of Lead Counsel. I have fulfilled this responsibility by selecting and retaining Lead Counsel with a proven history of handling this type of complex litigation.

8.    I selected Kahn Swick & Foti, LLC ("KSF") to serve as Lead Counsel. I believe KSF is well-qualified to represent the Class based on the firm's experience in achieving substantial recoveries in securities class actions. As part of my due diligence process, and prior to my selection of KSF, I assessed the firm's qualifications and communicated with KSF's Managing Partner Lewis S. Kahn.

9.    I will direct Lead Counsel to prosecute this action in an efficient, cost-effective manner while obtaining the best possible result for the Class. I will supervise Lead Counsel and

2

APP 13

Docusign Envelope ID: 6ECC337E-5CCF-4256-8524-07A649D9A744

actively oversee the prosecution of this action for the benefit of the Class by, among other things, reviewing substantive filings before they are filed with the Court and leading settlement discussions, if any, that will take place in this matter.

10.    I understand that a Lead Plaintiff's share of any recovery is the same as any other potential Class member. I will not accept and have not accepted any payment for serving as a representative party beyond my *pro rata* share, except any reasonable costs and expenses that are related to the Class representation, as may be ordered or approved by the Court.

Executed on September   9   , 2024 in Hammond, Indiana.



DocuSigned by:

Robert Ferrino

66854B7E33F74CD...

_____

ROBERT FERRINO

3

**APP 14**

APP 15

# EXHIBIT E

**American Airlines Securities Litigation**
**Loss Chart**

| | |
|---|---|
| **Class Period Begins** | 7/20/2023 |
| **Class Period Ends** | 5/28/2024 |
| **90-DAY LOOKBACK ENDS** | 8/26/2024 |
| **MEAN TRADING PRICE** | $ 10.74 |

| | |
|---|---|
| Total Shares Purchased During Class Period: | 163,155 |
| Total Retained Shares: | 113,155 |
| Net Funds Expended During Class Period: $ | (1,584,492.70) |
| Total Losses (All Accounts): $ | (385,149.95) |

**Account No. 1**

| DATE | TRANSACTION | QUANTITY | PRICE | TOTAL COST | DATE | TRANSACTION | QUANTITY | PRICE | TOTAL PROCEEDS | TOTAL GAIN or (LOSS) |
|---|---|---|---|---|---|---|---|---|---|---|
| 5/29/2024 | Purchase | 6,655 | $ 13.89 | $ (92,437.95) | | HELD | (6,655) | $ 10.74 | $ 71,472.55 | $ (20,965.40) |
| | | | | | | | | Total Loss Account No. 1 | $ | (20,965.40) |

**Account No. 2**

| DATE | TRANSACTION | QUANTITY | PRICE | TOTAL COST | DATE | TRANSACTION | QUANTITY | PRICE | TOTAL PROCEEDS | TOTAL GAIN or (LOSS) |
|---|---|---|---|---|---|---|---|---|---|---|
| 8/4/2023 | Purchase | 10,000 | 15.9399 | $ (159,399.00) | | HELD | (10,000) | $ 10.74 | $ 107,396.77 | $ (52,002.23) |
| 8/10/2023 | Purchase | 7,525 | 15.69 | $ (118,067.25) | | HELD | (7,525) | $ 10.74 | $ 80,816.07 | $ (37,251.18) |
| 8/10/2023 | Purchase | 2,475 | 15.68 | $ (38,808.00) | | HELD | (2,475) | $ 10.74 | $ 26,580.70 | $ (12,227.30) |
| 8/14/2023 | Purchase | 2,500 | 15.53 | $ (38,825.00) | | HELD | (2,500) | $ 10.74 | $ 26,849.19 | $ (11,975.81) |
| 8/14/2023 | Purchase | 7,500 | 15.53 | $ (116,475.00) | | | | | | |
| 8/18/2023 | Purchase | 5,000 | 14.85 | $ (74,250.00) | | | | | | |
| 8/22/2023 | Purchase | 9,000 | 14.8797 | $ (133,917.30) | | | | | | |
| 8/25/2023 | Purchase | 6,000 | 14.4999 | $ (86,999.40) | | | | | | |
| 9/1/2023 | Purchase | 3,500 | 14.6497 | $ (51,273.95) | | | | | | |
| 12/11/2023 | Purchase | 2,000 | 13.8677 | $ (27,735.40) | | | | | | |
| 1/18/2024 | Purchase | 7,000 | 12.9493 | $ (90,645.10) | | | | | | |
| | | | | | 2/23/2024 | Sale | (10,000) | $ 14.76 | $ 147,600.00 | |
| | | | | | 2/27/2024 | Sale | (10,000) | $ 15.17 | $ 151,700.00 | |
| | | | | | 3/4/2024 | Sale | (10,000) | $ 15.55 | $ 155,500.00 | |
| | | | | | 3/6/2024 | Sale | (10,000) | $ 15.92 | $ 159,200.00 | $ 32,703.85 |
| 3/6/2024 | Purchase | 10,000 | $ 14.97 | $ (149,692.00) | | HELD | (10,000) | $ 10.74 | $ 107,396.77 | $ (42,295.23) |
| 3/7/2024 | Purchase | 10,000 | $ 14.82 | $ (148,198.00) | | HELD | (10,000) | $ 10.74 | $ 107,396.77 | $ (40,801.23) |
| 3/7/2024 | Purchase | 4,500 | $ 14.41 | $ (64,845.00) | | HELD | (4,500) | $ 10.74 | $ 48,328.55 | $ (16,516.45) |
| 3/14/2024 | Purchase | 7,500 | $ 13.87 | $ (104,025.00) | | HELD | (7,500) | $ 10.74 | $ 80,547.58 | $ (23,477.42) |
| 4/5/2024 | Purchase | 17,000 | $ 14.19 | $ (241,211.30) | | HELD | (17,000) | $ 10.74 | $ 182,574.52 | $ (58,636.78) |
| 4/10/2024 | Purchase | 23,000 | $ 13.90 | $ (319,642.50) | | HELD | (23,000) | $ 10.74 | $ 247,012.58 | $ (72,629.92) |
| 4/15/2024 | Purchase | 2,000 | $ 13.38 | $ (26,760.00) | | HELD | (2,000) | $ 10.74 | $ 21,479.35 | $ (5,280.65) |
| 4/15/2024 | Purchase | 10,000 | $ 13.38 | $ (133,800.00) | | | | | | |
| | | | | | 5/13/2024 | Sale | (10,000) | $ 14.56 | $ 145,608.00 | $ 11,808.00 |
| 5/23/2024 | Purchase | 10,000 | $ 14.30 | $ (142,999.00) | | HELD | (10,000) | $ 10.74 | $ 107,396.77 | $ (35,602.23) |
| | | | | | | | | Total Loss Account No. 2 & 3 | $ | (364,184.55) |

| | | |
|---|---|---|
| TOTAL LOSSES (ALL ACCOUNTS): | $ | (385,149.95) |

**HELD** = For shares acquired during the Class Period, but held throughout the 90-day period immediately thereafter, losses have been determined using "the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *See* 15 U.S.C. § 78u-4(e)(1).

**APP 16**

# EXHIBIT F



**KAHN SWICK & FOTI, LLC**

**New Orleans, Louisiana**

1100 Poydras, Suite 960
New Orleans, LA 70163

**New York, New York**

250 Park Avenue, 7th Floor
New York, NY 10177

**Wilmington, Delaware**

112 French Street, Suite 201
Wilmington, DE 19801

**San Francisco, California**

580 California Street, Suite 1200
San Francisco, CA 94104

**Chicago, Illinois**

161 N. Clark Street, Suite 1700
Chicago, IL 60601

**Paramus, New Jersey**

61 S. Paramus Rd., Suite 250
Paramus, NJ 07652

Toll Free: (866) 467-1400
Phone: (504) 455-1400
Fax: (504) 455-1498   **APP 18**

Table of Contents

The Firm .......................................................................................................................................1

Securities Litigation .................................................................................................................1

    Settled Cases .......................................................................................................................... 1

Corporate Governance and Derivative Litigation ...............................................................3

    Settled Cases .......................................................................................................................... 3

Consumer Protection Litigation ...........................................................................................8

    Settled Cases .......................................................................................................................... 8

Shareholder M&A Class Action Litigation...........................................................................8

    Settled Cases .......................................................................................................................... 8

Antitrust Litigation................................................................................................................ 11

    Recent Victories ................................................................................................................... 11

Attorneys................................................................................................................................. 11

    Partners.............................................................................................................................. 11

        Lewis S. Kahn ................................................................................................................11

        Michael A. Swick............................................................................................................12

        Charles C. Foti, Jr. .......................................................................................................13

        Kim E. Miller ..................................................................................................................14

        Ramzi Abadou................................................................................................................16

        Melinda A. Nicholson....................................................................................................17

        Michael J. Palestina ......................................................................................................20

        J. Ryan Lopatka ............................................................................................................21

        Craig J. Geraci...............................................................................................................23

        Chris Quinn....................................................................................................................24

        Dennis White .................................................................................................................24

        Bruno Rosenbaum.........................................................................................................25

    Special Counsel....................................................................................................................26

        Vincent Giblin ...............................................................................................................26

    Of Counsel............................................................................................................................27

        Melissa Harris................................................................................................................27

        Daniel Kuznicki .............................................................................................................28

        C. Mark Whitehead III .................................................................................................28

Andrew J. Gibson..................................................................................................29

Associates.................................................................................................................30

Alexander L. Burns..............................................................................................30

James Fetter.........................................................................................................31

Jyoti Kehl.............................................................................................................31

Nicolas Kravitz ...................................................................................................32

James Lamb .........................................................................................................33

Brian C. Mears ....................................................................................................33

Gina Palermo ......................................................................................................34

Alexandra Pratt...................................................................................................35

Rhosean Scott......................................................................................................35

Frank Tamberino .................................................................................................36

Jenn Tetreault .....................................................................................................36

Matthew P. Woodard ..........................................................................................37

Other Professionals ................................................................................................37

Chuck Jouandot ..................................................................................................37

Ashley Errington..................................................................................................38

Bronwyn Gibson ..................................................................................................38

Sue Toledo ..........................................................................................................38

## The Firm

Kahn Swick & Foti, LLC ("KSF") (www.ksfcounsel.com) is a boutique law firm with offices in New York City, Delaware, San Francisco, Chicago, New Orleans, and New Jersey. KSF focuses predominantly on class actions, in the areas of securities and mergers & acquisitions, and on shareholder derivative and other complex litigation. Since its inception in 2000, KSF has recovered hundreds of millions of dollars for its clients.

KSF's Lawyers have extensive experience litigating complex cases in the following practice areas: (i) securities litigation; (ii) corporate governance and derivative litigation; (iii) consumer protection litigation; (iv) shareholder merger and acquisition class action litigation; and (v) antitrust litigation. A sampling of the firm's current cases and recent recoveries is set forth below.

*"[Kahn Swick & Foti] earned my unyielding admiration and respect in this case for the efficient and exceptionally reasonable way in which they found a prompt, fair, and equitable solution to the complex problems their clients faced..."*

*Hon. Mark W. Bennett,*
*United States District Judge*
*In Re: Elgaouni v. Meta Financial Group, Inc.*

## Securities Litigation

### SETTLED CASES

***In re Petrobras Securities Litigation***, No. 1:14-cv-9662 (S.D.N.Y.). *Member of Plaintiffs' Steering Committee* for the Individual Actions ("PSC"), federal securities class action against Brazil's state-controlled petrochemical company arising from "Operação Lava Jato," the largest corruption scandal in the history of Latin America, whereby Plaintiffs alleged Defendants deliberately overpaid on various construction contracts in return for kickbacks. The Class action settled in 2018 for **$3 billion** and, as a member of the PSC, KSF was found by the Court to have "made a substantial contribution to the class," June 22, 2018 Opinion and Order at 39 (D.E. 834).

***Pearlstein v. Blackberry Ltd., et al.***, No. 1:13-CV-07060-CM (S.D.N.Y.). *Lead Counsel.* The Hon. Colleen McMahon, United States District Judge for the Southern District of New York, entered a Final Judgment in this federal securities class action, approving a **$165 million** settlement between Lead Plaintiffs, represented by Lead Counsel KSF, and BlackBerry, Limited. The settlement, one of the largest securities

litigation recoveries of 2022 and achieved on the eve of trial, resolved Plaintiffs' claims that BlackBerry made materially false and misleading statements and omissions regarding the sales of, and accounting relating to, its BB10 smartphones.

*Erica P. John Fund, Inc. v. Halliburton Co., et al.*, No. 3:02-cv-1152 (N.D. Tex.). *Co-Class Counsel*, federal securities class action against oilfield services company and a high-level officer, in which Class Counsel obtained a unanimous decision by the U.S. Supreme Court in *Erica P. John Fund, Inc. v. Halliburton Co., et al.*, 563 U.S. 804 (2011) vacating and remanding a decision of the Fifth Circuit, and then successfully defeated Defendants' attack on the *Basic v. Levinson* presumption of reliance in *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014). These two Supreme Court decisions led to certification of the class, and ultimately resulted in a cash settlement of **$100 million** for investors.

*In re Chicago Bridge & Iron Secs. Litig.*, Case No. 1:17-cv-1580-LGS (S.D.N.Y.).  On August 2, 2022, the Hon. Lorna G. Schofield, United States District Judge for the Southern District of New York, entered a Final Judgment in this federal securities class action, approving a **$44 million** settlement obtained by Plaintiffs and KSF, as Lead Counsel, against a large engineering, procurement, and construction company, and certain officers and directors. The lawsuit alleged that Defendants made materially false and misleading statements and omissions regarding the performance of, and accounting relating to, CBI's nuclear business.

*Farrar v. Workhorse Group, Inc., et al.*, No. 2:21-cv-02072-CJC-PVC (C.D. Cal.). On July 28, 2023, after more than two years of hard-fought litigation, the Hon. Cormac J. Carney entered a Final Judgment approving a **$35 million** settlement of the Class' claims. Lead Counsel KSF achieved this excellent result after defeating Defendants' motion to dismiss and engaging in substantial fact discovery.

*Dr. Joseph F. Kasper, et. al. v. AAC Holdings, Inc., et. al.*, 3:15-cv-00923 (Consolidated) (M.D. Tenn.). *Co-Lead Counsel*, federal securities class action against a for-profit substance abuse treatment provider, and certain officers and directors, arising from Defendants' misleading statements regarding a criminal investigation into the death of a patient, resulting in a settlement of **$25 million** for investors.

*In re Virgin Mobile USA IPO Litigation,* 2:07-cv-05619-SDW-MCA (D.N.J.), *Co-Lead Counsel*, federal securities IPO-related class action against a company providing wireless communication services, certain officers and directors, certain controlling shareholder entities, and Virgin's underwriters, resulting in a cash settlement of **$19.5 million** for investors.

*Dougherty v. Esperion Therapeutics, Inc., et al.*, No. 2:16-cv-10089 (E.D. Mich.). Co-Lead Counsel, federal securities action against a pharmaceutical company and its chief executive officer, arising from

misleading statements assuring the market that its sole drug candidate would not require a completed (and costly) cardiovascular outcomes trial prior to approval, resulting in a settlement of **$18.25 million** for investors.

*In Re Eletrobras Securities Litigation*, Case No. 1:15-cv-05754 (Consolidated) (S.D.N.Y.). Co-Lead Counsel, federal securities class action against Centrais Eletricas Brasileiras S.A. and several of its former directors and officers, by U.S. investors after the company reported large losses related to a sprawling corruption scandal in Brazil. Nearly three years of protracted litigation resulted in a settlement of **$14.75 million** for investors.

*Abramson v. NewLink Genetics Corp., et al.,* 1:16-cv-03545-AJN (S.D.N.Y.). Lead Counsel, federal securities action against a pharmaceutical company and certain officers arising from Defendants' misleading statements regarding the about the scientific literature and the design of their clinical trial for a pancreatic cancer treatment candidate, resulting in a settlement of **$13.5 million** for investors.

*In re Tesco PLC Securities Litigation,* 14 Civ. 8495 (RMB) (S.D.N.Y.), *Lead Counsel*, federal securities class action against one of the world's largest grocery and general merchandise retailers based in the U.K., resulting in an all-cash settlement of **$12 million** for investors in ADRs and F shares in the United States.

# Corporate Governance and Derivative Litigation

## SETTLED CASES

*Orrego v. Lefkofsky (Groupon, Inc. Derivative Litigation)*, No. 12 CH 12420 (Ill. Cir. Ct, Cook Cnty., Ch. Div.). KSF acted as Co-Lead Counsel in the consolidated shareholder derivative action filed in the Chancery Division of the Cook County Circuit Court in Illinois, which was brought derivatively on behalf of Groupon, Inc. against certain of its current and former directors and officers for allegedly breaching their fiduciary duties by, among other things, causing Groupon to issue or make materially false and misleading statements and failing to implement necessary controls over Groupon's accounting function. KSF facilitated a settlement comprising of comprehensive corporate governance reforms with an estimated value of **$159 million**, including changes to the Compensation Committee Charter, implementation of director education requirements, enhanced Independent Director meeting obligations, augmentations to the Audit Committee and Disclosure Committee rules and procedures, creation of a new Director of Compliance position, and the retention of an independent auditing firm to conduct an assessment of the company's internal audit department.

*In re Bank of America Corp. Securities, Derivative, & Employment Retirement Income Security Act (ERISA) Litigation*, 09 Civ.580 (DC) (S.D.N.Y.). KSF served as court appointed Co-Lead Counsel in the Southern District of New York, and sued current and former executive officers and directors of the company, on behalf of shareholders. The substance of this action focused on Bank of America's January 1, 2009, acquisition of Merrill Lynch & Co., Inc. in a stock-for-stock transaction. This action alleged, among other things, that certain material information was omitted from the proxy statement filed with the Securities and Exchange Commission and mailed to stockholders on November 3, 2008. This proxy was critical in allowing defendants to obtain shareholder consent for the issuance of shares necessary to consummate the Merger. KSF was successful in resolving this action after defeating motions to dismiss by multiple defendants. In addition to major corporate governance reforms, KSF was also able to recover over **$62.5 million** for the company.

*Bassett Family Trust v. Costolo, et al. (Twitter, Inc. Derivative Litigation)*, C.A. No. 2019-0806 (Del. Ch.). As counsel for the plaintiff in this demand wrongfully-refused shareholder derivative action, KSF brought breach of fiduciary claims derivatively on behalf of Twitter, Inc. ("Twitter") against certain of its current and former directors and officers for breaches of duties involving false and misleading statements about Twitter's user engagement and growth and for insider trading. Plaintiffs were able to secure a settlement providing that Twitter's board of directors will pay **$38 million** in cash to Twitter. Twitter's board will also adopt a series of corporate governance reforms, which include (among other things): (i) enhanced board independence and oversight reforms, including amendments to the charters for the Disclosure Committee and the Audit Committee; (ii) enhancements to oversight of corporate strategy and risk, internal controls, and disclosures, including the creation of the Independent Chief Compliance Officer; and (iii) enhancements to corporate policies regarding compliance training, compensation, insider trading, and recapture of cash-based incentive compensation.

*In re Barnes & Noble Stockholder Derivative Litigation*, C.A. No. 4813 (Del. Ch.). As Co-Lead Counsel in this shareholder derivative action filed in the Court of Chancery of the State of Delaware on behalf of Barnes & Noble, Inc. against certain of its officers and directors, including Chairman Leonard Riggio, related to the company's 2009 acquisition of Mr. Riggio's private company Barnes & Noble College Booksellers, Inc., alleging that the purchase price, and the process by which it was agreed to, was not entirely fair to Barnes & Noble, Inc. and harmed shareholders, KSF helped obtain a settlement resulting in the recovery of **$29 million** for Barnes & Noble, Inc. in the form of reductions to the principal and interest payable to Mr. Riggio.

*Weil v. Baker (ArthroCare Corporation Derivative Litigation)*, No. 08-CA-00787 (W.D. Tex.). As Co-Lead Counsel in the consolidated federal derivative action on behalf of ArthroCare Corporation against

**APP 24**

certain of its officers and directors arising from alleged improprieties in the company's marketing of spine wands, KSF helped obtain a cash settlement of **$8 million**, along with important corporate governance changes.

*In re Fitbit, Inc. Stockholder Derivative Litigation*, Consolidated C.A. No. 2017-0402 (Del. Ch.). As Co-Lead Counsel in this shareholder derivative action filed in the Court of Chancery of the State of Delaware on behalf of Fitbit, Inc. ("Fitbit") against certain of its officers and directors, KSF alleged that certain insiders made stock sales in the company's initial public offering and—after agreeing to release the insiders from lock-up agreements that barred them from trading for 180 days after the initial public offering—an early secondary offering, taking take advantage of an artificially positive market response to Fitbit's flagship PurePulse heartrate monitoring technology. KSF was successful in resolving this action after defeating the defendants' motion to dismiss, recovering **$5 million** for Fitbit.

*In re Conduent Incorporated Shareholder Derivative Litigation*, Lead Case No. 650903/2021 (N.Y. Sup. Ct., N.Y. Cnty., Ch. Div.). KSF acted as Co-Lead Counsel in the consolidated shareholder derivative action filed in the New York Supreme Court, New York County, which was brought derivatively on behalf of Conduent Incorporated against certain of its current and former directors and officers for allegedly breaching their fiduciary duties by (i) failing to oversee its electronic tolling line of business, resulting in fines, government complaints, and revenue withholding and (ii) causing the Company to make materially false and misleading statements in press releases and SEC filings about the known issues with it legacy information technology infrastructure that was impacting the Company's financial guidance and growth. KSF facilitated a settlement comprising of robust and fulsome corporate governance reforms, including Board refreshment, formation of the Corporate Social Responsibility and Public Policy Committee, separation of the Chief Executive Officer and Chairperson positions, enhancements to the duties and responsibilities of the Audit Committee regarding financial reporting and internal controls, creation of a Board-level Risk Oversight Committee, addition of the Chief Risk Officer to the management-level Disclosure Committee, adoption of an enhanced Amended Compensation Recoupment Policy.

*In re FAB Universal Corporation Shareholder Derivative Litigation*, Lead Case No. 14-cv-687 (S.D.N.Y.). As sole Lead Counsel in this consolidated action, KSF brought breach of fiduciary claims derivatively on behalf of FAB Universal Corporation against certain of its current and former directors and officers. Claims brought included breaches of duties of loyalty, due care, good faith, independence, candor and full disclosure to shareholders; misappropriation of material, non-public information of the Company by certain individual defendants; and violations of Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9 promulgated thereunder. The action focused on defendants' publication of false and misleading statements concerning the Company's kiosk business in China, and the failure to disclose the

**APP 25**

issuance of $16.4 million worth of bonds to Chinese investors in April 2013. KSF obtained a settlement involving numerous corporate governance reforms, including the creation a new Disclosure Committee to put effective procedures and protocols in place and designed to ensure that all of the Company's public statements are vetted for accuracy, integrity and completeness. KSF was also able to cause the Company to modify the Charter of the Audit Committee to provide that at least one non-executive member of the Audit Committee has general expertise in accounting or financial management. Modifications were also caused to be made to the Company's Corporate Governance Committee and to the Company's Code of Conduct.

*In re Fifth Street Finance Corp. Stockholder Litigation,* Consolidated C.A. No. 12157 (Del. Ch.). As Co-Lead Counsel in this shareholder derivative action filed in the Delaware Court of Chancery on behalf of Fifth Street Finance Corporation ("FSC") against certain current and former directors of FSC, its investment advisor, Fifth Street Asset Management Inc. ("FSAM"), and current and former directors and officers of FSAM, KSF alleged that certain FSC and FSAM officers and directors caused FSC to pursue reckless asset growth strategies, to employ aggressive accounting and financial reporting practices, and to pay excessive fees under FSC's investment advisory agreement with FSAM, in order to inflate the perceived value of FSAM in the lead up to FSAM's initial public filing. KSF was instrumental in obtaining a settlement consisting of certain changes to FSC's investment advisory agreement and governance enhancements. The changes to the investment advisory agreement include a waiver by FSAM of fees equal to $10 million and an acknowledgment that plaintiffs were a substantial and remedial factor in the reduction of base management fees from 2% to 1.75%. The governance enhancements include additional Board governance provisions, enhanced policies, practices and procedures regarding FSC's valuation of its investments, increased disclosure of relevant issues, and increased consultation with outside advisors and independent third parties.

*Lowry v. Basile (Violin Memory, Inc. Derivative Litigation)*, No. 4:13-cv-05768 (N.D. Cal.). As counsel for the plaintiff in this shareholder derivative action, KSF brought breach of fiduciary claims derivatively on behalf of Violin Memory, Inc. against certain of its current and former directors and officers for breaches of duties and waste of corporate assets. The action focused on defendants' publication of false and misleading statements concerning the Company's operating results and financial condition and alleged waste of corporate assets by granting outsized compensation to the CEO that was not in line with the performance of the Company. KSF obtained a settlement involving numerous corporate governance reforms, including the formalization of a Disclosure Committee to put effective procedures and protocols in place and designed to ensure that all of the Company's public statements are vetted for accuracy, integrity and completeness. KSF was also able to cause the Company to modify the Charter of the

**APP 26**

Compensation Committee to provide that the committee will create annual and long-term performance goals for the CEO, whose compensation will be based on whether those performance goals are achieved. Modifications were also caused to be made to the Company's Audit Committee and to the Company's Corporate Governance Guidelines.

*In re Moody's Corporation Shareholder Derivative Litigation*, No. 1:08-CV-9323 (S.D.N.Y.). As Lead Counsel for the demand-excused shareholder derivative actions filed on behalf of Moody's Corporation against current and former executive officers and directors of the company, asserting various claims, including for breach of fiduciary duty, in connection with, inter alai, Moody's credit ratings on various mortgage-backed securities, KSF helped obtain a settlement in which the settling defendants agreed that Moody's had implemented or will adopt, enhance and/or maintain certain governance, internal control, risk management and compliance provisions, designed to identify, monitor and address legal, regulatory and internal compliance issues throughout the business and operations of Moody's Investors Service, Inc., the credit rating agency operating subsidiary of the company.

*In re Morgan Stanley & Co., Inc. Auction Rate Securities Derivative Litigation*, No. 1:08-CV-07587 (S.D.N.Y.). As Lead Counsel for shareholders in this federal derivative action against a prominent broker-dealer to redress harms to the company from its sales and marketing of auction rate securities, KSF obtained substantial corporate governance reforms that promised to avoid a recurrence of similar harms in the future.

*In re Star Scientific, Inc. Virginia Circuit Court Derivative Litigation,* Lead Case No. CL13-2997-6 (Va. Cir. Ct., City of Richmond). KSF acted as court appointed Lead Counsel in the consolidated state court shareholder derivative action filed on behalf of Star Scientific, Inc. against certain current and former directors and officers. This action focused on defendants' false statements and misrepresentations concerning the Company's product Anatabloc. Specifically, the action stated that defendants had caused or allowed the Company concealed: (i) private placements and related-party transactions; (ii) government investigations of the Company; and (iii) a December 2013 warning letter from the U.S. Food and Drug Administration. In resolving this matter, KSF obtained sweeping corporate governance changes, including but not limited to, the creation of a new board-level committee to review and oversee the Company's legal, regulatory, compliance, and government affairs functions. KSF also caused the Company to modify the charter of the Audit Committee to strengthen disclosure oversight and risk management. Modifications were also caused to be made to the Company's Compensation Committee. The Company was caused to adopt a set of Corporate Governance Guidelines. A new Governance and Nominating Committee was created and the position of Compliance Officer tasked with oversight and

**APP 27**

administration of the Company's corporate governance policies was added. Changes were also made to the Company's Corporate Code of Business Conduct and Ethics.

## Consumer Protection Litigation

### SETTLED CASES

*In re: General Motors Corp. Speedometer Products Liability Litigation,* MDL No. 1896, *Co-Lead Counsel.* Appointed co-lead counsel for national class of 4.2 million purchasers of certain GM trucks with defective speedometers. The case was resolved successfully by GM agreeing to fix defective speedometers for free and to reimburse class members for all past repair costs.

*Rose Goudeau, et. al. v. The Administrators of the Tulane Educational Fund, et. al.*, No. 2004-04758, Sec. 13, Div. J (Civil District Court for the Parish of Orleans), *Class Co-Counsel.* Nationwide class action certified on behalf of near relatives of individuals who donated their bodies to the Tulane Willed Body Program. The complaint alleged that the Tulane Willed Body Program sold the donated bodies and/or body parts to third parties. A settlement of **$8,300,000** was obtained for the class members.

*Barbara Thomas, et. al. v. ClearCredit, et. al.*, No. 03-2580 (E.D. La.). Co-Lead Counsel in national class action involving violations of the Fair Credit Reporting Act. Settled for approximately **$6 million** in benefits to the consumer class along with injunctive relief.

*Sterling Savings Bank v. Poleline Self-Storage LLC*, No. CV-09-10872 (Idaho Dist. Ct.), *Class Counsel.* In this putative class action, a borrower alleged that the Bank improperly used the 365/360 method of interest calculation on several commercial loans. A settlement of **$3.5 million** was recovered for bank customers.

## Shareholder M&A Class Action Litigation

### SETTLED CASES

*Helen Moore v. Macquarie Infrastructure and Real Assets, et al. (Cleco Corporation Merger)*, No. 251,417 c/w Nos. 251,456; 251,515; 252,446; 252,458; and 252,459, (9th JDC, Louisiana). Co-Lead Counsel. Class action for breach of fiduciary duties to shareholders relating to a proposed merger of utility company. Settlement consisted of **$37 million** common fund, just one month from trial. Counsel also secured a

landmark Louisiana appellate decision finding that merger-related challenges are direct, and not derivative, in nature.

***In re Saba Software, Inc. Stockholder Litigation***, Consol. Case No. 10697 (Delaware Court of Chancery 2015). *Member of Executive Committee.* Class action for breach of fiduciary duties to shareholders relating to a proposed merger of software company. Settlement consisted of **$19.5 million** common fund.

***In re American Capital, Ltd. Shareholder Litigation***, Case No. 422598-V (Circuit Court for Montgomery County, Maryland 2016). *Co-Lead Counsel.* Class action for breach of fiduciary duties to shareholders against both the target board and senior management and an activist investor fund (as a controller) relating to a proposed merger of a publicly traded private equity company. Settlement consisted of **$17.5 million** common fund from the target's board and the activist investor.

***Kurt Ziegler, et al. v. GW Pharm., PLC, et al.***, No. 3:21-cv-01019-BAS-MSB (S.D. Cal). *Co-Lead Counsel.* Class action for breach of federal securities laws relating to a proposed merger of pharmaceutical company. Settlement consisted of **$7.75 million** common fund.

***Kenneth Riche, et al v. James C. Pappas, et al.***, C.A. No. 2018-0177 (Del. Ch). Co-Lead Counsel. Class action for breach of fiduciary duties to shareholders against the target board and activist investors relating to a proposed merger of a publicly traded geothermal company. Settlement consisted of **$6.5 million** common fund, which represented a significant 7.7% premium to the $84 million adjusted enterprise value of the merger to the non-defendants shareholders/class members.

***Rice v. Genworth Financial Incorporated, et al.***, Consol. Case No. 3:17-cv-00059 (Eastern District of Virginia 2017). *Co-Lead Counsel.* Class action for violation of Section 14(a) relating to a proposed merger of insurance company. Settlement consisted of additional material disclosures to proxy statements.

***Wojno v. FirstMerit Corp., et al.***, Case No. 5:16-cv-00461 (Northern District of Ohio 2016). *Co-Lead Counsel.* Class action for violation of Section 14(a) relating to a proposed merger of bank holding company. Settlement consisted of additional material disclosures to proxy statements.

***In re BTU International, Inc. Stockholders Litigation***, Consol. C.A. No. 10310-CB (Delaware Court of Chancery 2014). *Co-Lead Counsel.* Class action for breach of fiduciary duties to shareholders relating to a proposed merger of electronics and solar goods companies. Settlement consisted of additional material disclosures to proxy statements. First known settlement to pass the exacting Trulia standards articulated by the Court of Chancery.

**APP 29**

*In re EnergySolutions, Inc. Shareholder Litigation*, C.A. 8203 (Delaware Court of Chancery 2014). *Plaintiff's Co-Lead Counsel*. Class action for breach of fiduciary duties to shareholders relating to a proposed merger of nuclear energy related companies worth $1.1 billion ($375 million in proposed shareholder consideration). Settlement consisted of $0.40 price bump which increased the consideration to shareholders by more than 10% or approximately $38 million. Settlement also included over 20 pages of additional disclosures to proxy statement relating to process and pricing claims.

*Hill v. Cohen, et al. (Summit Financial Services Group, Inc.),* 2013 CA 017640 (15th Judicial Circuit Court, Florida). *Co-lead Counsel*. Class action for breach of fiduciary duties to shareholders relating to a proposed merger of a financial services company. Contingent and delayed aspects of the proposed merger consideration, worth several million dollars, were accelerated and paid to shareholders ahead of schedule and settlement involved several pages of additional disclosures were made to the proxy statement.

*In re InSite Vision Inc. Consolidated Shareholder Litigation*, Lead Case No. RG-15774540 (c/w Case No. RG-15777471). *Counsel for Plaintiffs*. Class action for breach of fiduciary duties to shareholders relating to a proposed merger of medical companies. Litigation was followed by a public bidding war that resulted in a $30 million increase in merger compensation.

*In re Medtox Scientific, Inc. Shareholders Litigation*, Court File No. 62-CV-12-5118 (Minnesota District Court 2013). *Plaintiffs' Lead Counsel*. Class action for breach of fiduciary duties to shareholders relating to a proposed merger of medical technology companies. Settlement consisted of additional material disclosures to proxy statement.

*Heron v. International Rectifier Corporation, et al.*, Case No. BC556078 (Superior Court of the State of California, County of Los Angeles). *Co-Lead Counsel*. Class action for breach of fiduciary duties to shareholders relating to a proposed merger of electronics companies. Settlement consisted of additional material disclosures to proxy statements.

*Sachs Investment Group v Sun Healthcare Group, Inc., et al*. 30-2012-580354-CU-SL (Superior Court of the State of California 2013). *Plaintiffs' Counsel*. Class action for breach of fiduciary duties to shareholders relating to a proposed merger of healthcare companies. Settlement consisted of additional material disclosures to proxy statement.

*In re Susser Holdings Corp. Stockholders Litigation*, C.A. 9613 (Delaware Court of Chancery 2014). *Co-Lead Counsel*. Class action for breach of fiduciary duties to shareholders relating to a proposed merger of convenience store and gas station companies. Settlement consisted of additional material disclosures to proxy statements regarding hidden value of individual distribution rights in limited partnership.

## Antitrust Litigation

### RECENT VICTORIES

***Oliver, et al. v. American Express Company, et al***., No. 1:19-cv-00566-NGG-SMG (E.D.N.Y). On April 30, 2020, the Hon. Nicholas G. Garaufis, United States District Court Judge for the Eastern District of New York, entered an Order denying, in part, defendants' motion to dismiss. This matter, in which Kahn Swick & Foti, LLC is a member of Plaintiffs' Executive Committee, seeks damages, restitution, and injunctive relief against the American Express Company and American Express Travel Related Services Company, Inc. (collectively, "Amex"), on behalf of persons that used an electronic form of payment other than an Amex charge or credit card to purchase goods and services sold by merchants across the country at prices allegedly inflated by Amex's non-discrimination provisions. Judge Garaufis ruled that plaintiffs adequately pled violations of 22 state antitrust and/or consumer protection laws and allowed plaintiffs' case to proceed against Amex for these violations.

## Attorneys

### PARTNERS

#### Lewis S. Kahn



Lewis Kahn is a founding partner of KSF and serves as the firm's managing partner.  Mr. Kahn's practice is devoted to representing institutional and retail investors in connection with damages suffered as a result of securities fraud, breaches of fiduciary duties by corporate boards, and other egregious corporate conduct.

Mr. Kahn oversees the firm's securities practice, which has been responsible for settlements including the long-running securities class action against Halliburton where KSF was Co-Class Counsel with David Boies, a case in which the firm twice beat back Halliburton's attempt in the United States Supreme Court to eviscerate shareholder rights, and obtained a **$100 million** settlement for the Class after prior and subsequently replaced national securities counsel attempted to settle the case for $6 million. Most recently, Mr. Kahn negotiated settlement of *Pearlstein v. Blackberry Ltd., et al*., No. 1:13-CV-07060-CM (S.D.N.Y.), for **$165 million**, one of the largest securities litigation recoveries of 2022 and achieved on the eve of trial, resolving Plaintiffs' claims that BlackBerry

made materially false and misleading statements and omissions regarding the sales of, and accounting relating to, its BB10 smartphones. Other matters have included *In re Virgin Mobile USA IPO Litigation*, 2:07-cv-05619-SDW-MCA (**$19.5 million settlement**), *In re Tesco PLC Securities Litigation*, 14 Civ. 8495 (**$12 million settlement**), *In re BigBand Networks, Inc Securities Litigation*, 3:07-CV-05101-SBA (**$11 million settlement**), *In re U.S. Auto Parts Networks, Inc. Securities Litigation*, 2:07-cv-02030-GW-JC (**$10 million settlement**), *In re Bank of America Corp. Securities, Derivative, and Employment Retirement Income Security Act (ERISA) Litigation*, 09 Civ.580 (DC) (S.D.N.Y.) (**$62.5 million** cash payment to Bank of America o/b/o Board), *In re Barnes & Noble Stockholder Derivative Litigation*, C.A. No. 4813-VCS (Del. Ch. Ct.) (recovery of **$29 million** for Barnes & Noble, Inc. in the form of reductions to the principal and interest payable to CEO), and *In re EnergySolutions, Inc. Shareholder Litigation*, C.A. 8203-VCG (Del. Ch. 2014) ($0.40 price bump which increased the consideration to shareholders by more than 10% or approximately **$38 million**).

In addition to securities lawsuits, Mr. Kahn has significant experience with consumer fraud and mass tort class actions. Mr. Kahn has been appointed to various leadership positions in federal class action litigation over the years.

Mr. Kahn holds a Bachelor's degree from New York University in 1990 and received a Juris Doctor from Tulane Law School in 1994. Mr. Kahn is a member of the Louisiana Bar and is licensed to practice in all Louisiana state courts, as well as the United States Supreme Court, the United States Courts of Appeal for the Second, Fifth and Ninth Circuits, and the United States District Courts for the Eastern, Middle and Western Districts of Louisiana.

## Michael A. Swick

Michael A. Swick is a co-founding partner of KSF and heads the firm's case starting department, overseeing case evaluation and initiation in the firm's securities, shareholder derivative and mergers & acquisitions practice groups. Prior to founding KSF, Mr. Swick had a distinguished career working at several of the nation's premiere class action litigation firms.



Relying on analytical skills honed at Tulane Law School and Columbia University's Graduate program of Arts & Sciences, throughout his career, Mr. Swick has played an important role in investigating large securities frauds and in developing and initiating litigations against the nation's largest corporations. Over his career, Mr. Swick has also participated in the litigation of cases that have resulted in hundreds of millions of dollars in recoveries for aggrieved shareholders and institutional investors.

**APP 32**

Mr. Swick also works closely with the firm's institutional investor clients and participates in the management and development of KSF's portfolio monitoring systems.

In addition to his unique educational background, following law school, Mr. Swick also worked on the New York Mercantile Exchange, where he was involved first-hand, in the open-outcry trading of crude oil and natural gas futures and options contracts.

Mr. Swick received a Juris Doctor from Tulane Law School in 1994, and a Master of Political Philosophy from Columbia University Graduate School of Arts & Sciences in 1989 as well as a joint B.A. in Philosophy and Political Science from State University of New York at Albany in 1988. Mr. Swick was admitted to the State Bar of New York in 1997 and is admitted to practice before the United States District Court for the Southern District of New York, and the United States Supreme Court.

## Charles C. Foti, Jr.

Charles C. Foti, Jr. served as the Attorney General for the state of Louisiana from 2004-2008, after serving for 30 years as one of the most innovative law enforcement officials in the United States as Orleans Parish Criminal Sheriff. Throughout his career, General Foti has remained committed to public service.

As Attorney General for the state of Louisiana, General Foti's achievements include:

- Recovering over **$24 million** for Louisiana consumers in consumer fraud matters, **$8 million** in anti-trust litigation, **$9.1 million** for state employees through Office of Group Benefits, over **$2 million** for auto complaints, over **$33 million** in Medicaid Fraud.

- Investigating and apprehending numerous contractor fraud criminals in the wake of one of the worst natural disasters in United States history, Hurricane Katrina.

- Doubling the number of arrests for crime against children through the Louisiana Internet Crimes Against Children Task Force.

Prior to serving as Louisiana Attorney General, over the course of a distinguished career spanning decades, General Foti took countless cases to trial. General Foti served as the head of the criminal division of the city of New Orleans Attorney's Office. He served as the police attorney for the city of New Orleans and prosecuted federal cases including prisoner overcrowding cases. He also served as an assistant

**APP 33**

District Attorney for Orleans Parish. Even early in his career, he tried cases as in house counsel for the nationally-known insurance carrier, Allstate.

In his tenure as Orleans Parish Criminal Sheriff, General Foti oversaw the enormous expansion of the parish jail, growing from 800 prisoners in 1973 to more than 7,000 currently. As the prison expanded, so did the need for education and rehabilitation skills for prisoners. As Sheriff, General Foti started the first reading and GED programs, work release programs, drug treatment programs and the nation's first boot camp at the local level, all to prepare prisoners for a future without crime. Administratively, General Foti managed a multi-million dollar budget and a complex organization of more than 1,400 employees.

General Foti has for many years been an advocate for the elderly. As Sheriff, he and a small army of volunteers provided Thanksgiving meals for senior citizens in the New Orleans area. He started a back-to-work program for senior citizens that helps people over the age of 55 get back into the workforce.

General Foti received his Juris Doctor degree from Loyola University Law School in 1965, after serving his country in the United States Army from 1955 through 1958.

## Kim E. Miller

Kim E. Miller is a KSF partner who specializes in securities and other complex class action litigation. Ms. Miller supervises KSF's New York City office. Prior to joining KSF in 2006, Ms. Miller was a partner at one of the nation's leading plaintiff class action firms. Ms. Miller also spent time early in her career as a securities litigator in the defense bar.

> *"One of the best lawyers to appear in front of me in a long time..."*
>
> Hon. Charles R. Breyer,
> United States District Judge
> In Re:ShoreTel, Inc. Sec. Litig.

Recently, Ms. Miller was the lead plaintiff's lawyer for *Pearlstein v. BlackBerry Limited*, et al., No. 13-cv-7060 (S.D.N.Y.), and *In re Chicago Bridge & Iron N.V. Securities Litigation*, No. 1:17-cv-1580 (S.D.N.Y.), which resulted in settlement agreements on the eve of trial for $165 million and $44 million, respectively. She was also the lead plaintiff's lawyer in *Farrar v. Workhorse Group, Inc.*, et al., No. 2:21-cv-02072-CJC-PVC (C.D. Cal.). On July 28, 2023, after more than two years of hard-fought litigation, the Hon. Cormac J. Carney entered a Final Judgment approving a **$35 million** settlement of the Class' claims. She was also the firm's lead attorney in the *Halliburton* litigation (**$100M settlement**).

In a relatively recent Order and Final Judgment in an action where the Firm served as Lead Counsel, the Federal District Court noted:

"Indeed, I find that this action has been a model of how complex class actions should be conducted. Counsel for the Lead Plaintiff, Kim Miller, and her firm, Kahn Swick & Foti, L.L.C., and [Defense Counsel] showed the utmost professionalism and civility, required very limited court intervention while diligently pursuing their objectives, and sought and obtained a fair and reasonable settlement before incurring substantial costs for discovery and trial preparation, all to the benefit of the Lead Plaintiff, Class Members, and the Defendants....I applaud their skill, expertise, zealousness, judgment, civility, and professionalism in putting the best interests of their respective clients first and not only foremost, but exclusively ahead of their law firms' financial interests. Ms. Miller and [Defense Counsel] and their respective law firms earned my unyielding admiration and respect in this case for the efficient and exceptionally reasonable way in which they found a prompt, fair, and equitable solution to the complex problems their clients faced in this litigation, and they accomplished all of this with virtually no judicial intervention. In sum, my only deeply held regret in this case is that bioscience has not sufficiently advanced to allow the cloning of Ms. Miller and [Defense Counsel] for lead counsel roles in all complex civil class action litigation in the Northern District of Iowa."

*Elgaouni v. Meta Financial Group, Inc.*, 10-4108-MWB (N.D. Iowa)
(June 29, 2012) (Bennett, J.)

At another settlement hearing where Ms. Miller served as Lead Counsel for KSF, *In re ShoreTel, Inc. Sec. Litig.*, 3:08-cv-00271-CRB (N.D. Cal.), the District Court (Breyer, J.) noted: "You're one of the best lawyers to appear in front of me in a long time...."

Ms. Miller's class action trial experience includes participating as a trial team member in a four-month jury trial involving fraud-based claims that resulted in a jury verdict in favor of the class.

Earlier in her career, Ms. Miller was involved in a variety of other cases in which large settlements were obtained, including:

- **Settlement value of $127.5 million.** *Spahn v. Edward D. Jones & Co.*, L.P., 04-cv-00086-HEA (E.D. Mo.)

- **$110 Million Recovery.** *In re StarLink Corn Prods. Liab. Litig.*, MDL No. 1403 (N.D. Ill.)

- **$100 Million Recovery.** *In re American Express Financial Advisors*, Inc. Sec. Litig., 1:04-cv-01773-DAB (S.D.N.Y.)

**APP 35**

After graduating with honors from Stanford University in 1992 with a double major in English and Psychology, Ms. Miller earned her Juris Doctor degree from Cornell Law School, cum laude, in 1995. While at Cornell, Ms. Miller was the Co-Chair of the Women's Law Symposium, Bench Brief Editor of the Moot Court Board, and a member of the Board of Editors of the *Cornell Journal of Law & Public Policy*. She was also a judicial intern for The Honorable David V. Kenyon in the Central District of California. Her pro bono work includes representing families of 9/11 victims at *In re September 11 Victim Compensation Fund* hearings. Ms. Miller also has served as a fundraiser for the New York Legal Aid Society.

## Ramzi Abadou

Mr. Abadou is a KSF partner who oversees the Firm's San Francisco office. He specializes in securities litigation and is responsible for numerous precedent-setting securities decisions, including:



- *In re UnitedHealth Group PSLRA Litig.*, 2007 U.S. Dist. LEXIS 40623 (D. Minn. 2007) **($925.5 million recovery)**;

- *In re Eletrobras Secs. Litig.*, 245 F. Supp. 3d 450 (S.D.N.Y. 2017) **($14.75 million recovery)**;

- *Kasper v. AAC Holdings, Inc.*, 2016 U.S. Dist. LEXIS 87492 (M.D. Tenn. 2016) **($25 million recovery)**;

- *Dougherty v. Esperion Therapeutics*, 2020 U.S. Dist. LEXIS 216515 (E.D. Mich. 2020) **($18.25 million recovery)**;

- *Khoja v. Orexigen Therapeutics, 2021 U.S. Dist. LEXIS* 230105 (S.D. Cal. 2021) **($4.8 million recovery)**;

- *In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d 1276 (N.D. Ok. 2010) **($28 million recovery)**;

- *Minneapolis Firefighters' Relief Ass'n v. Medtronic, Inc.*, 278 F.R.D. 454 (D. Minn. 2011) **($85 million recovery)**;

- *In re CytRx Corp. Sec. Litig.*, 2015 U.S. Dist. LEXIS 91447 (C.D. Cal. 2015) **($8.5 million recovery).**

Mr. Abadou also prevailed in litigation before the United States Court of Appeals for the Ninth Circuit and the United States Supreme in *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) *cert. denied sub nom. Hagan v. Khoja*, 139 S. Ct. 2615 (2019). *Orexigen* significantly altered the civil pleading practice landscape in the Ninth Circuit, leading *Securities Law360* to describe *Orexigen* one of the "Biggest Securities Decisions of 2018."

**APP 36**

In 2010, Mr. Abadou was named one of the *Daily Journal's* Top 20 Lawyers in California under 40 and, since 2015, has been selected to *Super Lawyers* annually as a leading securities litigation practitioner. He has been invited to lecture on securities litigation at Stanford University Law School, the University of San Diego School of Law, Boston College Law School and is a Law Lecturer at U.C. Berkeley Law School. Mr. Abadou has been covered by the press in *Bloomberg*, *The Guardian*, *SFGate*, *NBC News* among others.

He obtained a B.A. from Pitzer College in 1994 and an M.A. from Columbia University in 1997. He earned his J.D. from Boston College Law School in 2002.

Mr. Abadou is a member of the San Francisco Bar Association, the Federal Bar Association for the Northern District of California and is a pro bono panelist with Federal Bar Association Justice & Diversity Project. He is admitted to the California Bar and is licensed to practice in all California state courts, as well as all United States District Courts in California, the Eastern District of Michigan, the United States Court of Appeals for the Ninth and Eleventh Circuits, and the Supreme Court of the United States.

## Melinda A. Nicholson

Melinda A. Nicholson, a partner in KSF's Louisiana office, focuses on shareholder derivative and class action litigation, representing institutional and individual shareholders in corporate governance litigation and securities fraud actions, and antitrust matters. Ms. Nicholson also oversees KSF's shareholder derivative practice.

Ms. Nicholson has been involved in a number of significant derivative and class action cases throughout the country seeking recovery for harmed shareholders and individuals, obtaining seminal decisions in shareholders' favor, including:

- *Oliver, et al. v. American Express Company, et al.*, No. 1:19-cv-00566 (E.D.N.Y). On April 30, 2020, the Hon. Nicholas G. Garaufis, United States District Court Judge for the Eastern District of New York, entered an Order denying, in part, defendants' motion to dismiss. This matter, in which Kahn Swick & Foti, LLC is a member of Plaintiffs' Executive Committee, seeks damages, restitution, and injunctive relief against the American Express Company and American Express Travel Related Services Company, Inc. (collectively, "Amex"), on behalf of persons that used an electronic form of payment other than an Amex charge or credit card to purchase goods and services sold by merchants across the country at prices allegedly inflated by Amex's non-discrimination provisions. Judge Garaufis ruled that plaintiffs adequately pled violations of 22 state antitrust and/or consumer protection laws and allowed plaintiffs' case to proceed against Amex for these violations.

**APP 37**

- *In re Fitbit, Inc. Stockholder Derivative Litigation*, Consolidated C.A. No. 2017-0402 (Del. Ch.). On December 14, 2018, Vice Chancellor Joseph R. Slights III of the Delaware Chancery Court rejected a motion to dismiss a stockholder derivative suit alleging insider trading and breach of fiduciary duty claims against executive officers and directors of Fitbit, Inc. ("Fitbit"). The lawsuit, in which Ms. Nicholson serves as co-lead counsel, alleges that certain insiders made $385 million in stock sales in the company's initial public offering and—after agreeing to release the insiders from lock-up agreements that barred them from trading for 180 days after the initial public offering—an early secondary offering, taking take advantage of an artificially positive market response to Fitbit's flagship PurePulse heartrate monitoring technology. Vice Chancellor Slights held that the plaintiffs' complaint—bolstered by internal company documents obtained by KSF and its co-counsel—reasonably alleges that, while Fitbit was actively promoting its PurePulse technology, the company internally was struggling to correct and contain news about serious problems with the accurate functioning of their devices containing PurePulse. In the opinion, Vice Chancellor Slights further held that the complaint adequately pled that the directors and officers who sold stock traded on inside information, and "designed the secondary offering to accommodate sellers' interests."

- *Dougherty v. Esperion Therapeutics, Inc., et al.*, No. 16-10089 (E.D. Mich.). On September 27, 2018, the Sixth Circuit Court of Appeals reversed and remanded the lower court's dismissal of the securities class action filed on behalf of a putative class of Esperion Therapeutics, Inc. investors. In a decision written by Senior Circuit Judge Eugene Edward Siler, Jr., the Sixth Circuit held that the district court erred by concluding that lead plaintiffs had not adequately alleged scienter, stating that, "Esperion has offered no innocent inference stronger than Plaintiffs' inference that Esperion knowingly or recklessly made material misrepresentations or omissions in its [] communications with investors." The Court further held that defendants' "innocent inference" explanations were either implausible or actually supported lead plaintiffs' allegation of recklessness.

Since joining KSF, Ms. Nicholson has also been involved in a number of cases which ultimately resulted in successful settlements, including:

- *Orrego v. Lefkofsky (Groupon, Inc. Derivative Litigation)*, No. 12 CH 12420 (Ill. Cir. Ct, Cook Cnty., Ch. Div.) (settlement consisting of broad corporate governance reforms with an estimated value of **$159 million**);

- *In re Bank of America Corporation Securities, Derivative, & Employee Retirement Income Security Act (ERISA) Litigation*, No. 09-MD-2058 (S.D.N.Y.) (Court-approved settlement including **$62.5 million cash recovery** and substantial corporate governance changes);

**APP 38**

- *Bassett Family Trust v. Costolo, et al. (Twitter, Inc. Derivative Litigation),* C.A. No. 2019-0806 (Del. Ch.) (settlement resulted **$38 million** payment and targeted corporate governance reforms);

- *In re Fifth Street Finance Corp. Stockholder Litigation,* Consolidated C.A. No. 12157 (Del. Ch.) (settlement resulted in governance enhancements and advisory fee reductions worth an estimated **$30 million**);

- *In re Barnes & Noble Stockholder Derivative Litigation,* C.A. No. 4813 (Del. Ch.) (settlement resulted in **$29 million recovery** for the company);

- *In re Fitbit, Inc. Stockholder Derivative Litigation* Consolidated C.A. No. 2017-0402 (Del. Ch.) (settlement resulted in **$5 million recovery** for the company);

- *In re FAB Universal Corporation Shareholder Derivative* Litigation, Lead Case No. 14-cv-687 (S.D.N.Y.) (settlement involving broad corporate governance reforms);

- *Lowry v. Basile (Violin Memory, Inc. Derivative Litigation),* No. 4:13-cv-05768 (N.D. Cal.) (broad corporate governance reform settlement); and

- *In re Moody's Corporation Shareholder Derivative Litigation,* 1:08-CV-9323 (S.D.N.Y.) (settlement involving comprehensive corporate governance reforms).

Prior to joining the firm in 2010, Ms. Nicholson worked for defense firms in New York, handling complex commercial litigations and regulatory investigations involving a variety of legal issues, including fiduciary obligations, securities violations, contractual breaches, antitrust and insurance coverage. Ms. Nicholson completed a joint B.A./J.D. program at Tulane University, receiving a B.A. in Political Science, with a concentration in American Politics and Policies and a minor in Economics, from Tulane in 2003 and a J.D. from Tulane in 2005. While at Tulane Law School, Ms. Nicholson served as a Notes and Comments Managing Editor for the Tulane Law Review, which published her comment, *The Constitutional Right to Self-Representation: Proceeding Pro Se and the Requisite Scope of Inquiry When Waiving Right to Counsel,* 79 TUL. L. REV. 755 (2005). She has received numerous awards, including the Dean's Medal for attaining the highest grade point average during the third year, the George Dewey Nelson Memorial Award for attaining the highest grade point average in common law subjects throughout the three years of law study, and Order of the Coif. She graduated from the law school *summa cum laude* and ranked second in her class.

Ms. Nicholson is regularly asked to give presentations and conduct CLEs addressing her practice areas.

Ms. Nicholson is admitted to practice in Louisiana, New York, and Texas, the United States Courts of Appeal for the Fifth Circuit, and before the United States District Courts for the Eastern District of

**APP 39**

Louisiana, Western District of Louisiana, Southern District of New York, Eastern District of New York, District of Colorado, and Eastern District of Michigan.

## Michael J. Palestina



Mr. Palestina practices securities and other complex class action litigation. He focuses his practice on securities litigation involving mergers and acquisitions. In his capacity as a KSF partner, Mr. Palestina currently serves as lead, co-lead, or executive committee counsel in several ongoing M&A cases and has previously served in the same capacity in several successfully resolved M&A cases.

For example, Mr. Palestina took part in the successful resolution of *In re EnergySolutions, Inc. Shareholder Litigation*, Consol. C.A. 8203-YCG (Del. Ch. 2013), a securities class action involving claims for breach of fiduciary duties to shareholders relating to a proposed merger of nuclear energy related companies worth $1.1 billion ($375 million in proposed shareholder consideration), where there was a $0.40 price increase, which increased the consideration to shareholders by more than 10%, or approximately $38 million, and over 20 pages of additional disclosures to the proxy statement relating to process and pricing claims. Mr. Palestina also served as one of three co-lead counsel in *In re American Capital, Ltd. Shareholder Litigation*, Case No. 422598-V (Circuit Court for Montgomery County, Maryland 2016), a securities class action involving claims for breach of fiduciary duty in connection with the sale of American Capital Ltd. against both American Capital's board and senior officers and Elliott Management Corporation, the activist investor fund that agitated for the sale. Therein, Mr. Palestina was instrumental in obtaining a **$17.5 million settlement** from American Capital's board members and officers and Elliott, in so doing defeating a motion to dismiss by Elliott and obtaining an unprecedented ruling that Elliott may be considered a controller and subject to entire fairness review at trial. More recently, in March 2020, after litigating the matter **to the eve of trial**, Mr. Palestina obtained a $6.5 million settlement recovery for former U.S. Geothermal Inc. shareholders in connection with its merger with Ormat Technologies, Inc; this recovery represented a 7.7% premium to the adjusted enterprise value of the buyout.

Several of Mr. Palestina's current cases also implicate evolving and novel areas of corporate merger law. For example, in *Helen Moore v. Macquarie Infrastructure and Real Assets, et al. (Cleco Corporation Merger)*, Case No. 251,417, c/q 251,456 and 251,515, Div. "C" (9th JDC, Louisiana, 2014), in which Mr. Palestina serves as one of two Interim Co-Lead Counsel, he was instrumental in securing a landmark Louisiana appellate decision finding that merger-related challenges are direct, and not derivative, in nature. Mr.

**APP 40**

Palestina is also currently litigating several similar cases that touch on the same direct-vs-derivative issue under Maryland law.

Prior to joining KSF, Mr. Palestina clerked for the honorable Catherine D. Kimball, former Chief Justice of the Louisiana Supreme Court, and practiced law at a well-respected New Orleans litigation firm. While there, Mr. Palestina gained valuable trial experience, focused on complex commercial litigation, and represented a number of judges and his fellow lawyers regarding ethical issues before the State's judicial and attorney disciplinary systems.

Mr. Palestina graduated from Tulane University in 2005 with a Bachelor of Arts in Political Science. He earned his J.D. in 2008 from Loyola University of New Orleans College of Law, where he graduated *magna cum laude*, was a William L. Crowe, Sr. Scholar, and was inducted into the Order of Barristers. While in law school, Mr. Palestina was a member of the Loyola Law Review and Loyola Moot Court, was the first place oralist in the Loyola Intramural Moot Court Competition, and represented Loyola at the Stetson International Environmental Moot Court Competition (where he was the fourth place oralist overall) and on the National Team at the New York Bar Association's National Moot Court Competition (where his team advanced to the finals). Mr. Palestina also served as a research assistant to the Leon Sarpy Professor of Law Professor Kathryn Venturatos Lorio, whom he assisted in a revision of her Westlaw treatise on Louisiana Succession and Donations, and as a Judicial Intern to Magistrate Joseph C. Wilkinson, Jr. of the United States Federal District Court for the Eastern District of Louisiana. Mr. Palestina's Law Review article, Of Registry: Louisiana's Revised Public Records Doctrine, was published in the Loyola Law Review.

Mr. Palestina is licensed to practice in Louisiana state and federal courts.

## J. Ryan Lopatka

J. Ryan Lopatka, a partner in KSF's Chicago office, focuses primarily on federal securities class action litigation.



Mr. Lopatka was a member of the team that litigated against Halliburton Company in one of the most closely followed securities cases of all time. The litigation, which spanned more than a decade, included two landmark decisions from the Supreme Court. The first, *Erica P. John Fund, Inc. v. Halliburton*, 1331 S.Ct. 2179 (2011), a 9-0 unanimous opinion, reversed the rulings of the district court and Fifth Circuit Court of Appeals denying the investors' motion for class certification on loss causation grounds. The second, *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct.

**APP 41**

2389 (2014), preserved the fraud-on-the-market doctrine, and helped pave the way towards a **$100 million recovery** for the class.

More recent successes include *Pearlstein v. BlackBerry Limited, et al.*, No. 13-cv-7060 (S.D.N.Y.) and *In re Chicago Bridge & Iron N.V. Securities Litigation*, No. 1:17-cv-1580 (S.D.N.Y.), which resulted in settlement agreements on the eve of trial for **$165 million** and **$44 million**, respectively.

Mr. Lopatka successfully argued before the United States Court of Appeals for the Second Circuit to vacate an order from the Southern District of New York granting motion to dismiss in a securities class action against NewLink Genetics Corp. The 26-page ruling from the three-judge panel in *Abramson v. NewLink Genetics Corp.*, 2020 U.S. App. LEXIS 21545 (2d Cir. July 13, 2020) revitalized investors' claims against the bio-pharmaceutical company, and further developed the law of the Second Circuit with regard to loss causation and the actionability of opinion statements under the Supreme Court's 2015 decision in *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S. 175 (2015). After remand, KSF secured a **$13.5 million** settlement for the class, an achievement the late Hon. William H. Pauley commended: "you turned a case that was a loser in the district court into a victory for plaintiffs…."

Before a three-judge panel of the Tenth Circuit in *Hogan v. Pilgrim's Pride Corp.*, 73 F. 4th 1150 (10th Cir. 2023), Mr. Lopatka successfully appealed the dismissal of a putative securities class action on repose grounds.  The case, currently pending in the District of Colorado, involves allegations that Defendants misled investors regarding Pilgrim Pride's operations and finances amid a years-long collusive scheme to fix chicken prices, and is the only one of three securities class actions involving similar claims against poultry producers to still survive.

Mr. Lopatka also dedicates his time to promote best practices in complex litigation. For example, Mr. Lopatka served alongside attorneys representing both plaintiffs and defendants as a project member with the Electronic Discovery Reference Model (EDRM) to identify common problems and solutions (including potential amendments to the Federal Rules of Civil Procedure) related to the process of recording documents withheld from production on a claim that they contain attorney-client communication or work product.

Mr. Lopatka received his J.D. from Tulane University Law School in 2010. During the summer of 2009, he studied international capital markets and securities law at Cambridge University and Queen Mary School of Law in London, England. He received his B.A. with honors in history from Loyola University New Orleans in 2004.

Mr. Lopatka is admitted to practice in Louisiana and Illinois.

## Craig J. Geraci

Craig J. Geraci, Jr. is a partner in KSF's Louisiana office and focuses on federal securities litigation and other complex class action litigation. He is actively involved in cases pending before federal courts across the United States.



Mr. Geraci has litigated numerous securities matters and helped recover more than **$325 million** for shareholders allegedly defrauded by publicly traded companies and their officers. For example, Mr. Geraci was a member of the litigation team in *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2389 (2014), a landmark securities-fraud class action, where the U.S. Supreme Court ruled for KSF's client on the most important issue in the case, and in *Erica P. John Fund, Inc. v. Halliburton*, 131 S.Ct. 2179 (2011), where the Court ruled unanimously for KSF's client. The *Halliburton* case ultimately resulted in a **settlement of $100 million**. More recently, Mr. Geraci was a member of the litigation teams in *In re Chicago Bridge & Iron Company N.V. Securities Litigation*, No. 1:17-cv-1580 (S.D.N.Y.) and *Pearlstein v. BlackBerry Limited, et al.*, No. 1:13-cv-7060 (S.D.N.Y.), both of which settled on the eve of a jury trial for **$44 million** and **$165 million**, respectively.

Mr. Geraci received his J.D. from Tulane University Law School in 2009 and received a B.S. with a major in finance from the University of New Orleans in 2005.

Prior to joining KSF, Mr. Geraci focused his practice on complex commercial and corporate litigation, primarily for clients in the energy industry. In that role, he litigated numerous matters in state and federal courts across the country, including a case where he helped obtain a unanimous verdict in a three-week jury trial, awarding more than $4 million in contract damages and $2.7 million in fraud and punitive damages. He also presented oral argument, as a second-year associate, before the U.S. Court of Appeals for the Federal Circuit.

Mr. Geraci is admitted to practice in Louisiana, Mississippi, Alabama, and Texas, and he is a member of those states' bar associations. Further, Mr. Geraci is admitted to practice before the United States Court of Appeals for the Second Circuit, Fifth Circuit, and Federal Circuit and the United States District Courts for the Eastern, Middle, and Western Districts of Louisiana, the Northern, Eastern, and Southern Districts of Texas, and the Northern and Southern Districts of Mississippi.

## Chris Quinn

Chris Quinn is a partner in the Delaware office of Kahn Swick & Foti, LLC. Mr. Quinn focuses his practice on the prosecution of stockholder class and derivative actions for breach of fiduciary duty in the Delaware Court of Chancery and Delaware Supreme Court.



Mr. Quinn has significant experience in all stages of litigation in the Court of Chancery, from case generation through trial, particularly in stockholder class and derivative actions arising from mergers and acquisitions and other significant transactions.  After starting his career at a large Delaware firm best known for its defense work, Chris worked prior to KSF at two plaintiff-side, boutique Delaware firms, where he was a key member of trial and litigation teams that recovered collectively more than **$1.0 billion** for stockholders and derivative plaintiffs.

While in law school, Chris was a summer associate at a prominent Delaware firm and served as a judicial intern for the Honorable J. Curtis Joyner of the United States District Court for the Eastern District of Pennsylvania.

Mr. Quinn earned his J.D. in 2012 from Villanova University School of Law, where he graduated *cum laude* and was an Associate Editor of *Villanova Law Review*, and earned bachelor's degrees in Finance and Economics from the University of Delaware in 2009.

## Dennis White

Dennis is a partner in KSF's Chicago office and oversees the firm's Institutional Investor Services.  In addition to over twenty plus years of legal experience in regulatory compliance, public policy, procurement, and legislative approval, Dennis brings significant public pension administration experience.



Prior to joining KSF, Dennis most recently served as the Executive Director of the Municipal Employees' Annuity and Benefit Fund of Chicago, a $3.5 Billion pension fund.  He also has served as a Trustee and the Interim Executive Director of the Cook County Pension Fund (the "CCPF"), a $14.3 Billion pension fund that provides pension, disability and other benefits to employees of both Cook County and the Forest Preserve District of Cook County.  He

**APP 44**

initially was elected to serve on the Board of Trustees as the Forest Preserve District's representative on the CCPF Board, while serving as the Chief Attorney of the Forest Preserve District of Cook County.

Prior to leading the Forest Preserve District's legal department as the Chief Attorney, Dennis began his legal career as a staff attorney in the legal division of the Board of Governors of the Federal Reserve System in Washington, D.C. Subsequently, he joined the Washington, D.C. office of Rudnick and Wolfe law firm (now known as DLA Piper); worked as a staff attorney and business executive for General Motors Corporation in Detroit, Michigan; and joined the Chicago office of Holland & Knight, LLP law firm as Senior Counsel.

Dennis earned his B.S. in Mechanical Engineering from the University of Illinois at Urbana-Champaign, his J.D. from Northwestern University Law School, and his M.B.A. from the University of Chicago Booth School of Business.

## Bruno Rosenbaum



Bruno Rosenbaum is a partner at KSF and head of the Firm's International Client Services & Development division, where he advises the firm's diverse international clients in domestic and non-domestic securities litigation. Mr. Rosenbaum specializes in securities fraud class actions, international financial regulation, officers' and directors' fiduciary and non-fiduciary obligations, and a vast array of securities law violations where damages to shareholders have occurred and an opportunity exists to recover losses, enhance corporate governance, and protect investors against misconduct and fraud.

Prior to joining KSF, Mr. Rosenbaum worked with several major international law firms in New York, Paris, Luxembourg, and Miami, focusing on U.S. and global securities litigation, passive loss recovery opportunities and corporate transactions.  Bruno is licensed in New York, Paris, and Luxembourg. Mr. Rosenbaum is fluent in English and French, conversant in German, Portuguese, and Spanish, and has elementary knowledge of Italian and Luxembourgish.  Mr. Rosenbaum received his LL.M. from Columbia Law School, where he served as editor for the Columbia Journal of European Law; an MBA and a Master II from Assas and a Master I from the Sorbonne.

## SPECIAL COUNSEL

### Vincent Giblin

**Special Counsel to KSF - DeCotiis Fitzpatrick Cole & Giblin, LLP - Paramus, NJ**

Vincent Giblin, as Special Counsel to KSF, is an experienced trial attorney and partner with DeCotiis Fitzpatrick Cole & Giblin LLP. Prior to his career in the private sector, Mr. Giblin served as an Assistant U.S. Attorney in the District of New Jersey. For his efforts at the U.S. Attorney's Office, Mr. Giblin received special recognition from the U.S. Secret Service, U.S. Postal Inspection Service and the Federal Bureau of Investigation. He was also bestowed with the 2002 Administrator's Award, one of the highest honors by the U.S. Drug Enforcement Administration, for his outstanding  achievement in law enforcement. Trials that Mr. Giblin participated in include: *United States v. Robert Kosch and Ravidath Ragbir*, a wire fraud conspiracy involving fraudulent mortgage proceeds; *United States v. Luis Cruz*, a gang-related crack cocaine conspiracy; and *Walsh v. Walsh*, a minority shareholder action.

Mr. Giblin regularly appears as trial counsel in state and federal courts. Mr. Giblin handles complex federal litigation, white collar criminal defense, and compliance matters for private corporate and not-for-profit organizations. Mr. Giblin has substantial experience with class action litigation including securities litigation, trade secret litigation, First Amendment issues, international business torts, and minority shareholder actions and bankruptcy-related litigation. Mr. Giblin currently serves as the outside general counsel for the International Union of Operating Engineers representing over 450,000 members nationally.

Mr. Giblin received a B.A. from Rutgers College in 1992 where he was a member of the Rutgers Intercollegiate Lacrosse Team. Following receiving his J.D. from Seton Hall University School of Law in 1995, he served as a law clerk for the Hon. Clarkson S. Fisher, U.S.D.J. for the U.S. District Court of the District of New Jersey. Mr. Giblin is admitted to practice in New Jersey, and is admitted to practice before the United States Court of Appeals for the Third Circuit, and the United States District Courts for the District of New Jersey, Southern District of New York, and District of Columbia.

## OF COUNSEL

### Melissa Harris



Melissa Harris, Of Counsel in KSF's New Orleans office, practices securities and other complex commercial and class action litigation. Ms. Harris has successfully litigated numerous securities matters in which shareholders stand to recover more than **$100 million** for shareholders allegedly defrauded by publicly traded companies and their officers. For example, Ms. Harris was a member of the litigation team in *Pearlstein v. Blackberry*, No. 13-7060 (S.D.N.Y.) (**$165 million settlement**), and *In re Chicago Bridge & Iron Company N.V. Securities Litigation*, No. 17-1580 (SD.N.Y.) (**$44 million settlement**) has been granted.  Ms. Harris is also litigating several pending securities fraud cases that have survived motions to dismiss and are now settlement stage, including *Farrar v. Workhorse*, No. 21-cv-2072, pending in the Central District of California, and *In re Pareteum Securities Litigation*, No. 19-9767, pending in the Southern District of New York.  Ms. Harris also has substantial experience in shareholder derivative suits and securities litigation involving mergers and acquisitions.

Prior to joining KSF, Ms. Harris worked at a well-respected regional law firm in New Orleans, where she handled defense of complex commercial litigation, government contracts disputes, and government investigations in state and federal courts around the country, as well as before federal agencies, including the Consumer Financial Protection Bureau, Federal Trade Commission, and United States Department of Justice. Ms. Harris also represented financial institutions and other companies in lawsuits under the federal False Claims Act and related state and local false claims laws. Ms. Harris has extensive experience with ESI and e-discovery and has presented and published on this topic numerous times.

Before moving to New Orleans, Ms. Harris clerked in federal court for four years in Hattiesburg, Mississippi for the Honorable M. Keith Starrett and the Honorable Michael T. Parker. A native New Yorker, Ms. Harris began her career at a large, prestigious defense firm in New York City where she handled complex commercial litigation, including antitrust, securities, and white-collar criminal matters, and regulatory investigations.

Ms. Harris graduated from Fordham Law School *magna cum laude,* in the top 2% of her class.  Ms. Harris was a member of the *Fordham Law Review,* was Order of the Coif, and received the Archibald R. Murray Public Service Award and the West Award for Outstanding Academic Achievement. Ms. Harris received

**APP 47**

her undergraduate degree from Vassar College *cum laude*, with a major in Classics and a minor in Religion.

Ms. Harris is admitted to practice in Louisiana and New York state courts, as well as in the United States District Courts for the Eastern, Middle, and Western Districts of Louisiana and the Southern and Eastern Districts of New York, and the United States Court of Federal Claims. She is a member of the Federal Bar Association, American Bar Association, Louisiana State Bar Association, and New Orleans Bar Association.

## Daniel Kuznicki



Daniel Kuznicki, Of Counsel in KSF's New York office focuses on securities litigation, representing shareholders in class actions concerning allegations of securities fraud and breaches of fiduciary duties in connection with corporate governance and mergers and acquisitions.

Before turning his attention to class action litigation, Mr. Kuznicki's practice focused on litigation and corporate matters involving trademarks, licensing, contracts, securities and real estate.

Mr. Kuznicki earned his juris doctorate from New York University School of Law in 2008 and graduated summa cum laude in 2005 with a bachelor's degree in Talmudic Law from Yeshiva Bnei Torah Institute.

Mr. Kuznicki is admitted to practice law in the State of New York, and the United States District Court for the Southern District of New York, as well as the United States Court of Appeals for the Second Circuit.

## C. Mark Whitehead III



Mark Whitehead, Of Counsel in KSF's New Orleans office, practices complex class action litigation.

Mr. Whitehead has been practicing in the field of mass torts and class actions since 2001. He has been involved in numerous environmental cases involving class claims for property damage and medical monitoring. Mark also represented the Boilermakers' Union Local 1814 in New Orleans, LA. He served on the plaintiff's committee for consolidated Vioxx mass tort litigation in New Jersey and has served on the science committee of the Plaintiff's Steering Committee in the PPA multi-district litigation, as well as serving similar roles in the Bextra/Celebrex, Vioxx, PPA, Fen-

**APP 48**

Phen, and Avandia MDLs. Mark is currently serving as a member of the science, bellwether trial, and expert witness committees in the Xarelto MDL. Mark has authored and co-authored publications in fields as diverse as aviation, neurosurgery, vascular surgery, and cardiology and was the recipient of the American Venous Forum Research Award. He has also served as acting coroner for Vermilion Parish and was on the Eunice, Louisiana Regional Airport Commission.

Mr. Whitehead received his J.D. from Tulane University Law School in 2000 after receiving his M.D. from Tulane University School of Medicine in 1995 and a B.S. from the University of Georgia in 1991.

Mr. Whitehead is admitted to practice in Louisiana and Florida state courts, as well as in the United States District Courts for the Eastern District of Louisiana, Middle District of Louisiana, Western District of Louisiana, United States District Courts for the Northern and Southern Districts of Florida, and the Fifth Circuit Court of Appeals. He is a member of the American Association for Justice, Louisiana Association for Justice, Florida Justice Association, Louisiana Bar Association, Florida Bar Association, District of Columbia Bar Association, Louisiana State Medical Society, and the Vermilion Parish Medical Society (past treasurer and vice president).

## Andrew J. Gibson

Mr. Gibson is of counsel to KSF. Andrew focuses his practice on merger and acquisition litigation, shareholder derivative actions, and other complex class action litigation.



Mr. Gibson is also responsible for the formation and management of the firm's Business Loss Claim division, wherein he represents hundreds of businesses and non-profit organizations in claims under the Deepwater Horizon Economic and Property Damage Settlement. He also has broad experience representing clients in commercial and casualty litigation in Louisiana state and federal courts and has obtained a consistently successful record for his clients.

Mr. Gibson received his J.D. from Loyola University New Orleans College of Law in 2004. While in school, he served as a Teaching Assistant and Staff member for the Moot Court program, was twice elected to the Executive Board of the Student Bar Association, and clerked at a nationally recognized law firm. During the summer of 2003, he studied Latin American civil law systems and international arbitration at the University of Costa Rica School of Law in San Jose, Costa Rica. He earned a Bachelor of Science degree in Business with a concentration in Pre-Law from the E.J. Ourso College of Business at Louisiana State

**APP 49**

University in 1997 and went on to work as a manager in the marketing department of a regional telecommunications company.

Mr. Gibson is a proud veteran of the United States Marine Corps where he served in the infantry as a Non-Commissioned Officer.

Mr. Gibson is very active in the local business community and has served on the Board of Directors and as Chairman of the Governmental Affairs Committee for the Saint Tammany West Chamber of Commerce, as a member of the St. Tammany Parish Home Rule Charter Committee (2014-15) and as a member of the St. Tammany Parish Inspector General Task Force (2013-2014).

## ASSOCIATES

### Alexander L. Burns

Alexander L. Burns is an associate in KSF's Louisiana office and focuses on federal securities class actions.



Mr. Burns graduated with honors from the University of Southern Mississippi in 2000 with a B.S.B.A. in accounting. In 2001, he earned his Master of Professional Accountancy and has been a licensed CPA since 2003. From 2001 to 2004 Mr. Burns was employed by Ernst & Young, L.L.P., auditing the financial statements of both privately held and publicly traded entities spanning a variety of industries including casino gaming, health care, insurance, and energy. Following the Enron scandal of the early 2000s, and anticipating the need for attorneys with a strong understanding of accounting issues, Mr. Burns left E&Y to attend law school in 2004.

Mr. Burns received his J.D. and B.C.L. from Louisiana State University's Paul M. Hebert Law Center in 2007. While at LSU, he was awarded the CALI Award for Academic Excellence in Contracts, served as Treasurer of the Trial Advocacy Board, and competed on various interschool mock trial teams. Mr. Burns has since practiced civil litigation, representing his clients' interests in contentious matters in both state and federal courts.

Mr. Burns is a licensed Certified Public Accountant in Louisiana. As an attorney, he is admitted to practice in Louisiana, the related Federal District Courts, the United States District Court for the Eastern District of Michigan, the United States Court of Appeals for the Fifth Circuit, and the United States Court of Appeals for the Ninth Circuit.

**APP 50**

## James Fetter

Mr. Fetter is an associate attorney at KSF and primarily focuses on securities litigation.



Prior to joining KSF, Mr. Fetter was an associate at a prominent civil rights law firm in Baltimore, Maryland. Mr. Fetter clerked on the U.S. Court of Appeals for the Fourth Circuit for the Honorable Albert Diaz. Mr. Fetter also worked as an associate at a AmLaw100 firm, where he focused on commercial litigation, products liability, and ADA compliance.

Mr. Fetter graduated *magna cum laude* and Order of the Coif from The Ohio State University Moritz College of Law, where he was an executive articles editor for the Ohio State Law Journal. During his time in law school, Mr. Fetter served as an extern at the U.S. District Court for the Southern District of Ohio and the Ohio Supreme Court. Mr. Fetter was also a legal intern at Disability Rights Ohio and a summer associate at an AmLaw100 firm. Mr. Fetter also served as a nonvoting board member for the ACLU of Ohio. Mr. Fetter received his undergraduate degree from Emory University and a Ph.D. in Political Science from the University of Notre Dame.

Mr. Fetter is admitted to practice in Maryland, Ohio, the U.S. Court of Appeals for the Fourth Circuit, the U.S. District Court for the District of Maryland, the U.S. District Court for the Southern District of West Virginia, and the U.S. District Court for the Eastern District of Michigan.

## Jyoti Kehl

Jyoti Kehl is an associate in KSF's Louisiana office and focuses primarily on federal securities class action litigation.



Since joining the firm in 2018, Jyoti has materially contributed to the prosecution of a number of securities class actions, including *Pearlstein v. BlackBerry Ltd.* ($165 million settlement achieved on the eve of trial, pending final approval); *In re Chicago Bridge & Iron Company N.V. Sec. Litig.* ($44 million settlement, pending final approval); and *Kanefsky v. Honeywell International Inc.* ($10 million settlement). Recently, she collaborated on drafting an amended complaint in *Farrar v. Workhorse Group, Inc.*, which survived in substantial part Defendants' motion to dismiss.

Jyoti received her J.D. cum laude from Tulane University School of Law in 2018, where she was a member of the International Criminal Court appellate moot court team and a Rule XX Student Attorney with the

**APP 51**

Tulane Criminal Justice Clinic. She received her B.A. in political science with an emphasis in international political economy from the University of California, Santa Barbara.

Ms. Kehl is admitted to practice in Louisiana.

## Nicolas Kravitz

Nicolas Kravitz is an associate in KSF's New Orleans office who prosecutes shareholder derivative lawsuits to redress breaches of fiduciary duty and other wrongdoing by public companies' boards of directors and executive officers. To date, Mr. Kravitz has been involved in litigation that has benefitted shareholders by successfully recovering more than **$50 million** and implementing robust corporate governance reforms worth millions more, including:



- **$46.75 million** recovery plus substantial corporate governance reforms obtained in settlement on behalf of Twitter, Inc. shareholders in the action *Bassett Family Trust v. Costolo, et al.*, No. 2019-0806-PAF (Del. Ch.);

- **$5 million** recovery obtained in settlement on behalf of Fitbit, Inc. shareholders in the action *In re Fitbit, Inc. Stockholder Derivative Litigation*, No. 2017-0402-JRS (Del. Ch.);

- Substantial corporate governance reforms obtained in settlement on behalf of Surgalign Holdings, Inc. shareholders in the action *In re RTI Surgical Derivative Litigation*, No. 1:20-cv-3347 (MFK) (N.D. Ill.); and

- Substantial corporate governance reforms obtained on behalf of GoPro, Inc. shareholders in the action *In re GoPro Stockholder Derivative Litigation*, No. 4:18-cv-00920-CW (N.D. Cal.).

Mr. Kravitz received his J.D., *cum laude*, from Georgetown University Law Center in 2014. Prior to joining KSF, he practiced corporate litigation in Wilmington, Delaware focusing on complex matters in the Delaware Court of Chancery, where he served as trial counsel in numerous matters and gained specialized experience in fiduciary duty litigation.

Mr. Kravitz is admitted to practice in Louisiana, Delaware, and the United States District Court for the District of Delaware.

**APP 52**

APP 53

## James Lamb

James Lamb is an associate attorney in the firm's corporate governance and derivative litigation practice.



Prior to joining KSF, Mr. Lamb served as a judicial extern for the Honorable André Birotte Jr. of the United States District Court, Central District of California and clerked for the Honorable Michael P. Linfield of the Superior Court of California, County of Los Angeles.

Mr. Lamb received his J.D. from the University of California, Irvine School of Law, where he was a semifinalist in UCI Law's moot court competition and later Vice-Chair of the law school's moot court board. During law school Mr. Lamb served as a research assistant for UCI Law's Center on Law, Equality, and Race for five semesters and interned with the American Civil Liberties Union of Southern California to broaden citizen access to local government deliberations. Mr. Lamb earned his undergraduate degree from Cornell University.

## Brian C. Mears

Brian C. Mears is an Associate Attorney in KSF's New Orleans office and focuses on securities litigation involving mergers and acquisitions. Mr. Mears has helped KSF secure material proxy disclosures, and, when necessary, monetary relief when shareholders were deprived of the fair value of their investment as a result of M&A transactions. For example, in March 2020, KSF helped secure a **$6.5 million** common fund for U.S Geothermal Inc. shareholders after the company was acquired by Ormat Technologies, Inc.



Mr. Mears received his J.D. and M.B.A. from Tulane University Law School. Prior to joining KSF, Mr. Mears completed a judicial clerkship and worked at a boutique civil litigation firm in New Orleans where his practice focused on employment and maritime personal injury matters in federal and state courts. During his time in law school, Mr. Mears was a member of the Sports Lawyers Journal, and he interned with the general counsel's office at Octagon, Inc., one of the world's largest sports agencies, and with the San Antonio Spurs. Prior to attending law school, Mr. Mears was a member of the women's basketball coaching staff at Tulane University.

Mr. Mears is admitted to practice in all Louisiana state courts and the United States District Court for the Eastern District of Louisiana.

Mr. Mears is a member of the Federal Bar Association, the American Bar Association, the American Association for Justice, the New Orleans Bar Association, and the Academy of New Orleans Trial Lawyers.

## Gina Palermo

Gina Palermo is an Associate Attorney in KSF's New Orleans office and focuses on securities litigation involving mergers and acquisitions.



Prior to joining KSF, Ms. Palermo worked at two boutique civil litigation firms in New Orleans, representing both individuals and businesses in complex commercial litigation, securities actions, construction disputes, and personal injury matters in federal and state courts. She also served as Assistant General Counsel to the Port of New Orleans and New Orleans Public Belt Railroad for three years, where she drafted and negotiated contracts and commercial leases and oversaw litigation for both entities.

Ms. Palermo received her J.D. from Louisiana State University Paul M. Hebert Law School in 2010, where she graduated cum laude. During her time in law school, Ms. Palermo was a Senior Editor of the Louisiana Law Review and interned with Chief Judge Burrell J. Carter at the First Circuit Court of Appeals. Her article, "Waking the Neighbors: Determining a Landowner's Liability for Rowdy Tenants Under Louisiana Law," was published in the Louisiana Law Review. Ms. Palermo received her B.A. in journalism from Louisiana State University in 2007, where she graduated summa cum laude and was awarded the University Medal for academic achievement.

Ms. Palermo is admitted to practice in all Louisiana state and federal courts.

## Alexandra Pratt



Alexandra Pratt is an associate attorney for the firm and focuses primarily on securities litigation.

Prior to joining KSF, Ms. Pratt clerked in federal court in the Eastern District of Texas for the Honorable John D. Love and in the Supreme Court of Virginia for the Honorable Senior Justice Charles S. Russell.  While at the Supreme Court of Virginia, Ms. Pratt also served as the law clerk for the Office of the Chief Staff Attorney.

Ms. Pratt received her J.D., *cum laude*, from William & Mary Law School, where she was a member of the Bill of Rights Journal.  During her time in law school, Ms. Pratt served as the chief of staff of the Center for Legal and Court Technology and interned with the United States Attorney's Office in the Eastern District of Virginia and the general counsel's office of Huntington Ingalls, the largest military shipbuilding company in the United States.  She received her undergraduate degrees from the University of Virginia.

Ms. Pratt is admitted to practice in Virginia.

## Rhosean Scott



Rhosean Scott is a staff attorney for the firm and focuses primarily on federal securities class action litigation.

Prior to joining KSF, Ms. Scott worked at several New York litigation boutiques representing plaintiffs in complex securities class actions. She has extensive experience investigating and conducting discovery in securities fraud and antitrust matters on behalf of individual and institutional investors. As part of the KSF team, Ms. Scott is currently prosecuting *In re Parateum Securities Litigation, Sam Farrar v. Workhorse Group Inc. et al.*, and *Pearlstein v. Blackberry Ltd., et al.*

Ms. Scott is a graduate of Tulane University Law School and served as a judicial law clerk to the Hon. Charles R. Jones of the Louisiana Fourth Circuit Court of Appeal.  She received a B.A. in Economics from Emory University.

Ms. Scott is admitted to practice in New York.

## Frank Tamberino

Frank Tamberino is an Associate Attorney in KSF's New York office who focuses on securities litigation.



Prior to joining KSF, Mr. Tamberino worked in the Private Clients department of a mid-size firm in Manhattan, where he gained experience in advanced estate planning and administration.

Mr. Tamberino received his J.D. from the Fordham University School of Law, where he worked as a staff member of the Fordham International Law Journal. Prior to law school, Mr. Tamberino received his A.B. from Harvard University, graduating cum laude with High Honors in History. While at Harvard, Mr. Tamberino wrote his thesis on the resurgence of the Mafia in Sicily in the wake of World War II.

## Jenn Tetreault

Jenn Tetreault is an associate attorney, primarily focusing on shareholder derivative actions on behalf of shareholders who have been harmed by the wrongdoing of the board of directors, officers, or majority shareholders of publicly traded companies.



Prior to joining KSF, Ms. Tetreault worked in general plaintiff's litigation at two firms in Phoenix metropolitan area of Arizona representing individuals and entities in, among other things, complex corporate litigation, construction disputes, contract actions, class actions, and civil rights litigation in federal, state, and appellate courts.

Ms. Tetreault received her J.D. from the Arizona State University Sandra Day O'Connor School of Law School in 2019, where she graduated *magna cum laude and with the highest pro bono distinctions*. During her time in law school, Ms. Tetreault was a Senior Research Editor of the *Arizona State Journal*, a Board Chair on the Moot Court, and interned with the Maricopa County Public Defender's Office and Chief Judge Mary H. Murguia at the Ninth Circuit Court of Appeals. Ms. Tetreault received her B.A. in philosophy from Arizona State University, Barrett Honors College in 2010, where she graduated *cum laude*.

Ms. Tetreault is admitted to practice in Arizona, the Arizona Supreme Court, and the United States District Court for the District of Arizona.

**APP 56**

## Matthew P. Woodard



Matthew P. Woodard is an associate at KSF's New Orleans office, where his practice focuses on prosecuting complex securities fraud class actions.

Matthew played a key role in securing KSF's appointment as Lead and Co-Lead Counsel in actions against The Boston Beer Company, Inc., Waterdrop, Inc., Workhorse Group, Inc., CarLotz, Inc., Qudian Inc., Honeywell International, Inc., Intellipharmaceutics International, Inc., Pilgrim's Pride Corporation, and Chicago Bridge & Iron Company N.V.

He is as a member of a litigation team that has helped recover more than $336 million for shareholders. *Pearlstein et al. v. BlackBerry et al.* (**$165 million** settlement); *Erica P. John Fund, Inc. v. Halliburton* (**$100 million** settlement); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.* (**$44 million** settlement); *Abramson v. NewLink Genetics Corp. et al.* (**$13.5 million** settlement); *In re Tesco PLC Sec. Litig.* (**$12 million** settlement).

Matthew received his Bachelor of Arts degree in English, *cum laude* with honors, from The University of the South: Sewanee and his Juris Doctor degree from Tulane University School of Law. During law school, Matthew served as the Senior Managing Editor for the Tulane Journal of Law & Sexuality: Volume 21.

Mr. Woodard is admitted to practice in Louisiana and is a member of the Louisiana State Bar Association.

## OTHER PROFESSIONALS

## Chuck Jouandot

**Law Office Administrator**



Mr. Jouandot handles all law firm administration, including overseeing accounting and human resources. He has previously served as President of a $400 million dollar bank. Mr. Jouandot holds a B.S. in Management from the University of New Orleans.

APP 58

## Ashley Errington

**Paralegal**

Ashley Errington graduated from Brigham Young University, where she majored in Middle Eastern Studies/Arabic and minored in Spanish. She also studied the general sciences at Delgado Community College. Ms. Errington has 17 years of experience as a litigation paralegal. In her free time, she serves on the Assyrian Studies Association's Archive Committee, and volunteers with Days for Girls.



## Bronwyn Gibson

**Legal Assistant**

Bronwyn Gibson provides legal and administrative support for all partners and staff. She performs a variety of legal duties such as correspondence with clients, special projects, online file organization and has strong working knowledge of LexisNexis Courtlink used to research and organize diversified workload. She received her bachelor's degree from University of Louisiana at Lafayette.



## Sue Toledo

**Human Resources and Accounting**

Sue Toledo, Accounting/HR Department. Born and raised in New Orleans, Louisiana, Ms. Toledo has been with Kahn Swick & Foti, LLC for over 10 years. She has over 30 years of experience working with law firms in the Administration Department. Ms. Toledo attended the University of New Orleans.



APP 59

# EXHIBIT G



# Mullins v. AZZ, Inc.

United States District Court for the Northern District of Texas, Fort Worth Division

August 9, 2018, Decided; August 9, 2018, Filed

ACTION NO. 4:18-CV-025-Y

**Reporter**
2018 U.S. Dist. LEXIS 222090 *

LOGAN MULLINS VS. AZZ, INC., ET AL.

## Core Terms

appoint, lead plaintiff, class period, discovery, contends, rebut

**Counsel:  [*1]** For Logan Mullins, Individually and on Behalf of all Others Similarly Situated, Plaintiff: Joe Kendall, LEAD ATTORNEY, Jamie Jean Gilmore, Kendall Law Group PLLC, Dallas, TX USA; Bradley J Vettraino, Jeffrey C Block, Thomas W Kirchofer, Block & Leviton LLP, Boston, MA USA.

For Oklahoma Law Enforcement Retirement System, Plaintiff: Trey H Crawford, LEAD ATTORNEY, Crawford Wishnew & Lang, Dallas, TX USA; Mark T. Jones, Crawford Wishnew & Lang PLLC, Dallas, TX USA.

For Azz, Inc., Thomas E. Ferguson, Paul W. Fehlman, Defendants: Elizabeth L Yingling, LEAD ATTORNEY, Baker McKenzie LLP, Dallas, TX USA; Eugenie Rogers, Kimberly F Rich, Baker & McKenzie LLP, Dallas, TX USA.

For Avner Davidian, Movant: Phillip Kim, The Rosen Law Firm PA, New York, NY USA; R Dean Gresham, Steckler Gresham Cochran, Dallas, TX USA.

For Ibew Local 353 Pension Plan, Movant: Danielle S Myers, LEAD ATTORNEY; PRO HAC VICE,, Robbins Geller Rudman & Dowd LLP, San Diego, CA USA; Jamie Jean Gilmore, Joe Kendall, Kendall Law Group PLLC, Dallas, TX USA; Juan Carlos Sanchez, PRO HAC VICE, Robbins Geller Rudman & Dowd LLP, San Diego, CA USA; Michael Albert, Robbins Geller Rudman & Dowd LLP (San Diego), San Diego, CA USA.

**Judges:** TERRY R. **[*2]**  MEANS, UNITED STATES DISTRICT JUDGE.

**Opinion by:** TERRY R. MEANS

## Opinion

ORDER ON MOTIONS TO APPOINT LEAD PLAINTIFF AND APPROVE COUNSEL

Pending before the Court is the Motion for Appointment as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Lead Counsel (doc. 13), which was filed by IBEW Local 353 Pension Plan ("the Plan"). Also pending before the Court is a similar motion filed by the Oklahoma Law Enforcement Retirement System ("OLERS") (doc. 21). After review of both motions, the related briefs, and the applicable law, the Court concludes that the Plan's motion should be granted, and OLERS motion should be denied.

Both motions seek appointment of the respective movants as lead plaintiff for the proposed class and approval of their counsel as lead counsel under the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Under the PSLRA, this Court must "appoint as lead plaintiff the member . . . of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members." 15 U.S.C. § 78u-4(a)(3)(B)(I). A rebuttable presumption arises that the movant who "has the largest financial interest in the relief sought by the class" and who can also satisfy the requirements **[*3]** of Federal Rule of Civil Procedure 23 is the most adequate plaintiff. *Id.* 78u-4(a)(3)(B)(iii). This presumption may be rebutted by "proof" that the presumptively most adequate plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render [him] incapable of adequately representing the class." *Id.* 78u-4(a)(3)(B)(iii)(II). "That the district court believes another plaintiff may be 'more typical' or 'more adequate' is of no consequence. So long as the plaintiff with the largest losses satisfies the typicality and adequacy

requirements, he is entitled to lead plaintiff status, even if the district court is convinced that some other plaintiff would do a better job." *In re Cavanaugh*, 306 F.3d 726, 732 (9th Cir. 2002).

To determine the largest financial interest, courts consider "'(1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered during the class period.'" *Ark. Teacher Ret. Sys. v. Insulet Corp.*, 177 F. Supp. 3d 618, 622 (D. Mass. 2016) (quoting *In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998)). The Plan has demonstrated, and OLERS does not dispute, that the Plan suffered the largest losses as a result of Defendants' alleged conduct.[1]

Rather, OLERS contends that the Plan does not meet **[*4]** the requirements of Rule 23. At this stage of the litigation, however, the Plan "need only make a preliminary showing that it satisfies the typicality and adequacy requirements of Rule 23." *In re Tronox, Inc. Sec. Litig.*, 262 F.R.D. 338, 344 (S.D.N.Y. 2009) (quotation omitted); *accord Gluck v. CellStar Corp.*, 976 F. Supp. 542, 546 (N.D. Tex. 1997) (Buchmeyer, J.).

Typicality "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those they purport to represent." *Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620, 625 (5th Cir. 1999). Identity of claims is not required; "[r]ather, the critical inquiry is whether the class representative's claims have the same essential characteristics as that of the putative class." *Schwartz v. TXU Corp. et al.*, No. 3:02-CV-2243-K, 2005 U.S. Dist. LEXIS 27077, 2005 WL 3148350, *14 (N.D. Tex. 2005) (Kinkeade, J.) (quotation omitted). "If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *Id.* The Plan's claims are typical of the class because, like the other plaintiffs, it purchased the common stock of defendant AZZ, Inc. ("AZZ"), during the class period, allegedly in reliance upon Defendants' false and misleading statements, and suffered damages as a result. If the Plan is "successful in proving its injury and losses resulting from . . . Defendants' allegedly fraudulent scheme, [the Plan] will necessarily prove **[*5]**

the conduct [that] underlies the claims of all purported plaintiffs, just as it will establish the elements of those claims." *Gluck, 976 F. Supp. at 546*.

"To meet the adequacy-of-representation requirement of Rule 23(a)(4), [c]ourts consider (1) whether the named representative shares common interest with other class members, and (2) whether the named representative will vigorously prosecute the interests of the class through the class counsel." *Schwartz, 2005 U.S. Dist. LEXIS 27077, 2005 WL 3148350 at *14*; *see also In re Lernout & Hauspie Sec. Litig.*, 138 F. Supp. 2d 39, 46 (D. Mass 2001) ("To meet the adequacy requirement, plaintiffs must demonstrate that they have common interests and an absence of conflict with the class members and that the plaintiffs' attorneys are qualified, experienced and vigorously able to conduct the litigation."). The Plan has demonstrated that it is "well suited to adequately represent the purported class" because it "has a significant financial interest in the litigation" and "[a]s an institutional investor, it is accustomed to acting in the role of a fiduciary, and its experience with investing and financial matters will only benefit the class." *Gluck, 976 F. Supp. at 546*. Furthermore, the Plan has selected able counsel with prior experience successfully pursuing securities claims. (The Plan's App. (doc. 16) 13-17, 113-115.)

Consequently, the Plan is **[*6]** presumed under the statute to be the most adequate plaintiff. As a result, OLERS must rebut the presumption with proof demonstrating the Plan "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render [him] incapable of adequately representing the class." *Id.* 78u-4(a)(3)(B)(iii)(II). "'[E]xacting proof' is needed to rebut the presumption," for "[c]onclusory assertions and mere speculation will not suffice." *Murphy v. JBS S.A.*, No. 17-CV-3084, 2017 U.S. Dist. LEXIS 166262 2017 WL 4480751, *4 (E.D.N.Y. Oct. 6, 2017) (quoting *In re Facebook, Inc.*, 288 F.R.D. 26, 40 (S.D.N.Y. 2012)); *see also In re SemGroup Energy Partners, L.P. Sec. Litig.*, No. 08-CV-425-GKF-PJC, 2008 U.S. Dist. LEXIS 87218, 2008 WL 4826318, at *2 (N.D. Okla. Oct. 27, 2008) ("speculative assertions" and "[m]ere innuendo and inferences will not suffice to support allegations of atypicality, conflict of interest or unique defenses").

OLERS first contends that the Plan "is compromised by a serious conflict of interest that will prevent it from acting as a true fiduciary for the class." (OLERS's Resp. (doc. 24) 1.) Specifically, OLERS suggests that "several IBEW 353 sister funds" have business relationships with

---

[1] The Plan alleges that it "suffered more than $181,900 in losses due to [D]efendants' alleged misconduct." (The Plan's Br. (doc. 14) 4.) OLERS alleges it "lost approximately $145,074 as a result of the wrongful conduct alleged." (OLERS's Br. (doc. 22) 1.)

two subsidiaries of AZZ. OLERS contends that IBEW Local 257 and IBEW Local 303 have business relationships with certain AZZ subsidiaries dating back to 2011. As a result, OLERS suggests that "IBEW 353 cannot serve, **[*7]** on the one hand, the class, and on the other, the IBEW organization and its funds." (*Id.* at 7.) But OLERS wholly fails to demonstrate that **the Plan**, as opposed to the local union, suffers from these alleged conflicts. And it is clear from the declaration of Marnie Niemi Hood, executive administrator of the Plan, that the Plan "and IBEW Local 353 (the union) are separate legal entities," that neither of them "has any known 'business relationship' with AZZ Inc. or its subsidiaries," and that the Plan "does not have any contract with IBEW Local 257 or IBEW Local 303." (The Plan's Reply App. (doc. 28) 3-4, ¶¶ 4, 7.)

OLERS also suggests that "IBEW is also atypical of other class members due to its non-public knowledge of the electricity business and also of AZZ." (OLERS's Resp. Br. (doc. 24) 8.) But OLERS has wholly failed to present any proof demonstrating that **the Plan** has any such non-public knowledge. And again, Hood's declaration rebuts the notion, contending that the Plan "is not aware of any non-public information concerning AZZ's business or operations." (The Plan's Reply App. (doc. 28) 4, ¶ 6.) Nor has OLERS presented authority demonstrating that any such knowledge would be disqualifying. **[*8]**

OLERS alternatively contends that it should be appointed as co-lead plaintiff or that it should be allowed to conduct limited discovery into IBEW Local 353's conflicts. The PSLRA permits discovery in connection with the appointment of lead plaintiff "only if the [competing party] first demonstrates a reasonable basis for a finding that the presumptively most adequate plaintiff is incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iv). "Courts must also, however, take care to prevent the use of discovery to harass presumptive lead plaintiffs, something that the [PSLRA] was meant to guard against." *In re Cendant Corp. Litig.*, 264 F.3d 201, 270 n.49 (3d Cir. 2001). OLERS has failed to demonstrate a reasonable basis for discovery, inasmuch as it has focused solely on the local union's alleged and attenuated conflicts-of-interest, rather than the Plan's. And for similar reasons, the Court is not inclined to appoint OLERS as a co-lead plaintiff. "Increasing the number of [l]ead [p]laintiffs would detract from the [PSLRA's] fundamental goal of client control, as it would inevitably delegate more control and responsibility to the lawyers for the class and make the class representative more reliant on the lawyers . . . and

would unnecessarily increase the time **[*9]** and expense spent on preparing and litigating the case." *Gluck*, 976 F. Supp. at 549.

Consequently, the Court concludes that the Plan is the most adequate plaintiff under the PSLRA, and that OLERS has failed to rebut the presumption that arises under the Act. As a result, the Plan is hereby APPOINTED as lead plaintiff, and its counsel are similarly APPOINTED as lead counsel. OLERS's request to appoint it as lead or co-lead plaintiff and its request for discovery regarding the appointment issue is DENIED.

SIGNED August 9, 2018.

/s/ Terry R. Means

TERRY R. MEANS

UNITED STATES DISTRICT JUDGE

---

**End of Document**



# Shaffer v. Digital Generation, Inc.

United States District Court for the Northern District of Texas, Dallas Division

September 19, 2013, Decided; September 19, 2013, Filed

Civil Action No. 3:13-CV-1684-N

**Reporter**
2013 U.S. Dist. LEXIS 204461 *; 2013 WL 12430537

ANASTACIA SHAFFER, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. DIGITAL GENERATION, INC., et al., Defendants.

## Core Terms

lead plaintiff, appointment, trading, rebutted, liaison, adequacy, largest, financial interest, lead counsel, law firm, trader

**Counsel: [*1]** For Anastacia Shaffer, Individually and on Behalf of All Others Similarly Situated, Ali Alavi, Plaintiffs: Jeremy Alan Lieberman, LEAD ATTORNEY, Pomerantz LLP, New York, NY; Laurence Rosen, Phillip Kim, The Rosen Law Firm, New York, NY; Marc I Gross, Pomerantz Haudek Block Grossman & Gross, New York, NY; Patrick Dahlstrom, Pomerantz LLP, Chicago, IL; Sammy Ford , IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX; Sandy A Liebhard, Bernstein Liebhard LLP, New York, NY; Sara E Fuks, PRO HAC VICE, The Rosen Law Firm PC, New York, NY; Thomas E Bilek, The Bilek Law Firm LLP, Houston, TX.

For Robert M Lowinger, Plaintiff: Thomas E Bilek, The Bilek Law Firm LLP, Houston, TX; Jeffrey Michael Haber, Laurence Jesse Hasson, PRO HAC VICE, Bernstein Leibhard LLP, New York, NY; Theodore Carl Anderson , III, Kilgore & Kilgore PLLC, Dallas, TX.

For Digital Generation Inc, Neil Nguyen, Scott K Ginsburg, Craig Holmes, Defendants: John C Wander, LEAD ATTORNEY, Vinson & Elkins, Dallas, TX; Jeff G Hammel, Latham & Watkins LLP, New York, NY; John S Cooper, Joseph M Bargnesi, Latham & Watkins LLP, Washington, DC; Kevin H Metz, PRO HAC VICE, Latham & Watkins LLP, Washington, DC; Kimberly Rae McCoy, **[*2]** Marissa A Wilson, Vinson & Elkins LLP, Dallas, TX; Sean M Berkowitz, PRO HAC VICE, Latham & Watkins LLP, Chicago, IL.

For Omar Choucair, Defendant: Karl G Dial, LEAD ATTORNEY, Greenberg Traurig LLP, Dallas, TX; Casey Lee Moore, Vistra Energy Corp., Irving, TX.

**Judges:** David C. Godbey, United States District Judge.

**Opinion by:** David C. Godbey

## Opinion

### ORDER

This Order addresses plaintiffs Ali Alavi and Robert M. Lowinger's competing motions for appointment as lead plaintiff in a securities class action. Because of serious concerns with Alavi's typicality and susceptibility to unique defenses, the Court grants Lowinger's motion for appointment as lead plaintiff and denies Alavi's motion for appointment as lead plaintiff. Additionally, the Court approves Lowinger's selection of lead counsel but rejects Lowinger's selection of liaison counsel.

### I. BACKGROUND OF THE SECURITIES CLASS ACTION

Plaintiffs seek recovery for Digital Generation, Inc. ("Digital Generation") securities purchased or otherwise acquired between June 20, 2011 and February 19, 2013 (the "Class Period"). Digital Generation is a Delaware Corporation with its executive office located in Irving, Texas.

According to plaintiffs' complaint, Digital Generation shares **[*3]** dropped in value by $2.53, or 28 percent, per share on February 19, 2013, after Digital Generation announced it would take significant impairments to online and television assets. Plaintiffs claim they relied on Digital Generation's public statements — including its quarterly financial statements — when they purchased shares in the company. Plaintiffs argue that these statements were materially false and misleading and

that the subsequent impairments caused Digital Generation securities to lose value, causing the plaintiffs' loss.

Plaintiff Anastacia Shaffer filed a complaint on behalf of herself and all similarly situated plaintiffs on May 2, 2013. The complaint seeks recovery under Sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5 promulgated under Section 10(b). On July 1, 2013, two members of the putative class — Plaintiffs Ali Alavi and Robert M. Lowinger — timely filed competing motions for appointment as lead plaintiff and for approval of lead and liaison counsel. *See* Alavi Mot. for Appointment as Lead Pl. [10]; Lowinger Mot. for Appointment as Lead Pl. [7].

## II. THE STANDARD FOR APPOINTING LEAD PLAINTIFF

The Private Securities Litigation Reform Act of 1995 ("PSLRA") governs the process of appointing **[*4]** a lead plaintiff and approving lead counsel. 15 U.S.C. § 78u-4(a)(3)(B). Under the PSLRA, the court "shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of the class members." *Id.* § 78u-4(a)(3)(B)(I).

"In choosing the lead plaintiff, 'the court shall adopt a presumption that the most adequate plaintiff . . . is the person or the group of persons that 1) has filed the complaint or moved to be lead plaintiff;' 2) has 'the largest financial interest in the relief sought by the class'; and 3) 'otherwise satisfies the requirement of Rule 23 of the Federal Rules of Civil Procedure.'" *In re BP, PLC Sec. Litig.*, 758 F. Supp. 2d 428, 433 (S.D. Tex. 2010) (footnote omitted) (quoting 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)). There are four requirements for class representatives under Rule 23, but only typicality and adequacy of representation are relevant to designate the lead plaintiff under the PSLRA. *See In re Oxford Health Plans, Inc. Sec. Litig.* (*Oxford I*), 182 F.R.D. 42, 49 (S.D.N.Y. 1998). "[W]hether the movant with the largest financial losses satisfies the typicality and adequacy requirements" is a threshold determination that "should be a product of the court's independent judgment." *In re Cedant Corp. Litig.*, 264 F.3d 201, 263 (3rd Cir. 2001).

This presumption may be rebutted by another member of the purported plaintiff class "only upon proof . . . that the presumptively most adequate plaintiff - (aa) will not fairly **[*5]** and adequately represent the interests of the

class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). This determination is very similar to the Rule 23 initial determination of adequacy and typicality — the notable difference is that other plaintiffs attempting to rebut the presumption may now present evidence that challenges the court's initial determination of typicality and adequacy.[1] *See In re Cavanaugh*, 306 F.3d 726, 730 (9th Cir. 2002). If a competing plaintiff successfully rebuts the presumption, the court then applies the presumption to the plaintiff with the next largest financial interest in the litigation who either filed the complaint or moved to be lead plaintiff and who can make a prima facie showing under Rule 23's adequacy and typicality requirements. *See In re XM Satellite Radio Holdings Sec. Litig.*, 237 F.R.D. 13, 18 (D.D.C. 2006).

## III. THE PROPER LEAD PLAINTIFF UNDER THE PSLRA IS LOWINGER, NOT ALAVI

### A. Alavi is Not the Most Adequate Plaintiff Because of the Amount of High-Volume Trading He Did During the Class Period

The Court finds that Alavi timely moved for appointment

---

[1] The court in *Cavanaugh* provides an in-depth explanation of the difference between the initial determination of adequacy and typicality and whether the presumption of most adequate plaintiff is rebutted:

> At first glance, it may seem incongruous to allow other plaintiffs to present evidence casting doubt on the determination just made by the district court that the presumptive lead plaintiff satisfies Rule 23's adequacy and typicality requirements, but the apparent incongruity is easily resolved: At step two of the process, when the district court makes its initial determination [of the presumptively most adequate **[*6]** plaintiff], it must rely on the presumptive lead plaintiff's complaint and sworn certification; there is no adversary process to test the substance of those claims. At the third stage [of determining whether the presumption has been rebutted], the process turns adversarial and other plaintiffs may present evidence that disputes the lead plaintiff's prima facie showing of typicality and adequacy. The district court may need to hold an evidentiary heading, and to make a renewed determination of typicality and adequacy.

306 F.3d at 730-31.

**APP 64**

as lead plaintiff, Alavi has the largest financial interest in the litigation,[2] and Alavi has made a prima facie showing of typicality and adequacy.[3] Thus, Alavi is the presumptively most adequate plaintiff. But this presumption is rebutted by the significant amount of apparent day trading engaged in by Alavi.

Being a day trader does not automatically disqualify someone from being the lead plaintiff. *See Tsirekidze v. Syntax-Brillian Corp.*, 2008 U.S. Dist. LEXIS 118562, 2008 WL 942273, at \*4 (D. Ariz. 2008). But "a **[*7]** high-volume day trader might be subject to the unique defense that frantic trading belies any true reliance on company reports or even the integrity of the stock price itself." *Id.* (citing *In re Safeguard Scientifics*, 216 F.R.D. 577, 582 (E.D. Pa. 2003)); *see also Eichenholtz v. Verifone Holdings, Inc.*, 2008 U.S. Dist. LEXIS 64633, 2008 WL 3925289 (N.D. Cal. 2008) (holding that even if the court assumed that a particular plaintiff was the presumptive lead plaintiff, evidence of the plaintiff's high volume day trading — over 5,000 trades, with an average of 19 trades a day, during a nine-month period — rebutted the presumption because the plaintiff "may be subject to a unique defense regarding its reliance upon publicly available information"); *Applestein v. Medivation Inc*, 2010 U.S. Dist. LEXIS 98255, 2010 WL 3749406 (N.D. Cal. 2010) (holding that the presumption

---

[2] In his motion, Alavi claims that he (1) purchased 1,371,548 shares of Digital Generation common stock during the Class Period; (2) retained 232,602 shares of Digital Generation shares at the end of the Class Period; (3) expended $14,328,830 on purchases of Digital Generation shares during the Class Period; and (4) suffered a loss of $575,246 on Digital Generation shares during the Class Period. *See* Mem. in Supp. of Alavi Mot. 6 [11]. Lowinger reports a loss of only $52,025 on Digital Generation shares during the Class Period and does not dispute Alavi's reported larger loss. *See* Seidman, Jr. Decl. Ex. C [9]; Mem. in Further Supp. of Lowinger Mot. at 1 [29].

[3] Based on Alavi's motion for appointment as lead plaintiff, Alavi satisfies the initial determination of typicality. Alavi's claims appear to be typical, if not identical, to other class members and the circumstances surrounding Alavi's claims, as represented in Alavi's motion, seem markedly similar to other class members. Alavi also appears to be able to adequately represent the purported class — Alavi has the ability and incentive to represent the claims of the class vigorously, he has retained adequate counsel, and there is no conflict with Alavi's claims and those asserted on behalf of the class. *See generally Gluck v. CellStar Corp.*, 976 F. Supp. 542, 546 (N.D. Tex. 1997); *In re XM Satellite Radio Holdings*, 237 F.R.D. at 18.

of most adequate plaintiff was rebutted due to the court having "serious concerns about [the plaintiff's] typicality and about his susceptibility to the defense that he was trading in response to information other than the alleged misstatements and omissions made" because of the plaintiff's frequent trading - 407 trades over a 644-day period, with as many as 44 trades in a single day). *But see In re Royal Ahold N.V. Sec. & ERISA Litig.*, 219 F.R.D. 343, 354 (D. Md. 2003) (rejecting the argument that a presumptive lead plaintiff was atypical because of its status as a day trader, reasoning that "where false information and misleading omissions pollute **[*8]** the market, all types of investors are injured" (citing *In re Oxford Health Plans, Inc. Sec. Litig. (Oxford II)*, 199 F.R.D. 119, 124 (S.D.N.Y. 2001))).

Alavi's transaction history indicates that he engaged in over 800 trades of Digital Generation stock during a 266-day window within the Class Period, making as many as 55 transactions in a single day. *See* Mem. in Supp. of Alavi Mot. Ex. B [11]. Alavi argues that such activity is not evidence that Alavi is a day trader because "[i]t is not always possible to trade entire blocks of shares either on a purchase or sale, and thus shares must be broken into smaller amounts of otherwise layered over several days." Mem. in Further Supp. of Alavi Mot. 5 [28]. The presumptive lead plaintiffs made similar arguments in *Eichenholtz* and *Applestein*, but the courts in each case ultimately concluded that the presumption of most adequate plaintiff had been rebutted. *See Eichenholtz*, 2008 U.S. Dist. LEXIS 64633, 2008 WL 3925289, at \*10-11; *Applestein*, 2010 U.S. Dist. LEXIS 98255, 2010 WL 3749406, at \*3. It is not necessary for this Court to label Alavi a day trader to find that the presumption of most adequate plaintiff has been rebutted. It is enough that Alavi's high volume trading activity, including buying and selling Digital Generation stock on the same day, raises serious concerns about his typicality and his susceptibility to unique defenses. Thus, Lowinger successfully **[*9]** rebuts the presumption that Alavi is the most adequate plaintiff.

### B. Lowinger, as the Plaintiff with the Next Largest Financial Interest in the Litigation, is the Most Adequate Plaintiff

The Court finds that Lowinger timely moved for appointment as lead plaintiff, Lowinger has the next

largest financial interest in the litigation,[4] and Lowinger has made a prima facie showing of typicality and adequacy.[5] Thus, as the presumption in favor of Alavi has been rebutted, Lowinger meets the requirements to trigger the presumption in his favor. Because there is no challenge to the presumption that Lowinger is the most adequate plaintiff, the presumption stands and the Court appoints Lowinger as lead plaintiff.

## IV. APPOINTMENT OF COUNSEL

The PSLRA states that the lead plaintiff "shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). "Giving the Lead Plaintiff primary control for the selection of counsel was a critical part of Congress' effort to transfer control of securities class actions from lawyers to investors." Gluck, 976 F. Supp. at 550; see also Cohen v. U.S. Dist. Court for N. Dist. of Cal., 586 F.3d 703, 712 (9th Cir. 2009) ("[L]ike the Third Circuit, we hold that if the lead plaintiff has made a reasonable choice of counsel, the district **[*10]** court should generally defer to that choice."). But, "the Court has discretion to decline to appoint the candidate proposed by lead plaintiff when warranted to protect the interests of the class." City of Monroe Employees' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc., 269 F.R.D. 291, 297 (S.D.N.Y. 2010).

The lead counsel proposed by Lowinger is the law firm Bernstein Liebhard LLP ("Bernstein Liebhard"). The Court can discern no reason to upset Lowinger's selection for lead counsel.

---

[4] As previously mentioned, Lowinger reports a loss of $52,025 on Digital Generation shares during the Class Period. See Seidman, Jr. Decl. Ex. C [9]. No other plaintiff besides Alavi has reported a larger loss to the Court.

[5] The initial typicality and adequacy analysis for Lowinger does not differ from Alavi's: Lowinger satisfies the typicality requirement — Lowinger's claims appear to be typical, if not identical, to other class members and the circumstances surrounding Lowinger's claims seem markedly similar to other class members. Lowinger also is able to adequately represent the purported class — Lowinger has the ability and incentive to represent the claims of the class vigorously, he has retained adequate counsel, and there is no conflict with Lowinger's claims and those asserted on behalf of the class. See generally Gluck, 976 F. Supp. at 546; In re XM Satellite Radio Holdings, 237 F.R.D. at 18.

Lowinger's proposed liaison counsel causes more concern. In complex litigation cases, liaison counsel are

> [c]harged with essentially administrative matters, such as communications between the court and other counsel (including receiving and distributing notices, orders, motions, and briefs on behalf of the group), convening meetings of counsel, advising parties of developments, and otherwise assisting in the coordination of activities and positions. Such counsel may act for the group in managing document depositories and in resolving scheduling conflicts. *Liaison counsel will usually have offices in the same locality as the court.* The court may appoint (or the parties may select) a liaison for each side, and if their functions are strictly limited to administrative matters, they need not be attorneys.

MANUAL FOR **[*11]** COMPLEX LITIGATION ("MCL" ) § 10.221 (4th ed. 2004) (emphasis added). The proposed liaison counsel, The Bilek Law Firm, L.L.P. ("Bilek Law"), does not have an office in Dallas or even in the Northern District of Texas. The administrative acts described in the MCL are typically best accomplished by a local firm. As such, the Court instructs Bernstein Liebhard to recommend a law firm with an office in the Dallas Division of the Northern District of Texas to be appointed as liaison council to perform the type of duties as outlined above by the MCL. Bernstein Liebhard must also submit, along with such recommendation, a proposed fee agreement with the recommended liaison counsel (which may be filed under seal).

If Lowinger or Bernstein Liebhard wish for Bilek Law to do substantive work on this case, the Court will certainly consider appointing Bilek Law as co-lead counsel. For such consideration to take place, Berstein Liebhard should submit a proposal on compensation (which may be filed under seal) and the division of labor to the Court. But both law firms are put on notice that this Court will not approve an award of fees for duplicative services or unnecessary billing. See Oxford I, 182 F.R.D. at 50 (appointing co-lead **[*12]** counsel "with the understanding that there shall be no duplication of attorney's services and that the use of co-lead counsel will not in any way increase attorney's fees and expenses"); In re Crayfish Co. Sec. Litig., 2002 U.S. Dist. LEXIS 10134, 2002 WL 1268013 (S.D.N.Y. 2002) ("Since the statute limits attorneys' fees and expenses to 'a reasonable percentage of the amount of any damages and pre-judgment interest actually paid to the class,' this Court shall not approve of any award of fees where it appears that the firms engaged in duplicative or

unnecessary billing." (quoting 15 U.S.C. § 77z-1(a)(B)(vi)(6))).

Lastly, Bernstein Liebhard is directed to confer with counsel for defendants and submit an agreed proposed scheduling order. If the parties cannot reach an agreement, then each side must submit its separate proposals.

## CONCLUSION

For the reasons stated above, the Court grants Robert M. Lowinger's motion for appointment as lead plaintiff and denies Ali Alavi's motion for appointment as lead plaintiff. Bernstein Liebhard LLP is appointed lead counsel.

The Court orders Bernstein Liebhard to submit within thirty days of the date of this Order: (1) an agreed proposed scheduling order (or, if no agreement can be reached, separate proposals), and (2) a recommendation for liaison counsel with an office in **[*13]** the Dallas Division of the Northern District of Texas and a proposed fee agreement. Additionally — also due within the same thirty days — the Court will consider, if desired, (3) a proposal from Bernstein Liebhard regarding Bilek Law Firm, L.L.P.'s doing substantive work in this case as co-lead counsel.

Signed September 19, 2013.

/s/ David C. Godbey

David C. Godbey

United States District Judge

---

**End of Document**

APP 67

◆ Last updated  September 16, 2024   03:09:55 pm GMT

# Town of Davie Police Pension Plan v. Pier 1 Imps., Inc.

United States District Court for the Northern District of Texas, Dallas Division

April 25, 2016, Decided; April 25, 2016, Filed

Civil Action No. 3:15-CV-3415-D

**Reporter**
2016 U.S. Dist. LEXIS 54627 *

TOWN OF DAVIE POLICE PENSION PLAN, individually and on behalf of all others similarly situated, Plaintiff, VS. PIER 1 IMPORTS, INC., et al., Defendants.

**Subsequent History:** Dismissed by, Without prejudice Town of Davie Police Pension Plan v. Pier 1 Imps., Inc., 273 F. Supp. 3d 650, 2017 U.S. Dist. LEXIS 127371 (N.D. Tex., Aug. 10, 2017)

Dismissed by Town of Davie Police Pension Plan v. Pier 1 Imps., Inc., 325 F. Supp. 3d 728, 2018 U.S. Dist. LEXIS 105892 (N.D. Tex., June 25, 2018)

Related proceeding at Police & Fire Ret. Sys. v. Plains All Am. Pipeline, L.P., 777 Fed. Appx. 726, 2019 U.S. App. LEXIS 21244 (5th Cir. Tex., July 16, 2019)

Related proceeding at Iron Workers Ben. & Pension Fund @ Iron Workers Dist. Council Philadelphia & Vicinity v. Anadarko Petroleum Corp., 2019 U.S. App. LEXIS 37306 (5th Cir., Dec. 16, 2019)

## Core Terms

class period, lead plaintiff, financial interest, largest, shares, appointment, allegations, lead counsel, frivolous, shorter, courts, common stock, longest, noticed, posits

**Counsel:  [*1]** For Town of Davie Police Pension Plan, individually and on behalf of all others similarly situated, Plaintiff: James M McCown, LEAD ATTORNEY, Nesbitt Vassar & McCown LLP, Addison, TX; Avi Josefson, Gerald H Silk, Michael D Blatchley, Bernstein Litowitz Berger & Grossman LLP, New York, NY; David Folsom, David T Moran, Jackson Walker LLP, Dallas, TX.

For Pier 1 Imports Inc, Alexander W. Smith, Charles H. Turner, Defendants: Stephen B Crain, LEAD ATTORNEY, Bracewell & Giuliani, Houston, TX; Joseph M Cox, Bracewell & Giuliani LLP, Dallas, TX.

For Kathleen D. Kenney, Movant: William B Federman, LEAD ATTORNEY, Federman & Sherwood, Oklahoma City, OK.

For James Greenshields, Janis su, Movants: William B Federman, Federman & Sherwood, Oklahoma City, OK.

For Alaska Electrical Pension Fund, Movant: Joe Kendall, LEAD ATTORNEY, Kendall Law Group LLP, Dallas, TX; Danielle S Myers, PRO HAC VICE, Robbins Geller Rudman & Dowd LLP, San Diego, CA.

For Employees' Retirement System of the Puerto Rico Electric Power Authority, Interested Party: W Kelly Puls, LEAD ATTORNEY, Mark A Haney, Puls Haney PLLC, Fort Worth, TX; Atara Hirsch, Jeffrey S Abraham, Mitchell MZ Twersky, Philip T Taylor, Abraham Fruchter & Twersky **[*2]**  LLP, New York, NY.

For Municipal Employees' Retirement System of Michigan, Interested Party: James M McCown, LEAD ATTORNEY, Nesbitt Vassar & McCown LLP, Addison, TX; Avi Josefson, Gerald H Silk, Michael D Blatchley, Bernstein Litowitz Berger & Grossman LLP, New York, NY; Charles L Babcock, David Folsom, David T Moran, Jackson Walker LLP, Dallas, TX.

**Judges:** SIDNEY A. FITZWATER, UNITED STATES DISTRICT JUDGE.

**Opinion by:** SIDNEY A. FITZWATER

# Opinion

MEMORANDUM OPINION AND ORDER

In this putative class action alleging securities fraud, two plaintiffs[1] move for appointment as lead plaintiff under

———————————————

[1] A third plaintiff—Employees' Retirement System of the

the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, and for approval of its selection of lead counsel.[2] For the reasons that follow, the court grants the motion of plaintiff Municipal Employees' Retirement System of Michigan ("Michigan") and denies the motion of plaintiff Alaska Electrical Pension Fund ("Alaska").

I

Plaintiffs sue Pier 1 Imports, Inc. ("Pier 1") and two of its executives for securities fraud under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. The instant putative class action—*Town of Davie Police Pension Plan v. Pier 1 Imports, Inc. et al.*, No. 3:15-CV-3415-D (N.D. Tex. filed Oct. 21, 2015) ("*Town of Davie*")—is the remaining case of two lawsuits. The other case—*Kenney v. Pier 1 Imports, Inc. et al.*, No. 3:15-CV-2798-D (N.D. Tex. filed Aug. 28, 2015)—was dismissed on the plaintiff's notice of dismissal.[3] Michigan and Alaska move to be designated lead plaintiff and for approval of their choice of lead counsel.[4] The court has heard oral argument.

II

Under the PSLRA, the court must "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members[.]" 15 U.S.C. § 78u—4(a)(3)(B)(I). The court must presume

that the most adequate plaintiff in any private action

_____

Puerto Rico Electric Power Authority ("PREPA")—essentially conceded in its response that it did not qualify for appointment as lead plaintiff, and it did not appear at oral argument. Accordingly, the court denies PREPA's October 26, 2015 motion for appointment **[*3]** of lead plaintiff and for approval of selection of lead counsel.

[2] The parties also move to consolidate this case with another suit. Because that suit has been dismissed on the plaintiff's notice of dismissal, the court denies the request as moot.

[3] The court for reference will use the relevant case name when referring to the filings in these actions.

[4] Plaintiffs Kathleen D. Kenney, James Greenshields, and Janis Su also moved for appointment of lead plaintiff, approval of lead **[*4]** counsel, and consolidation of related actions, but they later filed a notice of non-opposition to competing motions for similar relief. Consequently, the court terminated their motion.

arising under this chapter is the person or group of persons that—

(aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(I);
(bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

(cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

*Id.* § 78u—4(a)(3)(B)(iii)(I).

It is undisputed that Michigan and Alaska timely moved for appointment,[5] and that they satisfy the typicality and adequate representation requirements of Fed. R. Civ. P. 23(a). The only disputed issue—and thus the dispositive question—is whether Michigan or Alaska has the largest financial interest in the relief sought by the class.

III

Michigan and Alaska disagree on which class period the court should use in determining the party with the

_____

[5] Under the PSLRA, within 20 days of filing the complaint, **[*5]** the plaintiff

shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class—

(I) of the pendency of the action, the claims asserted therein, and the purported class period; and

(II) that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class.

15 U.S.C. § 78u—4(a)(3)(A)(I). "If more than one action on behalf of a class asserting substantially the same claim or claims arising under this chapter is filed, only the plaintiff or plaintiffs in the first filed action shall be required to cause notice to be published in accordance with clause (I)." *Id.* at § 78u—4(a)(3)(A)(ii).

*Kenney* was filed on August 28, 2015, and, on that same day, notice of the pendency of *Kenney* was published on *Business Wire*. On October 21, 2015 *Town of Davie* was filed, expanding the class period through September 24, 2015, and, on that same day, notice of pendency of *Town of Davie* was published on *PRNewswire*. All class members seeking appointment as lead plaintiff filed motions on October 26, 2015. Michigan and Alaska therefore both **[*6]** satisfy the first requirement of the PSLRA.

**APP 69**

largest financial interest.[6]

A

"[N]umerous courts have favored using the longest-noticed class period" for purposes of selecting a lead plaintiff. *In re BP, PLC Sec. Litig.*, 758 F.Supp.2d 428, 433-34 (S.D. Tex. 2010) (citing cases). This is because the longest, most inclusive class period encompasses more potential class members and increases potential damages. *See, e.g., Hom v. Vale, S.A.*, 2016 U.S. Dist. LEXIS 28863, 2016 WL 880201, at *4 (S.D.N.Y. Mar. 7, 2016) ("[T]he Court finds that the use of the longer, more inclusive class period is proper . . . because the longer class period encompasses more potential class members and damages."); *In re Doral Fin. Corp. Sec. Litig.*, 414 F.Supp.2d 398, 402-03 (S.D.N.Y. 2006) (same). Courts often disfavor making determinations regarding the merits of competing class periods at this early stage in litigation without the benefit of adversarial briefing. *See, e.g., In re BP*, 758 F.Supp.2d at 434 (quoting *Miller v. Dyadic Int'l, Inc.*, 2008 U.S. Dist. LEXIS 32271, 2008 WL 2465286, at *4 (S.D. Fla. Apr. 18, 2008)) ("The Court agrees with the district courts cited above who have found it generally inappropriate to narrow the class period at this stage of the litigation. 'Narrowing the class period is more appropriate at a later stage of litigation, with participation from **[*7]** the Defendant[s].'"); *Plumbers & Pipefitters Local 562 Pension Fund v. MGIC Inv. Corp.*, 256 F.R.D. 620, 624-25 (E.D. Wis. 2009) (explaining that it makes sense to define "class" as the broadest, most inclusive potential class "because at the outset of a case the court should view the facts in the light most favorable to the plaintiffs and should narrow the allegations only after the parties have had the opportunity to develop the record"); *Eichenholtz v. Verifone Holdings, Inc.*, 2008 U.S. Dist. LEXIS 64633, 2008 WL 3925289, at *2 (N.D. Cal. Aug. 22, 2008) ("[I]t would be premature for the court to use a class period that disregards damages potentially suffered due to [defendant's] alleged misrepresentation."); *Grand Lodge of Pa. v. Peters*, 2007 U.S. Dist. LEXIS 48191, 2007 WL 1812641, at *2 (M.D. Fla. June 22, 2007) ("[Lead plaintiff movant] asks this Court to delve into the merits of the claims and to define the class period at this early stage of the proceedings before a class has been certified or those issues have been fully briefed. This it cannot do.").

Courts often do not blindly accept the longest class

period, however, without further inquiry, because of the risk that "potential lead plaintiffs would be encouraged to manipulate the class period so they had the largest financial interest." *In re BP*, 758 F.Supp.2d at 434 (citing *MGIC*, 256 F.R.D. at 625). "[A]lthough courts avoid fully considering the merits of the claims at this stage, . . . they have disagreed about the appropriate level of scrutiny to apply to the longest noticed class period." Id. (citation omitted). Alaska **[*8]** and Michigan appear to follow the standard set out in *In re BP* and *MGIC*, where the courts "use[d] the longest noticed class period unless the factual allegations supporting that period [were] 'obviously frivolous.'" *Id.* (quoting *MGIC*, 256 F.R.D. at 625); *see also MGIC*, 256 F.R.D. at 625 ("I find that an adequate safeguard against abuse is to simply review the complaint and briefs to make sure that the allegations supporting the longer class period are not obviously frivolous."). Another court, however, has applied a plausibility standard identical to the one used in evaluating a motion to dismiss. *See In re Centerline Holding Co. Sec. Litig.*, 2008 U.S. Dist. LEXIS 36406, 2008 WL 1959799, at *3 (S.D.N.Y. May 5, 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). The court need not decide, however, the appropriate level of scrutiny to apply in this case to the longest noticed class period because the court reaches the same result under either standard.

B

1

Michigan maintains that the court should follow the longer class period—December 19, 2013 through September 24, 2015—alleged in *Town of Davie*. Alaska posits that the court should follow the shorter class period—December 19, 2013 through February 10, 2015—alleged in *Kenney* . Alternatively, Alaska asserts that, if the court follows the longer class period in *Town of Davie*, it should find that Michigan manipulated the class period so that **[*9]** it had the largest financial interest, and should disqualify Michigan from consideration for selection as lead plaintiff.

The parties agree that, under the longer class period, Michigan has the largest financial interest in the relief sought: Michigan purchased 367,600 shares of Pier 1 common stock and allegedly suffered $2.3 million in losses. Alaska purchased 70,406 shares of Pier 1 common stock and allegedly incurred $425,164 in losses. It also is undisputed that, if Michigan were disqualified from appointment, Alaska would have the largest financial interest of the remaining eligible

---

[6] Michigan and Alaska agree on the total amount of their financial interests within the two potential class periods.

plaintiffs under the longer class period. The parties also agree that, under the shorter class period, Alaska has the largest financial interest in the relief sought: Alaska purchased 55,367 shares of Pier 1 common stock and allegedly suffered $219,103 in losses, while Michigan did not purchase any shares of Pier 1 common stock or suffer any losses.

2

According to the complaint in *Kenney*, Pier 1 announced on December 19, 2013 that its financial condition was improving and, following a disappointing prior quarter, Pier 1 had achieved "solid third quarter financial results." *Kenney* Compl. ¶ 4. Pier 1 further **[*10]** stated that its "1 Pier 1" initiative aimed at combining e-commerce and in-store buying experience had been a "resounding success" and would be "an important growth driver going forward." *Id.* On this news, shares of Pier 1 common stock rose 5%. On February 10, 2015, however, Pier 1 reduced its financial guidance for the fiscal year ending February 28, 2015, attributing the sudden change in outlook to softer than expected sales in January and February 2015 and "unplanned" expenses primarily related to incremental supply chain costs associated with the "1 Pier 1" initiative. And Pier 1 announced that its Chief Financial Officer had retired. On this news, the price of Pier 1 shares fell from $16.97 per share to $12.84, or approximately 25%, on over 36 million shares traded.

The complaint in *Town of Davie* alleges that, on September 24, 2015, Pier 1 significantly reduced its earnings guidance for fiscal 2016, which it attributed to margin pressures from increased promotional and clearance activity, as well as inventory-related issues within its distribution center network. Pier 1 also announced results for the fiscal second quarter that ended August 20, 2015 that were lower than investors **[*11]** had been led to expect, and, despite assurances that inventory levels would normalize, Pier 1's inventories spiked to $533 million, up 11% since the February 2015 disclosures. As a result, and contrary to Pier 1's prior statements, Pier 1 was forced to offer steeper discounts and sales promotions, which caused the company's margins to contract. On this news, the price of Pier 1 shares fell from $8.67 per share to $7.61, or 12.2%.

3

Alaska avers that Michigan manipulated the class period so that it had the largest financial interest. Alaska asserts that Michigan first purchased shares on March

20, 2015, and thus Michigan did not purchase any shares until after the shorter class period alleged in *Kenney* had closed. As a result, Michigan was not a class member and not eligible for appointment as lead plaintiff. To overcome this hurdle, Alaska maintains that, six days before the lead plaintiff motion deadline expired, Michigan's counsel filed the complaint in *Town of Davie* solely to allow Michigan to assert a loss by extending the class period to encompass Michigan's purchases in March and April. Alaska argues that, because of this, the court should either (1) use the shorter class period, **[*12]** and appoint Alaska as lead plaintiff because it suffered the largest loss, or (2) use the longer class period, disqualify Michigan from consideration, and name Alaska lead plaintiff because it suffered the largest loss among the remaining eligible candidates.

Michigan contends, however, that the longer class period asserted in *Town of Davie* should be used because it is not "obviously frivolous." Michigan maintains that the complaint in *Town of Davie* was filed to allege new and important facts regarding Pier 1's misrepresentations that occurred after the *Kenney* lawsuit was filed. Michigan also posits that, when Pier 1 finally made these facts public, it corrected its prior misrepresentations regarding its inventory levels and margins, causing the price of the company's stock to drop by approximately 12%, which led to further damages to the class.

4

The court finds that the facts alleged in support of the longer class period in *Town of Davie* are not frivolous and are plausible. Alaska only contends that the filing of the complaint in *Town of Davie* was tactical. It does not posit that the facts giving rise to the longer class period are frivolous, and it does not offer any reason to disregard **[*13]** these allegations. In fact, Alaska's counsel acknowledged at oral argument that these allegations are plausible. And, in Alaska's motion, it uses its financial interest in the longer class period to argue that it has the largest financial interest in the relief sought. It is therefore reasonable to infer that Alaska not only believes the allegations supporting the longer class period are plausible, they are meritorious.

Critically, the longer class period benefits all plaintiffs because their financial interests are significantly larger in the longer class period than in the shorter class period. For example, Alaska's financial interest nearly doubles in the longer class period as compared to its

financial interest in the shorter class period.[7] Additionally, plaintiff Employees' Retirement System of the Puerto Rico Electric Power Authority ("PREPA"), who also moved for appointment as lead counsel, *see supra* note 1, followed the longer class period in *Town of Davie*, and recognized in its response that "[Michigan] appears to have the largest financial interest" in the action. PREPA Resp. at 2. The court therefore concludes that the allegations supporting the longer class period in *Town [\*14] of Davie* are not obviously frivolous and survive the plausibility standard. Accordingly, Michigan has demonstrated that it is entitled to the presumption that it is the most adequate plaintiff.

IV

To rebut the presumption that Michigan is the most adequate plaintiff, Alaska must offer "proof" that Michigan "will not fairly and adequately protect the interests of the class; or . . . is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u—4(a)(3)(B)(iii)(II). The court has already discussed and dismissed Alaska's challenge that Michigan's counsel tactically filed the complaint in *Town of Davie* the week before the lead plaintiff deadline to manipulate the lead plaintiff determination.

Alaska also contends that Michigan could be subject to unique defenses concerning its standing. Alaska posits that the defendants will attempt to trim the case to end in February 2015, and Michigan [\*15] will be forced to divert its attention away from advancing the class's interests in order to defend itself at the class's expense. Alaska posits that, if defendants prevail, Michigan will lack standing to represent the putative class because it purchased no shares before March 2015, and it will be necessary for the court to reopen the lead plaintiff appointment process.

"There is, of course, a marked difference between affirmatively demonstrating that [Michigan] is not an adequate representative or is subject to unique defenses and simply claiming that [Michigan] *might* be subject to such arguments in the future." *Gluck v. CellStar Corp.*, 976 F. Supp. 542, 547 (N.D. Tex. 1997)

(Buchmeyer, C.J.) (emphasis in original). Alaska has used the latter approach, merely alleging that the defendants might later challenge Michigan's standing. "Such speculative assertions are insufficient to rebut the presumption that [Michigan] is the most adequate plaintiff." Id*.; see also Glauser v. EVCI Career Colls. Holding Corp.*, 236 F.R.D. 184, 189 (S.D.N.Y. 2006) (citing cases) (rejecting "speculative and hypothetical argument that [lead plaintiff] *might* be subject to a later attack by Defendants") (emphasis in original). "The statute requires [Alaska] to present 'proof' of its assertions[.]" *Gluck*, 976 F. Supp. at 547-48 (citing 15 U.S.C. § 78u—4(a)(3)(B)(iii)(II)). And Alaska fails to offer any proof that [\*16] Michigan lacks standing or likely will be subject to such a challenge. As discussed above, Alaska does not attempt to challenge the facts alleged in support of the longer class period in *Town of Davie*, and Alaska appears to acknowledge that the facts alleged in support of the longer class period are meritorious. Accordingly, Alaska has failed to rebut the presumption that Michigan is the most adequate plaintiff.

\* \* \*

For the reasons explained, the court grants Michigan's October 26, 2015 motion for appointment as lead plaintiff and for approval of lead plaintiff's selection of lead counsel. The court designates Michigan as lead plaintiff and approves Bernstein Litowitz Berger & Grossmann LLP as lead counsel. The court denies Alaska's October 26, 2015 motion for appointment as lead plaintiff and for approval of selection of lead counsel.

**SO ORDERED**.

April 25, 2016.

/s/ Sidney A. Fitzwater

SIDNEY A. FITZWATER

UNITED STATES DISTRICT JUDGE

---

**End of Document**

---

[7] During the shorter class period in *Kenney*, Alaska purchased 55,367 shares of Pier 1 common stock and allegedly suffered $219,103 in losses, and, during the longer class period in *Town of Davie*, Alaska purchased 70,406 shares of Pier 1 common stock and allegedly suffered $425,164 in losses.

Ⓐ Last updated  September 16, 2024   03:08:47 pm GMT

# Bayati v. GWG Holdings, Inc.

United States District Court for the Northern District of Texas, Dallas Division

September 12, 2023, Decided; September 12, 2023, Filed

CIVIL ACTION NO. 3:22-CV-0410-B

**Reporter**
2023 U.S. Dist. LEXIS 161080 *; 2023 WL 5925880

SHIRIN BAYATI and MOJAN KAMALVAND, individually and on behalf of all others similarly situated, Plaintiffs, v. GWG HOLDINGS, INC.; ROY W. BAILEY; DAVID F. CHAVENSON; DAVID H. DE WEESE; MURRAY T. HOLLAND, and TIMOTHY L. EVANS, Defendants.

## Core Terms

consolidation, cases, mediation, lead plaintiff, Bonds, parties

**Counsel:  [*1]** For Shirin Bayati, Mojan Kamalvand, on behalf of themselves and a proposed class of all others similarly situated, Plaintiffs: Daniel C Girard, LEAD ATTORNEY, PRO HAC VICE, Girard Gibbs LLP, San Francisco, CA; Paul Downing Malmfeldt, LEAD ATTORNEY, PRO HAC VICE, Malmfeldt Law Group PC, Chicago, IL; Spencer Morgan Lee Cox, LEAD ATTORNEY, Warren T Burns, Burns Charest LLP, Dallas, TX; Adam E Polk, PRO HAC VICE, Girard Sharp LLP, San Francisco, CA; Jordan Elias, PRO HAC VICE, Girard Sharp LLP, San Fransisco, CA; Scott Lance Silver, PRO HAC VICE, Silver Law Group, Coral Springs, FL; Sean Greene, PRO HAC VICE, Girard Sharp LLP, El Segundo, CA.

For Thomas Horton, Lead Plaintiff, Frank nmi Moore, Lead Plainitiff, Plaintiffs: Daniel C Girard, LEAD ATTORNEY, PRO HAC VICE, Girard Gibbs LLP, San Francisco, CA; Paul Downing Malmfeldt, LEAD ATTORNEY, PRO HAC VICE, Malmfeldt Law Group PC, Chicago, IL; Scott Lance Silver, PRO HAC VICE, Silver Law Group, Coral Springs, FL.

For Frank Moore, Thomas Horton, Consol Plaintiffs: Spencer Morgan Lee Cox, LEAD ATTORNEY, Warren T Burns, Burns Charest LLP, Dallas, TX; Adam E Polk, Girard Sharp LLP, San Francisco, CA; Daniel C Girard, Girard Gibbs LLP, San Francisco, **[*2]**  CA; Jordan Elias, Girard Sharp LLP, San Fransisco, CA; Paul Downing Malmfeldt, Malmfeldt Law Group PC, Chicago, IL; Sean Greene, Girard Sharp LLP, El Segundo, CA.

For Brad K Heppner, Peter T Cangany, Jr, Thomas O Hicks, Dennis P Lockhart, Defendants: Michael W Stockham, Holland & Knight LLP, Dallas, TX.

For Roy W Bailey, Defendant: Steven H Stodghill, LEAD ATTORNEY, Winston & Strawn LLP, United Sta, Dallas, TX; John CC Sanders, Jr, Winston & Strawn LLP, Dallas, TX.

For David F Chavenson, Defendant: Timothy S Durst, LEAD ATTORNEY, Kristin Alvarado, O'Melveny & Myers LLP, Dallas, TX; Amy S Park, PRO HAC VICE, O'Melveny & Myers LLP, Menlo Park, CA.

For David H De Weese, Defendant: Timothy S Durst, LEAD ATTORNEY, Kristin Alvarado, O'Melveny & Myers LLP, Dallas, TX; Amy S Park, PRO HAC VICE, O'Melveny & Myers LLP, Menlo Park, CA; Michael W Stockham, Holland & Knight LLP, Dallas, TX.

For Timothy L Evans, Defendant: William Royal Furgeson, LEAD ATTORNEY, Furgeson Malouf Law PLLC, Dallas, TX.

**Judges:** JANE J. BOYLE, UNITED STATES DISTRICT JUDGE.

**Opinion by:** JANE J. BOYLE

## Opinion

### MEMORANDUM OPINION AND ORDER

Before the Court is Lead Plaintiffs Thomas Horton and Frank Moore (the "Lead Plaintiffs")'s Unopposed Motion to Consolidate **[*3]**  Cases (Doc. 55). Lead Plaintiffs ask the Court to lift the bankruptcy stay and consolidate this case, *Bayati v. GWG Holdings*, No. 3:22-CV-0410-B, (N.D. Tex. filed Feb. 18, 2022) (Boyle, J.) with another case now pending before the Court, *Horton v. Heppner*, No. 3:23-CV-1230-X, (N.D. Tex. filed Aug. 18, 2023)

**APP 73**

(Starr, J.). Doc. 55, Mot. Consolidate, 1. Lead Plaintiffs also request the Court issue a proposed consolidation order and appoint a mediator. *Id.* at 1-2. The Court **GRANTS in part** and **DENIES in part** the Motion (Doc. 55). The bankruptcy stay is **LIFTED**, and the Court **GRANTS** the request to consolidate the *Bayati* and *Horton* actions. The Court also accepts, in substantial part, the proposed consolidation order, but mediation shall be mandatory for all parties. The Court will therefore enter subsequent consolidation and mediation orders following this Order.

I.

BACKGROUND[1]

This is a putative securities class action. In February 2022, Plaintiffs Shirin Bayati and Mojan Kamalvand filed suit against GWG Holdings, Inc. ("GWGH") and several of its officers and directors (collectively, the "Defendants"). Doc. 1, Compl., ¶¶ 17-28. Bayati and Shirin alleged, individually and on behalf of other similarly situated investors, that Defendants' sale of bonds during 2020 and 2021 violated various provisions of the Securities Act. *See generally* Doc. 1, Compl.

Until **[*4]**   2018, GWGH's primary business was purchasing life insurance policies in the secondary market at a discount to the ultimate death benefit. *See id.* ¶ 35. GWGH primarily funded these purchases through the sale of bonds it marketed as "L Bonds." *Id.* ¶ 36. Beginning in 2018, however, GWGH started to shift its business away from purchasing life insurance policies and towards investing in a specific entity: the Beneficient Company Group L.P. ("Ben LP"). GWGH's stated aim was to build a business that would provide "mid-to-high net worth individuals trust services and related liquidity products and loans for alternative assets and illiquid funds." *Id.* ¶ 38.

Relevant here, in mid-2020, GWGH filed a Registration Statement for an L Bond offering with the Securities and Exchange Commission ("SEC"). *Id.* ¶ 66. The SEC declared the Registration Statement effective on June 3, 2020 (the "June 2020 Registration Statement"). *Id.* Between August 2020 and April 2021, GWGH issued over $350 million in L Bonds. *Id.* ¶ 69. Ultimately, however, GWGH revealed in February 2022 "that it was

---

[1] The Court draws on the facts as alleged in the Complaint (Doc. 1).

unable to continue making payments on the L Bonds." *Id.* ¶ 10. The L Bonds lost significant value. *See id.*

Plaintiffs Bayati and **[*5]**  Shirin each owned L Bonds issued pursuant to the June 2022 Registration Statement. *See id.* ¶¶ 15-16. They filed a class action in February 2022, alleging that Defendants made material misrepresentations and omissions in the June 2020 Registration Statement in violation of sections 11, 12 and 15 of the Securities Act. *Id.* ¶¶ 79, 85-106. More specifically, Bayati and Shirin allege Defendants misrepresented how GWGH intended to use the bond proceeds and how GWGH had previously used bond proceeds in 2019. *See, e.g.*, *id.* ¶¶ 5-6, 49-50, 54, 70. The reality, according to Bayati and Shirin, was that instead of growing GWGH's liquidity products for alternative assets, GWGH was diverting the bond proceeds to pay Ben LP's debts and improperly enrich Ben LP and its related entities and owners. *See id.* Bayati and Shirin also allege that the June 2020 Registration Statement incorporated financial statements and reports containing misrepresentations and omissions that helped obfuscate these realities in the L Bond offering. *See id.* ¶¶ 49, 73.

In April 2022, two months after Bayati and Shirin filed suit, GWGH filed for Chapter 11 bankruptcy. *See* Doc. 34, Suggestion of Bankruptcy. The Court entered an automatic stay and stayed **[*6]**  all claims against both GWGH and the non-debtor defendants, subject to a few exceptions. *See* Doc. 42, Order, 3. One of those exceptions was adjudicating Horton and Moore's motion to be lead plaintiffs in the action, *id.*, which the Court granted in August 2022, Doc. 51, Order Appointing Lead Plaintiff. Also during the stay, several non-debtor defendants were voluntarily dismissed "to facilitate Ben LP's attempt to implement its new business plan." Doc. 56, Mot. Consolidate Br., 4; *see also* Doc. 40, Notice of Dismissal. But, to preserve the claims against those non-debtor defendants, the Lead Plaintiffs filed a separate, parallel action in August 2023. *See Horton v. Heppner*, No. 3:23-CV-1230-X, (N.D. Tex. filed Aug. 18, 2023) (Starr, J.); *see also* Doc. 56, Mot. Consolidate Br., 4-5.

Since then, the Chapter 11 bankruptcy plan for GWGH has gone into effect, and the bankruptcy stay has therefore expired. *See* Order Chapter 11 Plan at 37, 84, *In re GWG Holdings, Inc.*, Ch. 11 Case No. 22-90032 (S.D. Tex. June 20, 2023), Doc. 1952; Notice of Effective Date, *In re GWG Holdings, Inc.*, Ch. 11 Case No. 22-90032 (S.D. Tex. Aug. 1, 2023), Doc. 2079. With both the *Bayati* and *Horton* actions pending, the Lead

Plaintiffs now seek to consolidate the cases. Doc. 55, Mot. Consolidate.

**II.**

**LEGAL STANDARD**

Consolidation of cases is appropriate "when the cases involve common questions of law and fact, and . . . [consolidation] would avoid unnecessary costs or delay." *St. Bernard Gen. Hosp., Inc. v. Hosp. Serv. Ass'n of New Orleans, Inc.*, 712 F.2d 978, 989 (5th Cir. 1983) (citing, **[*7]** *inter alia*, Fed. R. Civ. P. 42). However, "[c]onsolidation is improper if it would prejudice the rights of the parties." *Id.* Under Rule 42(a), "the court may: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay." Fed. R. Civ. P. 42(a). "District courts enjoy substantial discretion in deciding whether and to what extent to consolidate cases." *Hall v. Hall*, 584 U.S. 59, 138 S. Ct. 1118, 1131, 200 L. Ed. 2d 399 (2018).

When weighing whether to consolidate actions, a court considers factors such as:

> (1) whether the actions are pending before the same court; (2) whether the actions involve a common party; (3) any risk of prejudice or confusion from consolidation; (4) the risk of inconsistent adjudications of common factual or legal questions if the matters are tried separately; (5) whether consolidation will reduce the time and cost of trying the cases separately; and (6) whether the cases are at the same stage of preparation for trial.

*RTIC Drinkware, LLC v. YETI Coolers, LLC*, 2017 U.S. Dist. LEXIS 222938, 2017 WL 5244173, at *2 (W.D. Tex. Jan. 18, 2017).

**III.**

**ANALYSIS**

Unsurprisingly, given their shared procedural history, all the factors outlined above favor the consolidation of the *Bayati* and *Horton* actions. Both cases are now pending before this Court. And the cases make nearly identical legal claims based on the same **[*8]** set of facts. That

is, both actions allege violations of sections 11, 12, and 15 of the Securities Act based on the June 2020 Registration Statement. *Compare* Doc. 1, Compl., ¶¶ 85-106, *with* Complaint ¶¶ 153-178, *Horton v. Heppner*, No. 3:23-CV-1230 (N.D. Tex. May 26, 2023) (Starr, J.), Doc. 1. More precisely, both cases allege that Defendants (now split) made material misrepresentations in the June 2020 Registration Statement relating to GWGH's intended and prior use of bond proceeds. *Compare, e.g.*, Doc. 1, Compl., ¶¶ 5-6, 49, 54, 70, *with* Complaint ¶¶ 1-20, *Horton v. Heppner*, No. 3:23-CV-1230 (N.D. Tex. May 26, 2023) (Starr, J.), Doc. 1. These actions therefore relate to the same documents, reports, and financial statements. *See, e.g.*, *Weiss v. Friedman, Billings, Ramsey Grp., Inc.*, 2006 U.S. Dist. LEXIS 3028, 2006 WL 197036, at *1 (S.D.N.Y. Jan. 25, 2006) ("[C]onsolidation is particularly appropriate in the context of securities class actions if the complaints are based on the same public statements and reports . . . .") (internal quotations omitted). The actions are also filed on behalf of the same proposed class: investors who purchased L Bonds pursuant to the June 2020 Registration Statement. *Compare* Doc. 1, Compl., ¶¶ 1, 79, *with* Complaint ¶ 135, *Horton v. Heppner*, No. 3:23-CV-1230 (N.D. Tex. May 26, 2023) (Starr, J.).

Consolidation of these actions, which are both in their early stages, would therefore promote judicial efficiency. *See RTIC Drinkware*, 2006 U.S. Dist. LEXIS 3028, 2017 WL 5244173, at *2. And Defendants' consent to the consolidation ameliorates concerns **[*9]** over potential prejudice. *See* Doc. 56, Mot. Consolidate. Accordingly, the Court finds consolidation of the *Bayati* and *Horton* actions appropriate and **GRANTS** the request.

The parties also ask the Court to enter a proposed consolidation order which sets forth various procedures and appoints a mediator. *See generally* Doc. 55-1, Proposed Order. This request is **GRANTED in part** and **DENIED in part**. The Court will require mandatory mediation by all parties instead of the parties' proposed voluntary mediation. *See id.* ¶ 13. The Court will therefore issue more detailed consolidation and mediation orders following this Order.

**IV.**

**CONCLUSION**

In sum, the Court **GRANTS in part** and **DENIES in part**

**APP 75**

the Motion for Consolidation (Doc. 55). The bankruptcy stay previously entered in this case is **LIFTED**, and the Court **GRANTS** the request to consolidate the *Bayati* and *Horton* actions. The Court also accepts, in substantial part, the proposed consolidation order, but mediation shall be mandatory for all parties. The Court will therefore enter subsequent consolidation and mediation orders following this Order.

**SO ORDERED**.

**SIGNED: September 12, 2023**.

/s/ Jane J. Boyle

**JANE J. BOYLE**

**UNITED STATES DISTRICT JUDGE**

---

**End of Document**

**APP 76**

Ⓐ Last updated  September 16, 2024   03:10:51 pm GMT

# Kakkar v. Bellicum Pharms., Inc.

United States District Court for the Southern District of Texas, Houston Division

March 26, 2019, Decided; March 26, 2019, Filed, Entered

CIVIL ACTION NO. 4:18-CV-00338

**Reporter**

2019 U.S. Dist. LEXIS 50704 *; 2019 WL 1367653

KAKKAR, Plaintiff, VS. BELLICUM PHARMACEUTICALS, INC., et al, Defendants.

**Subsequent History:** Dismissed by Kakkar v. Bellicum Pharms., Inc., 2020 U.S. Dist. LEXIS 94918 (S.D. Tex., May 29, 2020)

## Core Terms

Investor, lead plaintiff, appointed, financial interest, largest, losses, adequacy, class action, class member, law firm, unrelated, notice

**Counsel:** **[*1]** For Nipun Kakkar, Plaintiff: Willie C Briscoe, The Briscoe Law Firm, PLLC, Dallas, TX.

For Frances J. Rudy, Consol Plaintiff: Robert J. Robbins, LEAD ATTORNEY, Robbins Gellar Rudman & Dowd LLP, Boca Raton, FL; Jason Anthony Richardson McDowell Hetherington LLP, Houston, TX.

For Bellicum Pharmaceuticals, Inc., Richard A. Fair, Alan A. Musso, Defendants: Gerard G Pecht, LEAD ATTORNEY, Norton Rose Fulbright US LLP, Houston, TX; Peter Andrew Stokes, Norton Rose Fulbright US LLP, Austin, TX.

For Bellicum Investor Group, Movant: William B Federman, LEAD ATTORNEY, Federman Sherwood, Oklahoma City, OK.

For Dong Kang, Movant: Danielle S Myers, Robbins Geller Rudman & Dowd LLP, San Diego, CA; Jason Anthony Richardson McDowell Hetherington LLP, Houston, TX.

For David Kim, Francisco Dos Ramos Alvarado, Robert Kennard, Linda Silberstein, Movants: J. Alexander Hood, PRO HAC VICE, Jeremy A Lieberman, Pomerantz LLP, New York, NY; Patrick V Dahlstrom, Pomerantz Grossman, Chicago, IL.

**Judges:** Honorable Alfred H. Bennett, United States District Judge.

**Opinion by:** Alfred H. Bennett

# Opinion

## ORDER

Before the Court are Plaintiff John Sodec, Jr.'s ("Sodec") Motion for Appointment as Lead Counsel (Doc. #14), Plaintiffs' David Kim ("Kim"), Linda **[*2]** Silberstein ("Silberstein"), Francisco Dos Ramos Alvarado ("Alvarado"), and Robert Kennard ("Kennard") (collectively "Bellicum Investor Group") Motion to for Appointment as Lead Counsel (Doc. #15), and Plaintiff Dong Kang's ("Kang") Motion for Appointment as Lead Counsel (Doc. #17). The Court reviewed all supporting documents related to the various competing Motions (Doc. #16, 20-23). Additionally, the Court heard oral argument on the Plaintiffs' Motions. After reviewing the parties' arguments and applicable legal authority, the Court grants Bellicum Investor Group's Motion.

## I. Background

This is a federal securities class action brought on behalf of investors who purchased publicly traded securities of Bellicum Pharmaceuticals, Inc. ("Defendant") between May 8, 2017 to January 30, 2018 (the "Class Period"). The class is "seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials." Doc. #1 at 1-2. The case *Rudy v. Bellicum Pharmaceuticals, Inc. et al.*, Civ. No. H-18-000795 (S.D. Tex.) **[*3]** ("*Rudy*") was

**APP 77**

consolidated into this case.

## II. Legal Standard

The Private Securities Litigation Reform Act ("PSLRA") sets forth the procedure for choosing a lead plaintiff in securities class actions. 15 U.S.C. § 78u-4(a)(3)(B). After notice has been given to class members and the cases have been consolidated, the Court is to appoint a lead plaintiff "[a]s soon as practicable." *Id.* at § 78u-4(a)(3)(B)(ii).

Section 21D(a)(3)(B) of the amended Exchange Act requires the Court to adopt a rebuttable presumption that the most adequate plaintiff in any private action arising under this chapter is the person or group of persons that:

> (aa) has either filed the complaint or made a motion in response to a notice . . . ;
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

If a presumption is created that a party is the most adequate lead plaintiff, it "may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff' either 1) "will not fairly and adequately protect the interests of the class"; or 2) "is subject to unique defenses that render such plaintiff incapable of adequately representing **[*4]** the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

## III. Analysis

None of the Movants filed either the complaint in this case or the *Rudy* complaint, but each made a timely motion to be appointed as lead plaintiff. *See* 15 U.S.C. § 78u-4(a)(3)(A) ("no later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff"). Notice concerning the pendency of this lawsuit was published on *Globe Newswire* and none of the moving parties challenged the adequacy of the notice. *See* Doc. #14, Ex.2. Because each Movant timely filed their Motion for Appointment as Lead Plaintiff, the Court turns to the two remaining elements of the presumption.

## A. Largest Financial Interest

"The PSLRA does not delineate a procedure for determining the 'largest financial interest' among the proposed class members." *In re Enron Corp. Sec. Litig.,* 206 F.R.D. 427, 440 (S.D. Tex. 2002). However, four factors courts find relevant to the calculation of the largest financial interest are 1) the number of shares purchased; 2) the number of net shares purchased; 3) the total net funds expended by the plaintiffs during the class period; and 4) the approximate losses suffered by the plaintiffs. *Id.* Courts place the greatest emphasis on the fourth factor, financial loss suffered by **[*5]** the plaintiffs. *In re Sequans Commc'ns S.A. Sec. Litig.,* 289 F. Supp. 3d 416, 420 (E.D.N.Y. 2018).

Under these criteria, Bellicum Investor Group has the largest financial interest. Collectively its members suffered $420,806 in losses.[1] Doc. #16, Ex. 2. As to the other Movants, Plaintiff Sodec suffered $57,604.78 in losses and Plaintiff Kang suffered $95,452.17 in losses. Doc. #14, Ex. 4; Doc. #17, Ex. 4. On each measure—losses suffered, total shares, net shares purchased, and net funds expended—Bellicum Investor Group's expenditures or losses is greater than the other two Movants. *Compare* Doc. #16, Ex. 2 *with* Doc. #17, Ex.4 *and* Doc. #14, Ex. 4. Ex. 4. Accordingly, Bellicum Investor Group suffered the largest financial loss and therefore has the largest financial interest in the relief sought by the class.

## B. Rule 23

After determining the largest financial interest, the Court must then ensure that the persons with the largest financial interest "otherwise satisfies the requirement of Rule 23." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc). "In a PSLRA motion to appoint lead plaintiff, the Court considers only whether the proposed plaintiff has made a "preliminary showing" that two of Rule 23's requirements—typicality and adequacy—are satisfied." *In re Sequans,* 289 F. Supp. 3d at 422 (citations omitted).

### i. Typicality

---

[1] Plaintiff Kim suffered $255,820 in losses, Plaintiff Silberstein lost $95,023, Plaintiff Alvarado lost $36,708, and Plaintiff Kennard lost $33,255.

"Typicality is satisfied if the class representatives' **[\*6]** claims or defenses are typical of, but not necessarily identical to, those of the class; class representatives should have the same interests and have suffered the same injuries as others in the class, and the representatives' and class members' claims need only share the same essential characteristics." *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 673 (S.D. Tex. 2006). There is no dispute among the Movants that each of their claims arises out of the same course events—allegedly false and misleading statements concerning the Defendants' product, BPX-501. Each Movant will make similar arguments that Defendants violated various provisions of the Exchange Act. Accordingly, the Court concludes that Bellicum Investor Group, the class members with the largest financial interest, have satisfied their burden to make a preliminary showing of typicality.

### ii Adequacy

The contention between the Movants is concerning the adequacy of Bellicum Investor Group. Specifically, Plaintiff Kang challenges Bellicum Investor Group's ability to adequately represent the class because it is "an uncohesive group" of four people living in four different states and is represented by two law firms. Doc. #21. Bellicum Investor Group argues that the group "is a small, cohesive partnership **[\*7]** of four investors, each of whom incurred significant losses in connection with their purchases of Bellicum securities, and each of whom understands and is prepared to execute the responsibilities of lead plaintiff." Doc. #20 at 2. Plaintiff Sodec does not challenge the adequacy of either of the other Plaintiffs to represent the class.

The standard for determining adequacy requires "an inquiry into 1) the zeal and competence of the representatives' counsel and 2) the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees." *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 130 (5th Cir. 2005) (quoting *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001) (cleaned up). Additionally, the PSLRA "requires that securities class actions be managed by active, able class representatives who are informed and can demonstrate they are directing the litigation." *Id.* (quoting *Berger*, 257 F.3d at 483) (cleaned up).

Bellicum Investor Group is represented by two law firms, Pomerantz LLP and Federman & Sherwood, and each

appears to be qualified and experienced counsel who have litigated numerous class actions. *See* Doc. #16, Ex. 5-6 (noting both firms have represented parties in securities actions in the Southern District of Texas). This appears to be a common **[\*8]** class action based upon alleged violations of the Exchange Act. The Court concludes that counsel would be able to competently represent the class in this litigation. Nothing about their interests appears to be antagonistic to the interests of other class members. Finally, as noted Bellicum Investor Group suffered a significant loss and thus has a sufficient financial interest in the case's outcome to suggest that they will pursue the case zealously.

Plaintiff Kang does not challenge the competence of Bellicum Investor Group's counsel, rather he challenges the cohesion of the group. Plaintiff Kang argues that the Bellicum Investor Group is a "cobbled together group of unrelated people" who have no pre-litigation relationship aside from losing their investments. Doc. #21 at 14. "A plaintiff group will generally be rejected if the court determines that it is 'simply an artifice cobbled together by cooperating counsel for the obvious purpose of creating a large enough grouping of investors to qualify as lead plaintiff' *In re Petrobras Secs. Litig.*, 104 F. Supp. 3d 618, 622 (S.D.N.Y. 2015). However, the PSLRA expressly allows for a "person or group of persons" to be appointed lead plaintiff 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

Furthermore, the "PSLRA does not define what a 'group' can or should **[\*9]** be, nor how its 'members' must be related to one another." *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388, 392 (S.D.N.Y. 2008). In fact, "[t]he majority of courts permit unrelated investors to join together as a group, and evaluate a motion to do so on a case-by-case basis, evaluating whether the grouping best serves the interest of the class." *In re Sequans*, 289 F. Supp. 3d at 423 (citing *Varghese*, 589 F. Supp. 2d at 392). In making such a determination, courts have examined: "(i) the size of the [group]; (ii) any evidence that the group was formed in bad faith; and (iii) the relationship between the parties." *In re Sequans*, 289 F. Supp. 3d at 423 (citing *Barnet v. Elan* Corp., 236 F.R.D. 158, 162 (S.D.N.Y. 2005)).

As to the size of the group, the Fifth Circuit noted "that the Securities and Exchange Commission has taken the position that a group of investors appointed to serve as lead plaintiffs ordinarily should comprise *no more than three to five persons." Berger*, 257 F.3d at 478 n.2 (5th Cir. 2001) (citing *In re Baan Co. Sec. Litig.*, 186 F.R.D.

**APP 79**

214, 224 (D.D.C.1999)) (emphasis added). The Circuit's concern was with large groups (*e.g.*, groups of twenty or thirty-nine members) that "were previously unaffiliated, each of whom have suffered modest losses, and who thus have no demonstrated incentive or ability to work together to control the litigation." *Id.* Likewise, the case that Plaintiff Kang relies upon for the argument that Bellicum Investor Group is not an adequate lead plaintiff, *Abouzied v. Applied Optoelectronics, Inc.*, No. 4.17-CV-2399, 2018 U.S. Dist. LEXIS 16801, 2018 WL 539362, at *5 (S.D. Tex. Jan. 22, 2018) **[\*10]** , involved a larger group, consisting of twelve members (three married couples, one unrelated individual, and one representative of five different entities). This larger group of unrelated people triggered the concerns raised by the Fifth Circuit in *Berger* concerning the size of the group indicating less incentive or ability to work together. *See Abouzied*, 2018 U.S. Dist. LEXIS 16801, 2018 WL 539362, at *4.

However, the Bellicum Investor Group is a small group of four people, one of whom has the largest loss of all the Movants, Plaintiff Kim. Plaintiff Kim alone suffered a loss of $255,820 (double Plaintiff Kang's loss of $95,452.17).[2] Therefore, the group is not too large and there is no evidence that it was formed in bad faith—it was not a group brought together in order to manufacture the greatest financial loss. *See Oklahoma Law Enforcement Ret. Sys. v. Adeptus Health Inc.*, No. 4:17-CV-00449, 2017 U.S. Dist. LEXIS 140268, 2017 WL 3780164, at *6 (E.D. Tex. Aug. 31, 2017) ("[t]he individual losses of both [members] surpass those of any other putative lead plaintiff here . . ." which "removes any real concern that this group of two class members was formed only to manufacture the greatest financial interest in order to be appointed lead plaintiff, and each individual plaintiff will remain invested in the outcome **[\*11]** of the litigation."). Accordingly, because the members of the Bellicum Investor Group (particularly Plaintiff Kim and Plaintiff Silberstein) have the greatest individual financial interests in this litigation, the group members have the incentive to remain invested in the litigation and represent the interests of the class.

Plaintiff Kang's primary argument against the adequacy of Bellicum Investor Group is that the group has no pre-litigation relationship outside of investment losses.

However, "[a]ny lingering uncertainty, with respect to the adequacy standard in securities fraud class actions, has been conclusively resolved by the PSLRA's requirement that securities class actions be managed by active, able class representatives who are informed and can demonstrate they are directing the litigation." *Berger*, 257 F.3d at 483 (5th Cir. 2001). "[A] group may submit evidence to suggest that even though the individuals are unrelated, the group is still able to act cohesively, effectively manage the litigation, and adequately represent the class." *Oklahoma Law Enf't Ret. Sys*, 2017 U.S. Dist. LEXIS 140268, 2017 WL 3780164, at *5. Here, the Bellicum Investor Group submitted evidence concerning the group member's ability and willingness to cohesively manage the litigation and represent the class. *See* Doc. #16, **[\*12]** Ex. 4. The joint declaration submitted by the group demonstrates their plan to "coordinate their efforts, oversee counsel, and diligently prosecute this litigation for the benefit of the class." Doc. #20 at 5; *see also* Doc. #16 at 3-4 (noting plans for group communications, collaboration, and management of the litigation). Furthermore, the four members are informed and experienced investors.[3]

Accordingly, for the aforementioned reasons, the Court finds Bellicum Investor Group meets the presumption that the group is the most adequate lead plaintiff. *See 15 U.S.C. § 78u-4(a)(B)(3)(iii)(I)*.

## C. Rebuttable Presumption

The presumption may be rebutted with evidence that the group "will not fairly and adequately protect the interests of the class or that they are subject to some unique defenses that would render them incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Plaintiff Kang's argument against Bellicum Investor Group as the presumptively most adequate lead plaintiff is that the group has no pre-litigation relationship which Plaintiff Kang argues means the group is a "lawyer-driven" group simply "cobbled together" to qualify as lead plaintiff in this case. However, as explained none of the concerns raised by Plaintiff Kang **[\*13]** rise to the level of suggesting that the group cannot fairly and adequately protect the class members' interests. Again, the Court emphasizes that

---

[2] Additionally, the Court notes the second largest individual loss within the Bellicum Investor Group is Plaintiff Silberstein who lost $95,023—nearly the same amount lost by Plaintiff Kang.

[3] Two of the members are doctors, one is an attorney, and one member holds a master's degree in environmental sciences from Yale University. The evidence suggests that the members are informed and able to direct the litigation. Doc. #16, Ex. 4; Doc. #35, Tr. 7:7-7:21.

one of the members of the Bellicum Investor Group alone has over double the largest single loss of all the individual investor Movants. Adding the three other individual investors to serve as co-lead plaintiff does not render the group inadequate. *See In re Sequans*, 289 F. Supp. 3d at 426. Plaintiff Kang presented no evidence that the group will not fairly and adequately represent the class. Additionally, the Court notes that the group outlined the procedure by which any potential disputes between group members would be handled should a disagreement between group members arise during the course of litigation. Doc. #16, Ex. 4 at 4 ¶ 9. Furthermore, there is no suggestion that the group members are subject to unique defenses that would render them incapable of representing the class.

## IV. Selection of Counsel

Under the PSLRA, "the most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). Bellicum Investor Group is represented by Pomerantz LLP and Federman & Sherwood. As discussed, both in this district to serve as lead **[*14]** counsel. *See* Doc. #16, Ex. 5-6. Furthermore, this district has previously allowed two law firms to serve as co-lead counsel in securities litigation. *See Laney v. Landry's Seafood Restaurants (In re Landry's Seafood Restaurant, Inc., Sec. Litig.)*, Inc., No. CIV.A. H-99-1948, 2000 U.S. Dist. LEXIS 7005, 2000 WL 33999467, at *5 (S.D. Tex. Mar. 30, 2000) ("[t]he Court finds no reason not to appoint the two law firms as Co-Lead Counsel. Both clearly have broad experience in prosecuting such actions."). The Court finds that Pomerantz LLP and Federman & Sherwood have extensive experience in prosecuting securities litigation and have worked together "with efficiency and without duplication of efforts or unnecessary increase in attorney's fees." Doc. #15 at 15; Doc. #16 at 2 ¶ 2, Ex. 5-6. The Court sees no reason to not adhere to Bellicum Investor Group's choice: Pomerantz LLP and Federman & Sherwood are appointed Co—Lead Class Counsel. The Court will place as a condition on this appointment that the law firms insure that there is no duplication of services or unnecessary increase in fees.

## IV. Conclusion

For the foregoing reasons, the Court appoints Bellicum Investor Group as Lead Plaintiff and Pomerantz LLP and Federman & Sherwood as Co—Lead Class

Counsel. Accordingly, Plaintiff Bellicum Investor Group's Motion (Doc. #15) is GRANTED. Plaintiff Kang and Plaintiff Sodec's Motions (Doc. #14 **[*15]** & Doc. #17) are DENIED.

It is so ORDERED.

**MAR 26 2019**

Date

/s/ Alfred H. Bennett

The Honorable Alfred H. Bennett

United States District Judge

---

**End of Document**

APP 81

Ⓐ Last updated  September 16, 2024    03:12:25 pm GMT

# In re Am. Serv. Group, Inc.

United States District Court for the Middle District of Tennessee, Nashville Division

August 28, 2006, Decided

CONSOLIDATED ACTION LEAD ACTION: 3:06-00323, RELATED ACTIONS: 3:06-337, 3:06-341 and 3:06-443

**Reporter**
2006 U.S. Dist. LEXIS 61779 *

IN RE: AMERICAN SERVICE GROUP, INC., et al.,

**Subsequent History:** Motion denied by In re Am. Serv. Group, 2009 U.S. Dist. LEXIS 28237 (M.D. Tenn., Mar. 30, 2009)

## Core Terms

lead plaintiff, financial interest, appointment, largest, movant, investor, notice, class member, alleged loss, consolidate, losses, stock

**Counsel:  [*1]**  For Plumbers and Pipefitters Local 51 Pension Fund, Individually and On Behalf of All Others Similarly Situated, Plaintiff: Dennis J. Herman, Ramzi Abadou, Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, LLP, San Francisco, CA. Douglas S. Johnston, Jr., George Edward Barrett, Timothy L. Miles, Barrett, Johnston & Parsley, Nashville, TN.

For Gail Beach, PLAINTIFF IN MEMBER CASE NO. 3:06cv341 - ADDED IN LEAD CASE FOR FILING PURPOSES, Plaintiff: Alison K. Clark, Marc A. Topaz, Richard A. Maniskas, Schiffrin & Barroway, LLP, Radnor, PA. Paul Kent Bramlett, Bramlett Law Offices, Nashville, TN.

For Nathan Moseley, Intervenor Plaintiff: Paul Kent Bramlett, Bramlett Law Offices, Nashville, TN.

For America Service Group, Inc., Michael Catalano, Michael W. Taylor, Defendants: B. Warren Pope, Benjamin Lee, Michael R. Smith, King & Spalding LLC, Atlanta, GA. Robert Jackson Walker, John C. Hayworth, Joseph F. Welborn, III, Walker, Tipps & Malone, Nashville, TN.

For Peoria Police Pension Fund, Defendant: Chet B. Waldman, Wolf, Popper LLP, New York, NY. Marcia Meredith Eason, Miller & Martin, Volunteer Building, Chattanooga, TN. Kevin C. Baltz, Miller & Martin PLLC, Nashville,  **[*2]**  TN.

For WILLIAM GERKEN, GERKEN & MOSELEY, INTERVENING PLAINTIFFS, Interpleader: Paul Kent Bramlett, Bramlett Law Offices, Nashville, TN.

For Jeffrey Schwartz, individually and on behalf of all others similarly situated, Plaintiff: James Gerard Stranch, III, James Gerard Stranch, IV, Joey Paul Leniski, Jr., Branstetter, Stranch & Jennings, Nashville, TN. Mark C. Gardy, Gardy & Notis, LLP, Englewood Cliffs, NJ. Nadeem Faruqi, Faruqi & Faruqi, New York, NY.

For America Service Group, Inc., Michael Catalano, Michael W. Taylor, Defendants: B. Warren Pope, Benjamin Lee, Michael R. Smith, King & Spalding LLC, Atlanta, GA. John C. Hayworth, Joseph F. Welborn, III, Walker, Tipps & Malone, Nashville, TN.

For Peoria Police Pension Fund, Defendant: Marcia Meredith Eason, Miller & Martin, Volunteer Building, Chattanooga, TN.

For Gail Beach, Individually and on behalf of all others similarly situated, Plaintiff: Alison K. Clark, Marc A. Topaz, Richard A. Maniskas, Schiffrin & Barroway, LLP, Radnor, PA. Paul Kent Bramlett, Bramlett Law Offices, Nashville, TN.

For David Waggoner, Individually and on behalf of all others similarly situated, Plaintiff: Daniel S. Sommers,
 **[*3]**  Jason M. Leviton, Steven J. Toll, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC. Paul Kent Bramlett, Bramlett Law Offices, Nashville, TN.

**Judges:** William J. Haynes, Jr., United States District Judge.

**Opinion by:** William J. Haynes, Jr.

## Opinion

**MEMORANDUM**

Plaintiffs in this consolidated action assert claims on behalf of themselves and all other person similarly situated under the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and 78t(a) and Rule 10b-5, 17 C.F.R. § 240.10b-5 against the Defendants: American Service Group, Inc. ("ASG"), Michael Catulano, ASG's president and Michael W. Taylor, ASG's chief financial officer. Plaintiffs' claims are for the Defendants' alleged materially false and misleading statements in various corporate documents that resulted in artificially high market prices for ASG's securities. Plaintiffs allege that based upon their positions at ASG, the individual Defendants were aware of and participated in these alleged violations of the Securities Exchange Act.

Before the Court are three (3) motions: (1) the Peoria Police Pension Fund ("Peoria Fund")'s motion for appointment **[*4]** as lead Plaintiff and approval of its selection of class counsel (Docket Entry No. 22); [1] (2) Plaintiffs Gerken's and Mosley's motion for appointment as lead Plaintiff and approval of their selection of class counsel, (Docket Entry No. 25); and (3) MARTA/ATU Local 732 Employees Retirement Plan ("MARTA")'s motion for appointment as lead Plaintiff and approval of its selection of class counsel (Docket Entry No. 28).

In support of their respective motions, each party cites its losses caused by the Defendants' alleged acts and the experience of their selected counsel. The Peoria Fund, an institutional investor purchased 14,975 of ASG shares at $ 24.86, expended in excess of $ 372,330 for these shares, and alleges a loss of $ 176,587.00. Plaintiffs Gerken and Mosley, private investors, allege a $ 6,389 loss. **[*5]** MARTA, an institutional investor, expended in excess of $ 488,000 in its purchase of ASG stock and asserts a loss of $ 211,151.00.

This action arises under the Private Securities Litigation Reform Act of 1995 (PSLRA), Pub. L. No. 104-67, that amended the Securities Act of 1933, 15 U.S.C. § 77a-77bbb, and the Securities Exchange Act of 1934, 15 U.S.C. § 78a-78111. 15 U.S.C. § 77z-1(a)(1). Among the PSLRA's threshold requirements is notice to potential class members upon the filing of the first class action. 15 U.S.C. § 78u-4. Under these provisions, the named Plaintiffs in the first filed action must publish

---

[1] This same motion is filed in Case No. 3:06-337, Docket Entry No. 30; 3:06-0341, Docket Entry No. 26; and 3:06-0443, Docket Entry No. 24. This Order in this lead action resolves the latter motions as well.

notice within twenty (20) days of filing the action to inform potential class members of their right to move to be appointed lead Plaintiffs. 15 U.S.C.A. § 78u-4(a)(3)(A)(i). The published notice should instruct potential class members "that, *no later than 60 days after the date on which the notice is published,* any member of the purported class may move the court to serve as led plaintiff of the purported class." 15 U.S.C.A. § 78u-4(a)(3)(A)(i)(II) **[*6]** (emphasis added). Such notice must be published "in a widely circulated national business-oriented publication or wire service." 15 U.S.C.A. § 78u-4(a)(3)(A)(i). "If more that one action on behalf of a class asserting substantially the same claim or claims arising under the chapter is filed, only the plaintiff or plaintiffs in the first filed action shall be required to cause notice to be published in accordance with clause (i)." 15 U.S.C.A. § 78u-4(a)(3)(A)(ii) (emphasis added). Here, it is undisputed that the Plaintiffs in the lead action provided the requisite notice by publications in national news media.

Once adequate notice is given, PSLRA describes a two-step process: consolidation of the various actions and appointment of the lead plaintiff.

> If more than one action on behalf of a class asserting substantially the same claim or claims arising under this chapter . . . has been filed, and any party has sought to consolidate those actions for pretrial purposes or for trial, the court shall not make the [lead-plaintiff] determination . . . until after the decision on the motion to consolidate is rendered.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) **[*7]** . The consolidation issue has been resolved. See Docket Entry No. 45.

Under PLSRA, the Court "shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interest of class members." 15 U.S.C. § 78u-4(a)(3)(B)(i). In addition, "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 77z-1(a)(3)(B)(v).

Under the PSLRA, with the filings of the complaints and motions, the Court must presume that the lead plaintiff with the "largest financial interest in the litigation" and whose claims are typical of other putative class members, is the most adequate plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). The lead plaintiff must also be capable of "fairly and adequately" protect[ing] the

interest of the class. Fed. R. Civ. P. 23(a)(3)-(4); 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc); 15 U.S.C. § 77z-1(a)(3)(B)(iii)(I)(bb). A statutory presumption arises **[*8]** that the plaintiff with the "largest financial interest" also satisfies the typicality element. In re Cardinal Health, Inc., Securities Litigation, 226 F.R.D. 298, 301 (S.D. Ohio 2005). This presumption can be rebutted "only upon proof . . . that the presumptively most adequate plaintiff . . . will not fairly and adequately protect the interest of the class; or is subject to unique defenses that render such plaintiff incapable of adequately representing the class. In re Cendant Corp., 182 F.R.D. 144, 149 (D.N.J. 1998). (quoting 15 U.S.C. §§ 77z-1(a)(3)(B)(iii)(II)(aa), (bb)). There is not any showing here to rebut this statutory presumption. Thus, the controlling issue is which movant has the "largest financial interest".

The PLSRA "provides no definitive method for determining the 'largest financial interest'". In re Cardinal Health, 226 F.R.D. at 302. "[T]he method used and the factors considered in determining each movant's financial interest remain fully within the discretion of the district court." Pirelli Armstrong Tire Corp. Retiree Med Benefits Trust v. LaBranche & Co., 229 F.R.D. 395, 406-407 (S.D.N.Y. 2004). **[*9]**

The Peoria Fund contends that the "largest financial interest" determination for the lead Plaintiff should focus on the percentage of each Plaintiff's loss from the decline in the prices of ASG's common share during the class period. Under this analysis, the Peoria Fund argues that it has the largest financial interest because the average price per share of ASG common stock purchased by Peoria Police was higher than the average price per share of ASG stock purchased by MARTA. Peoria Police Fund also argues that its stake in this litigation is also significantly greater, if the Court compares the size of each movant's losses to the total value of each movant's assets. MARTA's loss is $ 211,151 loss, but the assets of its retirement plain are $ 433.9 million dollars. In the Peoria Fund's view, its alleged loss of $ 176,587, when compared to its assets of $ 123.6 million dollars, reflects a greater financial interest. The Peoria Fund, however, does not suggest this analysis to be appropriate in comparing the losses of an institutional investor to an individual investor.

First, the PSLRA's legislative history reflects Congressional intent to favor institutional investors, that have the **[*10]** greater financial resources and experience to satisfy their fiduciary duties to the class members. *See e.g.*, In re Critical Path, Inc., 156 F. Supp. 2d 1102, 1109 (N.D. Cal. 2001) (emphasizing "the PSLRA's goal of increasing the appointment of institutional investors and lead plaintiffs"). Thus, the choice here is between MARTA and the Peoria Fund.

In determining which movant has the largest financial interest, however, most courts conduct a four-factor analysis consisting of: "(1) the number of shares that the movant purchased during the putative class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended by the plaintiff during the class period; and (4) the approximate losses suffered by the plaintiffs." Manual for Complex Litigation (Fourth) § 13.31 (2004); In re Cardinal Health, 226 F.R.D. at 303. Applying these factors as pertinent to the facts presented on these motions, considering the number of ASG stock purchased, the amounts expended for those stock purchases, and the alleged losses, MARTA has the "largest financial interest".

As to the Peoria Fund's various arguments, it **[*11]** must be remembered that "[t]he manifest intent of the (PSLRA) is determining the Plaintiff most capable of pursuing the action and representing the interests of the class." H. Conf. Rep. No. 104-369, at 34. This standard has been described as "let the money do the monitoring." Elliott J. Weiss & John S. Beckman, *Let the Money do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Action,* 104 Yale L.J. 2053 (1995). See S. Rep. 104-98, 1995 U.S.C.C.A.N. 679, 729 n.32 (stating that "[t]his article provided the basis for the 'most adequate plaintiff provision' in the PSLRA). MARTA meets this standard with regard to the amount of its loss. Moreover, MARTA's assets reflect its financial ability to commit the resources to pursue the interests of the putative class in this litigation.

To be sure, the plaintiff with the larger numeric loss is not automatically the plaintiff with the "largest financial interest". See In re Doral Fin. Corp. Sec. Litig., 414 F. Supp. 2d 398, 403 (S.D.N.Y. 2006) (movant with $ 2.3 million in alleged losses and another movant with $ 1.9 million in alleged losses deemed to have functionally **[*12]** equal damages given the "probable margins of error involved in the various damage estimates."); In re Pfizer, Inc. Sec. Litig., 233 F.R.D. 334, 338 (S.D.N.Y. 2005) ( a movant with $ 22.5 million in alleged losses and another $ 22.8 million in alleged losses have roughly equal damages ". . . [g]iven he probable margin of error involved in the damage estimates. . .").

**APP 84**

Moreover, some courts measure the "largest financial interest" by a plaintiff's losses as a percentage of its assets or holdings. See, Burke v. Ruttenberg, 102 F. Supp. 2d 1280, 1297, 1342 (N.D. Ala. 2000) and Laborers Local 1298 Pension Fund v. Campbell Soup Co., No. 00-152 (JEI), 2000 U.S. Dist. LEXIS 5481 at *5-6 (D.N.J. April 24, 2000). Other courts utilize accounting standards to determine this issue. Johnson v. Dana Corp., 236 F.R.D. 349, 351-52 (N.D. Ohio 2006) and authorities cited therein. None of the Plaintiffs argues for this latter method.

Here, given MARTA's losses, its assets and the limited number of Plaintiffs seeking lead plaintiff status, the Court does not ascertain any practical need for an alternate method for determining the largest **[*13]** financial interest nor for the appointment of co-lead plaintiffs. If, later in this litigation, good cause is shown to revisit this issue, any plaintiff may move the Court for reconsideration of its appointment of the lead plaintiff.

The next issue is the Court's approval of the lead Plaintiff's choice of counsel who will be lead counsel for the litigation. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). "[T]he role of class counsel is akin to that of a fiduciary to the absent class members." Greenfield v. Villager Indus., Inc., 483 F.2d 824, 832 (3d Cir. 1973). "[C]lass action counsel possess, in a very real sense, fiduciary obligations to those not before this court." Id. Here, MARTA's counsel is well qualified and experienced to represent the class in this action and the Court approves MARTA's choice of counsel.

Accordingly, the Peoria Police Pension Fund ("Peoria Fund")'s motion for appointment of lead Plaintiff and approval of its selection of class counsel (Docket Entry No. 22) should be denied; Plaintiffs' Gerken's and Mosley's motion for appointment of lead Plaintiff and approval of their selection of class counsel, (Docket Entry No. **[*14]** 25) should be denied; and (3) MARTA/ATU Local 732 Employees Retirement Plan ("MARTA")'s motion for appointment of lead Plaintiff and approval of its selection of class counsel (Docket Entry No. 28) should be granted.

An appropriate Order is filed herewith.

Entered this the 28th day of August, 2006.

William J. Haynes, Jr.

United States District Judge

**End of Document**

APP 85

⚠ Last updated  September 13, 2024   02:11:19 pm GMT

# Laborers Local 1298 Pension Fund v. Campbell Soup Co.

United States District Court for the District of New Jersey

April 24, 2000, Decided

CIVIL ACTION NO. 00-152 (JEI) (CONSOLIDATED LEAD CASE)

**Reporter**
2000 U.S. Dist. LEXIS 5481 *; Fed. Sec. L. Rep. (CCH) P90,963

LABORERS LOCAL 1298 PENSION FUND, on behalf of itself and all others similarly situated, Plaintiff 5. CAMPBELL SOUP COMPANY, DALE F. MORRISON and BASIL L. ANDERSON, Defendants

**Disposition: [*1]** Donald DeValle, Daryle Green, and Denise L. Nappier, Treasurer of the State of Connecticut as Trustee for the Connecticut Retirement Plans and Trust Funds appointed as lead plaintiffs.

## Core Terms

lead plaintiff, appointment, shares, class period, firms, largest, Retention, select, funds

## Case Summary

**Procedural Posture**

The court, pursuant to the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C.S. § 78u-4 et seq., appointed lead plaintiff in class action suit based on claims arising under §§ 10(b), 20(a) of the Securities Exchange Act, 15 U.S.C.S. §§ 78j, t, et seq., and Rule 10b-5 promulgated thereunder.

**Overview**

In a class action complaint under the Securities Exchange Act, 15 U.S.C.S. §§ 78j, t, et seq., the court appointed, pursuant to the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C.S. § 78u-4 et seq., as lead co-lead plaintiffs, plaintiff Connecticut State Treasurer and plaintiff shareholders who had purchased defendant corporation's stock as assets in their respective pension plans. The court determined that plaintiff state had the largest financial interest in the suit, and the interest of plaintiff shareholders, combined, was the second largest. The court further ordered appointed plaintiffs to select lead counsel in the matter and to file a

motion addressing various factors in the selection.

**Outcome**

The court appointed plaintiff state and plaintiff individual shareholders as co-lead plaintiffs in a class action against defendants in a suit under the Securities and Exchange Act.

# LexisNexis® Headnotes

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > General Overview

Pensions & Benefits Law > Governmental Employees > General Overview

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > Lead Plaintiff

Civil Procedure > ... > Pleadings > Amendment of Pleadings > General Overview

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > General Overview

**HN1[⬇]  Class Actions, Prerequisites for Class Action**

A lead plaintiff must be a member of the purported class, but need not be a named plaintiff. The Private Securities Litigation Reform Act (PSLRA), 15 U.S.C.S. § 78u-4 et seq., creates a presumption that the most adequate plaintiff in any private action arising under this chapter is the person or group of persons that has the largest financial interest in the relief sought by the class

**APP 86**

and otherwise satisfies the requirements of Fed. R. Civ. P. 23. 15 U.S.C.S. § 78u-4(a)(3)(B)(iii)(I). The PSLRA does not define whether the concept of "largest financial interest" should be viewed in terms of absolute dollars or as a percentage of a plaintiff's net worth.

Antitrust & Trade Law > Sherman Act > Defenses

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > General Overview

Antitrust & Trade Law > Clayton Act > Defenses

**HN2[⤓] Sherman Act, Defenses**

The presumption in favor of the person or group of persons with the largest financial interest can be rebutted by proof that such plaintiff (i) will not adequately protect the interest of the class or (ii) is subject to unique defenses which would render such plaintiff incapable of adequately representing the class. 15 U.S.C.S. §§ 78u-4(a)(3)(B)(iii)(II)(aa) and (bb).

Civil Procedure > ... > Class Actions > Class Attorneys > Appointments

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > Lead Plaintiff

Civil Procedure > ... > Class Actions > Class Attorneys > General Overview

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > General Overview

**HN3[⤓] Class Attorneys, Appointments**

The Private Securities Litigation Reform Act (PSLRA), 15 U.S.C.S. § 78u-4 et seq., delegates to the party selected as lead plaintiff the task of selecting counsel, subject to the approval of the court. 15 U.S.C.S. § 78u-4(a)(3)(B)(v).

Legal Ethics > Client Relations > Attorney Fees > Fee Agreements

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > Lead Plaintiff

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > General Overview

**HN4[⤓] Attorney Fees, Fee Agreements**

When lead plaintiffs come to an agreement on the issue of who should be named class counsel in an action under the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C.S. § 78u-4 et seq., a motion for approval should be served and filed. In deciding whether to approve the choice proffered by lead plaintiffs, the Court will consider the following: (1) the fee arrangement agreed to by the parties should provide for a cap on fees, but leave to the Court the determination of the actual fee to be awarded; and any method of allocating the fee award should be specified; (2) the fee agreement should clearly specify how the out-of-pocket costs of the litigation will be funded, and what the obligations of the lead plaintiffs will be should the suit be unsuccessful.

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > Lead Plaintiff

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > General Overview

**HN5[⤓] Securities Litigation Reform & Standards, Lead Plaintiff**

In deciding whether to approve the choice of class counsel proffered by lead plaintiffs in an action under the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C.S. § 78u-4 et seq., the Court will consider the following: (3) information on how counsel plans to staff the matter, including the number of lawyers and paralegals to be involved, the breakdown between partners and associates and an estimate of the number of hours to be expended through various stages of the litigation. If lead counsel plans to parcel out the work to other law firms, the need for and extent of such delegation must be detailed in the motion papers. (4) If the lead plaintiffs plan to appoint co-counsel to represent them, the moving papers should set forth the reasons for appointing two law firms and the plans for

**APP 87**

allocating work between them.

Securities Law > Civil Liability
Considerations > Securities Litigation Reform &
Standards > Lead Counsel

Securities Law > Civil Liability
Considerations > Securities Litigation Reform &
Standards > General Overview

Securities Law > Civil Liability
Considerations > Securities Litigation Reform &
Standards > Lead Plaintiff

**HN6[⬇]** **Securities Litigation Reform & Standards, Lead Counsel**

In deciding whether to approve the choice of class counsel proffered by lead plaintiffs in an action under the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C.S. § 78u-4 et seq., the Court will consider the following: (5) if lead counsel does not maintain a New Jersey office, it may be necessary under court rules to appoint local counsel, the role of such counsel should be carefully circumscribed to avoid duplication of services, wasted time and unnecessary expense.

**Counsel:** Samuel P. Sporn, Esq., Joel P. Laitman, Esq., Schoengold & Sporn, P.C., New York, NY, Co-Counsel for Laborers Local 1298 Pension Fund.

Nicholas Stevens, Esq., Starr, Gern, Davison & Rubin, Roseland, NJ, Co-Counsel for Laborers Local 1298 Pension Fund and Trust Advisors Equity Plus, LLC.

Peter L. Masnik, Esq., Kalikman & Masnik, Haddonfield, NJ, Co-Counsel for Maureen Rocks; Mike Proto; Bernard Koehne; Tom Bintliff; Donald R. Devalle; and Daryle Green.

Stuart J. Guber, Esq., Sherrie R. Savett, Esq., Berger & Montague, P.C., Philadelphia, PA, Co-Counsel for Maureen Rocks, Mike Proto, Donald DeValle and Daryle Green.

Thomas G. Shapiro, Esq., Theodore M. Hess-Mahan, Shapiro Haber & Urmy LLP, Richard J. Vita, Esq., Law Offices of Richard J. Vita, Boston, MA, Co-Counsel for Maureen Rocks.

Stephen J. Toll, Esq., Andrew Friedman, Esq., Cohen Milstein Hausfeld & Toll, Washington, DC, Co-Counsel for Mike Proto.

Andrew M. Schatz, Esq., Schatz & Nobel, P.C.,

Hartford, CT, Co-Counsel **[*2]** for Trust Advisors Equity Plus, LLC; Denise L. Nappier.

William J. Pinilis, Esq., Morristown, NJ, Co-Counsel for Robert Heinen.

Steven E. Cauley, Esq., Law Offices of Steven E. Cauley, P.A., Little Rock, AR, Co-Counsel for Robert Heinen.

Joseph J. DePalma, Esq., Lite DePalma Greenberg & Rivas, LLC, Newark, NJ, Co-Counsel for Joanna Lerner and Michael Joseph Maguire.

Stuart L. Berman, Esq., Schiffrin & Barroway, LLP, Bala Cynwyd, PA, Co-Counsel for Joanna Lerner.

Samuel H. Rudman, Esq., Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY, Co-Counsel for Michael Joseph Maguire.

Richard D. Kranich, Esq., Law Offices of Richard D. Kranich, New York, NY, Co-Counsel for Michael Joseph Maguire.

Faith R. Greenfield, Esq., Chief Litigation Counsel, Campbell Soup Company, Camden, NJ, Co-Counsel for Campbell Soup Company, Dale F. Morrison and Basil L. Anderson.

Alan E. Kraus, Esq., Riker, Danzig, Scherer, Hyland & Perretti LLP, Morristown, NJ, Co-Counsel for Campbell Soup Company, Dale F. Morrison and Basil L. Anderson.

Paul C. Saunders, Esq., Max R. Shulman, Esq., Cravath, Swaine & Moore, New York, NY, Co-Counsel for Campbell Soup Company, Dale **[*3]** F. Morrison and Basil L. Anderson.

**Judges:** JOSEPH E. IRENAS, U.S.D.J.

**Opinion by:** JOSEPH E. IRENAS

# Opinion

**ORDER APPOINTING LEAD PLAINTIFF**

**IRENAS**, District Judge:

It appearing that:

1. Ten class action complaints have been filed against Campbell Soup Company and two of its executives on claims arising under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j and t, *et seq.*, and

Rule 10b-5 promulgated thereunder. The facts alleged in each complaint are identical. [1] By a series of orders issued by this Court, all the complaints have been consolidated into a single action.

2. Pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C § 78u-4 *et seq.*, the first plaintiff to file, Laborers Local 1298 Pension Fund ("Laborers Local"), published a notice on *PR Newswire* [*4] on January 11, 2000, advising the public of the pendency and nature of the suit and of the right of any eligible shareholder to serve as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(A)(i). Three motions were made pursuant to 15 U.S.C. § 78u-4(a)(3)(B) for the appointment of lead plaintiff and the approval of the counsel representing each moving party. 15 U.S.C. § 78u-4(a)(3)(B)(v). The moving parties were Laborers Local, represented by Schoengold & Sporn, who had filed the initial complaint; Donald DeValle and Daryle Green, represented by Berger & Montague; and the Treasurer of the State of Connecticut, represented by Schatz & Nobel, P.C.. [2]

3. **HN1**[↑] A lead [*5] plaintiff must be a member of the purported class, but need not be a named plaintiff. The PSLRA creates a "presumption that the most adequate plaintiff in any private action arising under this chapter is the person or group of persons that . . . has the largest financial interest in the relief sought by the class . . . and . . . otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). The Act does not define whether the concept of "largest financial interest" should be viewed in terms of absolute dollars or as a percentage of a plaintiff's net worth.

4. Laborers Local asserts that it purchased 6,300 shares during the class period (November 18, 1997 to January 8, 1999), all of which were subsequently sold for a total loss of $ 100,494.00. [3] The State of Connecticut, through its pension funds, purchased 168,300 shares during the class period and asserts that its losses exceed $ 1,000,000. As of April 6, 2000, Connecticut still holds 77,800 shares of Campbell Soup. Donald DeValle and Daryle Green jointly seek to serve as lead plaintiff. DeValle purchased 5,302.2 shares during the class [*6] period which represents all the assets in his 401(k) Plan. Green purchased 5,742 shares which amounts to approximately 56% of the balance in his 401(k). Both men still retain all the shares purchased during the class period. Combined they assert a loss of about $ 131,000.

5. In absolute terms the State of Connecticut has, by far, the largest claim, while the combined claim of Green and DeValle [4] [*7] is a distant second. However, Connecticut's loss is a drop in the bucket compared to the billions of dollars in pension funds managed by the State Treasurer. For Green and DeValle their shares represent a substantial portion of their retirement funds. [5]

---

[1] Indeed, all the complaints are practically identical copies of the first complaint, including misspellings.

[2] Neither Daryle Green nor the State of Connecticut were named plaintiffs in any of the ten original complaints. Berger and Montague, P.C. did file a complaint on behalf of Donald DeValle, and Schatz and Nobel, P.C. filed a complaint on behalf of Trust Advisors Equity Plus, LLC.

[3] After publishing notice of the pending class action, counsel for the Laborers Local received inquiries from 73 shareholders who purchased 19,330 shares during the class period and claimed losses of $ 194,933.31. None of these individuals are proposed as lead plaintiffs.

[4] Although the PSLRA seems to contemplate a "group of persons" as a possible lead plaintiff, this Court agrees with those decisions which suggest that aggregating a group of unrelated individuals to create a plaintiff with the "largest financial interest" is contrary to the spirit of the law which seeks to replace lawyer driven litigation with client controlled litigation. *Sakhrani v. Brightpoint*, 78 F. Supp. 2d 845, 850-54 (S. D. Ind. 1999) ("Selecting as 'lead plaintiff' a large group of investors who have the largest aggregate losses but who have nothing in common with one another beyond their investment is not an appropriate interpretation of the term 'group' in the PSLRA."). However, DeValle and Green, both of whom are former Campbell employees have a commonality of interest which makes aggregating their claims appropriate.

[5] Although the cases grant the Court some discretion in selecting the lead plaintiff, no case has specifically interpreted the phrase "largest financial interest" in relative rather than absolute terms. Many courts have adopted a four-prong test to evaluate the size of a party's financial interest in the litigation. *See, e.g., Tarica v. McDermott International Inc.*, 2000 U.S.

6. The PSLRA requires that the person or group of persons selected as lead plaintiff "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc) Although the level of scrutiny at this stage of the proceeding is less intensive than undertaken on a motion to certify the class, the Court is satisfied that "(1) the class **[*8]** is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties [all of the moving plaintiffs] are typical of the claims or defenses of the class, and (4) the representative parties [all of the moving plaintiffs] will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). In addition, it seems clear that the questions of law or fact common to members of the class predominate over issues applying to individual class members, and a class action is superior to other methods of fairly and efficiently adjudicating the suit. Fed. R. Civ. P. 23(b).

7. **HN2[↑]** The presumption in favor of the person or group of persons with the largest financial interest can be rebutted by proof that such plaintiff (i) will not adequately protect the interest of the class or (ii) is subject to unique defenses which would render such plaintiff incapable of adequately representing the class. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa) and (bb). One party suggested that the indictment of Connecticut's previous State Treasurer for malfeasance in office **[*9]** might create some unique defense against the current occupant of that office. However, there is nothing in the record to suggest that Connecticut's purchase of Campbell stock was involved in the wrongdoing which led to the indictment, or that the indictment would interfere with the current Treasurer's ability to conduct the current litigation. It was also suggested that DeValle and Green, as former Campbell employees who purchased their shares for IRAs, might face some defenses not applicable to other plaintiffs. Nothing in the record suggests that these

employees were in the upper echelon of management or otherwise had specialized knowledge which might have put them on notice of the practices alleged in the Complaint.

8. **HN3[↑]** The PSLRA delegates to the party selected as lead plaintiff the task of selecting counsel, subject to the approval of the court. 15 U.S.C. § 78u-4(a)(3)(B)(v). At the present moment, not surprisingly, each party vying for appointment as lead plaintiff wants its own counsel to handle the case. All three firms, Schatz & Nobel, P.C., Schoengold & Sporn, P.C. and Berger & Montague, P.C., are experienced class action lawyers with extensive **[*10]** experience in the field. There is some question as to whether the Schatz firm and the Schoengold firm are large enough to handle this litigation solely with their own personnel. [6] At the oral argument all three law firms indicated an intention to parcel out the work in some undetermined fashion to the other two law firms. The Court has serious reservations about this approach. If a truly private litigant was interviewing potential counsel for possible retention in an important case, the client would not generally expect that the lawyer ultimately appointed would turn around and dole out the work to the other firms who had competed for the case. Not only would such action suggest the possibility of collusion among counsel, but it would likely be inefficient and would undercut the client's desire to select the best lawyers for the job. Thus, this practice is inconsistent with the expressed intent of the PSLRA to make the attorney-client relationship in class actions similar to that in ordinary litigation.

**[*11]**

9. It is the intention of the Court to appoint DeValle, Green and the Treasurer of the State of Connecticut as co-lead plaintiffs pursuant to the PSLRA. Connecticut has the largest financial interest in the suit, and the interest of DeValle and Green, combined, is the second largest. The Court also considers it desirable to have both an institutional investor, like Connecticut, and individual investors, like DeValle and Green, included as lead plaintiffs since each may bring a

---

Dist. LEXIS 5031, No. 99-3831, 2000 WL 377817, at *4(E. D. La., April 13, 2000)(the largest financial interest is determined by considering "(1) number of shares purchased; (2) number of net shares purchased; (3) total net funds expended by plaintiffs during class period; and (4) approximate losses plaintiffs suffered.").

---

[6] Apparently Schatz & Nobel consists of four lawyers while Schoengold & Sporn has six. Berger & Montague is considerably larger and appears to have the staffing necessary to handle the matter.

**APP 90**

unique perspective to the litigation. [7] Of course, the Court reserves "the right to alter this structure at any time and for any reason, and will do so if it finds that the progress of the litigation is being delayed . . . or if the structure established proves detrimental, in any way, to the best interests of the class." *In re Oxford Health Plans, Inc.*, 182 F.R.D. 42, 51 (S.D.N.Y. 1998).

**[*12]**

10. Some courts have commented on the possible conflict of interest between class members who sold all or a portion of their shares before the action was filed ("In/Out Plaintiffs") and those who still own some or all of their stock ("Retention Plaintiffs"). *See In re Party City Sec. Litig.*, 189 F.R.D. 91, 108, 110 (D.N.J. 1999)(discussing nature of conflict and holding that "the appointment of a group of lead plaintiffs consisting of both Retention Plaintiffs and In/Out Plaintiffs runs contrary to the goals of the PSLRA."). DeValle, Green and Connecticut are all Retention Plaintiffs. [8] Because the benefit of any verdict or settlement is, in effect, paid pro rata by all

---

[7] In *In re Oxford Health Plans, Inc.,* the court noted that naming more than one lead plaintiff "allows for broad representation and the sharing of resources and experience to ensure that the litigation will proceed expeditiously . . . and will assure the Court that any settlement when proposed will be provident." 182 F.R.D. 42, 49 (S.D.N.Y. 1998). Judge Brient felt that the appointment of three lead plaintiffs avoided the possibility of a tie vote which would deadlock the plaintiffs on an important issue. *Id* at p. 47. This Court questions whether litigation can really proceed smoothly where one of three lead plaintiffs strongly objects to a particular course of action. Since DeValle and Green are considered as a single group, the structure established in this Order will require unanimity among the lead plaintiffs.

[8] Connecticut purchased 168,300 shares of Campbell stock during the class period adding to the 98,400 shares already owned. Sales both during and after the class period have reduced its holdings as of April 6, 2000, to 77,800 shares. DeValle purchased 5,302.2 shares during the class period adding to the approximately 20,000 shares already owned. DeValle still owns all of these shares. Green purchased 5,742 shares during the class period, and on the first trading day after the class period (January 11, 1999) purchased an additional 4,916.3 shares. Green has never sold any of his Campbell stock. Laborers Local purchased 6,300 shares during the class period adding to the 6,000 shares already owned. During the class period it sold 4,500 shares of its original 6,000. After the close of the class period, it sold all of its remaining shares so that it owns none at the present time.

---

the shareholders (leaving aside the possible benefit of any available insurance coverage), while the benefits flow only to those who purchased shares during the class period, even a Retention Plaintiff will most often benefit from the litigation since the per share detriment will surely be less than the per share benefit. It may be that there exist persons who made large scale purchases before or after the class period but only small purchases during the class period who would be disadvantaged **[*13]** by the litigation. However, none of the proposed lead plaintiffs seems to fall into this category. [9]

**[*14]**

11. As noted earlier, it is the responsibility of the lead plaintiffs to select counsel, subject to court approval. The Court assumes from the oral argument that DeValle, Green and Connecticut filed their original motions to be appointed lead plaintiff with the intent that the counsel who filed the motions would also be class counsel should the motion be granted. However, the Court directs those who are appointed as lead plaintiffs to meet to discuss the issue of who should be named class counsel. **HN4**[⬆] When lead plaintiffs come to an agreement on this issue, a motion for approval should be served and filed. In deciding whether to approve the choice proffered by lead plaintiffs, the Court will consider the following:

> (1) The fee arrangement agreed to by the parties should provide for a cap on fees, but leave to the Court the determination of the actual fee to be awarded; if more than one firm is going to be working on behalf of the plaintiffs, the method of allocating the fee award should be specified;
>
> (2) The fee agreement should clearly specify

---

[9]

We do not perceive any conflict of interest between those who have retained their ITT shares and those who have since sold them. The personal interest of those who still hold ITT stock in gaining more from the exchange than they did far outweighs their concern that any award could damage ITT.

*Herbst v. ITT*, 495 F.2d 1308, 1314 (2d Cir. 1974); *see also In re Oxford*, 182 F.R.D. 42.

how the out-of-pocket costs of the litigation will be funded, and what the obligations of the lead plaintiffs will be should **[*15]** the suit be unsuccessful;

**HN5**[⬆] (3) The motion should include information on how counsel plans to staff the matter, including the number of lawyers and paralegals to be involved, the breakdown between partners and associates and an estimate of the number of hours to be expended through various stages of the litigation. If lead counsel plans to parcel out the work to other law firms, the need for and extent of such delegation must be detailed in the motion papers. As noted earlier, the Court has serious reservations about this course of action. *See* P 8, *supra*.;

(4) If the lead plaintiffs plan to appoint co-counsel to represent them, the moving papers should set forth the reasons for appointing two law firms and the plans for allocating work between them. The Court will want to assure that the appointment of co-counsel does not result in waste and inefficiency in the prosecution of the action. It is very unlikely that the Court will consider the appointment of more than two firms as co-counsel for the lead plaintiffs;

(5) Starr, Gern, Davison & Rubin style themselves as "Liaison Counsel" in papers submitted to this Court in connection with the motions to appoint lead **[*16]** plaintiff. While the Court recognizes that **HN6**[⬆] if lead counsel does not maintain a New Jersey office it may be necessary under court rules to appoint local counsel, the role of such counsel should be carefully circumscribed to avoid duplication of services, wasted time and unnecessary expense;

(6) The motion to approve the appointment of lead counsel must be served and filed no later than May 15, 2000. The lead plaintiffs should be prepared to appear in person on the return date of the motion to offer testimony concerning the process used to select counsel and to answer questions from the Court relating to such selection.

Based on the foregoing,

**IT IS** on this *24th* day of April, 2000,

**ORDERED THAT:**

1. Donald DeValle, Daryle Green, and Denise L. Nappier, Treasurer of the State of Connecticut as Trustee for the Connecticut Retirement Plans and Trust Funds are hereby appointed as lead plaintiffs in accordance with 15 U.S.C. § 78u-4(a)(3)(B)(i); and

2. The lead plaintiffs shall select lead counsel, subject to approval of this Court on motion, in accordance with 15 U.S.C. § 78u-4(a)(3)(B)(v), such motion **[*17]** to be served and filed no later than May 15, 2000; the hearing and oral argument on the motion shall be heard by the Court on Friday, May 19, 2000, at 2:00 p.m., in Courtroom 5A at the Mitchell H. Cohen United States Courthouse, One John F. Gerry Plaza, Camden, New Jersey.

JOSEPH E. IRENAS, U.S.D.J.

---

**End of Document**



# Brown v. Bilek

United States Court of Appeals for the Fifth Circuit

November 12, 2010, Filed

No. 09-20654

## Reporter

401 Fed. Appx. 889 *; 2010 U.S. App. LEXIS 23477 **

MICHAEL L. BROWN, Plaintiff-Appellant v. THOMAS E. BILEK; THE BILEK LAW FIRM, L.L.P.; and HOEFFNER & BILEK, L.L.P., Defendants-Appellees

**Notice:** PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History: [\*\*1]** Appeal from the United States District Court for the Southern District of Texas. USDC No. 4:09-CV-2193.

Brown v. Bilek, 2009 U.S. Dist. LEXIS 73770 (S.D. Tex., Aug. 20, 2009)

**Disposition:** Affirmed.

## Core Terms

district court, lead plaintiff, lead counsel, particularity, allegations, fee award, lawsuit, attorney's fees, class action, law firm, settlement, amend

## Case Summary

### Procedural Posture

Plaintiff shareholder appealed a dismissal under Fed. R. Civ. P. 12(b)6() by the United States District Court for the Southern District of Texas of his class action complaint brought against defendants, an attorney and his firms, alleging fraud and breach of fiduciary duty as a result of misrepresentations by defendants regarding a fee request as lead counsel in a securities fraud class action in which the shareholder was a member.

### Overview

The shareholder filed the present action nine months after the district court had approved the fee request of defendants as lead counsel. The district court dismissed the complaint seeking disgorgement and damages under Fed. R. Civ. P. 12(b)(6) and 9(b). On review, the court affirmed. It was undisputed that the shareholder's proposed class was encompassed by the litigation class of the former action, which was represented by an appointed lead plaintiff under 15 U.S.C.S. § 78u-4(a)(3)(B). The facts forming the basis for the shareholder's suit were inextricably woven into the prior litigation. Given the specific requirements of the Private Securities Litigation Reform Act of 1995, as well as the facts of the case, the shareholder, as an unnamed member of the previous class, could not circumvent the lead plaintiff's authority by filing an independent tort suit on behalf of members of the class complaining of acts and omissions that occurred in the context of the prior litigation. Thus, the shareholder's allegations had to be brought, if at all, in a motion under Fed. R. Civ. P. 60(b) by the lead plaintiff, mandating the dismissal for failure to state a claim.

### Outcome

The court affirmed the dismissal of the complaint with prejudice.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

**APP 93**

Civil Procedure > Dismissal > Involuntary Dismissals > Failure to State Claims

**HN1[⬇]  Standards of Review, De Novo Review**

An appellate court reviews a district court's dismissal under Fed. R. Civ. P. 12(b)(6) de novo, accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs. Factual allegations must be enough to raise a right to relief above the speculative level.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims

**HN2[⬇]  Heightened Pleading Requirements, Fraud Claims**

Pursuant to Fed. R. Civ. P. 9(b), in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally. Courts have also applied the particularity requirement of Rule 9(b) to breach of fiduciary duty claims predicated on fraud.

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > Lead Plaintiff

**HN3[⬇]  Securities Litigation Reform & Standards, Lead Plaintiff**

The Private Securities Litigation Reform Act of 1995 provides that a district court shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members. 15 U.S.C.S. § 78u-4(a)(3)(B)(I).

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > Costs & Attorney Fees

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > Lead Counsel

Securities Law > Civil Liability

Considerations > Securities Litigation Reform & Standards > Lead Plaintiff

**HN4[⬇]  Securities Litigation Reform & Standards, Costs & Attorney Fees**

The Private Securities Litigation Reform Act of 1995 (PSLRA) provides that, once selected, the lead plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class. 15 U.S.C.S. § 78u-4(a)(3)(B)(v). The PSLRA grants the lead plaintiff primary responsibility for selecting and supervising the attorneys who work on behalf of the class. Any attorney who wishes to be compensated out of the plaintiff class's recovery in a class action governed by the PSLRA must submit his fee requests to the PSLRA lead plaintiff. Under the framework established by the PSLRA, lead plaintiffs are entitled to significant discretion in selecting and compensating lead counsel and so to are they entitled to similar discretion in determining whether other firms have worked on behalf of the class, and whether and to what extent to compensate such firms.

Evidence > Inferences & Presumptions > Presumptions > Rebuttal of Presumptions

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > Lead Plaintiff

**HN5[⬇]  Presumptions, Rebuttal of Presumptions**

The Private Securities Litigation Reform Act of 1995 creates a rebuttable presumption that the lead plaintiff has the largest financial interest in the relief sought by the class. 15 U.S.C.S. § 78u-4(a)(3)(B)(iii)(I).

Civil Procedure > ... > Justiciability > Standing > General Overview

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > Lead Plaintiff

**HN6[⬇]  Justiciability, Standing**

An unnamed class member may not circumvent a

**APP 94**

401 Fed. Appx. 889, *889; 2010 U.S. App. LEXIS 23477, **1

Private Securities Litigation Reform Act of 1995 (PSLRA) lead plaintiff's authority by filing an independent tort lawsuit on behalf of members of the class complaining of acts and omissions that occurred in the context of the PSLRA-governed litigation.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims

**HN7[⤓]  Heightened Pleading Requirements, Fraud Claims**

The United States Court of Appeals for the Fifth Circuit has held that the standards of Fed. R. Civ. P. 9(b) require specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation why they are fraudulent. What constitutes particularity will necessarily differ with the facts of each case and hence the Fifth Circuit has never articulated the requirements of Rule 9(b) in great detail, but has found that the plaintiff must allege with particularity the defendant's acts with the plaintiff contends amount to fraud.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court

**HN8[⤓]  Standards of Review, Abuse of Discretion**

On review, an appellate court must review the denial of leave to amend the complaint for abuse of discretion.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court

**HN9[⤓]  Amendment of Pleadings, Leave of Court**

Courts of the United States Court of Appeals for the Fifth Circuit have affirmed denials of motions for leave to amend when plaintiffs fail to amend their complaint as a matter of right, fail to furnish the district court with a proposed amended complaint, and fail to alert both the court and defendants to the substance of their proposed amendment.

**Counsel:** For MICHAEL L BROWN, Plaintiff - Appellant:

Anthony G. Buzbee, Sean E. O'Rourke, Buzbee Law Firm, Houston, TX.

For THOMAS E. BILEK, BILEK LAW FIRM, L.L.P., HOEFFNER & BILEK, L.L.P., Defendant - Appellees: Kenneth Stuart Marks, William Randolph Merrill, Esq., Susman Godfrey, L.L.P., Houston, TX.

**Judges:** Before JONES, Chief Judge, PRADO, Circuit Judge, and O'CONNOR, District Judge. [*]

**Opinion by:** REED O'CONNOR

# Opinion

 **[*890]**  REED O'CONNOR, District Judge: [**]

Plaintiff-Appellant Michael L. Brown ("Brown") appeals the district court's dismissal of his complaint with prejudice under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim, and alternatively, under Rule 9(b) of the Federal Rules of Civil Procedure for failure to plead his fraud based claims with particularity. We conclude that the district court did not err in dismissing **[**2]** Brown's complaint with prejudice, and affirm.

**I. Factual Background and Procedural History**

A. *In re Enron* Class Action Litigation

The facts that give rise to the instant lawsuit grow out of prior litigation, a securities fraud class action in which Brown was a member of the class. Following the collapse of Enron Corporation in 2001, shareholders across the nation filed suit. The various shareholder lawsuits were consolidated in the United States District Court for the Southern District of Texas as Civil Action No. H-01-3624, captioned as *In re Enron Corp. Securities Litigation*, 206 F.R.D. 427 (S.D. Tex. 2002) ("*In re Enron*"), and heard by Judge Melinda Harmon. The *In re Enron* litigation presented corporate securities claims and invoked the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, 109

---

[*] District Judge, Northern District of Texas, sitting by designation.

[**] Pursuant to **5TH CIR. R. 47.5**, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in **5TH CIR. R. 47.5.4**.

Stat 737 (codified as amended in scattered sections of 15 U.S.C.). Pursuant to the PSLRA, specifically 15 U.S.C. § 78u-4, Judge Harmon appointed the Regents of the University of California (the "Regents") as lead plaintiff. In their role as lead plaintiff, the Regents selected, and the district court approved, the California law firm of Milberg Weiss Bershad Hynes & **[\*\*3]** Lerach LLP [1] ("Lead Counsel") to serve **[\*891]** as lead counsel for the Enron class of plaintiffs. Lead Counsel, in turn, chose attorney Thomas E. Bilek ("Bilek") and his law firm as one of two Houston-based firms to serve as local counsel.

Approximately seven years into the *In re Enron* litigation, the parties reached various settlements totaling approximately $7.2 billion. *See In re Enron Corp. Sec., Derivative & ERISA Litig.* (*Newby v. Enron Corp.*), 586 F. Supp. 2d 732, 740 (S.D. Tex. 2008) (district court's order acknowledging a "total [settlement] recovery of approximately $7.2 billion, plus interest, achieved in settlements in this action") (internal footnote omitted). Lead Counsel subsequently moved for attorneys' fees from the settlement recovery. "Specifically Lead Counsel [sought] a fee of 9.52 percent of the total recovery, or approximately $688 million, plus interest accrued, in accordance with a fee agreement negotiated with Lead Plaintiff the Regents of the University of California at the outset of [the] litigation." *Id.* **[\*\*4]** (internal footnote omitted). In support of the Regents' fee request, attorneys who had contributed work on behalf of the class submitted documentation to the court of the work performed and hours expended on the case. Bilek submitted a 107-page document setting forth the hours and tasks allegedly expended and performed by Bilek and his firm in the *In re Enron* litigation. The district court provided an opportunity for the parties to object to the fee request, and Brown filed no objection. [2] After extensive briefing and a fairness hearing, the district court found that the *ex ante* contingency fee agreement between the Regents and Lead Counsel "was negotiated at arm's length," "served to attract . . . one of the top, most experienced, and formidable securities law firms in the country," and that, at the time the fee was negotiated, "the 9.52 percentage [contingency fee] was lower than

that awarded in most securities class actions." *Id.* at 767. The district court approved Lead Counsel's requested fee based on the contingency agreement, finding that it was a "fair and reasonable fee."[3] *Id.* at 742, 828. The district court awarded the requested attorneys' fees to Lead Counsel. *Id.* at 828. **[\*\*5]** Lead Counsel then worked in conjunction with the Regents to determine which other attorneys should receive a portion of the fees awarded, and in what amounts. Lead Counsel allocated and distributed approximately $16 million of the $688 million attorneys' fee award to Bilek. [4]

B. Brown Files the Instant Lawsuit

Nine months after the district court approved Lead Counsel's fee request, Brown filed the instant case. In his complaint, **[\*892]** Brown asserted claims for fraud and breach of fiduciary duty against Bilek, The Bilek Law Firm, L.L.P., and Hoeffner & Bilek, L.L.P. Brown filed his complaint in Texas state court on behalf of the putative class of

> [a]ll persons or entities who, as shareholders of Enron Corporation, participated in, did not opt out of, and received monies as a result of the settlement of the class action case styled: *In re ENRON CORPORATION SECURITIES LITIGATION*, Civil Action No. H-01-3624 (Consolidated), in the United States District Court, Southern District of Texas, Houston Division.

Brown's complaint alleged that, "as part of the various attorneys' efforts in the [*In re Enron*] case to obtain

---

[1] The Milberg Weiss lawyers handling the case later changed firm affiliation and subsequently became part of the law firm of Coughlin Stoia Rudman & Robbins L.L.P.

[2] At the time of the hearing, Brown was unaware of Bilek's alleged misrepresentations, and therefore could not have objected at that time.

[3] The district court also analyzed the fee request under a loadstar analysis for use in the event that enforcement of the *ex ante* percentage agreement was appealed and overturned or modified in favor of a loadstar analysis. *Id.* at 778-804. An appeal of the fee award was later filed and remained pending at the time the district court entered the order dismissing Brown's complaint in this subsequent case. However, that appeal has since been dismissed by agreement. *See* Stipulated Dismissal of Appeal Pursuant to **Federal Rule of Appellate Procedure 42(b)**, *Newby v. Enron Corp.*, No. 08-20648 (5th Cir. Sept. 10, 2009); Dismissal Order, *Newby v. Enron Corp.*, No. 08-20648 (5th Cir. Sept. 16, 2009). Therefore, the district court's decision to adopt the *ex ante* fee **[\*\*6]** agreement is left undisturbed.

[4] In the district court, Brown alleged that Bilek received approximately $16 million in fees. On appeal, Brown alleges that Bilek received approximately $18 million. We use the figure presented to the district court, but our analysis would be the same using either amount.

fees," Bilek provided false and exaggerated information to **[\*\*7]** the district court. Brown further alleged that, "[a]s a result of Defendants' misrepresentations to the Court, Defendants received more than $16 million in attorneys' fees from the *Enron* Case. Such fee reduced the amount of recovery available to distribute to the class members."[5] Brown sought disgorgement and unspecified actual and punitive damages.

Pursuant to **[\*\*8]** the Class Action Fairness Act, 28 U.S.C. § 1332(d) and § 1443, Bilek removed the case from Texas state court to the Southern District of Texas. [6] Bilek moved to dismiss Brown's case, and the district court granted his motion. The district court held that Brown could not represent his purported class because it was already represented by the Regents, pursuant to their appointment under the PSLRA as lead plaintiff in the *In re Enron* litigation. Thus, the district court held, any claims asserted on behalf of the class should have been brought by the Regents. Additionally, the district court held that, even assuming Brown could act on behalf of the purported class, he could not challenge the *In re Enron* fee award in a subsequent tort lawsuit. The district court viewed Brown's suit as an attempt to obtain relief from the court order in *In re Enron* that the fee award to Lead Counsel was "fair and reasonable." Thus, the district court reasoned, the challenge should have been brought by a motion under Rule 60(b) of the Federal Rules of Civil Procedure to set aside the judgment in *In re Enron*, or by an action consistent with the PSLRA. Third, and in the alternative, the district court found **[\*\*9]** that Brown failed to plead his claims with particularity, as mandated by Rule 9(b) of the

———————————————————

[5] After receiving Brown's complaint, Bilek provided notice of the suit to the Regents. The Regents subsequently filed a notice on the docket of the *In re Enron* litigation stating that Bilek had submitted his time under oath, that they and Lead Counsel had reviewed the time Bilek submitted, that they had observed Bilek's work on the case over the years and that they "did not have any reason to believe that there was any impropriety with respect to Mr. Bilek's submitted time." Lead Plaintiff's Notice Regarding Case Against Thomas Bilek, *In re Enron Corp. Sec. Litig.* (*Newby v. Enron Corp.*), Civ. Act. No. H-01-3624 (S.D. Tex. June 22, 2009). Nevertheless, noting that they took Brown's allegations seriously, the Regents stated that they had requested substantiation of Brown's claims from Brown's attorney, who had not responded. *Id.*

[6] Following removal, Bilek's case was originally assigned to Judge Kenneth M. Hoyt. Judge Hoyt transferred the case to Judge Harmon since Judge Harmon has presided over the *In re Enron* litigation.

Federal Rules of Civil Procedure.

The district court dismissed Brown's complaint with prejudice, and this appeal follows.

## II. Standard of Review

**HN1**[↑] "This court reviews the district court's dismissal under Rule 12(b)(6) *de novo*, accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs." *Gonzalez v. Kay,* **[\*893]** 577 F.3d 600, 603 (5th Cir. 2009) (internal quotation marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

**HN2**[↑] Pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Courts have also applied the particularity requirement of Rule 9(b) to **[\*\*10]** breach of fiduciary duty claims predicated on fraud. *See, e.g., City of Driscoll, Texas v. Saenz,* No. C-06-543, 2007 U.S. Dist. LEXIS 3690, 2007 WL 173232, at *5 (S.D. Tex. Jan. 17, 2007) (citing, *inter alia, In re Elec. Data Sys. Corp. ERISA Litig.,* 305 F. Supp. 2d 658, 672 (E.D. Tex. 2004) ("Only a breach of fiduciary duty claim which includes a fraud claim implicates Rule 9(b).")).

## III. Analysis

A. Dismissal for Failure to State a Claim

Brown first challenges the district court's holding that Brown's claims against Bilek and his law firms must be brought, if at all, through the Regents in their capacity as lead plaintiff in the *In re Enron* litigation. We hold that based upon the facts present here, Brown's allegations must be presented through the Regents in a manner consistent with the PSLRA, rather than advanced by Brown in a separate tort lawsuit.

**HN3**[↑] The PSLRA provides that the district court "shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members." 15 U.S.C. § 78u-

**APP 97**

4(a)(3)(B)(I). [7] It is undisputed that Brown's proposed class is encompassed by the *In re Enron* litigation class, [**11] which is represented by the Regents as the appointed lead plaintiff. HN4[⬆] The PSLRA provides that, once selected, the lead plaintiff "shall, subject to the approval of the court, select and retain counsel to represent the class." *Id.* § 78u-4(a)(3)(B)(v). "[T]he PSLRA grants th[e] lead plaintiff primary responsibility for selecting and supervising the attorneys who work on behalf of the class." *In re Cendant Corp. Sec. Litig.* ("*Cendant II*"), 404 F.3d 173, 181 (3rd Cir. 2005). [8] "Any attorney who wishes to be compensated out of the plaintiff class's recovery in a class action governed by the PSLRA must submit his fee requests to the PSLRA lead plaintiff." *Id.* at 199. Under the framework established by the PSLRA, "lead plaintiffs are entitled to significant discretion in selecting and compensating lead counsel" and "so to are they entitled to similar discretion in determining whether other firms have benefited [sic] the class, and whether and to what extent to compensate such firms." [9] *Id.* at 180-81.

[*894] The facts that form the basis of Brown's suit are inextricably woven into the *In re Enron* litigation. Brown has alleged that Bilek committed fraud on the *In re Enron* court, plaintiff [**13] class, and lead plaintiff by making false representations regarding his work on behalf of the class. Brown seeks to disgorge the attorneys' fees received by Bilek through the PSLRA-governed fee award in *In re Enron* and to return such fees to the class members. [10] If Brown's action were successful, it would necessarily disturb the *ex ante* percentage fee agreement between the Regents and Lead Counsel, the district court's order approving that arrangement, as well as the Regent's determination of which non-lead counsel are entitled to attorneys' fees from the class recovery, and in what amounts. HN6[⬆] An unnamed class member may not circumvent a PSLRA lead plaintiff's authority by filing an independent tort lawsuit on behalf of members of the class complaining of acts and omissions that occurred in the context of the PSLRA-governed litigation. Given the specific requirements of the PSLRA, as well as the facts of this case, Brown's allegations must be brought, if at all, in a motion under Rule 60(b) of the Federal Rules of Civil Procedure by the Regents in their capacity as lead plaintiff. [11]

## B. Dismissal for Failure to Plead Fraud with Particularity

### 1. 9(b) Deficiency

The district court found that, in the alternative, Brown's complaint failed to meet the pleading requirements of Rule 9(b). Brown argues that the district court held him to too high of a pleading standard. After reviewing Brown's complaint *de novo*, we agree that it failed to meet the requirements of Rule 9(b).

HN7[⬆] This Circuit has held that "the Rule 9(b) standards require specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation why they are fraudulent." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) (citing *Nathenson v. Zonagen*, 267 F.3d 400, 412 (5th Cir. 2001)). "What constitutes 'particularity' will necessarily differ with [**15] the facts of each case and hence the Fifth Circuit has never articulated the requirements of Rule 9(b) in great detail," but "has found that the plaintiff must allege with particularity 'the defendant's acts with the plaintiff contends amount to fraud.'" *Guidry v. Bank*

---

[7] HN5[⬆] The PSLRA also creates a "rebuttable presumption" that the lead plaintiff "has the largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). Brown has [**12] advanced no argument attempting to rebut this presumption, nor has he alleged that the Regents would not adequately represent the interests of the class by rectifying Bilek's alleged fraud.

[8] *Cendant II* followed the Third Circuit's opinion in *In re Cendant Corp. Sec. Litig* ("*Cendant I*"), 264 F.3d 201 (3rd Cir. 2001), in which the court "rejected the District Court's use of an auction mechanism to select and compensate lead counsel, and remanded for a determination of attorneys' fees in accordance with the agreement between lead plaintiffs and their chosen lead counsel." *Cendant II*, 404 F.3d at 180.

[9] In reciting the PSLRA provisions governing the lead counsel's responsibility to select and monitor other counsel involved in a case, we are not called upon to discuss, nor do we reach any conclusion regarding the court's duties to oversee the reasonableness of the ultimate fee award. This decision is limited to Bilek's procedural duty to present his allegations first to counsel for the Regents pursuant to the statute.

[10] Brown does not argue that Bilek's portion of the fees should be re-allocated to the remaining attorneys [**14] rather than remitted to the class. Brown would lack standing to advance such a proposed remedy.

[11] Because this holding mandates dismissal of Brown's complaint for failure to state a claim, we do not opine on the subsequent and even more fact-specific question of whether, and if so, under what circumstances, a proper plaintiff may bring a tort lawsuit to challenge a PSLRA-governed fee award.

of LaPlace, 954 F.2d 278, 288 (5th Cir. 1992) (quoting Unimobil 84, Inc. v. Spurney, 797 F.2d 214, 217 (5th Cir. 1986)).

Turning to the facts of this case, Brown's complaint presents Bilek's alleged misbehavior in general terms that fall short of the heightened pleading requirements of Rule 9(b). Brown's complaint alleges that, "Bilek [] provided to the [*In re Enron*] Court information that was, in some cases patently and demonstrably false, and in other cases, grossly exaggerated, in order to justify a fee award for **[*895]** him and the law firms with whom he was affiliated." However, Bilek did not identify with particularity even one such piece of information, did not plead facts demonstrating why the information was patently and demonstrably false, and did not state to what extent it was exaggerated. His complaint further alleges, "Defendants breached [their] fiduciary duty by providing false information to the Court to justify **[**16]** a fee award, by violating the criminal laws, and by violating various attorney ethical obligations imposed by the State Bar of Texas." Brown does not support these general allegations with particular facts tending to show specifically what information was false, why the information was false, or which criminal laws and ethical obligations Bilek violated. After reviewing the facts of this case, we agree that Brown's complaint failed plead his allegations with the particularity required by Rule 9(b).

2. Denial of Leave to Amend

Brown also contends that, after finding his pleading deficient under Rule 9(b), the district court should have either granted him leave to amend his pleadings or dismissed his suit without prejudice. **HN8**[⬆] On review, this court must "review the denial of leave to amend the complaint for abuse of discretion." *McKinney v. Irving Indep. Sch. Dist.*, 309 F.3d 308, 312 (5th Cir. 2002). Brown provided the district court no guidance as to why he should be given an opportunity to replead, or to the substance of his proposed amended complaint. **HN9**[⬆] Courts of this Circuit have affirmed denials of motions for leave to amend when plaintiffs "fail[] to amend their complaint as a matter **[**17]** of right, fail[] to furnish the district court with a proposed amended complaint, and fail[] to alert both the court and defendants to the substance of their proposed amendment." *Id.* at 315. Even on appeal, Brown has not identified any facts he would add to his complaint if given the opportunity to replead, but instead has asserted that "it escapes logical reasoning as to how his Petition could be made more 'particular.'" Brief of Appellant Michael L. Brown at 22,

*Brown v. Bilek*, No. 09-20654 (5th Cir. Nov. 25, 2009). We therefore cannot say that the district court abused its discretion in dismissing Brown's complaint without first providing him the opportunity to replead.

## IV. CONCLUSION

Brown's complaint was properly dismissed for failure to state a claim because, on the facts of this case, his allegations must be presented through the lead plaintiff in a manner consistent with the PSLRA. Additionally, Brown's complaint was properly dismissed because he failed to plead his claims with particularity as required by Rule 9(b). We hold that the district court did not err in dismissing Brown's complaint with prejudice.

Affirmed.

**End of Document**

Ⓐ Last updated  September 16, 2024   03:14:02 pm GMT

# Bangzheng Chen v. CytRx Corp.

United States District Court for the Central District of California

June 13, 2014, Decided; June 13, 2014, Filed

CV 14-1956-GHK (PJWx)

**Reporter**

2014 U.S. Dist. LEXIS 194696 *

Bangzheng Chen v. CytRx Corp., et al.

**Subsequent History:** Related proceeding at Rajasekaran v. CytRx Corp., 2014 U.S. Dist. LEXIS 124550 (C.D. Cal., Aug. 21, 2014)

Related proceeding at In re : Cytrx Corp. Stockholder Derivative Litig., 2015 U.S. Dist. LEXIS 187009 (C.D. Cal., Jan. 8, 2015)

Motion granted by, in part, Motion denied by, in part, Motion denied by, Motion granted by, Dismissed by, in part In re CytRx Corp. Sec. Litig., 2015 U.S. Dist. LEXIS 91447 (C.D. Cal., July 13, 2015)

## Core Terms

lead plaintiff, consolidation, Appointment, adequacy, class member, Investor, motions, largest, movant, satisfies, losses

**Counsel:  [*1]** Attorneys for Plaintiff: Not Present.

Attorneys for Defendant: Not Present.

**Judges:** GEORGE H. KING, CHIEF UNITED STATES DISTRICT JUDGE.

**Opinion by:** GEORGE H. KING

## Opinion

**CIVIL MINUTES - GENERAL**

**Proceedings: (In Chambers) Order re:** (1) Motions to Consolidate [Dkt. Nos. 16, 17, 20, 23, 25]; and (2) Motions for Appointment of Lead Plaintiff [Dkt. Nos. 23, 25]

This matter is before us on several motions to consolidate, John Corbitt's Motion for Appointment of Lead Plaintiff, and Deepak Gupta's unopposed Motion for Appointment of Lead Plaintiff. We have considered the papers filed in support of these motions,[1] and deem them appropriate for resolution without oral argument. L.R. 7-15. The hearing on these matters set for June 16, 2014 at 9:30 a.m. is hereby **VACATED** and **TAKEN OFF CALENDAR**. As the Parties are familiar with the facts, we will repeat them only as necessary. Accordingly, we rule as follows:

### I. Background

This putative securities class action was filed in this Court on March 14, 2014. Three related actions were filed shortly thereafter: *Victor Perri v. CytRx Corp., et al.*, CV 14-2052 (filed March 18, 2014); *Hyun Dong Kim v. CytRx Corp., et al.*, CV 14-2689 (filed April 9, 2014); and *Kannan Rajasekaran v. CytRx* **[*2]** *Corp., et al.*, CV 14-3406 (removed to this Court on May 2, 2014).[2] These actions allege that CytRx Corporation ("CytRx"), a biopharmaceutical research and development company, violated federal securities laws by failing to disclose that a series of articles about the company were actually paid promotional materials. This promotional campaign

---

[1] Because we need not reference Gupta's Sur-Reply to resolve these motions, Gupta's Motion for Leave to file Sur-Reply [Dkt. No. 40] is **DENIED as moot**.

[2] On June 11, 2014, Rajasekaran filed a Motion to Remand to state court based on an anti-removal provision in the 1933 Securities Act. *See* 15 U.S.C. § 77v(a) (providing that "no case arising under the [1933 Securities Act] and brought in any State court of competent jurisdiction shall be removed to any court of the United States."). Because we must resolve this Motion to Remand before we can determine whether *Rajasekaran* should be consolidated with the other three actions, we will not consider *Rajasekaran* in this Order.

**APP 100**

allegedly caused CytRx stock to trade at artificially inflated prices. After TheStreet.com and SeekingAlpha.com revealed that a stock promotion firm was responsible for the supposed "news articles" about CytRx, the market value of CytRx securities declined precipitously.

Several CytRx investors brought motions (i) to consolidate these related actions into a single shareholder securities class action and (ii) to be appointed as lead plaintiff pursuant to the PSLRA. Seven movants timely filed lead plaintiff motions: (1) Deepak Gupta ("Gupta"); (2) Mitchell Kahn, Brent Reed, and Gordon Niedermayer ("Kahn Investor Group"); (3) Michael D. Gore ("Gore"); (4) Kisuk Cho ("Cho"); (5) Mark Butensky, Randall S. Pettit, and Diane D. Pettit ("CytRx Investor Group"); (6) John Corbitt ("Corbitt"); and (7) Luis Sosa, Karim Hamed, and Bahadir **[\*3]** Dora ("Sosa Investor Group"). Recognizing that they lacked the financial stake to serve as lead plaintiff under the PSLRA, most of these movants—the CytRx Investor Group, the Sosa Investor Group, Cho, the Khan Investor Group, and Gore—have since withdrawn their motions. While Corbitt has not affirmatively withdrawn his motion, he has filed no opposition to the competing motion filed by Gupta. Gupta is therefore the only remaining movant that is actively seeking appointment as lead plaintiff. Defendants CytRx and Steven A. Kriegsman (CytRx's CEO) do not oppose consolidation and take no position concerning the appointment of lead plaintiff.

## II. Consolidation

Before selecting a lead plaintiff, the Private Securities Litigation Reform Act ("PSLRA") requires that we first determine whether any actions "asserting substantially the same claim or claims" should be consolidated. 15 U.S.C. § 78u-4(a)(3)(B)(ii); *see also Andrade v. Am. Apparel, Inc., 2011 U.S. Dist. LEXIS 79795, at \*7 (C.D. Cal. Mar. 15, 2011)* ("The threshold issue under the PSLRA is consolidation." (internal citation and quotation marks omitted)). We have broad discretion to consolidate actions involving "common issues of law or fact," Fed. R. Civ. P. 42(a), and the PSLRA does not displace Rule 42's standard for consolidation, *Aronson v. McKesson HBOC, Inc., 79 F. Supp. 2d 1146, 1150-51 (N.D. Cal. 1999)*. Securities class actions like this one are **[\*4]** "particularly suited to consolidation to help expedite pretrial proceedings, reduce case duplication, avoid the involvement of parties and witnesses in multiple proceedings, and minimize the expenditure of time and money by everyone involved." *In re Century*

*Aluminum Co. Sec. Litig., 2009 U.S. Dist. LEXIS 81205, 2009 WL 2905962, at \*2 (N.D. Cal. Sept. 8, 2009)*.

Consolidation is plainly appropriate here. The *Chen, Perri*, and *Kim* actions make the same factual allegations, assert the same claims, cover substantially identical class periods,[3] and involve identical defendants.[4] Moreover, the CytRx Defendants do not oppose consolidation, and themselves concede that the *Chen, Perri*, and *Kim* actions are related. [*See* Dkt. No. 28, 1 n.1]. We therefore **GRANT** the motions to consolidate these three related actions into a single shareholder suit.

## III. Appointment of Lead Plaintiff

The PSLRA "provides a simple three-step process for identifying the lead plaintiff" in a securities fraud case. *In re Cavanaugh, 306 F.3d 726, 729 (9th Cir. 2002)*. "The first step consists of publicizing the pendency of the action, the claims made, and the purported class period." *Id.* The notice must advise that "any member of the purported class may move the court to serve as lead plaintiff." 15 U.S.C. § 78u-4(a)(3)(A)(i)(II). This step has been carried out here, as on March 15, 2014 counsel in **[\*5]** *Chen* (the first-filed action) published a notice in *GlobeNewswire*, a widely circulated business-oriented wire service, advising putative class members of their right to file a motion to be appointed as lead plaintiff by May 13, 2014. Gupta's motion was timely filed.

Next, "the district court must consider the losses allegedly suffered by the various plaintiffs" who have timely filed motions to serve as lead plaintiff, and select as the "presumptively most adequate plaintiff—and hence the presumptive lead plaintiff—the one who has the largest financial interest in the relief sought by the

---

[3] The *Chen* and *Kim* action were brought on behalf of shareholders who purchased CytRx securities between November 22, 2013 and March 13, 2014. (Chen Compl. ¶ 1; Kim Compl. ¶ 1). *Perri*'s class period is virtually identical, but it starts two days earlier, on November 20, 2013. (Perri Compl. ¶ 1).

[4] The *Perri* and *Kim* actions were brought only against CytRx and its CEO, Steven A. Kriegsman. *Chen* named two additional defendants, DreamTeamGroup and MissionIR, the advertising firms that allegedly wrote the paid promotional articles about CytRx, but these defendants were dismissed without prejudice on May 29, 2014 for plaintiff's failure to file proofs of service.

**APP 101**

class" and who otherwise satisfies Rule 23's typicality and adequacy requirements. *In re Cavanaugh*, 306 F.3d at 729-30 (internal citations omitted). The PSLRA thus creates "a rebuttable presumption that the plaintiff with the largest stake in the controversy will be the lead plaintiff." *Id.* at 729 n.2. Once we identify the plaintiff with the largest stake in the litigation, "further inquiry must focus on that plaintiff alone and [should] be limited to determining whether he satisfies the other statutory requirements." *Id.* at 732. At the final step, we consider whether any other member of the class has rebutted the presumptive lead plaintiff's showing of typicality **[*6]** and adequacy. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

## A. Gupta Has the Largest Financial Stake

Here, Gupta incurred over one million dollars in losses in connection with his purchases of CytRx stock during the class period (Nicholson Decl., Ex. B), while Corbitt, the only other movant who has not withdrawn his motion, has suffered losses of approximately $231,984. Under any measure (and by Corbitt's own implicit admission), Gupta has the "largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). Accordingly, because the PSLRA "provides in categorical terms that the *only* basis on which a court may compare plaintiffs competing to serve as lead is the size of their financial stake in the controversy," Gupta will be the presumptive lead plaintiff so long as he has made a prima facie showing of typicality and adequacy. *In re Cavanaugh*, 306 F.3d at 732.

## B. Gupta Satisfies Rule 23's Typicality and Adequacy Requirements

In making our initial assessment of Gupta's typicality and adequacy, "[a] wide ranging analysis is not appropriate." *Tanne v. Autobytel, Inc.*, 226 F.R.D. 659, 666 (C.D. Cal. 2005). We "must rely on the presumptive lead plaintiff's complaint and sworn certification; there is no adversary process to test the substance of [his] claims." *In re Cavanaugh*, 306 F.3d at 730. In other words, "[a]t this stage of the proceedings, nothing more than a preliminary **[*7]** showing is required." *Wenderhold v. Cylink Corp.*, 188 F.R.D. 577, 587 (N.D. Cal. 1999).

Under Rule 23, typicality exists where the class representative "possess[es] the same interest and suffer[ed] the same injury" as the class members. *Gen.*

*Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Like absent class members, Gupta purchased CytRx stock during the class period at allegedly artificially inflated prices and suffered financial loss as a result of CytRx's alleged misleading statements and omissions. Gupta's claims therefore arise "from the same event or course of conduct that gives rise to the claims of other class members" and are "based on the same legal theory." *Neal v. Casey*, 43 F.3d 48, 58 (9th Cir. 1994). Accordingly, Gupta's claims are "substantially similar, if not identical, to those of other class members." *See Tanne*, 226 F.R.D. at 667. In light of Gupta's sworn certification that he purchased CytRx securities and suffered losses during the class period (Nicholson Decl., Ex. A), Gupta has made a sufficient prima face showing of typicality. *See id.*

Gupta has likewise made a satisfactory prima facie showing of adequacy. A class representative satisfies Rule 23's adequacy requirement so long as (i) his **[*8]** interests align with those of absent class members, and (ii) he is both willing and able to prosecute the action vigorously on behalf of the class. *See Hanlon*, 150 F.3d at 1020. "Because one relevant factor in assessing adequacy is whether the plaintiff has a sufficient financial incentive to monitor the litigation vigorously, [our] finding that [Gupta] suffered the largest single loss of any plaintiff indicates that he will be an adequate representative." *Andrade*, 2011 U.S. Dist. LEXIS 79795, at *24. Gupta's sworn certification that "he is willing to accept the responsibilities of serving as a representative party on behalf of the class" provides further assurance that he is "committed to the prosecution of this action." *Tanne*, 226 F.R.D. at 668. Moreover, Gupta's interests are aligned with those of absent class members, each of whom seeks to recover losses stemming from CytRx's allegedly misleading promotional campaign. *See id.*

Some movants have withdrawn their motions and others have failed to file oppositions to Gupta's motion. Thus, no movant has challenged Gupta's typicality and adequacy. We therefore conclude that Gupta satisfies these Rule 23 requirements based on his prima facie showing. Accordingly, Gupta is presumptively the most adequate lead plaintiff pursuant to the **[*9]** PSLRA. We therefore appoint Gupta as lead plaintiff.

**APP 102**

## IV. Approval of Lead Counsel

Once a lead plaintiff has been designated by the court, the PSLRA directs that the plaintiff "shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v); *see also In re Cavanaugh,* 306 F.3d at 732 n.11 ("Congress gave the lead plaintiff, and not the court, the power to select a lawyer for the class."). Thus, to the extent that we may inquire into the counsel's qualifications to handle complex litigation, "such information is relevant only to determine whether the presumptive lead plaintiff's choice of counsel is so irrational, or so tainted by self-dealing or conflict of interest, as to cast genuine and serious doubt on that plaintiff's willingness or ability to perform the functions of lead plaintiff." *In re Cavanaugh,* 306 F.3d at 733. Gupta has selected Kahn, Swick & Foti, LLC, a boutique firm with offices in New York City and Louisiana, to represent the class as lead counsel. Based on the firm's resume and experience with class action securities litigation (*see* Nicholson Decl., Ex. D), the Court is satisfied that Kahn, Swick & Foti, LLC is qualified to serve as lead counsel in this case.

## V. Conclusion

In summary, we rule as follows: **[\*10]** (1) the *Chen, Perri*, and *Kim* actions are **CONSOLIDATED**; (2) the *Perri* (CV 14-2052) and *Kim* (CV 14-2689) actions are **DISMISSED** ; (3) Gupta is **APPOINTED** as lead plaintiff; and (4) Kahn, Swick & Foti, LLC is **APPROVED** as lead counsel for the class. After we rule on the recently filed *Rajasekaran* Motion to Remand [2:14-cv-3406, Dkt. No. 28] and determine whether *Rajasekaran* should be consolidated with this action, we shall issue a further order directing Gupta to file a consolidated Complaint.

**IT IS SO ORDERED**.

---

End of Document

APP 103

Ⓐ Last updated  September 16, 2024   03:15:06 pm GMT

## Dougherty v. Esperion Therapeutics

United States District Court for the Eastern District of Michigan, Southern Division

November 19, 2020, Decided; November 19, 2020, Filed

Case No. 16-10089

### Reporter

2020 U.S. Dist. LEXIS 216515 *; Fed. Sec. L. Rep. (CCH) P100,950; 2020 WL 6793326

KEVIN L. DOUGHERTY, ET AL., Plaintiffs, v. ESPERION THERAPEUTICS, INC., ET AL., Defendants.

**Prior History:** Dougherty v. Esperion Therapeutics, Inc., 2020 U.S. Dist. LEXIS 108072 ( E.D. Mich., May 31, 2020)

## Core Terms

stock, damages, class period, lead plaintiff, fraud-on-the-market, class member, courts, adequacy, factors, traded, common stock, misrepresentations, cardiovascular, disclosure, inflation, shares, artificial, corrective, predominance, measures, class certification, theory of liability, trading volume, press release, alteration, investors, cases

**Counsel:** [*1] For Kevin L Dougherty, Plaintiff: Angela L. Baldwin, The Miller Law Firm, Detroit, MI USA; Dennis A. Lienhardt, Sharon S. Almonrode, William Kalas, The Miller Law Firm, P.C., Rochester, MI USA; E. Powell Miller, The Miller Law Firm, Rochester, MI USA.

For Esperion Therapeutics, Inc., Tim M Mayleben, Defendants: Adam Slutsky, Deborah S. Birnbach, Ian Stearns, Katherine M. Anthony, Katherine McKenney, Morgan Mordecai, Goodwin Procter LLP, Boston, MA USA; Emily Unger, Goodwin Proctor LLP, Boston, MA USA; Matthew J. Boettcher, Plunkett & Cooney (Bloomfield Hills), Bloomfield Hills, MI USA.

For Roger Jolicoeur, Movant: Thomas L. Laughlin, IV, Scott & Scott LLP, New York, NY USA.

For Aurelio Scarpatetti, Movant: Edmond Prifti, Sachs Waldman Professional Corporation, Madison Heights, MI USA.

For Brian Berberian, Movant: Patrick E. Cafferty, Cafferty Clobes Meriwether & Sprengel LLP, Chicago, IL USA.

For Ronald E Wallace, Walter J Minett, Movants: Alayne Karen Gobeille, Alexander Louis Burns, Melinda A. Nicholson, Morgan Michelle Embleton, Kahn Swick & Foti LLC, New Orleans, LA USA; Austin P. Brane, Francisco J. Mejia, Kevin A. Lavelle, Ting H. Liu, Ryan A. Llorens, Robbins Geller Rudman and Dowd [*2] LLP, San Diego, CA USA; Ramzi Abadou, Kahn Swick & Foti LLP, San Francisco, CA USA; Sharon S. Almonrode, The Miller Law Firm, P.C., Rochester, MI USA.

**Judges:** Arthur J. Tarnow, Senior United States District Judge. UNITED STATES MAGISTRATE JUDGE, R. STEVEN WHALEN.

**Opinion by:** Arthur J. Tarnow

## Opinion

ORDER OVERRULING DEFENDANTS' OBJECTIONS [159] AND ADOPTING MAGISTRATE JUDGE WHALEN'S REPORT & RECOMMENDATION [152]

This is a securities fraud case brought pursuant to sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("SEA"), 15 U.S.C. §§ 78j(b), 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240. On May 31, 2020, Magistrate Judge R. Steven Whalen granted Plaintiffs' Motion for Class Certification and to Appoint Class Representatives and Class Counsel [66]. (ECF No. 152). On June 19, 2020, in response to a Joint Motion to Amend/Correct [154], Magistrate Judge Whalen issued a follow-up Order [157] designating the original Order [152] a Report and Recommendation ("R&R") pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 157, PageID.7502). Defendants filed Objections to the R&R on July 6, 2020. (ECF No. 159). Plaintiffs responded on July 20, 2020. (ECF No. 161). Defendants filed a reply

**APP 104**

on July 27, 2020. (ECF No. 162). The Court heard arguments on October 6, 2020.

For the **[\*3]** reasons stated below, the Court **OVERRULES** Defendants' Objections [159] and **ADOPTS** the R&R [152].

## FACTUAL BACKGROUND

Defendant, Esperion Therapeutics, Inc. ("Esperion"), is a pharmaceutical company whose "sole focus is the development of ECT-1002, a first-in-class oral medication designed to lower LDL-cholesterol, also known as 'bad cholesterol.'" *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 975 (6th Cir. 2018). "Defendant Tim M. Mayleben is Esperion's CEO and a member of its Board of Directors. As such, he was heavily involved in Esperion's efforts to secure Food and Drug Administration ('FDA') approval for ETC-1002." (ECF No. 152, PageID.7462). "Plaintiffs, the purchasers of Esperion common stock between August 18 and September 28, [2015,] brought this class action against Esperion and Mayleben for violating §§ 10(b) and 20(a) of the [SEA], as well as SEC Rule 10b-5." *Dougherty, 905 F.3d at 977*.

The thrust of Plaintiffs' claim is that, following an August 2015 meeting between Esperion executives and FDA officials, Esperion and Mayleben made false statements about ETC-1002's approval trajectory, misleading investors and "causing Esperion stock to trade at artificially inflated levels during the class period." *Id.* at 976, 978. Specifically, Esperion issued a press release on August 17, 2015, stating 1) that "[t]he **[\*4]** FDA [had] confirmed that LDL-C remain[ed] an acceptable clinical surrogate endpoint for the approval of an LDL-C lowering therapy such as ETC-1002 in patient populations [with HeFH or ASCVD]," and 2) that "[b]ased upon feedback from the FDA, approval of ETC-1002 in the HeFH and ASCVD patient populations [would] not require the completion of a cardiovascular outcomes trial." (ECF No. 152, PageID.7462). Additionally, in a conference call with market analysts that same day, Mayleben stated that "[ETC-]1002 will not require a CV outcomes trial to be completed prior to approval in patients with [HeFH] and ASCVD." *Dougherty, 905 F.3d at 976-77* (alterations in original).

As the Sixth Circuit noted in its order reversing this Court's initial dismissal of Plaintiffs' complaint:

> These statements require some explanation to be

fully understood in context. A cardiovascular outcomes trial (CVOT) is a costly, lengthy study that measures a drug's effectiveness in reducing cardiovascular risk over several years. Because lower LDL-cholesterol is presumed to improve overall heart health, the FDA does not typically require companies seeking approval of a new cholesterol-lowering drug to complete a CVOT and prove that the drug actually **[\*5]** reduces cardiovascular risk. Instead, the FDA treats LDL-cholesterol as a "surrogate endpoint," or proxy, for cardiovascular risk. In other words, if a new drug is shown to lower LDL-cholesterol, the FDA assumes that it also improves overall cardiovascular health. By saying that the FDA would continue to use LDL-cholesterol as a proxy for cardiovascular risk, and that the FDA would not require a completed CVOT prior to approving ETC-1002, Esperion was essentially telling its investors that ETC-1002 had a clear path to regulatory approval.

*Id.* at 976.

The problem, however, was that the FDA's minutes of the August 11, 2015 meeting—the official record—were contrary to Esperion's and Mayleben's assertions. (ECF No. 152, PageID.7464). As Magistrate Judge Whalen explained:

> When the minutes were released [publicly], Esperion issued another press release . . . stating, contrary to its earlier position, that the "FDA ha[d] encouraged the Company to initiate a cardiovascular outcomes trial promptly . . . since any concern regarding the benefit/risk assessment of ETC-1002 could necessitate a completed cardiovascular outcomes trial before approval." In a subsequent conference call, Mayleben characterized Esperion's **[\*6]** latest press release as "slightly different" than the language used in the August release. As the Sixth Circuit observed, "Market analysts seized on this change in position, and Esperion's stock dropped 48% the next day, from $35.09 per share to $18.33 per share." *Dougherty, 905 F.3d at 977*.

(*Id.*).

Plaintiffs thus filed this suit for damages on January 12, 2016. (ECF No. 1). The Court appointed Ronald E. Wallace and Walter J. Minett as Lead Plaintiffs on April 5, 2016. (ECF No. 25). Plaintiffs amended their complaint on May 20, 2016, and on July 5, 2016,

**APP 105**

Defendants moved to dismiss. (ECF No. 29; ECF No. 30). On December 27, 2016, the Court granted Defendants Motion to Dismiss [30]. (ECF No. 38). The Sixth Circuit reversed on September 27, 2018 and remanded the case back to this Court. *Daugherty, 905 F.3d at 984*.

## LEGAL STANDARD

Plaintiffs argue that "Defendants' Objections simply regurgitate their class certification Opposition" and that, consequently, a "clear error" standard of review is appropriate. (ECF No. 161, PageID.7665). While it is true that "[a] district court need not provide *de novo* review where the objections are 'frivolous, conclusive or general,'" that exception does not apply here. *Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986)* (quoting *Nettles v. Wainwright, 677 F.2d 404, 410 n.8 (5th Cir. 1982))*. Defendants' Objections each **[*7]** point to specific, allegedly defective, sections of the R&R. Accordingly, the Court reviews them *de novo* pursuant to 28 U.S.C. § 636(b)(1). *See, e.g., DiPonio Constr. Co. v. Int'l Union of Bricklayers & Allied Craftworkers, Local 9*, 739 F. Supp. 2d 986, 992 (E.D. Mich. 2010).

## ANALYSIS

**OBJECTION I: THE FRAUD-ON-THE MARKET PRESUMPTION OF RELIANCE DOES NOT APPLY BECAUSE PLAINTIFFS HAVE FAILED TO PROVE THAT THE MARKET FOR ESPERION STOCK WAS EFFICIENT DURING THE CLASS PERIOD.**

### A. Context: The Fraud-on-the-Market Theory and the Role of Efficiency

In order for Plaintiffs seeking class certification to satisfy the predominance requirement of Fed. R. Civ. P. 23(b)(3), they must demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members." This inquiry "begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co. (Halliburton I), 563 U.S. 804, 809, 131 S. Ct. 2179, 180 L. Ed. 2d 24 (2011)*. The element at issue here is Plaintiffs' reliance upon Defendants' alleged misrepresentations and/or omissions. *See Halliburton Co. v. Erica P. John Fund, Inc. (Halliburton II), 573 U.S. 258, 267, 134 S. Ct. 2398, 189 L. Ed. 2d 339 (2014)* (listing elements of claim). To satisfy the predominance

inquiry with respect to reliance, Plaintiffs have invoked the "fraud-on-the-market" presumption, endorsed by the Supreme Court in *Basic Inc. v. Levinson, 485 U.S. 224, 250, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)*, and reaffirmed in *Halliburton II, 573 U.S. at 266*.

In *Basic*, the Supreme Court explained that "[b]ecause most publicly available information is reflected in market price, an investor's reliance on any public **[*8]** material misrepresentations . . . may be presumed" in a securities fraud claim such as the one at issue here. 485 U.S. at 247. "The Court based [this] presumption on what is known as the 'fraud-on-the-market' theory, which holds that 'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations.'" *Halliburton II, 573 U.S. at 258* (quoting *Basic, 485 U.S. at 247*). Thus, "to demonstrate that the presumption of reliance applies in a given case," a plaintiff must show: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Id. at 268* (citing *Basic, 485 U.S. at 248, n.27*). Importantly, this presumption is "rebuttable rather than conclusive." *Id. at 268-69*.

Defendants' first objection focuses on the applicability of the fraud-on-the-market presumption, and specifically, the Magistrate Judge's analysis of whether Esperion's common stock traded in an efficient market during the class period. (ECF No. 159, PageID.7557). While there is no bright-line test for market efficiency, the Sixth Circuit has cited with approval **[*9]** the five-factor test laid out in *Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989)*. *See Freeman v. Laventhol & Horwath, 915 F.2d 193, 199 (6th Cir. 1990)*. These factors are:

> (1) a large weekly trading volume; (2) the existence of a significant number of reports by securities analysts; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 Registration Statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases.

*Id.* (citing *Cammer, 711 F. Supp at 1286-87*).

In addition to the *Cammer* factors, many courts, including several in this circuit, have also considered the three factors enumerated in *Krogman v. Sterritt, 202*

F.R.D. 467, 478 (N.D. Tex. 2001). *See, e.g., Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., 332 F.R.D. 556, 575-76 (M.D. Tenn. 2019)*. These include: (1) market capitalization ("the number of shares multiplied by the prevailing share price"); (2) bid-ask spread ("the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares"); and (3) float ("the percentage of shares held by the public, rather than insiders"). *Krogman,* 202 F.R.D. at 478.

### B. Failing to Satisfy the Fifth *Cammer* Factor Is Not a *Per Se* Bar

Defendants' principal objection to the R&R is that it failed to give proper weight to the fifth *Cammer* factor. (ECF No. 159, PageID.7557). Defendants argue that, **[*10]** as a matter of law, a positive showing under the fifth *Cammer* factor must be made in order for a plaintiff to benefit from the fraud-on-the-market presumption, regardless of whether other indirect indicia of efficiency are present. (ECF No. 159, PageID.7556). In making this argument, Defendants rely heavily on *OPERS,* a case in which the court declined to find efficiency in spite of the first three *Cammer* factors being satisfied. *See Ohio Pub. Emps.' Ret. Sys. v. Fed. Home Loan Mortg. Corp.* (*OPERS*), No. 4:08CV0160, 2018 U.S. Dist. LEXIS 137229 (N.D. Ohio Aug. 14, 2018), *perm. app. denied sub nom., In re Ohio Pub. Emps.' Ret. Sys.,* No. 18-0310, 2019 U.S. App. LEXIS 2337 (6th Cir. Jan. 23, 2019).

The Sixth Circuit has not addressed the question of whether the fifth *Cammer* factor is dispositive and district courts in this circuit have come out both ways. *Compare, e.g., OPERS,* 2018 U.S. Dist. LEXIS 137229, at *47 ("The [first four] *Cammer* factors are not enough, alone, to establish market efficiency."), *with, e.g., In re Accredo Health, Inc. Sec. Litig.,* No. 03-2216 DP, 2006 U.S. Dist. LEXIS 97621, at *33 (W.D. Tenn. Mar. 7, 2006) ("In order for the court to conclude that a market is efficient, 'it is not necessary that a stock satisfy all five factors.'" (quoting *Simpson v. Specialty Retail Concepts, Inc.,* 823 F. Supp. 353, 355 (M.D.N.C. 1993))), *R&R adopted,* 2006 U.S. Dist. LEXIS 97620.

Ultimately, while Defendants are correct that several courts have found the fifth *Cammer* factor to **[*11]** provide the best evidence of efficiency, most do not treat it as strictly necessary in making the market efficiency determination. *See, e.g., Waggoner v. Barclays PLC,* 875 F.3d 79, 97 (2d Cir. 2017); *Local*

703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp., 762 F.3d 1248, 1256 (11th Cir. 2014); *Weiner v. Tivity Health, Inc.,* 334 F.R.D. 123, 133 (M.D. Tenn. 2020) ("[T]he Sixth Circuit has not mandated use of [the *Cammer*] factors, and even in those cases where the factors are utilized, they are generally deemed to be an analytical tool rather than a checklist."); *Monroe Cnty. Emps.' Ret. Sys. v. S. Co., 332 F.R.D. 370, 385 n.8 (N.D. Ga. 2019)* (collecting cases). Against this backdrop, *OPERS,* on which Defendants so heavily rely, appears to be an outlier.

### C. Plaintiffs Have Demonstrated Efficiency

The Court now examines whether Plaintiffs have provided sufficient evidence of efficiency to invoke the fraud-on-the-market presumption of reliance. They have.

The Sixth Circuit has noted that "securities traded in national secondary markets . . . are well suited for application of the fraud on the market theory." *Freeman, 915 F.2d at 199*. Thus, the fact that Esperion's common stock traded on the NASDAQ during the Class Period is persuasive, though not conclusive, evidence of market efficiency. (ECF No. 66-11, PageID.1787).

The *Krogman* factors point in the same direction. During the Class Period, Esperion's market capitalization averaged $1.08 billion, its bid-ask spread averaged between 0.22% and 0.29%, and 97% **[*12]** of its outstanding shares stock were held by outsiders. (ECF No. 66-11, PageID.1800-02). These figures all suggest an efficient market. *See, e.g., Norfolk,* 332 F.R.D. at 576; *Cheney v. Cyberguard Corp., 213 F.R.D. 484, 501 (S.D. Fla. 2003)*.

As to the *Cammer* factors, Defendants do not dispute that Esperion's stock satisfies the first four. (ECF No. 161-2, PageID.7716). Defendants also admit "that the volume of trading in Esperion's common stock supports a finding that the market was efficient." (ECF No. 66-10, PageID.1765). Indeed, this is an understatement. During the Class Period, the average weekly trading volume was 29.76% and there were sixty market makers. (ECF No. 66-11, PageID.1782, 1788). This Court has previously found a "substantial presumption" of efficiency where, during the class period, the stock at issue had an average weekly trading volume above 1% and more than ten market makers. *Wilkof v. Caraco Pharm. Lab'ys, Ltd.,* 280 F.R.D. 332, 343 (E.D. Mich. 2012); *see Cammer,* 711 F. Supp. at 1293 (noting that

an even stronger presumption would apply to a trading volume above 2%). Consequently, even if Plaintiffs lacked direct evidence of cause and effect under the fifth *Cammer* factor, they would have, at this point, presented sufficient evidence of efficiency to invoke the fraud-on-the-market presumption.

Plaintiffs *do* have direct evidence of cause and effect, however. **[*13]** Plaintiffs' expert, Chad Coffman, performed an event study examining the response of Esperion's common stock to earnings announcements and press releases ("news") in the year leading up to the Class Period, during the class period, and in the year following the class period. (ECF No. 66-11, PageID.1780 n.25). Coffman then compared the stock's post-news movement with the stock's movement following days without news. (ECF No. 66-11, PageID.1790). After controlling for market and industry factors, Coffman found that "[t]he earnings announcement and press release days had a much greater percentage of significant price movements, higher daily trading volume on average, and statistically significant larger price changes than those found on days with no news." (ECF No. 66-11, PageID.1799). This, he concluded, "demonstrate[s] a clear cause-and-effect relationship between new material news and changes in the market price of Esperion common stock." (*Id.*). Defendants challenge this conclusion, not with an independent study, but rather by arguing that Coffman's analysis was flawed. (ECF No. 159, PageID.7559-60).

The Court finds these arguments unpersuasive. Coffman's analysis of the corrective **[*14]** disclosure date does not undermine the reliability of his findings. *See Wilkof,* 280 F.R.D. at 346; *Willis v. Big Lots, Inc.,* No. 2:12-cv-604, 2017 U.S. Dist. LEXIS 38933, at *12 (S.D. Ohio Mar. 17, 2017). Additionally, the Court's confidence as to market efficiency is not diminished by the fact that two of the statistically significant price movements Coffman noted were declines following positive news. *See Willis,* 2017 U.S. Dist. LEXIS 38993 at *14; *see also In re Accredo,* 2006 U.S. Dist. LEXIS 97621, at *29-30. Nor is it diminished by the fact that some of the price movements Coffman noted were on the second trading day. *See Wilkof,* 280 F.R.D. at 345-46 (analyzing price movements over two-day periods). Indeed, even assuming the validity of Defendants' concerns, Coffman's analysis would still demonstrate that approximately twenty-six percent of news days resulted in statistically significant movements, which Courts have found to be indicative of efficiency. (ECF No. 161, PageID.7671); *see, e.g., Angley v. UTI Worldwide Inc.,* 311 F. Supp. 3d 1117, 1123 (C.D. Cal.

2018); *McIntire v. China Media Express Holdings, Inc.,* 38 F. Supp. 3d 415, 430, 433 (S.D.N.Y. 2014). Accordingly, the Court finds that, at least for class-certification purposes, Coffman's results are sound, and Plaintiffs have provided sufficient evidence of efficiency for the fraud-on-the-market presumption to apply.

**OBJECTION II: DEFENDANTS HAVE REBUTTED THE PRESUMPTION OF RELIANCE UNDER *HALLIBURTON II*.**

As discussed above, the fraud-on-the-market presumption is rebuttable. *See Basic,* 485 U.S. at 248; *see also* **[*15]** *Halliburton II,* 573 U.S. at 269. In their second objection, Defendants argue that even if the fraud-on-the-market presumption applies, it has been rebutted, and that "[t]he R&R treated the presumption . . . as if it were irrebuttable."[1] (ECF No. 159, PageID.7562). Specifically, Defendants point to the fact that Coffman's report shows a statistically significant *decrease* in the price of Esperion common stock immediately following the August 17, 2015 statements. (ECF No. 159, PageID.7563).

*Halliburton II* makes clear that defendants can rebut the fraud-on-the-market presumption at the class-certification stage by showing "evidence that the asserted misrepresentation (or its correction) did not affect the market price." 573 U.S. at 280. The Sixth Circuit has clarified, however, that "price impact may be demonstrated either at the time that the alleged misrepresentations were made, *or at the time of their correction.*" *In re BancorpSouth, Inc.,* No. 17-0508, 2017 U.S. App. LEXIS 18044, at *4 (6th Cir. Sep. 18, 2017) (emphasis added). Defendants entirely skip over this precedent in their briefing, despite the fact that the vast majority of local courts have consistently followed this approach. *See, e.g., Willis,* 242 F. Supp. 3d at 656, 659; *see also Kasper v. AAC Holdings, Inc.,* No. 15-cv-00923-JPM-jsf, 2017 U.S. Dist. LEXIS 109608, at *35 (M.D. Tenn. July 14, 2017) ("Price impact can be shown either by an increase in price following a **[*16]** fraudulent public statement *or a decrease in price following a revelation of the fraud.*" (emphasis added) (quoting *Erica P. John Fund, Inc. v. Halliburton Co.,* 718 F.3d 423, 434 (5th Cir. 2013), *vacated and remanded on other grounds by Halliburton II,* 573 U.S. 258, 134 S.

---

[1] While Defendants are correct that the R&R did not specifically address the issue of rebuttal, the Magistrate Judge's comments at the hearing make clear that he understood and considered this argument. (ECF No. 161-2, PageID.7703).

Ct. 2398, 189 L. Ed. 2d 339)).

As there is no dispute that the prices of Esperion common stock fell precipitously following the corrective disclosure on September 28, 2015, the Court finds that Defendants have failed to rebut the fraud-on-the-market presumption by showing lack of price-impact. (ECF No. 161-2, PageID.7700). Accordingly, the issue of reliance is common to all Plaintiffs.

**OBJECTION III: PLAINTIFFS HAVE NOT ARTICULATED A DAMAGES METHODOLOGY SATISFYING RULE 23(B)(3).**

In *Comcast Corp. v. Behrend*, the Supreme Court elaborated upon the predominance requirement of Fed. R. Civ. P. 23(b)(3) as it pertains to theories of damages at the class-certification stage. 569 U.S. 27, 34-35, 133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013). Specifically, the Court explained that in order to satisfy predominance, plaintiffs must establish that "damages are capable of measurement on a class-wide basis" and that "[the] model purporting to serve as evidence of damages . . . measure[s] only those damages attributable to [the plaintiff's] theory [of liability]." *Id.* at 34-35. The Sixth Circuit has since clarified, however, that *Comcast* "breaks no new ground on the standard for certifying **[\*17]** a class action." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 860 (6th Cir. 2013) (quoting *Comcast*, 568 U.S. at 41 (Ginsburg, J., dissenting)).

Defendants' third objection to the R&R is that it incorrectly concluded that Coffman's proposed damages model satisfied *Comcast* "merely because similar models have been consistent with theories of liability in other cases." (ECF No. 159, PageID.7564). According to Defendants, Plaintiffs' proposed model fails to satisfy *Comcast* because it measures damages that are attributable to "confounding information" and uses "copied-and-pasted" language. (ECF No. 159, PageID.7565-66). These arguments are unpersuasive.

As the Magistrate Judge explained, Plaintiffs' sole theory of liability is that "Defendants' fraudulent misstatements and omissions concerning the EOP2 Meeting artificially inflated Esperion's stock price, causing Class members out-of-pocket damages when that inflation was removed as the truth emerged." (ECF No. 152, PageID.7474) (quoting ECF No. 98, PageID.3563). The essence of Plaintiffs' damages methodology, as articulated by Coffman in his initial report, is as follows:

[T]he standard and well-settled formula for assessing damages for each class member seeking relief under Section 10(b) and Rule 10b-5 is the "out-of-pocket" method which measures **[\*18]** damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale . . . . [T]he most common methodology to quantify artificial inflation is to perform an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations. This analysis, and the evidence supporting it, would be common to the class. Damages for any individual class member could then be calculated formulaically based upon information collected in the claims process (i.e., the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions).

(ECF No. 66-11, PageID.1805-06).

Measuring damages using "the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale" matches precisely with Plaintiffs' out-of-pocket theory of liability. (ECF No. 66-11, PageID.1805-06). Moreover, because "there is no chance of aggregated damages attributable to rejected liability theories, the Supreme Court's concerns [from *Comcast*] do not **[\*19]** apply." *In re VHS of Mich., Inc.*, 601 F. App'x 342, 344 (6th Cir. 2015). Indeed, as the R&R correctly noted, numerous courts in the Sixth Circuit (and beyond) have found Plaintiffs' proposed methodology sufficient in securities fraud claims based on misstatements or omissions. *See, e.g., Weiner*, 334 F.R.D. at 137-38; *Kasper*, 2017 U.S. Dist. LEXIS 109608, at *39-40; *see also, e.g., Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 451 (W.D. Tex. 2019).

While Defendants are correct that confounding information (other negative information released alongside the corrective disclosure) cannot be disaggregated using only an event study, their framing of Coffman's deposition testimony is highly misleading. Coffman does not concede that his event study precludes disaggregation. (ECF No. 87-3, PageID.2827, 2865). Moreover, Defendants' argument is really a merits inquiry into loss causation, an element of Plaintiffs' claim under SEA § 10(b) and SEC Rule 10b-5. *See Halliburton II*, 573 U.S. at 265 (defining loss causation). Such an inquiry is not required for class certification. *Halliburton I*, 563 U.S. at 813; *see, e.g., Weiner*, 334 F.R.D. at 137-38 ("Plaintiffs must prove that

**APP 109**

the portion of the price fall they seek in damages is directly attributable to the misrepresentation, . . . *[but] they do not need to prove it at the certification stage.*" (alteration in original) (emphasis added) (quoting *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 687-88 (5th Cir. 2015))). Indeed, even if Defendants are correct that other negative information in the September 27, 2015 disclosure **[*20]** was partially responsible for the decline in Esperion's stock price, the extent to which damages would need to be disaggregated is an issue common to all class members. (ECF No. 98-2, PageID.3636).

Finally, Defendants' "copied-and-pasted" argument is grasping at straws. (ECF No. 159, PageID.7565). Defendants cite no authority for this proposition, and other courts have rejected similar arguments. *See, e.g., Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.* (*PERSM*), No. 16-cv-10632, 2020 U.S. Dist. LEXIS 32586, at *25-26 (N.D. Ill. Feb. 26, 2020). Accordingly, the Court finds that Plaintiffs' have satisfied predominance under Fed. R. Civ. P. 23(b)(3).

**OBJECTION IV: THE PSLRA FOCUSES ON THE ADEQUACY OF PLAINTIFFS, NOT THEIR COUNSEL, AND PLAINTIFFS HAVE FAILED TO ESTABLISH ADEQUACY UNDER RULE 23(A)(4)**.

Fed R. Civ. P. 23(a)(4) requires that "[t]he representative parties [to a class action] . . . fairly and adequately protect the interests of the class." In the Sixth Circuit, courts determine whether class representatives have met this requirement using a two-part test: "1) [T]he representative[s] must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996) (quoting *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976)). "Put another **[*21]** way, [courts] 'review[] the adequacy of class representation to determine whether class counsel are qualified, experienced and generally able to conduct the litigation, and to consider whether the class members have interests that are not antagonistic to one another.'" *Pelzer v. Vassalle*, 655 F. App'x 352, 364 (6th Cir. 2016) (second alteration in original) (quoting *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000)).

The Private Securities Litigation Reform Act ("PSLRA") does not alter this general approach. "Although Congress made several important changes in the [PSLRA], it pointedly did not change the requirements of Rule 23. Indeed, it . . . enacted language that is identical

to Rule 23's typicality and adequacy requirements . . . ." *In re Cavanaugh*, 306 F.3d 726, 738-39 (9th Cir. 2002) (citing 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)). Consequently, "where the class is represented by competent and zealous counsel, . . . a perceived lack of . . . interest on the part of the named plaintiffs [does not preclude certification] unless their participation is so minimal that they virtually have abdicated to their attorneys the conduct of the case." *Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 451 (S.D. Ohio 2009) (quoting *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 727 (11th Cir. 1987)).

Defendants argue in their fourth objection that the Magistrate Judge focused too heavily on the adequacy of Class Counsel without sufficiently "consider[ing] the adequacy of . . . Lead Plaintiffs themselves." (ECF No. 159, PageID.7569). Specifically, **[*22]** Defendants contend that Lead Plaintiffs are inadequate for failing to sufficiently supervise class counsel, as evidenced by their allegedly insufficient knowledge of the litigation. (ECF No. 159, PageID.7569, 7572). Defendants attempt to support these claims by invoking "Congress's emphatic command [in the PSLRA] that competent plaintiffs, rather than lawyers, direct [securities] cases." (ECF No. 159, PageID.7568 (quoting *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 484 (5th Cir. 2001)). But these arguments ignore the Sixth Circuit's two-factor test. Under this Circuit's standard, the Magistrate Judge arrived at the correct conclusion: Lead Plaintiffs satisfy Fed. R. Civ. P. 23(a)(4). (ECF No. 152, PageID.7469).

First, Lead Plaintiffs plainly have "common interests with unnamed members of the class." *In re Am. Med. Sys., Inc.*, 75 F.3d at 1083 (quoting *Senter*, 532 F.2d at 525). Both Walter and Minett purchased Esperion common stock during the Class Period and suffered major losses following the corrective disclosure. (ECF No. 24-2, PageID.520). Second, Lead Plaintiffs have "vigorously prosecute[d] the interests of the class *through qualified counsel.*" *In re Am. Med. Sys., Inc.*, 75 F.3d at 1083 (emphasis added) (quoting *Senter*, 532 F.2d at 525). In March 2016, Lead Plaintiffs selected, and this Court approved, Robbins Geller Rudman & Dowd LLP ("RGRD") and Kahn Swick & Foti, LLC ("KSF"), to serve as **[*23]** Class Counsel. (ECF No. 18, PageID.350; ECF No. 24-2, PageID.521; ECF No. 25, PageID.527). Both of these firms, which "have significant collective experience in class [action] litigation," satisfy Fed. R. Civ. P. 23(g). (ECF 152, PageID.7469). Moreover, since 2016, Lead Plaintiffs, through Class Counsel, have filed an amended complaint, prevailed at the Sixth Circuit, prepared and filed numerous pleadings, and pursued

**APP 110**

discovery. (*Id.*).

At bottom, by arguing that Lead Plaintiffs are inadequate for not having detailed knowledge of the litigation and not exercising control over the day-to-day management of the case, Defendants seek to apply a more rigorous standard to the adequacy determination than courts in the Sixth Circuit typically do. *See, e.g., Rankin v. Rots*, 220 F.R.D. 511, 520 (E.D. Mich. 2004) ("The Sixth Circuit appears to focus on the adequacy of plaintiff's counsel and whether plaintiff has a conflicting interest, not the personal qualifications of the named plaintiff."); *see also PERSM*, 2020 U.S. Dist. LEXIS 32586, at *21 n.5 (describing the Fifth Circuit's heightened adequacy standard, which Defendants rely upon, as "idiosyncratic").

While Lead Plaintiffs are not micromanaging all aspects of the litigation, "their participation is [not] so minimal that they virtually have abdicated to their **[*24]** attorneys the conduct of the case." *Ross*, 257 F.R.D. at 451 (quoting *Kirkpatrick*, 827 F.2d at 727). Through their respective deposition transcripts, Lead Plaintiffs demonstrate not only that they understand their fiduciary responsibilities as class representatives, but also that they have been adequately discharging those responsibilities by reviewing case documents, communicating with Class Counsel as necessary, and participating in discovery. (ECF No. 87-4, PageID.2916-17, 2937-38, 2944; ECF No. 87-5, PageID.2996, 3020-23). Courts in this circuit have found plaintiffs adequate who do far less. *See, e.g., Plumbers & Pipefitters Nat'l Pension Fund v. Burns*, 292 F.R.D. 515, 521 (N.D. Ohio 2013); *see also Ballan v. UpJohn*, Co., 159 F.R.D. 473, 482 (E.D. Mich. 1994) ("To satisfy the adequacy test, the named representative of a class need only be adequate and need not be the best of all possible plaintiffs."). Accordingly, despite the fact that Plaintiffs could be more informed as to certain details of the litigation—for example, knowing the name of their expert—the Court finds them adequate under Fed. R. Civ. P. 23(a)(4).

**OBJECTION V: WALLACE'S TRADING ACTIVITY IN ESPERION STOCK RENDERS HIM AN ATYPICAL CLASS MEMBER UNDER RULE 23(A)(3).**

"[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based **[*25]** on the same legal theory." *Wilkof*, 280 F.R.D. at 338-39 (alteration in original)

(quoting *In re Am. Med. Sys.*, 75 F.3d at 1082). The "claim need not always involve the same facts or law, provided there is a common element of fact or law." *Id.* at 339 (quoting *Senter*, 532 F.2d at 525 n.31). "The purpose of the typicality requirement is to assure that the named representative's interests align with those of the class and that the plaintiff will advance the interest of the class." *Id.* (citing *In re Am. Med. Sys.*, 75 F.3d at 1082). One way a plaintiff might be found atypical is if they are subject to "unique defenses." *O'Neil v. Appel*, 165 F.R.D. 479, 492 (W.D. Mich. 1995) (citing *Ballan*, 159 F.R.D. at 479-81). However, "[t]he presence of a unique defense will not automatically destroy typicality." *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 304 (E.D. Mich. 2001) (citing *In re Synthroid Mktg. Litig.*, 188 F.R.D. 287, 291 (N.D. Ill. 1999)). Rather, "[typicality] is only [destroyed] when the defense will 'skew the focus of the litigation' and create 'a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'" *Id.* at 304-05 (quoting *Alaska v. Suburban Propane Gas Corp.*, 123 F.3d 1317, 1321 (9th Cir. 1997)).

These principles provide helpful context to Defendants' fifth and final objection to the R&R. In this last objection, Defendants argue that the R&R failed to consider whether Wallace's trading of Esperion shares after the corrective disclosure date subjects him to a unique defense sufficient to render him atypical. (ECF No. 159, PageID.7574). Wallace purchased 7,500 **[*26]** shares of Esperion stock during the Class Period at prices ranging between $41.80 and $64.84. (ECF No. 18-3, PageID.364). He also traded a significant number of Esperion shares following the Class Period at prices ranging from $14.45 to $28.60. (ECF No. 61, PageID.7683; ECF No. 87-4, PageID.2899). His final trade was on March 29, 2016, two weeks after he requested to be lead plaintiff. (ECF No. 18; ECF No. 87-4, PageID.2952; ECF No. 100-18, PageID.448).

Though it is somewhat of a close question, the majority of courts appear to hold that post-disclosure purchases, particularly those at lower prices, do not "skew the focus of the litigation" to such an extent that the interests of unnamed class members are endangered. *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. at 304-05 (quoting *Alaska*, 123 F.3d at 1321); *see PERSM*, 2020 U.S. Dist. LEXIS 32586, at *14; *see also Weiner*, 334 F.R.D. at 130 ("[C]ourts routinely certify a class with representatives who purchased stock during and after a class period." (quoting *In re Select Comfort Corp. Sec. Litig.*, 202 F.R.D. 598, 607 (D. Minn. 2001))). *Compare, e.g., Ballan*, 159 F.R.D. at 481 (finding plaintiff atypical

**APP 111**

in part because he had "purchased [Defendant's] stock *at the same price* both several months before and shortly after [the alleged disclosure date]" (emphasis added)), *with, e.g., Ross,* 257 F.R.D. at 446 (finding "Plaintiff's purchase of stock six days after the Class Period" to be "irrelevant" and noting **[\*27]** that "[i]t is not inconsistent with the pleadings for Plaintiff to have purchased stock *after its price had been deflated* by curative disclosures" (emphasis added)).

Against this backdrop, the cases cited by Defendants appear to reflect a minority view. *See Weiner,* 334 F.R.D. at 130 (describing *Rocco v. Nam Tai Elecs., Inc.,* 245 F.R.D. 131 (S.D.N.Y. 2007), on which Defendants lean, as "against 'the weight of authority,' a 'deviat[ion] from th[e] general rule,' and 'not generally accepted'" (alterations in original) (citations omitted) (first quoting *In re Connetics Corp. Sec. Litig.,* 257 F.R.D. 572, 577 (N.D. Cal. 2009); then quoting *Local 703,* 762 F.3d at 1260; and then quoting *Feder,* 429 F.3d at 137)). Accordingly, because Wallace's claims are based on the same legal theory as other Class members, and because the unique defense against Wallace will not distract the litigation to the detriment of those members, the Court finds Wallace typical under Fed. R. Civ. P. 23(a)(3).

## CONCLUSION

**IT IS ORDERED** that Defendants' Objections [159] are **OVERRULED**.

**IT IS FURTHER ORDERED** that the R&R [152] is **ADOPTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Class Certification [66] is **GRANTED**. The Class is certified, and Class Representatives and Class Counsel are appointed, as specified in the R&R. (ECF No. 152, PageID.7477).

**SO ORDERED**.

Dated: November 19, 2020

/s/ Arthur J. Tarnow

Arthur J. Tarnow

Senior United States District **[\*28]** Judge

APP 112

⬥ Last updated  September 16, 2024   03:16:22 pm GMT

# Kasper v. AAC Holdings, Inc.

United States District Court for the Middle District of Tennessee, Nashville Division

July 14, 2017, Decided; July 14, 2017, Filed

No. 15-cv-00923-JPM-jsf

### Reporter

2017 U.S. Dist. LEXIS 109608 *; Fed. Sec. L. Rep. (CCH) P99,816; 2017 WL 3008510

DR. JOSEPH F. KASPER, individually and on behalf of all others similarly situated, Plaintiff, v. AAC HOLDINGS, INC., JERROD N. MENZ, MICHAEL T. CARTWRIGHT, ANDREW W. MCWILLIAMS and KIRK R. MANZ, Defendant.

**Subsequent History:** Appeal denied by In re AAC Holdings, Inc., 2017 U.S. App. LEXIS 21121, 2017 WL 4801185 (6th Cir., Oct. 24, 2017)

**Prior History:** Kasper v. AAC Holdings, Inc., 2016 U.S. Dist. LEXIS 87492, 2016 WL 3660519 (M.D. Tenn., July 1, 2016)

## Core Terms

misrepresentations, Plaintiffs', disclosure, class member, stock, appoint, indictment, proposed class, predominance, Defendants', omission, class period, class representative, traded, class action, investor, alleged misrepresentation, affiliates, cured, class certification, question of law, Courts, criminal investigation, curative, publicly, certify, Prerequisites, rebuttable, purchases, damages

**Counsel:** [*1] For Dr. Joseph F. Kasper, Individually and On Behalf of All Others Similarly Situated, Plaintiff: David W. Garrison, Barrett Johnston Martin & Garrison, LLC, Nashville, TN; Jeffrey C. Block, Steven P. Harte, Block & Leviton LLP, Boston, MA; Paul Kent Bramlett, Robert P. Bramlett, Bramlett Law Offices, Nashville, TN.

For Judith D. Tenzyk, Consol Plaintiff: J. Alexander Hood, II, Jeremy A. Lieberman, Marc Gorrie, Pomerantz LLP (NY Office), New York, NY; Patrick V. Dahlstrom, Pomerantz LLP (Chicago Office), Chicago, IL; Paul Kent Bramlett, Robert P. Bramlett, Bramlett Law Offices, Nashville, TN.

For Jacquelin Welsh, Consol Plaintiff: James A. Holifield, Jr., Holifield Janich Rachal & Associates, PLLC, Knoxville, TN.

For AAC Holdings, Inc., Jerrod N. Menz, Michael T. Cartwright, Defendants: Britt K. Latham, Joseph B. Crace, Jr., Bass, Berry & Sims (Nashville Office), Nashville, TN; David Gouzoules, Jessica Perry Corley, John Latham, Lisa R. Bugni, Alston & Bird LLP (Atlanta Office), Atlanta, GA.

For Kathryn Sevier-Phillips, Defendant: Britt K. Latham, Joseph B. Crace, Jr., Bass, Berry & Sims (Nashville Office), Nashville, TN; Jessica Perry Corley, John Latham, Lisa R. Bugni, Alston & Bird LLP [*2]  (Atlanta Office), Atlanta, GA.

For Andrew W. McWilliams, Kirk Manz, Defendants: Britt K. Latham, Joseph B. Crace, Jr., Bass, Berry & Sims (Nashville Office), Nashville, TN; David Gouzoules, Alston & Bird LLP (Atlanta Office), Atlanta, GA.

For JAMES P GILL, Intervenor Plaintiff: Alexander L. Burns, Joseph Scott St. John, Kahn Swick & Foti, LLP (Louisiana Office), Madisonville, LA; Donald R. Hall, Jr., Kaplan Fox Kilsheimer LLP, New York, NY; Paul Kent Bramlett, Bramlett Law Offices, Nashville, TN; Ramzi Abadou, Kahn Swick & Foti, LLP, San Francisco, CA; Timothy L. Miles, David W. Garrison, Barrett Johnston Martin & Garrison, LLC, Nashville, TN.

For Judith D. Tenzyk, Movant: Jeremy A. Lieberman, Pomerantz LLP (NY Office), New York, NY.

For Arkansas Teacher Retirement System, Movant: Alexander L. Burns, Kahn Swick & Foti, LLP (Louisiana Office), Madisonville, LA; David W. Garrison, Jerry E. Martin, Timothy L. Miles, Barrett Johnston Martin & Garrison, LLC, Nashville, TN; Donald R. Hall, Jr., Frederic S. Fox, Jeffrey P. Campisi, Kaplan Fox Kilsheimer LLP, New York, NY.

For Robert Salyer, Movant: Joey P. Leniski, Jr., Branstetter, Stranch & Jennings, PLLC, Nashville, TN.

**Judges:** JON P. McCALLA, UNITED [*3]  STATES DISTRICT JUDGE.

**Opinion by:** JON P. McCALLA

# Opinion

**ORDER CONCERNING CLASS CERTIFICATION**

Before the Court is Plaintiffs' Motion to Certify the Class, Appoint Class Representatives, and Appoint Class and Liaison Counsel, filed October 18, 2016. (ECF No. 77.) Defendants filed a response in opposition on January 24, 2017. (ECF No. 106.) Plaintiffs filed a reply on February 10, 2017. (ECF No. 108.)

For the reasons stated below, the Court GRANTS Plaintiffs' Motion to Certify the Class:

> [A]ll persons and entities who purchased or otherwise acquired AAC securities between October 2, 2014, and [August 4, 2015 at 9:40 a.m. (EST)], inclusive. Excluded from the class are Defendants, directors, and officers of AAC, as well as their families and affiliates.
> (ECF Nos. 78 at PageID 2513; 119 at PageID 4070.)

The Court GRANTS Plaintiffs' Motion to appoint Kaplan Fox, Kahn Swick and Barrett Johnston as Class Counsel. The Court GRANTS Plaintiffs' request to appoint Lead Plaintiff as Class Representative.

## I. BACKGROUND

### A. Factual Background

This case involves allegations that Defendants AAC Holdings, Inc. ("AAC"), AAC's Chairman and Chief Executive Officer ("CEO") Michael T. Cartwright, AAC's Chief Financial Officer ("CFO") Kirk **[*4]** R. Manz, former AAC President and Director Jerrod N. Menz, Chief Accounting Officer Andrew W. McWilliams along with 'insider defendants'—those that possessed the power and authority to control the contents of AAC's press releases, investor and media presentations, and Securities and Exchange Commission ("SEC") filings as well as intimately involved with and aware of, or deliberately disregarded, all aspects of the Company's operations[1]—violated Sections 10(b) and 20(a) of the

Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5(b) promulgated thereunder. (Am. Compl., ECF No. 50 ¶ 2.)

AAC provides inpatient substance abuse treatment for individuals with drug and alcohol addiction. (Id. ¶ 4.) Gary Benefield was a patient and resident of an AAC facility called "A Better Tomorrow." (Id. ¶ 6 & n.3.) Benefield died in July 2010 after being administered drugs by an AAC employee. (Id. ¶ 6 n.3.)

On August 29, 2013, in light of Benefield's death, California Deputy Attorney General Hardy R. Gold executed a sworn declaration, stating that the California Department of Justice's "criminal investigation of [AAC Affiliates] i[s] continuing and nearing completion. I anticipate that criminal charges will be filed." ( **[*5]** Id. ¶ 7 (emphasis removed).) This declaration was filed "in a lawsuit brought by Defendant Menz and the AAC Affiliates for defamation against a whistleblower who had provided background information for the California DOJ's investigation into Mr. Benefield's death." (Id.) On September 18, 2013, Defendant Menz was personally copied on a letter from his counsel, Barry P. King, to California Chief Deputy Attorney General Nathan R. Barankin that referenced the Gold declaration. (Id. ¶ 8.)

AAC went public on October 1, 2014,[2] offering common stock to investors in an initial public offering set at $15 per share. (Id.) The stock began trading on the New York Stock Exchange on October 2, 2014. (Id.) On July 2, 2015, the share price reached $44.75 per share. (Id. ¶ 5.) Plaintiffs allege, however, that "AAC's success as a publicly-traded Company was the result of an undisclosed fraudulent scheme to deceive investors about an active criminal investigation by the California [DOJ] of Defendant Menz and AAC's largest and most profitable subsidiaries." (Id. ¶ 6.)

On July 21, 2015, a California grand jury returned a second-degree murder and dependent adult abuse indictment against Defendant Menz, AAC **[*6]** affiliates,

---

[1] Plaintiffs also name Defendant General Counsel and Secretary of AAC, Kathryn Sevier Phillips. Plaintiffs assert that "[a]t all relevant times, Ms. Phillips was AAC's chief lawyer and

reported directly to Defendant Cartwright. In her role, Ms. Phillips either knew about or was severely reckless in not being aware of the Benefield Litigation and California DOJ investigation. She also participated alongside the Insider Defendants in making the ultimate decision to conceal the criminal investigation from AAC's shareholders." (Am. Compl., ECF No. 50 ¶ 45.)

[2] On October 1, 2014, the SEC declared as effective the Registration Statement that AAC previously filed with the SEC on Form S-1. (Id. ¶ 9.)

and others, for the death of Benefield. (Id. ¶ 19.) On July 29, 2015, the Superior Court in California unsealed the criminal indictment returned by a grand jury against Menz and AAC's affiliates. (Id. ¶ 138.)

Also on July 29, 2015, Plaintiffs allege that "AAC partially disclosed that 'charges' had been brought 'against subsidiaries of AAC and two current and three former employees.' Defendants, however, failed to disclose that the charges included the second-degree murder and dependent adult abuse of Mr. Benefield." (Id. ¶ 20.) On the same day, AAC also allegedly reported better than expected financial results for AAC's 2015 second quarter. (Id. ¶ 21.)

"[O]n August 1, 2015, the Company hosted an earnings conference call where Defendant Cartwright claimed that, while he was 'just now having the opportunity to review [the six page] indictment,' he 'firmly believe[d] that the California Department of Justice case is without merit.'" (Id.)

On August 3, 2015, AAC's stock price fell by $5.22 per share (or by 14%). (Id. ¶ 22.) The next day, Bleeker Street Research published a report entitled, "American Addiction Centers: Even More Undisclosed Deaths and the Start of Real Problems," which revealed **[*7]** new facts and details about the indictment and history of wrongdoing at the AAC Affiliates. (Id.) On August 4, 2015, AAC's stock fell to $12.90 per share. (Id. ¶ 23.)

On August 5, 2015, Forbes published an article entitled, "AAC Holdings' Lawyers Knew About Criminal Investigation in 2013," which reported that "[i]n a response to questions from Forbes about when it became aware of the criminal investigation, the company said in a statement last week it learned of the grand jury investigation into the death of Gary Benefield about six weeks ago." (Id. ¶ 23.) The article further stated that "AAC Holdings had not disclosed the criminal investigation into Gary Benefield's death in any of its securities filings that were made with the SEC as it prepared for its IPO last year or since, until the indictment was unsealed." (Id. ¶ 24.)

## B. Procedural Background

On August 24, 2015, Dr. Joseph F. Kasper, individually and on behalf of those similarly situated, filed a complaint against Defendants. (ECF No. 1.) On October 23, 2015, Plaintiffs filed a Motion to Appoint Lead Plaintiff, Lead Counsel, and Liasion Counsel, as well as a Motion to Consolidate Cases. (ECF Nos. 19-25.) On

October 26, 2015, the Court **[*8]** consolidated Tenzyk v. AAC Holdings, Inc., et al. (Case No. 3-15-cv-0986) and Kasper v. AAC Holdings, Inc., et al. (Case No. 3-15-cv-0923). (ECF No. 32.) On December 30, 2015, the Court entered a Stipulation and Order Appointing Lead Plaintiffs, Lead Counsel, and Liaison Counsel. (ECF No. 47.) The Court's Order appointed Arkansas Teacher Retirement System ("ATRS") and James P. Gills, M.D. as Lead Plaintiffs. (Id.)

On February 29, 2016, Plaintiffs filed an Amended Complaint for consolidated class actions. (ECF No. 50.)

On April 14, 2016, Defendants filed a Motion to Dismiss, asserting that Plaintiffs failed to plead an actionable misstatement or omission or strong inference of scienter, and that the Section 20(a) claim should be dismissed. (ECF Nos. 54-55.) Plaintiffs filed their response in opposition on May 31, 2016. (ECF No. 56.) Defendants filed their reply on June 15, 2016. (ECF No. 58.) On July 1, 2016, the Court denied Defendant's Motion to Dismiss, finding that Plaintiffs pled with sufficient specificity required by the statute for an actionable misstatement and omission, and scienter; and sufficiently alleged a claim for Rule 20(a) to survive a motion to dismiss. (ECF Nos. 59-60.)

On July 6, 2016, **[*9]** the Court ordered Defendants to serve their answer to the Consolidated Complaint by July 22, 2016. (ECF No. 62.) Defendants then filed their answer on July 22, 2016. (ECF No. 65.) On August 31, 2016, the Court entered a Joint Initial Case Management Order. (ECF No. 72.)

On November 4, 2016, the Court entered the Stipulation and Protective Order for the parties. (ECF No. 84.) On November 28, 2016, Plaintiffs filed a Motion to Set a Case Management Conference. (ECF Nos. 85-87.) Plaintiffs alleged that Defendants failed to produce a single document in response to the Requests Plaintiffs served on July 19, 2016. (ECF No. 86.) As a result, Plaintiffs sought to discuss the case management schedule to determine how Defendants' failure effects and/or delays the schedule. (Id. ¶¶ 13-14.) The Court found the motion moot in light of the teleconference scheduled with Judge McCalla. (ECF No. 90.)

The Court held a telephonic status conference on December 13, 2016, amending the discovery and trial schedule. (ECF Nos. 91-92.) On December 22, 2016, proposed class representative, Dr. James Gills, withdrew his request to be appointed class representative. (See ECF No. 94.) Thus, ATRS is the one remaining **[*10]** plaintiff seeking to be appointed

class representative.

On December 22, 2016, Defendants filed a redacted response in opposition to Plaintiffs' Motion for Class Certification. (ECF No. 95.) Defendants refiled an un-redacted response in opposition on January 24, 2017. (ECF No. 106.)

Plaintiffs filed a reply on February 10, 2017. (ECF No. 108.) On February 15, 2017, Defendants moved for Oral Argument on Lead Plaintiffs' Motion for Class Certification. (ECF No. 110.) The Court granted the motion for oral argument on February 23, 2017. (ECF No. 111.) A telephonic motion hearing was set for April 4, 2017 at 9:30 a.m. (CST). (ECF No. 112.)

On March 8, 2017, Plaintiffs sought leave to file a sur-reply on the issue of class certification. (ECF No. 115.) Defendants opposed the motion on March 10, 2017. (ECF No. 116.) Defendants filed a response in opposition to Plaintiff's sur-reply on March 10, 2017. (ECF No. 116.)

On April 4, 2017, the Court held a telephonic Motion Hearing regarding Plaintiffs' pending motions. (Min. Entry, April 4, 2017). Following the hearing, the Court entered an Order Requiring Supplemental Briefing. (ECF No. 117.) The parties filed timely supplemental briefs on April 18, **[*11]** 2017 (ECF No. 119) and May 2, 2017 (ECF No. 121).

The Court addresses the pending motions. First, the Court addresses the motion to certify class. Second, the Court addresses the motions to appoint class counsel and certify Lead Plaintiff ATRS as representative of the proposed class.

## II. DISCUSSION

## 1. MOTION TO CERTIFY CLASS

### A. Legal Standard

### 1. Implied Prerequisites to Rule 23(a)

"[The] courts have implied two . . . prerequisites to class certification that must be satisfied prior to even addressing the requirements of Rule 23(a). . . ." City of Fairview Heights v. Orbitz, Inc., 05-CV-840-DRH, 2008 U.S. Dist. LEXIS 25646, 2008 WL 895650, at *2 (S.D.

Ill. Mar. 31, 2008). First, "the class must be sufficiently defined so that the class is identifiable." Id. (citing Alliance to the End Repression v. Rochford, 565 F.2d 975, 977 (7th Cir. 1977)). Second, the named plaintiffs must fall within the proposed class and have standing both at the time the complaint is filed and at the time the class is certified. Farm Labor Org. Comm. v. Ohio State Highway Patrol, 184 F.R.D. 583, 586 (N.D. Ohio 1998). With respect to the first prerequisite, "the class description [must be] sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." Wright, et al., supra, § 1760, at 134. "A proposed class may be deemed overly broad if it would include members who have not suffered harm at the hands of the defendant." Faralli v. Hair **[*12]** Today, Gone Tomorrow, 1:06-CV-504, 2007 U.S. Dist. LEXIS 1977, 2007 WL 120664, at *6 (N.D. Ohio Jan. 10, 2007) (quoting Chaz Concrete Co. v. Codell, 2006 U.S. Dist. LEXIS 60013, 2006 WL 2453302, at *6 (E.D. Ky. Aug. 23, 2006)). Moreover, "the proposed class definition must be sufficiently definite to ascertain class membership and must not depend on a merits-based adjudication to determine inclusion." Schilling v. Kenton Cnty., Ky., No. CIV. A. 10-143-DLB, 2011 U.S. Dist. LEXIS 8050, 2011 WL 293759, at *7 (E.D. Ky. Jan. 27, 2011).

### 2. Rule 23(a) Requirements

Under Federal Rule of Civil Procedure 23(a), the Court may certify a class only if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "These four requirements — numerosity, commonality, typicality, and adequate representation — serve to limit class claims to those that are fairly encompassed within the claims of the named plaintiffs because class representatives must share the same interests and injury as the class members." In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig., 722 F.3d 838, 850 (citing Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 131 S. Ct. 2541, 2550, 180 L. Ed. 2d 374 (2011)). "Rule 23 does not set forth a mere pleading standard. A party seeking class

**APP 116**

certification must affirmatively demonstrate his compliance with the Rule — that is, he must be prepared to prove that there are in fact sufficiently **[*13]** numerous parties, common questions of law or fact, etc." Dukes, 131 S. Ct. at 2551. "[I]f Plaintiff's definition of the class is found to be unacceptable, the court may construe the complaint or redefine the class to bring it within the scope of Rule 23 . . . ." 7A Charles Alan Wright, et al., Federal Practice and Procedure § 1759, at 130-31 (3d ed. 2005).

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The Sixth Circuit has held that there is "no specific number" that will or will not render joinder impracticable. In re Am. Med. Sys., Inc., 75 F.3d 1069, 1079 (6th Cir. 1996). "[W]hile there is no strict numerical test, 'substantial' numbers usually satisfy the numerosity requirement." Daffin v. Ford Motor Co., 458 F.3d 549, 552 (6th Cir. 2006) (citing In re Am. Med. Sys., 75 F.3d at 1079).

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Supreme Court has held that "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury." Dukes, 131 S. Ct. at 2551. "The interests and claims of the various Plaintiffs need not be identical. Rather, the commonality test is met when there is at least one issue whose resolution will affect all or a significant number of the putative class members." Fallick v. Nationwide Mut. Ins. Co., 162 F.3d 410, 424 (6th Cir. 1998) (quoting Forbush v. J.C. Penney Co., 994 F.2d 1101, 1106 (6th Cir. 1993)).

Rule 23(a)(3) requires that the claims or defenses of the representative **[*14]** parties be typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). A representative's claim is typical if "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." In re Am. Med. Sys., 75 F.3d at 1082. "Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." Sprague v. Gen. Motors Corp., 133 F.3d 388, 399 (6th Cir. 1998) (citing In re Am. Med. Sys., 75 F.3d at 1082). A class representative is not typical "when a plaintiff can prove his own claim but not 'necessarily have proved anybody else's claim.'" Beattie v. CenturyTel, Inc., 511 F.3d 554, 561 (6th Cir. 2007) (quoting Sprague, 133 F.3d at 399).

"[A] representative's claim need not always involve the same facts or law, provided there is a common element of fact or law." Id. In Beattie, the Sixth Circuit concluded that the named plaintiffs' claims were typical when the plaintiffs alleged that Defendant billed for a telephone service under a misleading description, despite the fact that some class members enrolled in the service and some did not. Id. The Sixth Circuit stated that, despite the differing actions of the class members, the named plaintiffs' claims still **[*15]** arose from the same allegedly deceptive billing practice that gave rise to the claims of the other class members. Id.

Rule 23(a)(4) requires that the representative parties demonstrate that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). For a class representative to be deemed adequate, "(1) the representative must have common interests with unnamed members of the class, and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." Senter v. Gen. Motors Corp., 532 F.2d 511, 524-25 (6th Cir. 1976). The first step of this analysis "serves to uncover conflicts of interest between named parties and the class they seek to represent." Gooch v. Life Investors Ins. Co. of Am., 672 F.3d 402, 429 (6th Cir. 2012) (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)).

### 3. Rule 23(b)(3) Requirement

In addition to the requirements of Rule 23(a), "the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 131 S. Ct. 2541, 2548, 180 L. Ed. 2d 374 (2011). A class should be certified under Rule 23(b)(3) when (1) common questions of law and fact predominate over any question affecting only individual class members; and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

### a. Predominance & Reliance

"To meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof **[*16]** and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." Randleman v. Fidelity Nat'l Title Ins. Co., 646 F.3d 347, 353 (6th Cir. 2011) (citation omitted).

**APP 117**

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 131 S. Ct. 2179, 2184, 180 L. Ed. 2d 24 (2011) ("Halliburton I") (quoting Fed. R. Civ. P. 23(b)(3)). "The elements of an implied § 10(b) cause of action for securities fraud are (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Amgen Inc. v. Connecticut Ret. Plans & Trust Funds, 568 U.S. 455, 133 S. Ct. 1184, 1207, 185 L. Ed. 2d 308 (2013) (internal citations omitted).

"The reliance element [of a § 10(b) and Rule 10b-5 securities fraud claim] 'ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury.'" Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2407, 189 L. Ed. 2d 339 (2014) ("Halliburton II") (quoting Conn. Retirement Plans and Trust Funds, 133 S. Ct. at 1192). The Supreme Court held in Basic v. Levinson, 485 U.S. at 245 (1988), that plaintiffs can satisfy the reliance element in a Rule 10b-5 action by invoking a rebuttable presumption of reliance, rather than proving direct reliance on a misrepresentation. This rebuttable presumption was based on the "fraud-on-the-market" theory, and presumes that

> [a]n investor **[*17]** who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action.

Basic, 485 U.S. at 247.

To invoke the Basic presumption, "a plaintiff must prove that: (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." Halliburton II, 134 S. Ct. at 2413 (citing Basic, 485 U.S. at 248; Amgen, 133 S. Ct. at 1198).

The presumption is rebuttable, however, and a defendant may rebut the presumption of reliance with "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." Basic, 485 U.S. at 248. For example, a defendant could rebut the presumption with evidence that "the misrepresentation did not, for whatever reason, actually affect the market price, or that the plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud." Halliburton II, 134 S. Ct. at 2408.

Defendant may also rebut **[*18]** the "presumption of reliance by showing that the plaintiff's reliance on the market price was actually unreasonable," such as by showing that "the investor knew, or had reason to know, that the misrepresentations were in fact false." Semerenko v. Cendant Corp., 223 F.3d 165, 180 & n. 8 (3d Cir. 2000). "In determining the duration of a securities fraud class based on a fraud-on-the-market theory, the Court must determine whether a curative disclosure had been made so as to render it unreasonable for an investor, or the market, to continue to be misled by the defendants' alleged misrepresentations." In re Fed. Nat. Mortg. Ass'n Sec., Derivative & ""ERISA" Litig., 247 F.R.D. 32, 38 (D.D.C. 2008) (internal quotation marks omitted).

> Courts must tread a fine line when parties dispute whether a particular release cured prior misrepresentations. While a court cannot delve into the merits, it should preliminarily evaluate when curative information was publicly announced or otherwise disseminated to the market, for the class period should end when prior misrepresentations are fully cured. Thus, a majority of courts engage in a limited review to determine when a market was cured of prior misrepresentations. Courts that have engaged in this limited review refuse to narrow the class period if there is a substantial **[*19]** question of fact as to whether the release had cured the market or was itself misleading.

Bovee v. Coopers & Lybrand, 216 F.R.D. 596, 614 (S.D. Ohio 2003) (internal citations and quotation marks omitted); accord Shirk v. Fifth Third Bancorp, No. 05-CV-49, 2007 U.S. Dist. LEXIS 26534, 2007 WL 1100429, at *16 (S.D. Ohio Apr. 10, 2007); In re Schering-Plough Corp./ENHANCE Sec. Litig., No. CIV.A. 8-397 DMC/JAD, 2012 U.S. Dist. LEXIS 138078, 2012 WL 4482032, at *9 (D. N.J. Sept. 25, 2012); Hodges v. Akeena Solar, Inc., 274 F.R.D. 259, 271 (N.D. Cal. 2011); In re Enron Corp. Sec., 529 F. Supp. 2d 644, 712 (S.D. Tex. 2006).

**B. Parties' Arguments**

**1. Plaintiffs' Arguments**

Plaintiffs originally moved the Court to certify the following Class:

> [A]ll persons and entities who purchased or otherwise acquired AAC securities between October 2, 2014, and August 3, 2015, inclusive. Excluded from the class are Defendants, directors, and officers of AAC, as well as their families and affiliates.

(Memo. Mot. to Certify Class, ECF No. 78 at PageID 2513.) Later, however, "after Plaintiffs' consideration of the Court's questions during the April 4, 2017 telephonic hearing, [Plaintiffs request that] the Court . . . certify a class of purchasers of AAC common stock that ends on August 4, 2015 at 9:40 a.m [EST]." (ECF No. 119 at PageID 4070.) The Court's analysis, therefore, centers on this newly defined Class and class period.

Lead Plaintiff moves for class certification under Rule 23(b)(3), which authorizes certification where: (1) "the questions of law or fact common to class members predominate over any questions affecting only **[*20]** individual members"; and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Plaintiffs also request the Court appoint Lead Plaintiff as Class Representative, and appoint law firms of Kaplan Fox & Kilsheimer LLP and Kahn Swick & Foti, LLC as Class Counsel, and Barrett Johnston Martin & Garrison, LLC, as Liaison Counsel for the Class. (ECF No. 78 at PageID 2513.)

Plaintiffs argue that the prerequisites for class certification to Rule 23 are met. (Id. at PageID 2514.) Plaintiffs argue the numerosity requirement is satisfied because "the members of the Class likely number in the thousands and reside in many states." (Id. at PageID 2518.) Plaintiffs argue commonality requirement is also met because "Defendants made uniform misrepresentations to the investing public through their public statements filed with the SEC . . . [and made] material misrepresentations and omissions [that] injured each Class member who acquired the stock during the Class Period . . . [rending] virtually all of the questions of law or fact at issue [as] common to the Lead Plaintiffs and all other purchasers of AAC securities during the Class Period." (Id. **[*21]** at PageIDs 2520-21.) Plaintiffs argue the typicality requirement is met because "the

claims asserted by Lead Plaintiffs are typical of, if not identical to, the claims of the other Class members . . . that Defendants violated Sections 10(b) and 20(a) of the Exchange Act by making statements that misrepresented or omitted material facts." (Id. at PageID 2522.) Plaintiffs also assert that Lead Plaintiffs will fairly and adequately protect the interests of the Class because "Lead Plaintiffs' interests are neither antagonistic to nor in conflict with the interests of the other Class members." (Id. at PageID 2523.)

Plaintiffs further contend they meet the requirements of Rule 23(b)(3). (Id. at PageID 2524.) Plaintiffs argue the predominance standard is satisfied because all Class member claims will be proved using the same evidence. (Id. at PageID 2524.) Plaintiffs also argue that the Class is entitled to a presumption of reliance under a fraud-on-the-market theory and a failure-to-disclose theory.

Under the fraud-on-the-market theory, Plaintiffs argue the facts withheld by AAC were material, which allows the Court to presume reliance on those facts. (Id. at PageID 2525.) Reliance is also presumed, Plaintiffs argue, under **[*22]** a fraud-on-the-market theory, because the shares are traded in an efficient market. (Id. at PageID 2526.)

Plaintiffs assert that each of the five factors used to find an efficient market are satisfied here: (1) there was 4.19% average weekly trading volume; (2) at least 36 analyst reports issued during the class period along with other news reports; (3) by trading on the New York Stock Exchange Plaintiffs "meets the spirit of this [numerous market makers] factor;" (4) Defendants filed a S-3 Registration Statement on November 10, 2015; and (5) Plaintiffs' event study analysis demonstrates a cause-and-effect relationship between the truth coming to light and a change in market price of AAC common stock. (Id. at PageIDs 2527-30.) Plaintiffs further support their argument by asserting market capitalization, bid-ask spread, institutional ownership, and lack of autocorrelation also support a finding that the market was efficient during the Class Period. (Id. at PageIDs 2530-32.) "[D]efendants concede that there's an efficient market for AAC common stock in this case." (Class Cert. Hr'g Tr., ECF No. 118 at PageID 4030:13-14.)

Plaintiffs also assert the Class is entitled to a presumption of reliance under **[*23]** the failure-to-disclose theory. (ECF No. 78 at PageID 2533.) Under this theory, Plaintiffs contend, they need not prove reliance or materiality — the Complaint need only allege actionable omissions or misrepresentations. (Id. at

**APP 119**

PageID 2534.)

## 2. Defendants' Arguments

Defendants make four central arguments in their response. First, Defendants argue Plaintiffs' class cannot be certified because Plaintiffs are unable to meet the typicality and adequacy requirements of Rule 23(a). (Def.'s Resp., ECF No. 106 at PageID 3368.) Defendants first highlight that proposed class representative, ATRS, "purchased 114,743 shares of AAC common stock after the July 29th press release announcing the existence of the California DOJ investigation and the resulting indictment." (Id. at PageID 3369.) These post-disclosure purchases, Defendants contend, render ATRS vulnerable to defenses that are not typical of the remaining Class members, and thus ATRS is neither typical nor adequate. (Id. at PageID 3370.)

Second, Defendants contend Rule 23(b)(3)'s predominance requirement is not met because there was no price impact. (Id. at PageID 3365.) Defendants specifically contend that after the "fully corrective disclosure" on July 29, 2015, **[*24]** when AAC announced that there was an indictment in connection with a California DOJ investigation, there was no statistically significant price movement on July 30, 2015. (Id. at PageID 3367.) The lack of a price impact following this disclosure precludes Plaintiffs from securing a presumption of reliance. (Id.)

Third, Defendants argue that Plaintiffs failed to establish that damages may be calculated on a Class-wide basis under the predominance requirement of Rule 23(b)(3). (Id. at PageID 3371.) Defendants specifically take issue with Plaintiffs' expert's proposed model for determining damages, because Plaintiffs' expert does not explicitly establish how the proposed event-study model is consistent with the allegations in the case. (Id. at PageID 3371.) Defendants also argue that the event-study model proffered by Plaintiffs' expert would not establish that damages existed on July 30, 2015. (Id. at PageID 3372.)

Fourth, Defendants argue that if the Court certifies the class it should limit the class period to July 29, 2015 rather than August 3, 2015. (Id. at PageID 3374.) July 29, 2015 is the appropriate date, Defendants argue, because that is when the AAC indisputably disclosed the existence of **[*25]** the California DOJ investigation. (Id.) Defendants further contend "the information that was released to the market between July 30, 2015 and

August 4, 2015, simply did not add any new information regarding the existence of the California DOJ investigation." (Id. at PageID 3376.)

## 3. Plaintiffs' Response

Plaintiffs respond to Defendants' arguments by asserting first that Plaintiffs need not prove price impact at the certification stage; rather, it is Defendants' burden to present evidence of a lack of price impact. (ECF No. 108 at PageIDs 3410-11.) Moreover, Plaintiffs argue that their expert provides a rebuttal that establishes a price impact based on the AAC announcement on the indictment alone. (Id. at PageID 3413.) Plaintiffs also contend that Defendants misconstrue the Complaint's allegations: "The full extent of Defendants' Class Period misrepresentations was not related 'solely' to revealing the [existence of the] investigation, but also intentionally misleading investors about the operational risks to the Company stemming from their intentional failure to disclose the investigation." (Id. at PageID 3414.) Plaintiffs argue the "[c]orrective disclosures related to those Class Period misrepresentations **[*26]** did not all occur on July 29, 2015 — but rather included additional, new disclosures on August 3-4, 2015." (Id.)

Plaintiffs also contend that ATRS's post-Class Period purchases do not render it atypical or inadequate because "'purchasing stock subsequent to a materially adverse disclosure, 'averaging down,' is a common technique used to decrease the average cost of an investment and which cannot be used to defeat a proposed class representative's typicality.'" (Id. at PageID 3415 (quoting In re Select Comfort Corp. Sec. Litig., 202 F.R.D. 598, 607 n.12 (D. Minn. 2001).)

## C. Analysis

### 1. Implied Prerequisites to Rule 23(a)

Defendant does not dispute that the proposed Class meets the implied prerequisites to Rule 23(a). The Court finds the Class is sufficiently definite to determine whether an individual is a class member, Allen v. Int'l Truck & Engine Corp., 3:07-cv-361, 2011 U.S. Dist. LEXIS 79723, 2011 WL 2975543, at *5 (S .D. Ohio July 21, 2011), because class members must have acquired or purchased AAC stock during the class period. Lead Plaintiff also appears to fall within the proposed Class

**APP 120**

such that it had standing[3] to bring the Complaint. Brunet v. City of Columbus, 1 F.3d 390, 399-400 (6th Cir. 1993); Young v. Nationwide Mut. Ins. Co., 693 F.3d 532, 537 (6th Cir. 2012). It allegedly suffered "losses of $591,922 as a result of purchasing AAC Holdings' common stock traded during the Class Period at artificially inflated prices." (ECF No. 23 at PageID 279.)

**2. Rule 23(a) Prerequisites**

### a) Numerosity [*27]

Defendant does not dispute that the proposed Class is sufficiently numerous. Plaintiffs assert that the Class members would "likely number in the thousands and reside in many states." (ECF No. 78 at PageID 2518.) The Class appears so numerous that joinder of all the members would be impracticable.

### b) Commonality

The Sixth Circuit has stated that there need only be one question common to the class, but the answer of that question must be central to and advance the litigation. In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation, 722 F.3d 838, 853 (6th Cir. 2013); Sprague v. Gen. Motors Corp., 133 F.3d 388, 397 (6th Cir. 1998).

Plaintiffs assert that the entire class shares five common questions of fact listed in Plaintiffs' Motion. (ECF No. 78 at PageID 2521.) Common questions in this case, as in other cases involving Section 10(b) and Rule 10b-5 allegations, include "several common questions of law and fact concerning the falsity or misleading nature of the [ ] public statements made by [AAC], the presence or absence of scienter, and the materiality of the misrepresentations, if any." Basic Inc. v. Levinson, 485 U.S. 224, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988). Defendants do not oppose these asserted common questions of fact. The Court, therefore, finds the commonality requirement is satisfied.

---

[3] Standing requires a showing by Plaintiffs of: (1) injury in fact; (2) causal connection between the injury and the complained of conduct; and (3) that success on the merits will likely redress the injury. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).

### c) Typicality

The claims of the representative party, Lead Plaintiff, must be typical of the claims of the class. Fed. R. Civ. P. 23(a)(3). To satisfy this requirement, **[*28]** "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 156, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982). Lead Plaintiff's claims here are similar to those of other putative class members. All members allegedly bought "AAC Holdings' common stock" during the proposed class period, relying on AAC withholding material information, and suffered "losses of $591,922" when the truth came to light through a series of corrective disclosures. (ECF No. 23 at PageID 279, 281.)

Defendants contend that Lead Plaintiff is atypical because it bought AAC shares following the July 29, 2015 disclosure. (ECF No. 106 at PageID 3369.) These post-disclosure purchases, Defendants contend, render Lead Plaintiff vulnerable to defenses that are not typical of the remaining Class members, and thus Lead Plaintiff is neither typical nor adequate. (Id. at PageID 3370.) But in the Rule 10b-5 context, our sister courts find that "purchasing stock subsequent to a materially adverse disclosure, 'averaging down,' is a common technique used to decrease the average cost of an investment and which cannot [automatically] be used to defeat a proposed class representative's typicality." In re Countrywide Fin. Corp. Sec. Litig., 273 F.R.D. 586, 603 n.36 (C.D. Cal. 2009); accord In re DVI Inc. Sec. Litig., 249 F.R.D. 196, 204 (E.D.Pa. 2008); Feder v. Electronic Data Sys. Corp., 429 F.3d 125, 138 (5th Cir. 2005); In re Sepracor Inc., 233 F.R.D. 52, 56 (D. Mass. 2005); Malone v. Microdyne Corp., 148 F.R.D. 153, 159 (E.D.Va. 1993).

### d) Adequacy [*29]

Lead Plaintiff must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Defendants contend that Lead Plaintiff is inadequate for the same reason expressed under typicality. "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Young v. Nationwide Mut. Ins. Co., 693 F.3d 532, 543 (6th Cir. 2012) (quoting Amchem Prods., Inc. v.

**APP 121**

Windsor, 521 U.S. 591, 625-26, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)) (internal quotation marks omitted). It appears that Lead Plaintiff as no conflicts of interest, and has the same interest and injury as other class members. Additionally, for the reasons stated above, an 'averaging down' strategy, alone, is not enough to render the Lead Plaintiff inadequate in a Rule 10b-5-related action. The Court therefore finds that Lead Plaintiffs are adequate representatives of the Class under Rule 23(a)(4).

### 3. Rule 23(b)(3) Requirements

The Court finds that Plaintiffs have satisfied the Rule 23(b)(3) requirements. Common questions of law and fact predominate over any question affecting only individual class members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

### a) Predominance

For the sake of a complete [*30] Rule 23(b)(3) analysis, the Court holds that, though not challenged by Defendants, all elements of the Rule 10b—5 claim are based on evidence that is common to the class.

### 1. Materiality of Misstatements/Omissions

The alleged wrongdoing giving rise to the claim is uniform as to the entire class. Proving Defendants' liability will depend on the same evidence relating to the materiality of the misstatements and omissions at issue and Defendants' state of mind in making such statements or failing to disclose certain information about the indictment or investigation. See Amgen, 133 S.Ct. at 1195-96 (stating that "materiality is a common question for purposes of Rule 23(b)(3)" (quotation omitted)). The Court finds this factor satisfied.

### 2. Scienter

Likewise, whether Defendants acted with scienter is a common question based on the Defendants' state of mind, not on any individualized inquiry involving class members. The Court, therefore, finds this factor satisfied.

### 3. Connection between Misstatements/Omissions and Security Price

Also, whether a connection exists between the misstatements or omissions and the value of AAC's stock is a common question uniform to the entire class. Accordingly, the Court finds this factor satisfied.

### 4. Reliance on Misstatements/Omissions [*31]

"Whether common questions of law or fact predominate in [Rule 10b-5] action often turns on the element of reliance." Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 131 S. Ct. 2179, 180 L. Ed. 2d 24 (2011). Courts have long recognized that without a classwide presumption of reliance in securities fraud cases, Rule 23(b)(3)'s predominance requirement "would often be an insuperable barrier to class certification, since each of the individual investors would have to prove reliance on the alleged misrepresentation." Dukes, 131 S.Ct. at 2552 n. 6; see also Halliburton I, 563 U.S. at 810 (explaining that "requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would prevent such plaintiffs from proceeding with a class action, since individual issues would overwhelm the common ones.") (citing Basic, 485 U.S. at 242). Accordingly, the Supreme Court has identified two avenues through which plaintiffs may invoke a rebuttable presumption of reliance: the "fraud-on-the-market" presumption, as outlined in Basic Inc. v. Levinson, and the Affiliated Ute presumption, as set forth in Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-154, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972). Plaintiffs contend they are entitled to a presumption of reliance under both theories. Because the Court finds that Plaintiffs are entitled to a presumption of reliance under Basic such that the class may be certified, it is unnecessary for the Court to reach [*32] the question of whether Plaintiffs are similarly entitled to such a presumption under Affiliated Ute.

Basic's "fraud on the market" theory provides a rebuttable presumption that because "the market price of shares traded on well-developed markets reflects all publicly available information," including any misrepresentations, "all traders who purchase stock in an efficient market are presumed to have relied on the accuracy of a company's public statements." Basic, 485 U.S. at 246-7; Dukes, 131 S.Ct. at 2552 n. 6; see also Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2404, 189 L. Ed. 2d 339 (2014) ("Halliburton II") (reaffirming Basic's presumption of reliance). To invoke

this presumption at the class certification stage, plaintiff must show: (1) the alleged misrepresentations were publicly known, (2) the misrepresentations were material, (3) AAC's stock traded in an efficient market, and (4) "the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed." Halliburton I, 131 S. Ct. at 2185 (quoting Basic, 485 U.S. at 248, n. 27); Halliburton II, 134 S. Ct. at 2416. However, the presumption may be rebutted where a defendant offers evidence that "severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." Basic, 485 U.S. at 248; see Halliburton II, 134 S. Ct. at 2415-16.

### i. Misrepresentations Publicly Known [*33]

Defendants do not substantively challenge that the alleged misrepresentations, e.g., failing to reveal the existence of the criminal investigation and intentionally misleading investors about the operational risks to the Company stemming from their intentional failure to disclose the investigation (ECF No. 108 at PageID 3414), were publicly known. The record also establishes that there was no disclosure by AAC concerning the indictment in any public document. The Court, therefore, finds this factor satisfied.

### ii. Misrepresentations Were Material

Even though materiality is a prerequisite for invoking the presumption, the Supreme Court held that it should be left to the merits stage of the litigation because it does not bear on the predominance requirement of Rule 23(b)(3). Halliburton II, 134 S. Ct. at 2416. Accordingly, this Court does not address the materiality of the alleged misrepresentations at this time.

### iii. Efficient Market

Defendants do not dispute that the proposed Class traded in an efficient market. (Class Cert. Hr'g Tr., ECF No. 118 at PageID 4030:13-14.) Plaintiffs argue the five factors espoused in Cammer v. Bloom in determining whether a security was traded on an efficient market are present in this case (see ECF No. [*34] 78 at PageID 2527): (1) a large weekly trading volume; (2) the existence of a significant number of reports by securities analysts; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the

company to file an S-3 Registration Statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases. Cammer v. Bloom, 711 F.Supp. 1264, 1286-87 (D.N.J. 1989); Bovee v. Coopers & Lybrand, 216 F.R.D. 596, 605 (S.D. Ohio 2003). The Court finds that the market in the instant case was efficient, and this factor is satisfied.

### iv. Plaintiffs Traded Stock After the Misrepresentation Occurred and Prior to Curative Disclosure

Defendants also do not dispute that Plaintiffs traded stock after the omission/misrepresentation occurred and prior to the curative disclosure. Defendants do argue, however, that Lead Plaintiff also traded stock after the July 29, 2015 disclosure. See supra Part II.E.2(c)-(d) (typicality and adequacy); (ECF No. 95 at PageID 2987). Defendant does not advance this argument as to any other Class members nor discusses whether such a transaction would render this factor unsatisfied. As proposed, the Class would limit members to those who purchased or otherwise acquired AAC securities between October 2, 2014, [*35] and August 4, 2015.

### v. Defendants' Rebuttal

"Price impact can be shown either by an increase in price following a fraudulent public statement or a decrease in price following a revelation of the fraud." Erica P. John Fund, Inc. v. Halliburton Co., 718 F.3d 423, 434 (5th Cir. 2013), vacated and remanded on other grounds by 134 S. Ct. 2398, 189 L. Ed. 2d 339 (2014). Defendants state that there was no statistically significant price decrease on the day of or following the first July 29, 2015 disclosure, and thus there was no price impact. Plaintiffs argue, however, that the July 29, 2015 disclosure was not fully curative, and that the following partial disclosures up until August 4, 2015 fully cured the misrepresentations.

"In determining the duration of a securities fraud class based on a fraud-on-the-market theory, the Court must determine whether a curative disclosure had been made so as to render it unreasonable for an investor, or the market, to continue to be mislead by the defendants' alleged misrepresentations." In re Fed. Nat. Mortg. Ass'n Sec., Derivative & "ERISA" Litig., 247 F.R.D. 32, 38 (D.D.C. 2008) (internal quotation marks omitted).

**APP 123**

Courts must tread a fine line when parties dispute whether a particular release cured prior misrepresentations. While a court cannot delve into the merits, it should preliminarily evaluate when curative **[*36]** information was publicly announced or otherwise disseminated to the market, for the class period should end when prior misrepresentations are fully cured. Thus, a majority of courts engage in a limited review to determine when a market was cured of prior misrepresentations. Courts that have engaged in this limited review refuse to narrow the class period if there is a substantial question of fact as to whether the release had cured the market or was itself misleading.

Bovee v. Coopers & Lybrand, 216 F.R.D. 596, 614 (S.D. Ohio 2003) (internal citations and quotation marks omitted); accord Shirk v. Fifth Third Bancorp, No. 05-CV-49, 2007 U.S. Dist. LEXIS 26534, 2007 WL 1100429, at *16 (S.D. Ohio Apr. 10, 2007); In re Schering-Plough Corp./ENHANCE Sec. Litig., No. CIV.A. 8-397 DMC/JAD, 2012 U.S. Dist. LEXIS 138078, 2012 WL 4482032, at *9 (D.N.J. Sept. 25, 2012); Hodges v. Akeena Solar, Inc., 274 F.R.D. 259, 271 (N.D. Cal. 2011); In re Enron Corp. Sec., 529 F. Supp. 2d 644, 712 (S.D. Tex. 2006). The Court now makes a limited review of the disclosures to determine when the misrepresentations were fully cured.

July 29, 2015 Disclosure: On July 29, 2015, AAC publicly disclosed that charges had been brought against subsidiaries of AAC and two current and three former employees, referring to the July 21, 2015 California indictment. (ECF Nos. 50 ¶ 20; 65 ¶ 124.) Defendants did not disclose that the charges included the second-degree murder and dependent adult abuse of Mr. Benefield. (ECF No. 50 ¶ 20.) On the same day, AAC also reported better than expected financial results for AAC's 2015 second **[*37]** quarter. (ECF Nos. 50 ¶ 21; 65 ¶ 125.)

At this juncture, the Court finds AAC's July 29th disclosure concerning the indictment was not curative, as it was tempered by a positive financial report. In short, these reports did not amount to a disclosure of information such that the causal link is severed between the release of information claiming the full extent of the indictment and/or that AAC knew of the investigation several weeks prior to disclosing it, and the stock price drop in early August.

August Disclosures: Plaintiffs allege that "on August 1,

2015, the Company hosted an earnings conference call where Defendant Cartwright claimed that, while he was 'just now having the opportunity to review [the six page] indictment,' he 'firmly believe[d] that the California Department of Justice case is without merit.'" (ECF No. 50 ¶ 21.)

At this time, the Court finds that this disclosure fails to convey the extent of the indictment, suggests that AAC has only recently come to understand the case, and also tempers by claiming the case is without merit. The Court finds, therefore, that this disclosure falls short of curative disclosure of the misrepresentation alleged by Plaintiffs. (See ECF No. 119 at **[*38]** PageID 4067.)

On August 4, 2015, Bleeker Street Research published a report entitled "American Addiction Centers: Even More Undisclosed Deaths and the Start of Real Problems" revealing new facts and details about the indictment and history of wrongdoing at the AAC Affiliates. (Id.) On August 5, 2015, Forbes published an article entitled "AAC Holdings' Lawyers Knew About Criminal Investigation in 2013," reporting that "[i]n a response to questions from Forbes about when it became aware of the criminal investigation, the company said in a statement last week it learned of the grand jury investigation into the death of Gary Benefield about six weeks ago." (ECF No. 50 ¶ 23.) The article went on to state that "AAC Holdings had not disclosed the criminal investigation into Gary Benefield's death in any of its securities filings that were made with the SEC as it prepared for its IPO last year or since, until the indictment was unsealed." (Id. ¶ 24.)

At this time, the Court finds that these disclosures, specifically those made on August 5, 2015, tie together the partial disclosures and fully cure the alleged misrepresentations. It is clear from these disclosures the indictment concerns the death **[*39]** of a patient and whether AAC knew of the investigation but failed to properly disclose it. Following August 5, 2015, it would have been unreasonable for an investor, or the market, to continue to be misled by the defendants' alleged misrepresentations. Accordingly, upon its limited review, the Court finds the Plaintiffs' presumption of reliance is not rebutted.

**5. Economic Loss**

Defendants, citing Comcast Corp. v. Behrend, 569 U.S. 27, 133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013), argue that Plaintiffs cannot establish predominance because

**APP 124**

Plaintiffs' expert failed to advance a methodology for calculating damages on a classwide basis in a manner that is consistent with their theory of liability. (ECF No. 98 at PageIDs 3177-3178.) Comcast requires that if Plaintiffs advance a methodology for calculating damages on a classwide basis, then they must also show that the methodology is consistent with their theory of liability. 133 S. Ct. at 1433.

The Court finds that Plaintiffs have satisfied Comcast. Specifically, Plaintiffs' expert used an event study to calculate damages on a classwide basis. (See Coffman Expert Rebuttal, ECF No. 109-4 at PageID 3606; Coffman Report, ECF No. 80-4 at PageID 2780.) The Court finds that the proffered methodology is often viewed by courts as consistent with **[*40]** Plaintiffs' theory of liability based on misrepresentations or omissions in securities litigation. See, e.g., Hatamian v. Advanced Micro Devices, Inc., No. 14-CV-226 YGR, 2016 U.S. Dist. LEXIS 34150, 2016 WL 1042502, at *9 (N.D. Cal. Mar. 16, 2016); Willis v. Big Lots, Inc., No. 2:12-CV-604, 242 F. Supp. 3d 634, 2017 U.S. Dist. LEXIS 38926, 2017 WL 1063479, at *11 (S.D. Ohio Mar. 17, 2017); Wallace v. IntraLinks, 302 F.R.D. 310, 318 (S.D.N.Y. 2014); In re Wilmington Trust Sec. Litig., 310 F.R.D. 243, 246 (D. Del. 2015); see also In re VHS of Mich., Inc., 601 Fed.Appx. 342, 344 (6th Cir. 2015) ("Comcast applies where multiple theories of liability exist, those theories create separable anticompetitive effects, and the combined effects can result in aggregated damages. . . . Where there is no chance of aggregated damages attributable to rejected liability theories, the Supreme Court's concerns do not apply."). Accordingly, the Court finds that individual damages issues will not predominate over common issues in this case.

### 6. Loss Causation[4]

In addition to the allegedly deceptive statements and omissions and Defendants' scienter, loss causation for

---

[4] "Loss causation is a familiar and distinct concept in securities law; it is not price impact." Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 131 S. Ct. 2179, 180 L. Ed. 2d 24 (2011). "Loss causation . . . requires a plaintiff to show that the misrepresentation caused a subsequent economic loss. That has nothing to do with whether an investor relied on that misrepresentation in the first place, either directly or through the fraud-on-the-market theory." Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 131 S. Ct. 2179, 180 L. Ed. 2d 24 (2011).

the putative class is also capable of proof through common evidence. Each Class member's claim for relief is based on the same corrective disclosures that allegedly caused AAC's stock value to drop. Accordingly, the Court finds this factor satisfied.

### b) Superiority

Finally, before certifying a class under Rule 23(b)(3), the Court must find that a class action is "superior to other available methods for fairly and efficiently adjudicating **[*41]** the controversy." Fed. R. Civ. P. 23(b)(3). To make this decision, the Court considers: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. Id.

Defendants do not contest Plaintiffs' assertion that a class action is superior to any other form of adjudication in the instant case. Based on the potential number of Plaintiffs in the Class, the Class members' interests in resolving the issue in one case, and the lack of any additional litigation concerning the instant case, it appears that a class action is superior to other available methods in the instant case. The Court, therefore, finds a class action is superior to any other available methods to adjudicate the claims raised here.

### 2. MOTIONS TO APPOINT CLASS COUNSEL & CERTIFY LEAD PLAINTIFF AS REPRESENTATIVES OF THE PROPOSED CLASS

Plaintiffs seek to appoint Kaplan Fox, Kahn Swick and Barrett Johnston as Class Counsel, and certify **[*42]** Lead Plaintiffs as representatives of the proposed Class. (ECF No. 78 at PageID 2537.)

Rule 23(g)(1)(A) sets out four factors a court must consider in appointing Class Counsel: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A).

**APP 125**

Plaintiffs argue that each of the named attorneys "have extensive experience prosecuting securities class actions" and "have effectively used their experience to vigorously pursue the interests of all Class members, including the filing of a detailed Complaint, successfully defending the Complaint against Defendants' motion to dismiss, by pursuing an aggressive discovery plan, and by preparing this action for trial." (ECF No. 78 at PageID 2537.) Defendants do not dispute whether Plaintiffs' motion to appoint as Class Counsel should be granted.

Pursuant to Federal Rule of Civil Procedure 23, and the reasons stated above, the Court appoints Lead Plaintiff ATRS as the Class Representative.

Accordingly, the Court GRANTS Plaintiffs' **[*43]** Motion to appoint Kaplan Fox, Kahn Swick and Barrett Johnston as Class Counsel and Plaintiffs' Motion to appoint Lead Plaintiff Class Representative.

## III. CONCLUSION

For the reasons stated above, the Court GRANTS Plaintiffs' Motion to Certify the Class:

> all persons and entities who purchased or otherwise acquired AAC securities between October 2, 2014, and August 4, 2015 at 9:40 a.m. (EDT). Excluded from the class are Defendants, directors, and officers of AAC, as well as their families and affiliates.

(ECF No. 119 at PageID 4070.)

The Court also GRANTS Plaintiffs' Motion to appoint Kaplan Fox, Kahn Swick and Barrett Johnston as Class Counsel and Plaintiffs' request to appoint Lead Plaintiff as Class Representative.

**IT IS SO ORDERED**, this 14th day of July, 2017.

/s/ Jon P. McCalla

JON P. McCALLA

UNITED STATES DISTRICT COURT JUDGE

---

End of Document

APP 126