**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| IN RE AMERICAN AIRLINES GROUP INC. SECURITIES LITIGATION | Master File No.: 4:24-cv-00673-O<br>(Consolidated with 4:24-cv-00823-O)<br><br>**CLASS ACTION**<br><br>Demand for Jury Trial |

**CONSOLIDATED COMPLAINT FOR VIOLATIONS OF**
**THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS


I. NATURE OF THE ACTION ..... 2

II. JURISDICTION AND VENUE ..... 7

III. PARTIES ..... 8

A. Plaintiffs ..... 8

B. Defendants ..... 9

C. Relevant Non-Parties: Confidential Witnesses ..... 11

IV. SUBSTANTIVE ALLEGATIONS ..... 12

A. American's Core Business Is Selling Airline Tickets to Passengers Through Multiple Distribution Channels ..... 12

1. American's Passenger Travel Consists of Leisure, Business, and Blended Travel ..... 14

2. American's AAdvantage Program Rewards Customers Through Travel Perks ..... 15

3. American Historically Contracted with Travel Agencies, TMCs, and Corporations to Offer Incentives and Benefits For Booking on American ..... 15

B. NDC Was Developed as an Alternative to EDIFACT, Which the Travel Industry Relied on to Exchange Booking Data Between Travel Providers and Travel Purchasers ..... 17

C. American Attempts to Force Widespread NDC Adoption By Restricting Access to Forty Percent of Its Booking Content ..... 18

D. American Reduces Corporate and Agency Incentives and Threatens to Eliminate Even More Perks ..... 21

1. American Alienates TMCs, Agencies, and Corporations by Removing Incentives and Favors for Business Travelers and Instituting Contracts with Difficult NDC Adoption Goals ..... 21

2. American Reduces Incentives for Corporations ..... 23

3. American Cancels Contracts with Small and Medium-Sized Businesses to Restrict Their Ability to Work with Travel Agencies ..... 24

E. American's Aggressive Commercial Strategy Drives Customers Away ..... 25

1. American's Unfeasible Deadline for NDC Implementation Introduced Technological Impediments to Booking, Causing Customers to Push Back ..... 25

2. Corporate Buyers and Travel Agencies Shift Business Away from American ..... 28

a. TMCs and Agencies Shift Business Travel Away from American ..... 28

b. SMBs and Corporations Shift Their Business Travel Away from American ..... 29

c. American's Internal Data Shows Poor NDC Adoption and the Company Losing Share of the Business Travel Market in 2023 into 2024 ..... 31

V. DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ..... 36

A. July 20, 2023 Statements in American's 2Q 2023 Form 10-Q ..... 36

B. July 20, 2023 Statements on American's 2Q 2023 Earnings Call .................................... 40
C. October 19, 2023 Statements in American's 3Q 2023 Form 10-Q .................................. 42
D. October 19, 2023 Statements on American's 3Q 2023 Earnings Call ............................. 46
E. November 1, 2023 Statements at the 2023 Skift Conference ........................................... 49
F. January 25, 2024 Statements on American's FY2023 Earnings Call ............................... 51
G. February 21, 2024 Statements in American's FY2023 Form 10-K ................................. 56
H. March 12, 2024 Statements at the 2024 J.P. Morgan Industrials Conference .................. 60
I. April 10, 2024 Statements at the Elevate + TravelConnect Conference ........................... 63
J. April 23, 2024 Statements to Travel Media ...................................................................... 66
K. April 25, 2024 Statements in American's 1Q 2024 Press Release and Investor Relations Update ............................................................................................................................... 68
L. April 25, 2024 Statements in American's 1Q 2024 Form 10-Q ....................................... 72
M. April 25, 2024 Statements on CNBC's Squawk Box ...................................................... 76
N. April 25, 2024 Statements on American's 1Q 2024 Earnings Call ................................. 79
VI. DEFENDANTS REVEALED THE TRUTH IN A SET OF DISCLOSURES MADE ON MAY 28, 2024 AND MAY 29, 2024 ..................................................................................... 85
A. Defendants' May 28, 2024 Announcements ................................................................... 85
B. Defendants' Presentation at the Bernstein Conference on May 29, 2024 ........................ 86
VII. POST-CLASS PERIOD EVENTS .......................................................................................... 93
A. Bloomberg Publishes a May 29, 2024 Expose on Defendant Raja's Termination ........... 93
B. American's 2Q 2024 Press Release on July 25, 2024 ...................................................... 94
C. American's 2Q 2024 Earnings Call on July 25, 2024 ...................................................... 96
VIII. ADDITIONAL SCIENTER ALLEGATIONS ...................................................................... 101
A. Defendants Regularly Participated in Meetings Discussing American's Poor Performance Due to Distribution Strategy Changes .......................................................................... 101
B. Defendants' Hiring of Consulting Firm Amidst Changes to American's Distribution Strategy Strongly Supports Scienter ............................................................................. 103
C. Defendants' Post-Class Period Admissions Support Scienter ......................................... 104
D. Defendants' Access to and Review of Data Demonstrating the Negative Impacts of NDC Distribution Changes Supports Scienter ........................................................................ 106
1. Defendants Received Detailed Reports Concerning American's Performance Compared to Competitors and NDC Adoption ............................................................... 107
2. Defendants' Admitted Access to and Review of Metrics Concerning NDC Rollout and its Effects on Market Share, Revenues, and Third-Party Bookings Supports Scienter ................................................................................................. 108
3. Defendants' Granular Review of Agency and Corporate Metrics Supports Scienter . 114

E. Defendants' Evasive Answers to Analysts' and Journalists' Pointed Questions is Indicative of Scienter ........ 115

F. Defendants' Statements Concerned American's Primary Source of Revenue and Core Operation, Further Supporting Scienter ........ 117

IX. LOSS CAUSATION ........ 120

X. CLASS ACTION ALLEGATIONS ........ 127

XI. PRESUMPTION OF RELIANCE ........ 129

XII. NO STATUTORY SAFE HARBOR ........ 131

COUNT I ........ 132

COUNT II ........ 134

PRAYER FOR RELIEF ........ 136

DEMAND FOR JURY TRIAL ........ 137

1. Co-Lead Plaintiffs Dominik Dumancic and Luis Vicente Davidoff Cracasso ("Co-Lead Plaintiffs") and additional plaintiff Richard Wilkinson (together with Co-Lead Plaintiffs, "Plaintiffs"), bring this action pursuant to 15 U.S.C. §§ 78j(b) and 78t(a) ("Section 10(b)" and "Section 20(a)," respectively) of the Securities Exchange Act of 1934 (the "Exchange Act") and 17 C.F.R. § 240.10b-5 ("Rule 10b-5") promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), individually and on behalf of themselves and all persons similarly situated who purchased or otherwise acquired securities of American Airlines Group Inc. ("American" or the "Company") between July 20, 2023 and May 28, 2024, inclusive (the "Class Period").[1]

2. Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on the investigation of their undersigned attorneys ("Lead Counsel"), which included, among other things, review and analysis of: (i) public documents, public filings, and wire and press releases published by and regarding American; (ii) Defendants' other public statements, including transcripts of interviews Defendants participated in as transcribed by third party news aggregators (including S&P Global, FactSet, and Seeking Alpha), and recordings of such interviews; (iii) interviews with individuals who are former employees of American; (iv) reports of securities and financial analysts, news articles, and other commentary and analysis concerning the Company and the industry in which they operate; and

---

[1] Excluded from the Class are: (i) all Defendants named herein (defined at ¶ 29, *infra*); (ii) members of the Individual Defendants' (defined at ¶29, *infra*) immediate families; (iii) subsidiaries and affiliates of American; (iv) any person who is or was an officer or director of American during the Class Period; (v) any entity in which any defendant has a controlling interest; and (vi) the legal representatives, heirs, successors, and assigns of any such excluded person or entity. All emphasis is added and all internal citations omitted unless otherwise noted.

(v) pertinent court filings. Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their control.

## I. NATURE OF THE ACTION

3. Plaintiffs bring this securities class action alleging that throughout the Class Period, Defendants knowingly and materially misrepresented the success of changes to American's sales distribution strategy to investors.

4. American is one of the United States' three largest providers of air transportation for passengers and cargo. The Company operates in a highly competitive environment, competing for passenger airfare against the other two largest providers of airfare—United Airlines and Delta—as well as with low-cost carriers and ultra low-cost carriers, such as Southwest Airlines and Spirit Airlines, respectively.

5. Prior to the Class Period, American traditionally sold airfare and ancillary services to corporate customers through third party distributors who used global distributions systems ("GDSs"), centralized platforms that act as middlemen between travel agencies and airlines. These GDSs relied on Electronic Data Interchange for Administration, Commerce, and Transport ("EDIFACT"), a universal language for data sharing, to exchange information regarding airfare and ancillary services. This traditional method for distributing airfare and ancillary services is referred to herein as "EDIFACT channels."

6. Beginning in December 2022 and continuing through Spring of 2024, American made a series of changes to the way it sold airfare and ancillary services to its corporate customers. The Company's new distribution strategy, coined "Modern Retailing," aimed to push corporate customers away from booking through EDIFACT channels to booking directly through

American's website, mobile app, or a direct connection with the airline, all of which involved using New Distribution Capability ("NDC") technology. In theory, changing ticket distribution to an NDC standard could reduce costs paid to GDSs and travel agencies while providing American with more control of the price and presentation of its airfare to its customers.

7. To induce customers to shift to NDC and direct bookings, in April 2023, American removed forty percent of its airfare content from EDIFACT channels and restricted its availability to the Company's direct and NDC channels. American also implemented changes to booking agreements with travel agencies and corporations who were booking their own travel (either through an in-house corporate travel department, a travel management company ("TMC"), or a travel agency) by reducing the number of incentives those customers previously received for buying American services through EDIFACT channels, in favor of awarding incentives tied to bookings made directly with American or through NDC-enabled channels.

8. From July 2023 through April 2024, Defendants touted the success of their changes to American's distribution strategy, and issued false earnings guidance for the second quarter and full-year 2024 ("2Q/Full Year 2024 guidance") that reflected the supposed financial success of their new distribution strategy. Defendants also falsely claimed that they were very encouraged both by third parties' response to distribution changes and adoption of NDC technology, as well as by corporate customers' continued demand. For example, speaking of corporate customers, Defendant Raja positively touted "**the durability of these customers' demand**" and Defendant Isom stated that "**[t]here's nothing that I see in terms of customer behavior that would suggest that we're not on the right path**." Defendants continued to echo these claims throughout the Class Period.

9. However, contrary to their public representations, Defendants had no basis for their portrayal of the results from their new distribution strategy, or for their 2Q/Full Year 2024 guidance because American's distribution strategy changes were driving travel agencies and corporate customers away in droves, and American's share of business among airlines as a whole was withering. Indeed, confidential witnesses ("CWs") who were employed by American during the Class Period recounted that American's relationships with both travel agencies and corporate customers quickly deteriorated after the Company began introducing its distribution changes. For instance, by April 2023, before the Class Period even began, it was clear to CW2 that, as a result of American's aggressive push towards NDC distribution, agencies and companies were booking fewer flights with American than they had in the past, with some avoiding American entirely. Similarly, CW1 personally "saw share move away swiftly" by TMCs, which predominately cater to business and corporate travelers. This reduction in share became "particularly noticeable" to CW1 in June 2023 and continued thereafter. Similarly, CW1 confirmed that American "lost so much share" of small and medium-sized businesses ("SMBs") since many were unwilling to stop using agencies.

10. Critically, based on data available to them through American's SalesLink Insights platform, PRISM reports, and from the International Air Transport Association ("IATA") (explained more fully below), Defendants knew that customers were not adopting NDC technology and instead, American was losing market share to competitors. As CW2 explained, by July 2023 bookings from larger agencies declined 15% compared to year-over-year levels, and bookings for corporate accounts were "much lower" than that. CW2 elaborated that PRISM data demonstrated that American's agency and corporate bookings and percentage of share

metrics remained "consistently down" through the end of CW2's tenure at the end of January 2024.

11. Moreover, after the Class Period, Defendants admitted to having known that American's lagging revenue and "softness in customer bookings" were a direct result of "changes that we have made to our sales and distribution strategy." Defendant Isom further admitted that American knew that these issues existed during the first quarter of 2024 but nevertheless obscured the severity of impacts in hopes that the results would reverse, stating in relevant part: "[W]e identified a deviation in terms of our revenue performance versus some of our large network peers **in the first quarter**" of 2024.

12. Despite knowing about these materially negative effects of the new strategy on their business,, Defendants continued to knowingly misrepresent American's sales success throughout the first and second quarters of 2024. Indeed, as late as April 25, 2024 (one month before quarter close), the Individual Defendants were asked point blank during an earnings call to describe American's performance with "managed corporate travel volume" in relation to competitors who reported market share around "14%, 15%." Defendants did not demur. Rather, Defendant Raja clearly lied, stating, in pertinent part, and in contradiction to information known "in the first quarter," that such "**<u>revenues are coming back very materially for us</u>**" including with regard to "**<u>corporate contract and corporate customers</u>**[.]" At the same time Defendants issued knowingly false financial guidance and, referring to American's supposedly positive performance with NDC deployment, stated "**<u>that's implicit in our [falsely high] guide for Q2 and for the year.</u>**"

13. Just one month later, on May 28, 2024 and May 29, 2024, Defendants disclosed the truth when reporting that Defendant Raja would be leaving the Company in June 2024 and

that American was significantly reducing its guidance for the second quarter of 2024. During the 2024 Bernstein Conference (defined in ¶ 205) on May 29, 2024, Defendant Isom confirmed that American was reducing its second quarter guidance and revealed that the Company was slashing its growth estimates for the full year 2024 "due to the changes that we have made to our sales and distribution strategy." Defendant Isom further admitted that, with respect to NDC implementation, American "move[d] faster than we should and we didn't execute well[,]" "used a lot of sticks[,]" and that its "approach [was and] is driving customers away from American." During the 2024 Bernstein Conference, Defendant Isom also linked Raja's departure to American driving customers away with the changes to its agency and corporate strategy.

14. Upon this news, American's stock dropped dramatically, falling from a closing price of $13.44 per share on May 28, 2024 to close at $11.62 per share on May 29, 2024 and resulting in American's largest single-day drop since June 2020, when the COVID-19 pandemic decimated travel demand. As Defendant Isom would later admit during the Company's July 25, 2024 2Q 2024 Earnings Call (defined in ¶ 219) American's guidance reduction was directly related to the Company's changes to its distribution strategy—not general air travel market factors. Indeed, American's competitor, United Airlines, *reaffirmed* its guidance within minutes of American's May 28, 2024 announcement—ostensibly at the ready for American's disclosure of the truth.

15. Analysts reacted swiftly. For instance, in a May 28, 2024 report, Bernstein analysts were surprised by the extent of American's guidance reduction, stating in relevant part: "[a] significant miss driven in part by close in bookings[,]" *i.e.*, bookings that are made close in time to a flight date (frequently used for corporate fliers), which "puts AAL's ability to reap the full value of a robust summer flying season in greater doubt" and further attributed the "close in

booking weakness … to loss of corporate travel share associated with recent distribution strategy changes (positive read across to DAL/UAL[Delta/United]).” Barclays wrote in a report published on May 30, 2024 that “a relevant contributor to the revenue weakness[]” was American’s NDC strategy during the Class Period, noting that American was now “abandoning its ‘modern retailing approach’ and that the CCO has left.” Barclays further observed “[n]o other airline has followed this path[,]” that “American’s revenue guidance was very out of kilter with peers,” and that “the issue was [American’s] guidance not the reality of the travel market.”

16. Moreover, after the Class Period on July 25, 2024, Defendant Isom disclosed the full impact of American’s disastrous distribution strategy when reporting American’s operating results for the second fiscal quarter of 2024. There, Defendant Isom disclosed that, as a result of the Company’s distribution strategy changes, American lost $750 million in revenue during the first half of 2024, and was expected to experience another $750 million impact to revenue for the second half of 2024. Isom further admitted that American had ceded market share from agencies and corporate customers to its competitors during the Class Period and stated that, in an effort to regain that share, American was reversing the changes to its distribution strategy.

17. Defendants’ fraud caused investors to purchase American securities at artificially inflated prices and suffer immense financial harm thereby. Plaintiffs now seek damages individually and on behalf of the Class.

## II. JURISDICTION AND VENUE

18. The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

19. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

20. This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

21. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District. American is headquartered in this District, with its principal place of business located at 1 Skyview Drive, Fort Worth, Texas 76155.

## III. PARTIES

### A. Plaintiffs

22. Court-appointed Co-Lead Plaintiff Dominik Dumancic ("Dumancic") was damaged by purchasing the American securities set forth in his Certification of Plaintiff Pursuant to Federal Securities Laws (ECF No. 7-2), which Dumancic incorporates by reference herein, at artificially inflated prices during the Class Period caused by Defendants' materially false and misleading public statements.

23. Court-appointed Co-Lead Plaintiff Luis Vicente Davidoff Cracasso ("Cracasso") was damaged by purchasing the American securities set forth in his Certification Pursuant to Federal Securities Laws (ECF No. 16-2), which Cracasso incorporates by reference herein, at artificially inflated prices during the Class Period caused by Defendants' materially false and misleading public statements.

24. Additional named Plaintiff Richard Wilkinson ("Wilkinson") was damaged by purchasing the American securities set forth in his Certification Pursuant to Federal Securities Laws (attached hereto as Exhibit A), which Wilkinson incorporates by reference herein, at

artificially inflated prices during the Class Period caused by Defendants' materially false and misleading public statements.

**B. Defendants**

25. American is a public corporation, organized and existing under the laws of the State of Delaware with its principal place of business located in Ft. Worth, Texas. American is a holding company whose business is operated through its principal, wholly owned subsidiaries: American Airlines, Inc., Envoy Aviation Group Inc., PSA Airlines, Inc. and Piedmont Airlines, Inc, among others. During the Class Period, the Company's common stock traded on the Nasdaq Global Select Market (the "Nasdaq") under the symbol "AAL."

26. Defendant Robert D. Isom, Jr. ("Isom") was, at all relevant times, the Company's Chief Executive Officer ("CEO"), President, and a member of American's Board of Directors (the "Board").

27. Defendant Devon E. May ("May") was, at all relevant times, the Company's Executive Vice President and Chief Financial Officer ("CFO").

28. Defendant Vasu S. Raja ("Raja") was the Company's Executive Vice President and Chief Commercial Officer ("CCO") between April 2022 and May 28, 2024. Prior to these roles, Raja served as Senior Vice President and Chief Revenue Officer between June 2020 and April 2022, and as Senior Vice President of Network Strategy between October 2019 and June 2020. On May 28, 2024, American issued a press release announcing, *inter alia*, that Raja's responsibilities would be immediately assumed by Stephen Johnson, Vice Chair of American's Board of Directors and Chief Strategy Officer, and that Raja would be leaving the Company in June 2024.

29. Defendants Isom, May, and Raja are referred to herein collectively as the "Individual Defendants." The Company and the Individual Defendants are collectively referred to herein as "Defendants."

30. The Individual Defendants, by virtue of their high-level positions at American, directly participated in the management of American and were directly involved in the day-to-day operations of American at their highest levels. As such, they were privy to confidential, proprietary information concerning the Company and its business operations, growth, and financial condition. As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

31. As senior executives at a publicly-held company with securities registered with the SEC and traded on the Nasdaq, the Individual Defendants each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of American's publicly traded securities would be based on accurate information. Each Individual Defendant violated these requirements and obligations during the Class Period.

32. As a result of their positions of control and authority as senior executives, the Individual Defendants were able to and did control the content of the public statements issued by the Company during the Class Period. Each Individual Defendant had the ability to correct the statements or prevent them from being released into the public sphere. Accordingly, the Individual Defendants are responsible for the accuracy of the materially false and misleading public statements detailed in this Complaint.

33. Further, as a result of their positions of control and authority as senior executives, the Individual Defendants had access to adverse, undisclosed information about the Company's business, operations, financial statements, and internal controls through their access to internal corporate documents and conversations with other corporate officers and employees. The Individual Defendants knew or recklessly disregarded that these adverse undisclosed facts rendered the positive representations made by or about the Company materially false and misleading.

### C. Relevant Non-Parties: Confidential Witnesses

34. CW1 was employed at American from 2019 to January 2024. In CW1's last six months at American, CW1's position was Travel Agency Account Manager. During this time, CW1 was based out of one of American's hub cities, and managed accounts for two "very large" corporate travel agencies.

35. CW2 was an American employee for over three decades until leaving the Company on January 31, 2024. During the Class Period, CW2 worked as a Retail Business Manager within American's Global Sales division managing small, medium, and large-sized travel agency accounts located in the Midwestern and Southern Region of the United States. CW2 reported to Director of Airline Retailing for the United States and Canada, Jerome Riese, who reported to Director of Airline Retailing, Jay Creech. Creech, in turn, reported to Neil Geurin, Managing Director of Airline Retailing, who reported to Scott Laurence, who reported directly to Defendant Raja. CW2 also interacted with Scott Laurence, explaining that while Sales and Partnerships were distinct organizations within American, Laurence was responsible for both, and Raja used Laurence as a "mouthpiece" to issue directives. As a Retail Business Manager, CW2's daily responsibilities included contacting travel agencies in CW2's region to address service issues, including assisting with travelers' needs, meeting with agencies to ensure

that they were meeting goals that American set for them and to discuss ways to increase American's share of business with those agencies, and providing training and presentations to agencies. CW2 also participated in bi-weekly and quarterly reviews with higher-ups, including Geurin, to discuss the performance of CW2's accounts.

## IV. SUBSTANTIVE ALLEGATIONS

### A. American's Core Business Is Selling Airline Tickets to Passengers Through Multiple Distribution Channels

36. Through its subsidiaries, American operates as a major network air carrier providing scheduled air transportation for passengers and cargo. American treats all of the flight equipment operated through its principal subsidiary, regional airline subsidiaries, and third-party regional carriers as one fleet, which the Company deploys through a single route scheduling system. American also manages its operations under a single business unit that provides air transportation for passengers and cargo.

37. American generates the vast majority of its revenue from passenger travel. For instance, in its financial and operational report for the fourth quarter and fiscal year ended December 31, 2023 which was filed with the SEC on February 21, 2024 on Form 10-K (the "FY2023 Form 10-K"), American reported total operating revenues of $52.8 billion in 2023, of which $48.5 billion corresponded to passenger revenues (*i.e.*, almost 92%). American's passenger travel business includes sales relating to airfare and ancillary services, such as seat upgrades, checked baggage, Wi-Fi access, and premium dining.

38. American's "direct" sales channels include the Company's website, mobile app, American Airlines reservations, American Airlines Vacations, and American Airlines Ticket Centers. Through American's direct channels, which are mostly, if not fully, controlled by the Company, travelers are direct customers of the airline.

39. The Company also sells airfare and ancillary services through third-party distribution channels, including travel agencies, specialized agencies called travel management companies ("TMCs"), metasearch engines or aggregator services (*e.g.*, Google Flights and Kayak), and online travel agencies ("OTAs"), such as Expedia, Orbitz, and Booking Holdings. When American fares or services are sold to travelers through third-party distribution channels, such travelers are considered the mutual customers of both American and the third-party distributor.

40. TMCs are agencies that primarily cater to business and corporate travelers. At all relevant times, there were five large TMCs that dominated the corporate travel planning industry for large companies—American Express Global Business Travel ("AmEx GBT"), BCD Group N.V., CWT (formerly Carlson Wagonlit Travel), FCM Travel, and Corporate Travel Management Ltd.—as well as various small-to-mid-sized TMCs, such as Anthony Travel.

41. GDSs, such as Amadeus, Sabre, and Travelport, operate as the intermediary between third party distributors (*i.e.*, TMCs and agencies) and airlines. GDSs are centralized platforms for viewing airline schedules, booking airline seats, issuing airline tickets, and providing other travel-related services. Airlines pay GDSs per transaction as compensation for listing their fares within the GDSs' software, with fees typically ranging between two and four percent of a ticket price (*i.e.*, an average of $4 to $6 per booking). Third party distributors use the GDSs' software to offer and sell airfares and ancillary services to travelers.

42. Approximately $14 billion of the $48.5 billion of revenue that corresponded to passenger revenues in 2023 (roughly 29%) was booked through "the distribution channel traditionally used by travel agencies and corporate managed travel programs" (i.e., EDIFACT).

### 1. American's Passenger Travel Consists of Leisure, Business, and Blended Travel

43. American's passenger travel customers include individuals who are flying for leisure, business, and "blended" (both leisure and business) purposes. Business and blended travel are most commonly booked as "managed travel," wherein a business traveler's employer either has an in-house corporate travel department and/or contracts with a TMC to book and manage travel for the employees. Many employers, especially corporations, prefer to manage travel for their employees because the structure ensures adherence to the employer's travel policies and provides duty-of-care protections for traveling employees. By contrast, with "unmanaged travel," a company's employees are free to make their own travel arrangements, including choosing their preferred carriers, hotels, and car rental agencies, without the use of a third party to facilitate bookings.

44. At the beginning of the Class Period, during the Company's earnings call for the second quarter of 2023 ("2Q 2023 Earnings Call") on July 20, 2023, Defendant Raja described the breakdown of American's passenger flights as: "a mix of 35% leisure style travel, 35% blended style travel, 30% [business]."

45. A portion of American's fares are sold via "close-in bookings," which consist of flight reservations made within a relatively short time frame before the flight's departure, typically within 21 days. Many close-in bookings are made for business travelers, whose employers are more willing to pay for premium fares or services. While the Company does not report the portion of its revenues derived from close-in bookings, Defendant Isom confirmed on May 29, 2024 that close-in bookings represented some of the "highest premium customers" that American serviced.

### 2. American's AAdvantage Program Rewards Customers Through Travel Perks

46. American's AAdvantage frequent flier loyalty program is one of the world's largest loyalty programs with over 100 million members. With the Company's AAdvantage program, members who fly on American, any oneworld Alliance airline, any of American's other airline partners, or who use an American co-branded credit card can earn AAdvantage "miles" and/or "loyalty points." Through American's AAdvantage program, one eligible AAdvantage mile earns the member one loyalty point.

47. While AAdvantage members can redeem AAdvantage miles for flights, upgrades, car rentals, hotel stays, and travel experiences, AAdvantage loyalty points afford members a certain status level, such as Gold, Platinum, Platinum Pro, and Executive Platinum. Each status level provides certain benefits and perks like complimentary upgrades, free checked bags, and priority boarding, as well as additional bonus mileage credits depending on status level.

### 3. American Historically Contracted with Travel Agencies, TMCs, and Corporations to Offer Incentives and Benefits For Booking on American

48. Historically, before a United States travel agency could sell and issue American airfare and ancillary services to businesses, the agency was required to enter into two agreements: (1) the Agent Reporting Agreement with Airlines Reporting Corporation ("ARC"), a company which enables travel agencies to consolidate the management of their relationships with global air travel suppliers and gives them the ability to issue tickets on flights worldwide; and (2) the American Airlines Addendum to the Governing Travel Agency Agreements for ARC Accredited Agents and their affiliates (the "American Addendum") (collectively with the ARC Agent Reporting Agreement, the "Governing Travel Agency Agreements").

49. The American Addendum enumerated the Company's policies for issuing commissions (if any) and certain incentives to travel agencies.

50. American also offered incentives through contracts with consumer travel agencies. For instance, in its "Basic Economy Upsell Program" agreement with Expedia, American agreed to pay Expedia incentive fees for "Upsell Tickets" (*i.e.*, when optional services and upgrades are added to the ticket).

51. Similarly, in American's "Premium Performance Payment" agreement with Expedia, the Company agreed to pay Expedia a certain amount for meeting certain growth percentage thresholds in its sale of premium tickets.

52. Travel agencies also receive incentives from GDS providers, including volume awards that incentivize bookings through their systems.

53. Prior to the Class Period, American similarly entered into contracts with corporate customers to incentivize the corporations to book with American through third party distribution channels. In these contracts, American historically offered, *inter alia*, automatic upgrades to AAdvantage status levels, discounted fares and preferred seats, priority boarding, dedicated account managers, and access to the Company's SalesLink Insights and SalesLink Services. SalesLink Insights is an online tool that provides agencies, TMCs, and corporations with the ability to view their progress in meeting contract performance terms such as spending and revenue share, and data relating to ancillary services, savings, and "Flex Funds," a service giving third parties access and management over fee waivers. SalesLink Services is a self-service online portal that American customers can use to make certain service requests, such as changing unacceptable itineraries or correcting customer names on tickets, and to access real-time reporting for such requests. CW2 confirmed that with SalesLink Insights, third parties can see only data pertaining to their own bookings and services, but American can see data for all third parties that it contracts with, such as all agencies.

54. Defendant Raja stated on July 20, 2023, that at the peak of the Company's corporate contracting prior to its decided shift towards NDC in 2023, up to 35% of all AAdvantage members with elevated status levels had such statuses due to upgrades given in corporate contracts, rather than through actually flying and accumulating AAdvantage loyalty points.

### B. NDC Was Developed as an Alternative to EDIFACT, Which the Travel Industry Relied on to Exchange Booking Data Between Travel Providers and Travel Purchasers

55. Traditionally, the travel industry used EDIFACT channels for the third party distribution of airfare. EDIFACT is a global standard for electronic data sharing that the airline and travel industries have utilized since the 1980s to exchange information between airlines, travel agents, and businesses. EDIFACT only allows airlines to share a small portion of information about airfare and related services. Many modern airline services such as seat upgrades, extra baggage, extra leg room, in-flight entertainment and Wi-Fi, à la carte menu options, and insurance cannot be merchandised through EDIFACT channels.

56. EDIFACT is heavily reliant on GDSs to take real-time availability from airlines along with the airlines' filed fares and build itineraries using market prices. The GDSs then present that information to the third party distributors (*i.e.*, TMCs and travel agencies) who order the tickets in the GDS and inform the airlines of the transactions.

57. In 2012, the global airline industry trade association IATA developed NDC to transform how airlines distribute and sell flight content. NDC allows airlines to market their fares and services with photos and detailed descriptions of their services, to continuously adjust their pricing, provide personalized offers and bundles, and offer ancillary services like seat upgrades, in-flight meals, Wi-Fi, etc. NDC also establishes a direct data connection for information to flow between a traveling customer and the airline, which allows airlines to more

directly communicate with travelers and bypass GDS providers, meaning airlines avoid paying extra fees while taking greater control over their products as compared to distribution through EDIFACT channels.

58. As such, NDC represents an opportunity for carriers to make more money, through continuous pricing and offering a wider array of ancillary services, and to lower costs by reducing distribution fees charged by the GDSs.

59. NDC is not a universal system, as each airline builds its own application programming interface ("API") through various IT providers and technology partners. Therefore, to access this information, travel agencies and businesses can book travel using NDC through either a direct connection, such as an airline's website or NDC API, or through an indirect channel, whereby third-party intermediaries, like GDSs and content aggregator companies such as Travelfusion, TPConnects, or ARC Direct Connect, connect to an airline's NDC APIs to access and display airline offers, fares, and ancillary services to travelers.

60. Thus, for a business to be NDC-compatible requires committing the time and investments necessary to enable NDC functionality in an industry where many consumers are accustomed to buying tickets through intermediaries rather than buying directly from airlines.

### C. American Attempts to Force Widespread NDC Adoption By Restricting Access to Forty Percent of Its Booking Content

61. CW2 explained that starting in late 2022 and continuing past the end of CW2's tenure at the end of January 2024, American made a series of changes to its distribution strategy in order to push companies and travel agencies to use American's NDC channels to book directly with American.

62. Moreover, as CW2 later learned from a meeting with Neil Geurin and Jay Creech in October of 2023, Defendant Raja wanted to drive NDC adoption so that American could

eventually eliminate third parties, like agencies, entirely from the distribution process. CW2 recalled hearing that Raja felt it was unfair to the Company to have a third party booking American's flights, and that instead, Raja felt that American should be able to manage its own bookings.

63. As a part of this push, on December 5, 2022, American Airlines sent memoranda to travel agencies, TMCs, and corporate customers notifying them that they would need to be connected to American's NDC technology by April 2023 to ensure access to the Company's full range of third-party public channel content. If travel agencies, TMCs, and corporate customers chose not to connect through American's NDC channels, then American estimated that the third parties and corporate customers would lose access to over 40% of fares available to them via EDIFACT channels, including American's lowest-priced "basic economy" fares, as well as some ancillary products. American's decision to make basic economy fares accessible only through NDC channels was significant because it also hampered the Company's ability to attract price-conscious travelers to compete with so-called ultra low-cost carriers, like Frontier, Spirit, and Allegiant. Indeed, when American first introduced basic economy fares in 2017, Defendant Isom explained that the Company was offering these entry-level price points to "help us compete more effectively with the growing number of ultra-low-cost carriers."

64. CW2 confirmed that unless a customer used NDC channels, they would not be able to purchase American's basic economy rates, the lowest-priced fares that American offers. CW2 confirmed that these changes were directed by Defendant Raja.

65. A March 2023 American and Hickory Global Partners joint presentation, titled "Modern Retailing with American Airlines" ("2023 Modern Retailing Presentation") also confirmed that more than 40% of the fares available via EDIFACT channels would become

exclusively available via NDC channels. The 2023 Modern Retailing Presentation noted that American was no longer making its lowest priced fares available through EDIFACT channels and was instead only offering "Everyday Main and Premium cabin fares" through that legacy channel. American also exclusively offered its Main Plus, Main Select, and Flagship Business Plus fares through NDC enabled channels and American-owned channels.[2]

66. As a result of these changes, in order to purchase American's exclusive NDC content, travel agencies and corporate customers would either have to book with American directly or connect to "[t]hird-party modern retailing (NDC-enabled channels)" (*i.e.*, travel agencies and booking tools connected to American's NDC).

67. According to CW2, American's NDC-based modern distribution channel, as it pertained to travel agencies, was referred to within the Company as its "Direct Connect" platform because travel agencies and corporations were supposed to use it to book directly with American, rather than rely more heavily on traditional, third-party GDSs and EDIFACT technology to facilitate bookings.

68. American aggressively pushed NDC because doing so allowed the Company to increase their margins by selling more products and services while also reducing the Company's distribution costs. American also sought to shift agencies to using NDC because doing so would cause travelers to interface with the Company more directly for bookings and services, limiting or cutting third parties out of the distribution process and thereby opening the door for American

[2] With Main Plus, customers receive main cabin extra or preferred seats, free additional checked baggage, and preferred boarding. Similarly, with Main Select, customers receive main cabin extra or preferred seats, priority privileges (including priority check-in, security, and boarding), fully refundable fares, and confirmed same-day flight changes. American's Flagship Business Plus is a premium service for long-haul flights wherein customers receive Flagship First check-in, Flagship First dining, Group 1 boarding, and a free third checked bag.

to reduce (if not entirely eliminate) the incentives it paid to travel agencies under contracted incentive agreements. For instance, American's March 4, 2024 Investor Day Presentation depicted the purported benefits, stating:




69. On April 3, 2023, American removed a substantial portion of its fare inventory out of the traditional EDIFACT channels, such that many fares and services could only be booked through NDC channels.

### D. American Reduces Corporate and Agency Incentives and Threatens to Eliminate Even More Perks

#### 1. American Alienates TMCs, Agencies, and Corporations by Removing Incentives and Favors for Business Travelers and Instituting Contracts with Difficult NDC Adoption Goals

70. In the first half of 2023, as part of its shift in sales distribution strategy, American reduced incentives and perks that had previously been offered to travel agencies and TMCs and mandated new contracts for agencies and TMCs that set lofty goals for NDC adoption.

71. CW1 explained that prior to when American imposed changes on agencies, the Company and agencies operated as partnerships. Starting in 2023, however, CW1 recalled that American changed its approach to agencies in favor of dealing directly with travelers.

72. CW1 stated that American's relationships with agencies began deteriorating around January 2023, when American announced the retirement of Alison Taylor, Chief Customer Officer, and Defendant Raja took over her duties. CW1 stated that, at this time, American began alienating travel agencies. According to CW1, this included American telling all agencies (with the exception of AmEx GBT whose contract renewed at a different time) that their existing contracts would not be renewed, and that all such agencies would have to enter into a *new* type of contract with American by June 30, 2023 or else have to wait until the end of the following quarter to obtain any kind of contract.

73. Notably, the new contracts that American began offering to large TMCs in 2023 no longer offered strong levels of incentives or special passenger statuses and corresponding perks, such as "waivers and favors."

74. In the Spring of 2023, American's contracts with third parties came up for renewal. According to CW2, who worked in Global Sales as a Retail Business Manager, American told agencies, TMCs, and corporations in Spring of 2023 that they would have to sign new contracts with the Company by the end of June 2023, effective July, in order to keep receiving incentives and other benefits from American (the "July 2023 Contracts"). As CW2 explained, the July 2023 Contracts included incentives wherein American would pay money to agencies, TMCs, and corporations based on how many bookings they made through NDC channels—for example, 1–1,500 NDC bookings might result in a payment of $X, but over 1,500 NDC bookings would generate a payment of $Y, and so on, all of which was tracked by

American and the third party through the Company's SalesLink Insights software. Moreover, CW2 stated that if agencies did not achieve certain market share goals set by American under the July 2023 Contracts, then American would reduce the discounts available to these customers by 50% or more of what had been given under prior contracts.

75. CW2 stated that American set several goals for agencies and TMCs through the July 2023 Contracts, relating to utilization of modern retailing, and bookings and financial metrics, but in essence, if an agency or TMC did not meet the goals set out in the contract, then American would not pay any incentive payments for that given quarter.

76. With these changes in approach to agencies and corporate customers, American was focused less on selling tickets via TMCs, and instead, circumvented such TMCs in favor of selling tickets directly to customers via NDC channels.

**2. American Reduces Incentives for Corporations**

77. Similarly, in 2023, American also reduced the amount of incentives that the Company offered to corporations. Specifically, CW1 explained that in Spring of 2023, American was reducing and not renewing various perquisites that American had previously made available for corporations under American's "executive status" and other customer status levels (e.g., platinum and several others). According to CW1, the perquisites that were no longer available included bulk ticket discounts and concierge keys. American's concierge keys are considered an elite status and afford the traveler with numerous perks including dedicated check in-lines, three complimentary checked bags, access to certain high-end airport lounges, and access to preferred or main cabin extra seats. CW1 stated, for the first year beginning Spring 2023, American's goal was to reduce corporate perquisites to 75-90% of what had been offered previously.

78. CW1 also recalled that by Fall 2023, American ended its "Flex Funds" program for corporations (internally referred to as "waivers and favors" within American). Through

American's "Flex Fund" program, the Company offered fee waivers to corporations to resolve ticketing errors. For instance, CW1 explained that, through the "Flex Funds" program, corporate clients could get a new ticket for an employee in the event of an error like the employee's name had been spelled incorrectly. CW1 recalled that American gave corporations a deadline by which to use or lose their remaining Flex Funds, which CW1 believed was October 1, 2023. According to CW1, American's 2023 actions resulted in "pissing off" corporations.

### 3. American Cancels Contracts with Small and Medium-Sized Businesses to Restrict Their Ability to Work with Travel Agencies

79. CW1 stated that the Company in 2023 also flat-out cancelled or did not renew contracts it had offered to SMBs through agencies. As CW1 explained, in 2018, American saw an opportunity with SMBs who never previously had a contract with an airline. At that time, American offered "off-the-shelf contracts" to SMBs through travel agencies wherein the Company offered SMBs special terms to incentivize SMBs to book with American. Then in 2023, CW1 stated, American cancelled its SMB contracts and instead began offering its new AAdvantage Business program to SMBs, which enabled SMBs to get perquisites, such as AAdvantage miles, from AAL. But CW1 explained that a condition to SMBs receiving perquisites was the SMBs had to book their travel directly with American and could not book their travel with American through travel agencies. Accordingly, when American stopped offering SMB contracts in 2023 and instead began offering AAdvantage Business in October 2023, the Company did so in order to drive SMBs to book travel through the Company's direct NDC channels.

80. Indeed, on October 16, 2023, American publicly announced its AAdvantage Business program, which replaced its Business Extra program. American claimed that the AAdvantage Business program would allow SMBs who registered for the program to accrue

status quicker by allowing those companies to earn one reward mile for every dollar they spend on flights and one point per dollar spent toward AAdvantage loyalty status. American further claimed that such points would be in addition to reward miles and loyalty points flyers earn as an individual AAdvantage member. However, unlike with its Business Extra program, these points could only be earned if the travel was purchased through the American Airlines website or app—*i.e.*, direct booking channels. As American phased out its Business Extra program, it told businesses that any Business Extra program benefits (such as priority boarding) would end on January 31, 2024.

81. Though American did not publicly say as much, AAdvantage Business was part of the Company's modern distribution strategy aimed at edging out agencies and TMCs. Indeed, CW2 confirmed that AAdvantage Business was an attempt by American to cut out agencies altogether from SMBs' bookings.

**E. American's Aggressive Commercial Strategy Drives Customers Away**

**1. American's Unfeasible Deadline for NDC Implementation Introduced Technological Impediments to Booking, Causing Customers to Push Back**

82. Although American was aggressively pushing for NDC implementation to reduce its distribution costs and increase revenues, many of the travel industry's key players, including GDSs, TMCs, and third-party booking technology, were not technologically prepared to facilitate full NDC implementation.

83. NDC is not a single integrated system but rather a patchwork of different technologies, each of which is tailored to a particular carrier. As a result, it created technological hurdles for each entity trying to access the information. For instance, in a February 9, 2023 article titled, "SAP Concur Warns GDS NDC Connections Might Not Be Active by April AA Deadline[,]" SAP Concur acknowledged that technological obstacles existed for NDC

implementation, stating in relevant part: "The reality today is that even a flawless API delivered in April by the GDSs will take time for us and your TMCs to connect" and that SAP Concur could not "realistically predict how long that will take because the APIs are not yet fully built for necessities of corporate travel."

84. American acknowledged that there would be discrepancies between what features would be available on its NDC channels, stating on March 27, 2023, "[l]ike any significant technology transition, some providers will offer more servicing features and functionalities in their initial releases than others." Nevertheless, American attempted to couch these shortcomings as inconsequential, stating in relevant part: "[t]he small number of servicing functionalities that won't be available immediately either don't affect a significant number of transactions or will become available shortly." American grossly downplayed the loss of functionality and mammoth parade of issues that customers would experience as a result of a premature implementation.

85. CW2 recounted that integrating into American's modern distribution channel (*i.e.*, NDC channels) was not straightforward or economic for companies and agencies, as travel agencies and companies had to invest time and money into new technology and have a dedicated IT person from American's new distribution channel team to facilitate the switch and as a result, customers had to rethink their strategies for travel.

86. CW2 provided an example where American's corporate customer, the Chicago-based company Aon plc, attempted to switch from using AmEx GBT for booking travel to American's modern retailing platform (*i.e.*, NDC channels). According to CW2, in late 2022 or early 2023, Aon determined that it would take too much work to set up and be able to use the NDC platform, did not want to spend the resources to do so, and expressed to the Company that while NDC was urgent for American, it was not urgent for Aon. CW2 added that Aon was not

alone in reaching this conclusion, and that CW2 learned from speaking with peers in the Global Sales division that nearly everyone had stories similar to Aon's: corporations were having a hard time using American's NDC technology.

87. For instance, according to CW2, customers were unable to obtain major, necessary information with American's NDC channels that were available through EDIFACT channels, such as "duty-of-care data." As CW2 explained, corporations have to comply with duty-of-care requirements for their traveling employees, and need to be informed of risks to travelers' safety—for example, if a region is impacted by war, a company needs data immediately on how many of its employees are traveling in that region– and American's NDC technology could not gather the data necessary for companies to comply with their duty-of-care requirements.

88. CW2 also stated that certain other services were not available through American's NDC channels, such as the ability to communicate to agencies to notify them of changes to flight schedules. Similarly, as *The Wall Street Journal* reported in a January 9, 2025 article, travel managers at corporations lost "important protections and benefits" on American's modern distribution channels, such as being able to change names on tickets. As a result, according to CW2, there was "a lot of pushback" from customers about having to use them.

89. CW2 explained that, prior to American's push for customers to book directly through NDC channels, it was easier to perform services like changing tickets because the travel agencies were able to make those changes for a customer. However, with NDC, the travel agencies lost the ability to perform those functions on behalf of corporate travelers. Instead, American controlled the tickets and all changes had to be made through the host of American's NDC platform, Sabre. CW2 explained that corporate customers would contact American and ask

for help in various situations but the only response that CW2 and CW2's colleagues could offer was to direct the customer to Sabre.

### 2. Corporate Buyers and Travel Agencies Shift Business Away from American

#### a. TMCs and Agencies Shift Business Travel Away from American

90. In early 2023, when American forced TMCs to sign new contracts offering far fewer incentives for business travelers in an effort to drive NDC adoption, the TMCs responded by shifting travelers to other airlines instead of American. As CW1 explained, certain agencies "had more control on share" (*i.e.*, more ability to direct business to or away from particular airlines), and these agencies would no longer use American anymore. Indeed, CW1 personally "saw share move away swiftly" by the TMCs. This reduction in share became "particularly noticeable" to CW1 when American's "old agency deal expired"—*i.e.*, in June 2023—and continued thereafter. The decline reflected that American was "just not competitive" anymore. CW1 attributed part of American's lack of competitiveness to the Company no longer offering agencies the perquisites, such as "waivers and favors" or special passenger "statuses" that had been available in the past. As a result, according to CW1, American's share of travel agency business essentially "bottomed out," including in the Atlanta market, which was especially important to American.

91. CW2 explained for example that Anthony Travel, a TMC which handles travel arrangements for universities, and which had historically brought "a lot of revenue" to American, ended up pulling back in offering American's fares to travelers because of the Company's changes towards NDC distribution.

#### b. SMBs and Corporations Shift Their Business Travel Away from American

92. When American stopped offering SMB contracts in 2023 and instead began offering AAdvantage Business to SMBs to book travel through the Company's direct NDC channels, SMBs had increased difficulty managing their travel bookings due to lack of control and information transparency using American's NDC channels.

93. For instance, CW1 stated that SMBs had difficulty managing their travel bookings directly through American as opposed to when using agencies. Specifically, CW1 explained that booking through travel agencies provided SMBs better visibility into accounting information and offered superior data to help companies fulfill duty-of-care requirements for their employees, such as in the event of a natural disaster while employees are traveling. CW1 stated that companies could access travel data much easier through agencies versus when a company's employees book their own travel directly with an airline because the "real-time data" from airlines "is not great." CW1 similarly recalled that under the AAdvantage Business program, if a company's employee's flight was cancelled, the SMB or its employee would essentially have to handle booking a new flight on their own rather than an agency providing this service for them.

94. As a result, because American's NDC channels could not offer the same quality of information to SMBs as travel agencies, and direct bookings like AAdvantage Business were inconvenient for SMBs and their employees, many SMBs were unwilling to stop using travel agencies and switch to direct booking through, *e.g.*, AAdvantage Business.

95. Indeed, CW1 confirmed that, because of the AAdvantage Business, American "lost so much share" of SMBs' business since many were unwilling to stop using agencies.

96. Similarly, as a result of American's changes, CW2 stated that a lot of companies and travel agencies determined that using American's NDC platform was too complicated and

"pull[ed] back" from booking flights with American in favor of airlines like United Airlines that remained more "user-friendly,[,]" which CW2 stated definitely impacted revenue.

97. It was clear to CW2 by April 2023 that, as a result of American's aggressive push towards NDC distribution, agencies and companies were booking fewer flights with American than they had in the past, with some avoiding American entirely. CW2 knew this from discussions with CW2's agency clients who were having "a really hard time getting up and running" using American's NDC channels.

98. CW2 added that in response to the changes and lack of support from American, agencies began deprioritizing American flights versus those of competitor airlines when offering options to travelers, explaining that agencies began causing American's fares to come up at the very bottom of the listings for a given flight route. CW2 explained that agencies were pulling back from using American in June 2023, when new contracts between American and its agencies and/or business accounts went into effect, and continued thereafter.

99. American's changes in favor of NDC distribution also alienated large corporations, driving them to book their employees' travel at competitor airlines. CW1 recalled learning from a colleague that one of American's customers, the defense firm Lockheed Martin, had been "so pissed off" by the Company's changes that Lockheed Martin designated American as its "least-preferred" vendor for air travel, causing the Company to lose "tons" of share from the customer. CW1 stated that when American's changes pissed off travel managers, some went "out of their way" to book with any airline other than American. Because CW1 departed American in January 2024, it follows that this must have occurred between the Company implementing changes to corporate contracts in Spring 2023 and January 2024.

100. Corroborating CW1's recollection, *The Wall Street Journal* reported in a January 9, 2025 article that, in response to American's distribution changes, Lockheed Martin "retracted American's status as a preferred carrier[,]" caused the Company's flights to appear lower in search results in Lockheed's flight booking system, and gave pop-up notifications in the system to suggest alternatives to American flights, which resulted in Lockheed "slash[ing] its spending with American—once its most frequently-used carrier—by 30%."

**c. American's Internal Data Shows Poor NDC Adoption and the Company Losing Share of the Business Travel Market in 2023 into 2024**

101. Multiple CWs confirmed that, starting in 2023 and continuing into 2024, American's internal data demonstrated both that agencies, TMCs, and corporations were not adopting NDC as quickly or as broadly as the Company demanded, and that American was losing market share of corporate travel as a result.

102. CW2 explained that American measured the performance of its agency accounts through both the Company's SalesLink Insights platform and through "PRISM" reports. According to CW2, while each individual agency or TMC could view data pertaining to its own bookings and services in SalesLink Insights, American employees and management could see global data pertaining to *all* third parties on the platform, including granular details per agency or TMC, and per route in American's network. Further, CW2 recounted, SalesLink Insights contained financial results measured by quarter, and indicated whether an agency or TMC account was "on trend," so that sales personnel including CW2 could then, for example, talk to the third party to ask them what could be done to bring up the third party's bookings in a particular route.

103. CW2 stated that SalesLink Insights also allowed American to track metrics such as how much "share" of agency bookings were going to the Company versus competitor airlines,

and the rates that each agency used American's NDC distribution channels versus EDIFACT channels. As CW2 explained, Passenger Share Performance ("PSP"), or simply "share," was a key metric that basically indicated how many travelers booked with American versus with competitor airlines.

104. Indeed, CW1 and CW2 confirmed that American used PSP to estimate what the Company believed its market share should be. CW1 also confirmed that PSP was a key metric for American and explained to calculate PSP, American would estimate what it believed its share of the market should be using the number of aircraft AAL was operating and the overall Quality Service Index ("QSI").

105. The QSI model is an analytical tool used to, *inter alia*, plan the Company's network, and forecast passenger behavior. Using the QSI model, American would generate a QSI score, and, coupled with internal data such as the number of aircraft owned by American, calculate an estimate predicting what American's share should be for a given month.

106. CW1 provided an example of how American would evaluate performance using PSP, stating if American internally determined that its share of travel agency business should be 33%, and determined, based on IATA reports, that the Company achieved 33%, then American's PSP score would be 100%. Thus, if American's PSP was 100%, it follows that the Company accurately predicted its market share.

107. During the last six months of CW1's employment with American, which ended in January 2024, however, CW1 recalled that American's PSP never came in above 90%, meaning that travel agencies were directing corporate bookings to competitor airlines, particularly Delta and United Airlines. When asked if the loss of corporate travel agency share reflected that American might have been gaining business by selling directly to consumers, CW1 stated that

American was also coming up short on "top line revenue," so, in CW1's view, this must have been because "corporate buyers" (*i.e.*, the corporate clients of the travel agencies) were "not circumventing agents" after all.

108. CW2 also recalled that American used a software called PRISM to track certain metrics such as American's share of bookings versus that of competitor airlines by both revenues and percentage—to gauge how the Company was performing with agencies and corporations—and whether bookings were made through agencies and TMCs or through NDC—to track NDC adoption. As CW2 explained, PRISM contained detailed data by month, and finalized data was available in PRISM roughly one month after the close of a given quarter. CW2 was emailed reports of PRISM data in a spreadsheet format at least monthly. CW2 explained that CW2 and other salespersons monitored metrics from SalesLink Insights and PRISM "constantly" because the metrics determined their quarterly bonuses. Moreover, CW2 confirmed that NDC utilization rates, in particular, were a key metric for American in 2023 into 2024.

109. According to CW2, once American pushed the July 2023 Contracts onto agencies, TMCs, and corporations, bookings and American's percentage of share for these third parties went down and stayed down. Specifically, CW2 observed that right after the new contracts were put into place, bookings from larger agencies declined 15% compared to year-over-year levels, and bookings for corporate accounts were "much lower" than that. CW2 elaborated that PRISM data demonstrated that American's agency and corporate bookings and percentage of share metrics remained "consistently down" through the end of CW2's tenure at the Company (which ended January 2024).

110. CW2 also stated that it was apparent that agencies and TMCs were not booking with the Company because American's ranking as a travel provider to corporations dropped

noticeably. As CW2 detailed, many corporations book their employees' travel through multiple airlines, and therefore, airlines were ranked as primary, secondary, tertiary, etc. travel service providers based on the number of bookings the corporation made with each airline. According to CW2, once the July 2023 Contracts went into effect, American dropped from being the primary or secondary provider and became the secondary or tertiary provider for a "huge number" of corporations, which indicated that corporations were booking less with American and more with competitors. By way of example, CW2 recounted that for Aon, American dropped from being the corporation's secondary provider to become its tertiary provider.

111. Moreover, CW2 stated that agencies, TMCs, and corporations were not meeting American's goals for booking through NDC as set forth in the July 2023 Contracts, indicating that they were not adopting booking through NDC channels. CW2 explained that while certain of American's accounts like Expedia, Orbitz, and Kayak were doing relatively well because these companies had started on the Internet and were essentially "built for NDC," many clients were not set up for NDC implementation, including AmEx GBT, BDC, and small-to-medium-sized agencies, which comparatively were not doing well in adopting the NDC channels. Most of CW2's agencies and TMCs in 2023 were not making *any* bookings through NDC at all, which CW2 discussed with peers in American's Sales division. CW2 recalled that these sales peers would ask each other, "how many NDC bookings did you have this week, or this last quarter?" and each peer that CW2 would speak to would simply respond "none." "Everything" with the exception of companies like Expedia, Orbitz, and Kayak "was down" in bookings according to CW2.

112. Information regarding American's dwindling market share and poor NDC adoption rates was circulated up the corporate chain and discussed among management. For

instance, CW1 stated that Defendant Raja could "see the numbers" for business between American and agencies by way of reviewing data from reports issued by IATA. As CW1 explained, IATA published monthly reports providing very detailed airline industry data, including how much share a given agency represented "in any given cabin." CW1 also stated that IATA published preliminary results within a few weeks of a month's close, as well as final results six weeks following a given month's close. CW1 explained that IATA partnered with firms called Direct Data Solutions and ARC to provide reports on each travel agency's market share of airline ticket sales.

113. Accordingly, Defendant Raja could observe metrics breaking down the share of business bookings between American's direct/NDC channels versus managed travel by way of reviewing data from reports issued by IATA.

114. CW1 also stated that American's Revenue Management team held a weekly meeting to review raw data provided by IATA, which included the performance of each TMC by region. The regions covered included Domestic, Asia-Pacific ("APAC"), Latin America ("LATAM"), Atlantic Joint-Business, and Pacific Joint-Business. CW1 recalled that these weekly revenue meetings were attended by American's Vice President of Revenue Management, Scott Chandler, as well as then-Managing Director of Commercial and Partner Analysis Tim Lyon. CW1 stated that it was clear from the IATA data presented at the weekly meetings that American was losing corporate market share in 2023 and "everyone knew" it. CW1 reiterated that "we saw share going down" but, in response, American's leadership said that it was expected. CW1 added that Defendant Raja's response was that corporate clients essentially had no choice but to use American because the Company's "network" was so extensive.

## V. DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

115. Throughout the Class Period, American's changes to its distribution and sales strategy caused travel agencies, TMCs, and corporate customers to migrate their bookings to the Company's competitors, eroding American's market share and decimating revenues. To conceal these issues from investors, throughout the Class Period, Defendants issued a series of material misstatements and omitted material facts in American's public statements. These material misstatements and omissions created a false impression that: (i) customers were not only implementing NDC technology but also embracing it; (ii) business demand, particularly amongst SMBs and managed corporate travel, was strong and would continue to be moving into 2024; (iii) American had securely held onto its market share; and (iv) revenue production was encouraging and undergirded by a "strong foundation" so much so that the Company was on track to hit its financial targets for the 2Q 2024 and full year 2024.

116. All the statements that Plaintiffs allege are false and/or misleading are bolded and underlined within this Section (V). All other statements are included for context. Insofar as Plaintiffs allege in this Section (V) that information provided by CWs supports that the following statements are false or misleading, Plaintiffs repeat and fully incorporate therein the corresponding specific allegations derived from the CWs that are set forth above and identified by paragraph number below.

### A. July 20, 2023 Statements in American's 2Q 2023 Form 10-Q

117. On July 20, 2023, before the stock market opened for trading that day, American filed with the SEC a Form 10-Q to report the Company's financial and operational results for its second fiscal quarter ended June 30, 2023 (the "2Q 2023 Form 10-Q").

118. The 2Q 2023 Form 10-Q provided, *inter alia*, summary risk factors that "may affect [American's] business, results of operations and financial condition, or the trading price of our common stock or other securities." These risk factors contained materially incomplete and misleading disclosures concerning the Company's distribution system and framed risks as merely hypothetical, not actualized. For example, one of the summary risk factors stated that "**[i]f we encounter problems with any** of our third-party regional operators or **third-party service providers, our operations could be adversely affected by a resulting decline in revenue or negative public perception about our services**."

119. The 2Q 2023 Form 10-Q also contained a longer risk factors section under Part II, Item 1A, describing "risk factors that may affect our business, results of operations and financial condition, or the trading price of our common stock or other securities." These risk factors contained materially incomplete and misleading disclosures concerning the Company's "business model," including "practices and contracts with providers of distribution systems," and framed risks to "revenues" and "demand" as merely hypothetical, not actualized:

> We have in the past instituted, and intend to institute in the future, changes to our business model designed to increase revenues and offset costs. These measures include … changes to our practices and contracts with providers of distribution systems to provide additional content flexibility ….
>
> * * *
>
> We may introduce additional initiatives in the future; however, as time goes on, we expect that it will be more difficult to identify and implement additional initiatives. **We cannot assure that these measures or any future initiatives will be successful in increasing our revenues** or offsetting our costs. **Additionally, the implementation of these initiatives may create logistical challenges that could** harm the operational performance of our airline or **result in decreased demand**.

120. The 2Q 2023 Form 10-Q also stated that changes to American's distribution channel procedures "**may affect our relationships with conventional travel agents, travel management companies, GDSs and OTAs**":

> **To remain competitive, we will need to** manage successfully our distribution costs and rights, **increase our distribution flexibility and improve the functionality of our distribution channels,** while maintaining an industry-competitive cost structure. . . . **These imperatives may affect our relationships with conventional travel agents, travel management companies, GDSs and OTAs**, including if consolidation of conventional travel agents, travel management companies, GDSs or OTAs continues, or should any of these parties seek to acquire other technology providers thereby potentially limiting our technology alternatives. **Any inability to manage our third-party distribution** costs, rights and **functionality at a competitive level or any material diminishment or disruption in the distribution of our tickets could have a material adverse effect on our business, results of operations and financial condition**.

121. The statements identified in ¶¶ 118-120 above were materially false and misleading when made because the harms, posed as mere hypotheticals, were actualized: American's changes to its distribution system were disastrous for the Company's relationships with travel agents, TMCs, and corporations, thereby negatively impacting American's revenues and demand for American's airfare and ancillary services. The material falsity of Defendants' statements is supported by ample evidence, including testimony from various CWs confirming that: (i) American's shift to NDC channels actually *reduced* its distribution flexibility because, on Raja's direction, American eliminated the ability to purchase basic economy rates on EDIFACT channels, making them exclusively available on NDC channels (¶¶ 64-65); (ii) corporate customers did not purchase tickets through American's NDC channels—with bookings dropping "much lower" than 15% after the July 2023 Contracts went into effect and, along with percentage of share metrics, remaining "consistently down" (¶ 109)—because certain other services and information was not available through those channels, such as "duty-of-care data" and the benefit of a dedicated agent that could modify flight schedules or change tickets on

behalf of corporate travelers (¶¶ 87-89, 93-95) (the latter of which was later corroborated by *The Wall Street Journal's* January 9, 2025 article (*see* ¶ 88)); (iii) American's relationships with travel agencies began deteriorating as early as January 2023 after the Company decided that existing agency contracts would not be renewed and uniformly imposed the July 2023 Contracts on agencies, which, when they went into effect, immediately resulted in larger agency bookings declining 15% compared to year-over-year levels and, along with percentage of share metrics, remaining "consistently down" (which Defendants knew based on data available to them) (¶¶ 72-75, 101-106, 108-109, 111-114); (iv) beginning in June 2023, TMCs and corporate customers moved to American's competitors given that the Company no longer offered certain incentives and other benefits such as special passenger statuses (¶¶ 72-75, 77, 90-91); (v) smaller agencies lacked the technical expertise necessary to transition to NDC and American failed to provide any support (¶¶ 85, 92-96, 111); (vi) rather than adopting NDC technology, American's distribution strategy changes drove travel agencies and corporate customers away from the Company beginning in April 2023 and throughout the Class Period (¶¶ 85-86, 90-91, 96-101); and (vii) once the July 2023 Contracts went into effect, American dropped from being primary or secondary provider to the secondary or tertiary provider for numerous corporations (¶¶ 98-100, 110).

122. The statements were further false and misleading given Defendants' admissions during the May 29, 2024 Bernstein Conference, the 2Q 2024 Earnings Call on July 25, 2024, and as reported in a May 29, 2024 *Bloomberg* article, that the Company's modern retailing strategy caused problems for agencies, corporate customers, and other third party intermediaries, which caused American to cede market share "from an agency and a corporate perspective" and "contributed to lagging revenue over the past few quarters."

### B. July 20, 2023 Statements on American's 2Q 2023 Earnings Call

123. On July 20, 2023, American held the 2Q 2023 Earnings Call at 8:30 a.m. E.T., before the stock market opened for trading that day, to report on the Company's financial and operational results for its third fiscal quarter ended June 30, 2023.

124. During the question-and-answer portion of the 2Q 2023 Earnings Call, in response to a Melius Research LLC analyst question regarding "corporate" travel, Defendant Raja stated: "And indeed, total business revenues have really regained their 2019 composition in the system. **So we remain encouraged on business demand**."

125. Also on the 2Q 2023 Earnings Call, Michael John Linenberg, an analyst from Deutsche Bank AG, Research Division, asked Defendant Raja for additional details on "corporate" travel trends. In response, Raja stated that "**we're encouraged by what we see is really the durability of these customers' demand**":

> **Michael John Linenberg**
>
> … I guess two questions here. I guess Vasu, just with the rollout of your new distribution strategy, any early learnings direct versus indirect? I sort of caught the 2:1 unmanaged versus managed on your corporate piece. I think if we go back historically, they were probably more evenly divided. So it seems like there's a bit of a shift there. Whatever you can tell us, thanks, and then I have a follow-up.
>
> **Vasu Raja**
>
> Look, first of all, all of our selling and distribution changes are done with a really simple lens, really to which Robert talked about in his opening remarks. We want to make it as easy as possible for our best customers to be able to shop by and self-service their experience with American Airlines.
>
> And everything has been oriented around that. **It has indeed been very eye-opening and has performed probably above what our expectations are**.
>
> * * *
>
> And last and maybe most importantly, **we're encouraged by what we see is really the durability of these customers' demand**. These are customers who tend to use our network where it's most unique. They fly more times in a year.

> **<u>They already have bookings out into the fall</u>**. They tend to sell themselves up. **<u>And importantly, they prefer coming to us direct.</u>** So we're currently in taking roughly 70% to 75% of our revenues going through our direct channels. We anticipate that will grow. **<u>We're encouraged by this</u>**, and we're actually going to continue to accelerate the changes. **<u>By the end of the year, 100% of what we sell, customers will be able to service online through our app or our dot-com</u>**.

126. The statements identified in ¶¶ 124-125 above were each materially false, misleading and/or omitted material facts necessary to make the statements therein not false or misleading when made because Defendants could not have been encouraged by business demand, the durability of their customers' demand, or by revenues purportedly booked through direct channels because business travel demand for American was being negatively affected by the Company's distribution changes, and third party distribution partners were not adopting NDC direct channels. The material falsity of Defendants' statements is supported by ample evidence, including testimony from various CWs confirming that: (i) corporate customers did not purchase tickets through American's NDC channels—with bookings dropping "much lower" than 15% after the July 2023 Contracts went into effect and, along with percentage of share metrics, remaining "consistently down" (¶ 109)—because certain other services and information was not available through those channels, such as "duty-of-care data" and the benefit of a dedicated agent that could modify flight schedules or change tickets on behalf of corporate travelers (¶¶ 87-89, 93-95) (the latter of which was later corroborated by The Wall Street Journal's January 9, 2025 article (*see* ¶ 88)); (ii) American's relationships with travel agencies began deteriorating as early as January 2023 after the Company decided that existing agency contracts would not be renewed and uniformly imposed the July 2023 Contracts on agencies, which, when they went into effect, immediately resulted in larger agency bookings declining 15% compared to year-over-year levels and, along with percentage of share metrics, remaining "consistently down" (which Defendants knew based on data available to them) (¶¶ 72-75, 101-106, 108-109, 111-114); (iii)

beginning in June 2023, TMCs and corporate customers moved to American's competitors given that the Company no longer offered certain incentives and other benefits such as special passenger statuses (¶¶ 72-75, 77, 90-91); (iv) smaller agencies lacked the technical expertise necessary to transition to NDC and American failed to provide any support (¶¶ 85, 92-96, 111); (v) rather than adopting NDC technology, American's distribution strategy changes drove travel agencies and corporate customers away from the Company beginning in April 2023 and throughout the Class Period (¶¶ 85-86, 90-91, 96-101); and (vi) once the July 2023 Contracts went into effect, American dropped from being primary or secondary provider to the secondary or tertiary provider for numerous corporations (¶¶ 98-100, 110).

127. The statements were further false and misleading given Defendants' admissions during the May 29, 2024 Bernstein Conference, the 2Q 2024 Earnings Call on July 25, 2024, and as reported in a May 29, 2024 *Bloomberg* article, that the Company's modern retailing strategy caused problems for agencies, corporate customers, and other third party intermediaries, which caused American to cede market share "from an agency and a corporate perspective" and "contributed to lagging revenue over the past few quarters."

**C. October 19, 2023 Statements in American's 3Q 2023 Form 10-Q**

128. On October 19, 2023, American reported its financial and operational results for its third quarter ended September 30, 2023 by filing a Form 10-Q with the SEC (the "3Q 2023 Form 10-Q") before the stock market opened for trading that day.

129. The 3Q 2023 Form 10-Q provided, *inter alia*, summary risk factors that "may affect [American's] business, results of operations and financial condition, or the trading price of our common stock or other securities." These risk factors contained materially incomplete and misleading disclosures concerning the Company's distribution system and framed risks as merely hypothetical, not actualized. One of the summary risk factors stated that "**[i]f we**

**encounter problems with any** of our third-party regional operators or **third-party service providers, our operations could be adversely affected by a resulting decline in revenue or negative public perception about our services**."

130. The 3Q 2023 Form 10-Q also contained a longer risk factors section under Part II, Item 1A. These risk factors contained materially incomplete and misleading disclosures concerning the Company's "business model," including "practices and contracts with providers of distribution systems," and framed risks to "revenues" and "demand" as merely hypothetical, not actualized:

> We have in the past instituted, and intend to institute in the future, changes to our business model designed to increase revenues and offset costs. These measures include … changes to our practices and contracts with providers of distribution systems to provide additional content flexibility ….
>
> * * *
>
> We may introduce additional initiatives in the future; however, as time goes on, we expect that it will be more difficult to identify and implement additional initiatives. **We cannot assure that these measures or any future initiatives will be successful in increasing our revenues** or offsetting our costs. **Additionally, the implementation of these initiatives may create logistical challenges that could harm the operational performance of our airline or result in decreased demand**.

131. The 3Q 2023 Form 10-Q also contained a risk factor that stated that any inability of American to manage third-party distribution functionality "**could have a material adverse effect on our business, results of operations and financial condition**":

> **To remain competitive, we will need to** manage successfully our distribution costs and rights, **increase our distribution flexibility and improve the functionality of our distribution channels**, while maintaining an industry-competitive cost structure . . . . **These imperatives may affect our relationships with conventional travel agents, travel management companies, GDSs and OTAs**, including if consolidation of conventional travel agents, travel management companies, GDSs or OTAs continues, or should any of these parties seek to acquire other technology providers thereby potentially limiting our technology alternatives. **Any inability to manage our third-party distribution**

> costs, rights and **functionality at a competitive level or any material diminishment or disruption in the distribution of our tickets could have a material adverse effect on our business, results of operations and financial condition**.

132. The statements identified in ¶¶ 129-131 above were each materially false, misleading and/or omitted material facts necessary to make the statements therein not false or misleading when made because the harms, posed as mere hypotheticals, were actualized: American's changes to its distribution system were disastrous for the Company's relationships with travel agents, TMCs, and corporations, thereby negatively impacting American's revenues and demand for American's airfare and ancillary services. The material falsity of Defendants' statements is supported by ample evidence, including testimony from various CWs confirming that: (i) American's shift to NDC channels actually *reduced* its distribution flexibility because, on Raja's direction, American eliminated the ability to purchase basic economy rates on EDIFACT channels, making them exclusively available on NDC channels (¶¶ 64-65); (ii) corporate customers did not purchase tickets through American's NDC channels—with bookings dropping "much lower" than 15% after the July 2023 Contracts went into effect and, along with percentage of share metrics, remaining "consistently down" (¶ 109)—because certain other services and information was not available through those channels, such as "duty-of-care data" and the benefit of a dedicated agent that could modify flight schedules or change tickets on behalf of corporate travelers (¶¶ 87-89, 93-95) (the latter of which was later corroborated by *The Wall Street Journal's* January 9, 2025 article (*see* ¶ 88)); (iii) American's relationships with travel agencies began deteriorating as early as January 2023 after the Company decided that existing agency contracts would not be renewed and uniformly imposed the July 2023 Contracts on agencies, which, when they went into effect, immediately resulted in larger agency bookings declining 15% compared to year-over-year levels and, along with percentage of share metrics,

remaining "consistently down" (which Defendants knew based on data available to them) (¶¶ 72-75, 101-106, 108-109, 111-114); (iv) beginning in June 2023, TMCs and corporate customers moved to American's competitors given that the Company no longer offered certain incentives and other benefits, such as "waivers and favors" and special passenger statuses (¶¶ 72-75, 77-78, 90-97); (v) smaller agencies lacked the technical expertise necessary to transition to NDC and American failed to provide any support (¶¶ 85, 92-96, 111); (vi) rather than adopting NDC technology, American's distribution strategy changes drove travel agencies and corporate customers away from the Company beginning in April 2023 and throughout the Class Period (¶¶ 85-86, 90-91, 96-101); (vii) once the July 2023 Contracts went into effect, American dropped from being primary or secondary provider to the secondary or tertiary provider for numerous corporations (¶¶ 98-100, 110); (viii) in 2023, the Company cancelled or did not renew contracts with SMBs through agencies and would not offer them perquisites unless they booked directly with American rather than through agencies, but SMBs had difficulty managing their travel bookings directly through American, which resulted in American losing "so much share" of its SMBs' business, as many SMBs were unwilling to stop using agencies (¶¶ 79, 93-95); (ix) contrary to Defendants' statements suggesting harm to relationships with third parties was a mere possibility, as CW2 learned during an October 2023 meeting with Neil Geurin and Jay Creech, Raja directed American's NDC strategy so that the Company could eventually eliminate third parties from the distribution process entirely (¶ 62 ); and (x) during the October 19, 2023 State of the Airline meeting, May stated that corporate and agency bookings were down and below American's plan. (¶¶ 237, 255)

133. The statements were further false and misleading given Defendants' admissions during the May 29, 2024 Bernstein Conference, the 2Q 2024 Earnings Call on July 25, 2024, and

as reported in a May 29, 2024 *Bloomberg* article, that the Company's modern retailing strategy caused problems for agencies, corporate customers, and other third party intermediaries, which caused American to cede market share "from an agency and a corporate perspective" and "contributed to lagging revenue over the past few quarters."

**D. October 19, 2023 Statements on American's 3Q 2023 Earnings Call**

134. On October 19, 2023, American held an earnings call at 8:30 a.m. E.T., before the stock market opened for trading that day, to report on the Company's financial and operational results for its third fiscal quarter ended September 30, 2023 (the "3Q 2023 Earnings Call").

135. At the start of the 3Q 2023 Earnings Call, American's then Managing Director of Investor Relations, Scott Long, instructed investors to refer to risk factors detailed in the 3Q 2023 Form 10-Q. These risk factors contains false or misleading statements, as discussed in Section V.C, *supra* ("October 19, 2023 Statements in American's 3Q 2023 Form 10-Q").

136. During his prepared remarks on the 3Q 2023 Earnings Call, Defendant May stated that "**[w]e have seen steady improvement in business travel with encouraging signs from both managed** and unmanaged **corporate customers**, strong international demand and historically high premium revenue, both domestically and internationally."

137. During the question-and-answer portion of the 3Q 2023 Earnings Call, Andrew George Didora, an analyst from BofA Securities, Research Division, asked Defendant Raja to "speak a little more in terms of what you're seeing on the corporate side, particularly as it relates to both large and small corporates" and whether Raja had "seen any sort of unexpected share shifts." Defendant Raja notably did not answer the question directly, instead discussing the selling and distribution strategy changes and stating: "**We actually performed better year-over-year among contracted corporations than we had in a number of months prior to it[,]**"

and "**we're actually really encouraged by what we've seen, encouraged by its revenue production, and look forward to continuing the momentum**."

138. During the same call, Conor T. Cunningham, an analyst from Melius Research LLC, asked Defendants about the Company's lagging margins as compared to its competitors. In response, Defendant Isom assured investors, "**We feel really confident about how we're seeing '24 especially on a competitive basis against our peers**."

139. The statements identified in ¶¶ 136-138 above were each materially false, misleading and/or omitted material facts necessary to make the statements therein not false or misleading when made because Defendants were not seeing encouraging signs from managed corporate customers or confident in American's 2024 competitive standing against peers. The material falsity of Defendants' statements is supported by ample evidence, including testimony from various CWs confirming that: (i) corporate customers did not purchase tickets through American's NDC channels—with bookings dropping "much lower" than 15% after the July 2023 Contracts went into effect and, along with percentage of share metrics, remaining "consistently down" (¶ 109)—because certain other services and information was not available through those channels, such as "duty-of-care data" and the benefit of a dedicated agent that could modify flight schedules or change tickets on behalf of corporate travelers (¶¶ 87-89, 93-95) (the latter of which was later corroborated by *The Wall Street Journal's* January 9, 2025 article (*see* ¶ 88)); (ii) American's relationships with travel agencies began deteriorating as early as January 2023 after the Company decided that existing agency contracts would not be renewed and uniformly imposed the July 2023 Contracts on agencies, which, when they went into effect, immediately resulted in larger agency bookings declining 15% compared to year-over-year levels and, along with percentage of share metrics, remaining "consistently down" (which Defendants knew based

on data available to them) (¶¶ 72-75, 101-106, 108-109, 111-114); (iii) beginning in June 2023, TMCs and corporate customers moved to American's competitors given that the Company no longer offered certain incentives and other benefits, such as "waivers and favors" and special passenger statuses (¶¶ 72-75, 77-78, 90-97); (iv) smaller agencies lacked the technical expertise necessary to transition to NDC and American failed to provide any support (¶¶ 85, 92-96, 111); (v) rather than adopting NDC technology, American's distribution strategy changes drove travel agencies and corporate customers away from the Company beginning in April 2023 and throughout the Class Period (¶¶ 85-86, 90-91, 96-101); (vi) once the July 2023 Contracts went into effect, American dropped from being primary or secondary provider to the secondary or tertiary provider for numerous corporations (¶¶ 98-100, 110); (vii) in 2023, the Company cancelled or did not renew contracts with SMBs through agencies and would not offer them perquisites unless they booked directly with American rather than through agencies, but SMBs had difficulty managing their travel bookings directly through American, which resulted in American losing "so much share" of its SMBs' business, as many SMBs were unwilling to stop using agencies (¶¶ 79, 93-95); and (viii) during the October 19, 2023 State of the Airline meeting, May stated that corporate and agency bookings were down and below American's plan. (¶¶ 237, 255).

140. The statements were further false and misleading given Defendants' admissions during the May 29, 2024 Bernstein Conference, the 2Q 2024 Earnings Call on July 25, 2024, and as reported in a May 29, 2024 *Bloomberg* article, that the Company's modern retailing strategy caused problems for agencies, corporate customers, and other third party intermediaries, which caused American to cede market share "from an agency and a corporate perspective" and "contributed to lagging revenue over the past few quarters."

### E. November 1, 2023 Statements at the 2023 Skift Conference

141. On November 1, 2023, at 9:10 am CT, Defendant Isom presented at the 2023 Skift Aviation Forum (the "2023 Skift Conference"). Host Edward Russell asked Isom during the 2023 Skift Conference how American's NDC execution was "performing" and about the status of American's rollout of "changes in the way you distribute tickets." In response, the American CEO stated that he was "**really pleased with the start**" of that execution and "**as I look out into 2024, I feel really comfortable about the platform that we have in place**."

142. The statements identified in ¶ 141 above were each materially false, misleading and/or omitted material facts necessary to make the statements therein not false or misleading when made because Defendant Isom had no reasonable basis to be pleased with American's NDC implementation or comfortable with American's NDC platform moving into 2024. The material falsity of Defendants' statements is supported by ample evidence, including testimony from various CWs confirming that: (i) corporate customers did not purchase tickets through American's NDC channels—with bookings dropping "much lower" than 15% after the July 2023 Contracts went into effect and, along with percentage of share metrics, remaining "consistently down" (¶ 109)—because certain other services and information was not available through those channels, such as "duty-of-care data" and the benefit of a dedicated agent that could modify flight schedules or change tickets on behalf of corporate travelers (¶¶ 87-89, 93-95) (the latter of which was later corroborated by *The Wall Street Journal's* January 9, 2025 article (*see* ¶ 88)); (ii) American's relationships with travel agencies began deteriorating as early as January 2023 after the Company decided that existing agency contracts would not be renewed and uniformly imposed the July 2023 Contracts on agencies, which, when they went into effect, immediately resulted in larger agency bookings declining 15% compared to year-over-year levels and, along with percentage of share metrics, remaining "consistently down" (which Defendants knew based

on data available to them) (¶¶ 72-75, 101-106, 108-109, 111-114); (iii) beginning in June 2023, TMCs and corporate customers moved to American's competitors given that the Company no longer offered certain incentives and other benefits, such as "waivers and favors" and special passenger statuses (¶¶ 72–75, 77-78, 90-97); (iv) smaller agencies lacked the technical expertise necessary to transition to NDC and American failed to provide any support (¶¶ 85, 92-96, 111); (v) rather than adopting NDC technology, American's distribution strategy changes drove travel agencies and corporate customers away from the Company beginning in April 2023 and throughout the Class Period (¶¶ 85-86, 90-91, 96-101); (vi) once the July 2023 Contracts went into effect, American dropped from being primary or secondary provider to the secondary or tertiary provider for numerous corporations (¶¶ 98-100, 110); (vii) in 2023, the Company cancelled or did not renew contracts with SMBs through agencies and would not offer them perquisites unless they booked directly with American rather than through agencies, but SMBs had difficulty managing their travel bookings directly through American, which resulted in American losing "so much share" of its SMBs' business, as many SMBs were unwilling to stop using agencies (¶¶ 79, 93-95); and (viii) during the October 19, 2023 State of the Airline meeting, May stated that corporate and agency bookings were down and below American's plan. (¶¶ 237, 255).

143. The statements were further false and misleading given Defendants' admissions during the May 29, 2024 Bernstein Conference, the 2Q 2024 Earnings Call on July 25, 2024, and as reported in a May 29, 2024 *Bloomberg* article, that the Company's modern retailing strategy caused problems for agencies, corporate customers, and other third party intermediaries, which caused American to cede market share "from an agency and a corporate perspective" and "contributed to lagging revenue over the past few quarters."

### F. January 25, 2024 Statements on American's FY2023 Earnings Call

144. On January 25, 2024, American held an earnings call before the stock market opened for trading that day to report on the Company's financial and operational results for its fourth quarter and fiscal year ended December 31, 2023 (the "FY2023 Earnings Call").

145. At the beginning of the FY2023 Earnings Call, American's VP, Investor Relations & Corporate Development, Scott Long, directed investors to review risk factors listed in the Company's 3Q 2023 Form 10-Q that had been filed with the SEC on October 19, 2023, thus incorporating the 10-Q by reference. Several of those risk factors contained false or misleading statements, as discussed in Section V.C, *supra* ("October 19, 2023 Statements in American's 3Q 2023 Form 10-Q").

146. During his prepared remarks on the FY2023 Earnings Call, Defendant Isom indicated that Defendants were seeing positive trends in business travel, stating "[d]emand remains strong and we have seen robust bookings to start the year as travel trends have begun to normalize across entities. **We're also very encouraged by the trends we're seeing in business travel**." Isom specifically highlighted that American "**continue[d] to see strength among small- and medium- sized businesses**." Moments later, Isom relatedly stated that "**[w]e're very encouraged by the results**" of changes made to American's distribution strategy, which he claimed gave "**improved access to our best products and enable[d] American to provide better customer service to the individual traveler**."

147. Defendant May provided the Company's full-year guidance during his prepared remarks on the FY2023 Earnings Call, stating in relevant part: "**This year, we expect to produce adjusted earnings per diluted share of between $2.25 and $3.25. Using the midpoint of that guidance, we are forecasting free cash flow production of over $2 billion**."

148. During the question-and-answer portion of the FY2023 Earnings Call, a Wolfe Research analyst pressed the Company on its guidance, asking:

> So overall, we've seen some of the other airlines so far guide to positive [revenue per available seat mile ("RASM")] this year. How come you guys are flat to down on RASM? Any thoughts that explains the difference between what you're guiding to and maybe what some of the others are saying?

149. In response, Defendant Isom attempted to quell concerns around declining demand, stating in relevant part: "Look, **we see obviously tremendous demand**."

150. During the FY2023 Earnings Call, in response to a question from Jamie Nathaniel Baker, an analyst from JP Morgan Chase & Co, Research Division, about how well American was doing in terms "corporate recovery" to pre-pandemic levels, and whether Defendants "need to make further adjustments[,]" Defendant Raja stated, with regard to American's NDC "distribution strategy," including specifically "with corporate travel management or travel agencies" that **"[w]e see that we're producing revenue** . . . **more to the liking of our customers**." Defendant Raja further stated that "**[a]ll of our financial incentives targeted to [travel agencies and travel managers] are really around helping them shift. So we've actually been very encouraged by what we've seen**."

151. Andrew George Didora, from BofA Securities, Research Division, also pointedly asked on the FY2023 Earnings Call "what have been the growing pains thus far with the NDC rollout?" In response, Defendant Raja sidestepped answering whether there were any issues with American's push for NDC distribution, instead stating "**we have been similarly enthusiastic and even a little surprised at how quickly the transition has happened …. We're really encouraged by what we've seen there**."

152. The statements identified in ¶¶ 146-147, 149-151 above were each materially false, misleading and/or omitted material facts necessary to make the statements therein not false

or misleading when made because Defendants had no reasonable basis to be encouraged by business travel trends, American's SMBs results, the results related to American's changes to travel agency incentives, or American's transition to NDC, nor was American producing revenue in a manner more to its customers' liking or expecting to meet its full-year 2024 guidance. The material falsity of Defendants' statements is supported by ample evidence, including testimony from various CWs confirming that (i) American's shift to NDC channels actually *reduced* access to the Company's best products, because, on Raja's direction, American eliminated the ability to purchase basic economy rates and certain premium content on EDIFACT channels, making them exclusively available on NDC channels (¶¶ 64-65); (ii) corporate customers did not purchase tickets through American's NDC channels—with bookings dropping "much lower" than 15% after the July 2023 Contracts went into effect and, along with percentage of share metrics, remaining "consistently down" (¶ 109)—because certain other services and information was not available through those channels, such as "duty-of-care data" and the benefit of a dedicated agent that could modify flight schedules or change tickets on behalf of corporate travelers (¶¶ 87-89, 93-95) (the latter of which was later corroborated by *The Wall Street Journal's* January 9, 2025 article (*see* ¶ 88)); (iii) American's relationships with travel agencies began deteriorating as early as January 2023 after the Company decided that existing agency contracts would not be renewed and uniformly imposed the July 2023 Contracts on agencies, which, when they went into effect, immediately resulted in larger agency bookings declining 15% compared to year-over-year levels and, along with percentage of share metrics, remaining "consistently down" (which Defendants knew based on data available to them) (¶¶ 72-75, 101-106, 108-109, 111-114); (iv) beginning in June 2023, TMCs and corporate customers moved to American's competitors given that the Company no longer offered certain incentives and other benefits, such as "waivers and

favors" and special passenger statuses (¶¶ 72–75, 77-78, 90-97); (v) smaller agencies lacked the technical expertise necessary to transition to NDC and American failed to provide any support (¶¶ 85, 92-96, 111); (vi) rather than adopting NDC technology, American's distribution strategy changes drove travel agencies and corporate customers away from the Company beginning in April 2023 and throughout the Class Period (¶¶ 85-86, 90-91, 96-101); (vii) once the July 2023 Contracts went into effect, American dropped from being primary or secondary provider to the secondary or tertiary provider for numerous corporations (¶¶ 98-100, 110); (viii) in 2023, the Company cancelled or did not renew contracts with SMBs through agencies and would not offer them perquisites unless they booked directly with American rather than through agencies, but SMBs had difficulty managing their travel bookings directly through American, which resulted in American losing "so much share" of its SMBs' business, as many SMBs were unwilling to stop using agencies (¶¶ 79, 93-95); (ix) contrary to Defendants' statements suggesting that all of the financial incentives were targeted to help travel agencies and travel managers shift, as CW2 learned during an October 2023 meeting with Neil Geurin and Jay Creech, Raja directed American's NDC strategy so that the Company could eventually eliminate third parties from the distribution process entirely (¶ 62); and (x) during the October 19, 2023 State of the Airline meeting, May stated that corporate and agency bookings were down and below American's plan. (¶¶ 237, 255).

153. The statements were further false and misleading given Defendants' admissions during the May 29, 2024 Bernstein Conference, the 2Q 2024 Earnings Call on July 25, 2024, and as reported in the 2Q 2024 Press Release and a May 29, 2024 Bloomberg article, that the Company's modern retailing strategy caused problems for agencies, corporate customers, and other third party intermediaries, which caused American to cede market share "from an agency

and a corporate perspective[,]" "contributed to lagging revenue over the past few quarters[,]" and resulted in American lowering 2Q 2024 and FY 2024 guidance. Defendant Isom further admitted during the 2Q 2024 Earnings Call that Defendants knew at least as early as 1Q 2024 that the Company's revenue was performing poorly when compared to peers as a result of its distribution strategy but, in a reckless gamble, hoped it would "reverse itself."

154. Defendants' false and misleading statements had their intended effect. Indeed, American's share price increased $1.43 per share, or more than 10%, from its close at $13.93 per share on January 24, 2024 to close at $15.36 per share on January 25, 2024.

155. Analysts also found Defendants' guidance misstatements and false assurances regarding business demand during the FY2023 Earnings Call to be indicative of American's successful NDC implementation. For instance, in a report published on January 25, 2024, J.P. Morgan stated that American's "2024 forecast exceeds our own" and did so without "any heaps of unreasonable optimism that [the analyst] can identify[.]" J.P. Morgan further elaborated on American's distribution changes, stating:

> If there's one thing that we need to highlight, it's that American's distribution strategy does not seem to be hurting them. Recall we spent considerable time last year highlighting American's concurrent distancing from one-time corporate partners (or, American's "scorched earth policy" according to several disgruntled travel managers we spoke with across financial services and elsewhere). At this stage, our concerns have not manifested. To wit, selling expenses are down 8-9%. Meanwhile, 65% of revenue is coming through Loyalty members, with an estimated 45% of revenue coming through Loyalty members that are purchasing premium content, up 3 points yr/yr. That does not suggest wide-scale defections to Delta and United, in our view, and it's a topic that has also died down as we've spoken to American's competitors. To quote American's call, "we sell our product through the internet," and we have limited grounds to quibble with that statement. What appears increasingly clear to us is that much of the negative sentiment surrounding American's one-time perceived lack of free cash flow continues to exit the stock...and we can't complain that three competitors have recently taken up residence alongside our existing Overweight rating.

156. Then, on January 26, 2024, Seaport Research Partners issued a report, titled "A compelling glide path to better earnings & FCF [free cash flow]; Upgrading shares[,]" wherein the analyst highlighted that the Company's "[s]hares were up 10.3% yesterday and are now up 12% YTD" and pointed to "further upside … on a compelling earnings trajectory and thus valuation[.]" As a result, Seaport upgraded American Airlines to buy and set a price target of $23.00. In its report, Seaport also emphasized that "we believe AAL is a guide and beat story in 2024[,]" reiterated the Company's "AAL guided to a 2024 EPS of $2.25-$3.25 on MSD growth[,]" and further noted that "NDC … is a source of revenue upside that we've previously quantified at $350- $500MM annually, or more. NDC boils down to 'better merchandizing,' which permits more sophisticated revenue management of AAL's lowest yielding bookings."

**G. February 21, 2024 Statements in American's FY2023 Form 10-K**

157. On February 21, 2024, American reported its financial and operational results for its fourth quarter and fiscal year ended December 31, 2023 by filing a Form 10-K with the SEC (the "FY2023 Form 10-K") before the stock market opened for trading that day.

158. The FY2023 Form 10-K provided, *inter alia*, summary risk factors that "may affect [American's] business, results of operations and financial condition, or the trading price of our common stock or other securities." These risk factors contained materially incomplete and misleading disclosures concerning the Company's distribution system and framed risks as merely hypothetical, not actualized. One of the summary risk factors stated that "**[i]f we encounter problems with any** of our third-party regional operators **or third-party service providers, our operations could be adversely affected by a resulting decline in revenue or negative public perception about our services**."

159. American's FY2023 Form 10-K also contained a longer risk factors section under Part I, Item 1A that provided various risk factors "that may affect our business, results of

operations and financial condition, or the trading price of our common stock or other securities." These risk factors contained materially incomplete and misleading disclosures concerning the Company's "business model," including "practices and contracts with providers of distribution systems," and framed risks to "revenues" and "demand" as merely hypothetical, not actualized:

> We have in the past instituted, and intend to institute in the future, changes to our business model designed to increase revenues and offset costs. These measures include … changes to our practices and contracts with providers of distribution systems to provide additional content flexibility….
>
> * * *
>
> We may introduce additional initiatives in the future; however, as time goes on, we expect that it will be more difficult to identify and implement additional initiatives. **We cannot assure that these measures or any future initiatives will be successful in increasing our revenues** or offsetting our costs. **Additionally, the implementation of these initiatives may create logistical challenges that could harm the operational performance of our airline or result in decreased demand**.

160. Also within the risk factors section, the FY2023 Form 10-K stated :

> **To remain competitive, we will need to** manage successfully our distribution costs and rights, **increase our distribution flexibility, continue to migrate the distribution of tickets to our proprietary and other modern distribution channels,** and improve the functionality of our distribution channels, while maintaining an industry-competitive cost structure and a high level of customer satisfaction. Further, as distribution technology changes we will need to continue to update our technology by acquiring new technology from third parties, building the functionality ourselves, or a combination, which in any event will likely entail significant technological and commercial risk and involve potentially material investments. **These imperatives may affect our relationships with conventional travel agents, travel management companies, GDSs and OTAs,** including if consolidation of conventional travel agents, travel management companies, GDSs or OTAs continues, or should any of these parties seek to acquire other technology providers thereby potentially limiting our technology alternatives. **Any inability to manage our third-party distribution** costs, rights and **functionality at a competitive level or any material diminishment or disruption in the distribution of our tickets could have a material adverse effect on our business, results of operations and financial condition.**

161. The statements identified in ¶¶ 158-160 above were materially false, misleading and/or omitted material facts necessary to make the statement therein not false or misleading

when made because the harms, posed as hypotheticals, were actualized: American's changes to its distribution system were disastrous for the Company's relationships with travel agents, TMCs, and corporations, thereby negatively impacting American's revenues and demand for American's airfare and ancillary services. The material falsity of Defendants' statements is supported by ample evidence, including testimony from various CWs confirming that: (i) American's shift to NDC channels actually *reduced* its distribution flexibility because, on Raja's direction, American eliminated the ability to purchase basic economy rates on EDIFACT channels, making them exclusively available on NDC channels (¶¶ 64-65); (ii) corporate customers did not purchase tickets through American's NDC channels—with bookings dropping "much lower" than 15% after the July 2023 Contracts went into effect and, along with percentage of share metrics, remaining "consistently down" (¶ 109)—because certain other services and information was not available through those channels, such as "duty-of-care data" and the benefit of a dedicated agent that could modify flight schedules or change tickets on behalf of corporate travelers (¶¶ 87-89, 93-95) (the latter of which was later corroborated by *The Wall Street Journal's* January 9, 2025 article (*see* ¶ 88)); (iii) American's relationships with travel agencies began deteriorating as early as January 2023 after the Company decided that existing agency contracts would not be renewed and uniformly imposed the July 2023 Contracts on agencies, which, when they went into effect, immediately resulted in larger agency bookings declining 15% compared to year-over-year levels and, along with percentage of share metrics, remaining "consistently down" (which Defendants knew based on data available to them) (¶¶ 72-75, 101-106, 108-109, 111-114); (iv) beginning in June 2023, TMCs and corporate customers moved to American's competitors given that the Company no longer offered certain incentives and other benefits, such as "waivers and favors" and special passenger statuses (¶¶ 72–75, 77-78,

90-97); (v) smaller agencies lacked the technical expertise necessary to transition to NDC and American failed to provide any support (¶¶ 85, 92-96, 111); (vi) rather than adopting NDC technology, American's distribution strategy changes drove travel agencies and corporate customers away from the Company beginning in April 2023 and throughout the Class Period (¶¶ 85-86, 90-91, 96-101); (vii) once the July 2023 Contracts went into effect, American dropped from being primary or secondary provider to the secondary or tertiary provider for numerous corporations (¶¶ 98-100, 110); (viii) in 2023, the Company cancelled or did not renew contracts with SMBs through agencies and would not offer them perquisites unless they booked directly with American rather than through agencies, but SMBs had difficulty managing their travel bookings directly through American, which resulted in American losing "so much share" of its SMBs' business, as many SMBs were unwilling to stop using agencies (¶¶ 79, 93-95); (ix) contrary to Defendants' statements suggesting harm to relationships with third parties was a mere possibility, as CW2 learned during an October 2023 meeting with Neil Geurin and Jay Creech, Raja directed American's NDC strategy so that the Company could eventually eliminate third parties from the distribution process entirely (¶ 62); and (x) during the October 19, 2023 State of the Airline meeting, May stated that corporate and agency bookings were down and below American's plan. (¶¶ 237, 255).

162. The statements were further false and misleading given Defendants' admissions during the May 29, 2024 Bernstein Conference, the 2Q 2024 Earnings Call on July 25, 2024, and as reported in a May 29, 2024 *Bloomberg* article, that the Company's modern retailing strategy caused problems for agencies, corporate customers, and other third party intermediaries, which caused American to cede market share "from an agency and a corporate perspective" and "contributed to lagging revenue over the past few quarters." Defendant Isom further admitted

during the 2Q 2024 Earnings Call that Defendants knew at least as early as 1Q 2024 that the Company's revenue was performing poorly when compared to peers as a result of its distribution strategy but, in a reckless gamble, hoped it would "reverse itself."

### H. March 12, 2024 Statements at the 2024 J.P. Morgan Industrials Conference

163. On March 12, 2024, Defendants Isom and May spoke at the 2024 J.P. Morgan Industrials Conference (the "2024 JP Morgan Conference"). During the 2024 JP Morgan Conference, Defendant Isom reaffirmed the Company's full-year guidance, and misattributed that decision to American's purportedly "strong" demand performance, stating in relevant part: "**<u>[W]e feel really comfortable about demand. Demand is strong" and "we still anticipate producing $2 billion of free cash flow[.]"</u>**

164. During the question-and-answer portion of the 2024 JP Morgan Conference, Defendant Isom stated that he felt "**<u>really good about how [American has] been able to hang on to our [market] share</u>**" despite the push into NDC distribution:

> **Mark Stephen Streeter**
>
> So one thing Jamie and I are intensely focused on is your push into new distribution channels and what you've done with your corporate sales force, which you've downsized it more so than your competitors. And so, how is that -- you referred to it a little bit at the Investor Day. We talked about it on the quarterly -- our quarterly wrap up as well because it looks like so far, so good. <u>We can't necessarily see anything in your numbers that show that -- but we're hearing from others that there may be some share shift</u>. Obviously, I think the corporate travel world is all up in arms about what you're doing and pushing the ball forward. So, just maybe you can talk a little bit about your experience with pursuing those new distribution channels and the strategy behind what you're doing with the corporate sales force.
>
> **Robert D. Isom**
>
> And I'm really proud of us being aggressive and taking some bold moves. It's not without risk, obviously. But there is -- **<u>I'm very pleased with where we stand right now. There's nothing that I see in terms of customer behavior that would suggest that we're not on the right path</u>**.... And while you may have seen some changes to our sales force, I feel really good about what I see in terms

> of cost of sale, and **<u>I also feel really good about how we've been able to hang on to our share as well</u>**. So as we go forward, everybody -- we want everybody to come with us. And whether it's the GDSs or whether it's the TMCs, there's a place at American where we can all do well, but it takes investment in technology. And it's where the marketplace is going to go anyway. Customers are going to demand being able to service and to shop with how they do everywhere else. And so as we push forward here, **<u>I see our customers, I see our partners all engaging in a way that's beneficial for us and ultimately, American Airlines</u>**.

165. The statements identified in ¶¶ 163-164 above were each materially false, misleading and/or omitted material facts necessary to make the statements therein not false or misleading when made because Defendants lacked a reasonable basis to be pleased with American's competitive standing, to claim they had seen nothing in their customers' behavior suggesting they were not on the right path, or to be feeling "really good" about the Company's ability to hold onto market share, given Defendants were already seeing negative reactions and changes in their customers' behavior evidencing that American was not on the right path and its distribution strategy was then driving customers away, which Defendant Isom later admitted on May 29, 2024 had already negatively impacted American's market share and revenue. The material falsity of Defendants' statements is supported by ample evidence, including testimony from various CWs confirming that: (i) corporate customers did not purchase tickets through American's NDC channels—with bookings dropping "much lower" than 15% after the July 2023 Contracts went into effect and, along with percentage of share metrics, remaining "consistently down" (¶ 109)—because certain other services and information was not available through those channels, such as "duty-of-care data" and the benefit of a dedicated agent that could modify flight schedules or change tickets on behalf of corporate travelers (¶¶ 87-89, 93-95) (the latter of which was later corroborated by *The Wall Street Journal's* January 9, 2025 article (*see* ¶ 88)); (ii) American's relationships with travel agencies began deteriorating as early as January 2023 after the Company decided that existing agency contracts would not be renewed and uniformly

imposed the July 2023 Contracts on agencies, which, when they went into effect, immediately resulted in larger agency bookings declining 15% compared to year-over-year levels and, along with percentage of share metrics, remaining "consistently down" (which Defendants knew based on data available to them) (¶¶ 72-75, 101-106, 108-109, 111-114); (iii) beginning in June 2023, TMCs and corporate customers moved to American's competitors given that the Company no longer offered certain incentives and other benefits, such as "waivers and favors" and special passenger statuses (¶¶ 72-75, 77-78, 90-97); (iv) smaller agencies lacked the technical expertise necessary to transition to NDC and American failed to provide any support (¶¶ 85, 92-96, 111); (v) rather than adopting NDC technology, American's distribution strategy changes drove travel agencies and corporate customers away from the Company beginning in April 2023 and throughout the Class Period (¶¶ 85-86, 90-91, 96-101); (vi) once the July 2023 Contracts went into effect, American dropped from being primary or secondary provider to the secondary or tertiary provider for numerous corporations (¶¶ 98-100, 110); (vii) in 2023, the Company cancelled or did not renew contracts with SMBs through agencies and would not offer them perquisites unless they booked directly with American rather than through agencies, but SMBs had difficulty managing their travel bookings directly through American, which resulted in American losing "so much share" of its SMBs' business, as many SMBs were unwilling to stop using agencies (¶¶ 79, 93-95); and (viii) during the October 19, 2023 State of the Airline meeting, May stated that corporate and agency bookings were down and below American's plan. (¶¶ 237, 255).

166. The statements were further false and misleading given Defendants' admissions during the May 29, 2024 Bernstein Conference, the 2Q 2024 Earnings Call on July 25, 2024, and as reported in the 2Q 2024 Press Release and a May 29, 2024 Bloomberg article, that the

Company's modern retailing strategy caused problems for agencies, corporate customers, and other third party intermediaries, which caused American to cede market share "from an agency and a corporate perspective[,]" "contributed to lagging revenue over the past few quarters[,]" and resulted in American lowering 2Q 2024 and FY 2024 guidance. Defendant Isom further admitted during the 2Q 2024 Earnings Call that Defendants knew at least as early as 1Q 2024 that the Company's revenue was performing poorly when compared to peers as a result of its distribution strategy but, in a reckless gamble, hoped it would "reverse itself."

**I. April 10, 2024 Statements at the Elevate + TravelConnect Conference**

167. On April 10, 2024, Defendant Raja spoke at the Elevate + TravelConnect Conference (the "2024 Elevate + TravelConnect Conference"). During his presentation, Raja stated that American was "**trying to make [the] transition to NDC as riskless as possible**" for travel agencies, and that he was "**encouraged about where some of that is going**":

> And we, as all of us, we need to evolve to a world where we give the customers what they want. It's easy by American Airlines and the tools and technology of NDC make that more possible. . . . [**A]nd one thing that we're actively involved in for any of our retailing partners here or elsewhere, is helping the travel industry transition to it.**
>
> We are key almost, in fact, **all of our agency related initiatives are about trying to make the transition to NDC as riskless as possible for them,** and as beneficial as possible for our joint customers. Because we know that there's customers who want to go shop at an agency. **We want customers to be able to shop at an agency, but we try to equip with them with as many financial incentives as possible. We're actually really encouraged about where some of that is going. And contrary to what may get reported publicly, I think there's a lot of agencies, a lot more than meet the eye, who are very front footed** about doing what's right for customers and really **embracing what the internet can mean as a retailing tool.**

168. During the 2024 Elevate + TravelConnect Conference, Defendant Raja also emphasized that the Company was earnestly partnering with travel agencies to adopt NDC distribution:

> … And then the third thing, which may be closest to the people here is what we call our retailing partnerships, which is corporate travel manager, managed corporate accounts, travel agencies, even ATPCO or ARC, anybody who facilitates this travel ecosystem where more customers can go and access it and access the kind of experience that Alex had. Let's give the end customer the best that the contemporary tools and digital technology can go and offer. And so **we're really keen on using all of those partnerships to grow together because, and we mean partnership as partnership. When we do that all together, we all get a benefit and I think frankly it's happening right now, and we'll probably see a lot more of this after May 1**, which is as more travel agencies go and embrace NDC and are driving more volumes through it. Not only are they getting more in incentive payment from American Airlines, they are having a better customer outcome, and frankly, they're creating a more competitive business for themselves. **And some of the ones that are succeeding the most are in some cases, small and mid-sized businesses, not large, publicly-traded travel management companies.** So anyways, I'll just say **more to come on all of it**, but so much of where we go in the future is both good for our partners and enabled by our partners.

169. The statements identified in ¶¶ 167-168 above were each materially false, misleading and/or omitted material facts necessary to make the statements therein not false or misleading when made because American was not helping the travel industry transition to NDC, the agency related changes were not trying to make the NDC transition riskless to travel agencies, and SMBs were not successfully transitioning to NDC. Defendants also lacked basis to be encouraged by agencies' transition to NDC. The material falsity of Defendants' statements is supported by ample evidence, including testimony from various CWs confirming that: (i) corporate customers did not purchase tickets through American's NDC channels—with bookings dropping "much lower" than 15% after the July 2023 Contracts went into effect and, along with percentage of share metrics, remaining "consistently down" (¶ 109)—because certain other services and information was not available through those channels, such as "duty-of-care data" and the benefit of a dedicated agent that could modify flight schedules or change tickets on behalf of corporate travelers (¶¶ 87-89, 93-95) (the latter of which was later corroborated by *The Wall Street Journal's* January 9, 2025 article (*see* ¶ 88)); (ii) American's relationships with travel

agencies began deteriorating as early as January 2023 after the Company decided that existing agency contracts would not be renewed and uniformly imposed the July 2023 Contracts on agencies, which, when they went into effect, immediately resulted in larger agency bookings declining 15% compared to year-over-year levels and, along with percentage of share metrics, remaining "consistently down" (which Defendants knew based on data available to them) (¶¶ 72-75, 101-106, 108-109, 111-114); (iii) beginning in June 2023, TMCs and corporate customers moved to American's competitors given that the Company no longer offered certain incentives and other benefits, such as "waivers and favors" and special passenger statuses (¶¶ 72-75, 77-78, 90-97); (iv) smaller agencies lacked the technical expertise necessary to transition to NDC and American failed to provide any support (¶¶ 85, 92-96, 111); (v) rather than adopting NDC technology, American's distribution strategy changes drove travel agencies and corporate customers away from the Company beginning in April 2023 and throughout the Class Period (¶¶ 85-86, 90-91, 96-101); (vi) once the July 2023 Contracts went into effect, American dropped from being primary or secondary provider to the secondary or tertiary provider for numerous corporations (¶¶ 98-100, 110); (vii) in 2023, the Company cancelled or did not renew contracts with SMBs through agencies and would not offer them perquisites unless they booked directly with American rather than through agencies, but SMBs had difficulty managing their travel bookings directly through American, which resulted in American losing "so much share" of its SMBs' business, as many SMBs were unwilling to stop using agencies (¶¶ 79, 93-95); (viii) contrary to Defendants' statements suggesting agency related initiatives were trying to make the transition as riskless as possible or that American was using its partnerships to grow together with agencies and third party distributors, as CW2 learned during an October 2023 meeting with Neil Geurin and Jay Creech, Raja directed American's NDC strategy so that the Company could

eventually eliminate third parties from the distribution process entirely (¶¶62); and (ix) during the October 19, 2023 State of the Airline meeting, May stated that corporate and agency bookings were down and below American's plan. (¶¶ 237, 255).

170. The statements were further false and misleading given Defendants' admissions during the May 29, 2024 Bernstein Conference, the 2Q 2024 Earnings Call on July 25, 2024, and as reported in a May 29, 2024 *Bloomberg* article, that the Company's modern retailing strategy caused problems for agencies, corporate customers, and other third party intermediaries, which caused American to cede market share "from an agency and a corporate perspective" and "contributed to lagging revenue over the past few quarters[.]" Defendant Isom further admitted during the 2Q 2024 Earnings Call that Defendants knew at least as early as 1Q 2024 that the Company's revenue was performing poorly when compared to peers as a result of its distribution strategy but, in a reckless gamble, hoped it would "reverse itself."

**J. April 23, 2024 Statements to Travel Media**

171. On April 23, 2024, American issued a statement via email to several travel industry media outlets, claiming there had been "**great response from agencies**" in adopting NDC:

> Customers are at the center of what we do. American is evolving to give our customers the travel management experience they have come to expect, and we've invited the industry to come along with us. **We've seen a great response from agencies increasingly adopting modern retailing technology** and many have already achieved preferred retailer status. The majority of our indirect bookings are now made via an agency with NDC capabilities, and the current list of agencies beyond 30% NDC bookings is already impressive. **We anticipate even more who are on the cusp of meeting the threshold to do so very soon**, which will provide customers with excellent preferred agency options to go along with our offerings on aa.com. As such, we've decided to extend the update to the way customers earn AAdvantage miles and Loyalty Points on flights to July 11. This extension gives an opportunity for those agencies to complete the transition. **We'll continue to work closely with travel agencies to support them through this transition for our mutual customers.**

172. The statements identified in ¶ 171 above were each materially false, misleading and/or omitted material facts necessary to make the statements therein not false or misleading when made because Defendants were not seeing agencies increasingly adopting NDC. American was also not supporting travel agencies transition mutual customers to NDC. The material falsity of Defendants' statements is supported by ample evidence, including testimony from various CWs confirming that: (i) corporate customers did not purchase tickets through American's NDC channels—with bookings dropping "much lower" than 15% after the July 2023 Contracts went into effect and, along with percentage of share metrics, remaining "consistently down" (¶ 109)—because certain other services and information was not available through those channels, such as "duty-of-care data" and the benefit of a dedicated agent that could modify flight schedules or change tickets on behalf of corporate travelers (¶¶ 87-89, 93-95) (the latter of which was later corroborated by *The Wall Street Journal's* January 9, 2025 article (*see* ¶ 88)); (ii) American's relationships with travel agencies began deteriorating as early as January 2023 after the Company decided that existing agency contracts would not be renewed and uniformly imposed the July 2023 Contracts on agencies, which, when they went into effect, immediately resulted in larger agency bookings declining 15% compared to year-over-year levels and, along with percentage of share metrics, remaining "consistently down" (which Defendants knew based on data available to them) (¶¶ 72-75, 101-106, 108-109, 111-114); (iii) beginning in June 2023, TMCs and corporate customers moved to American's competitors given that the Company no longer offered certain incentives and other benefits, such as "waivers and favors" and special passenger statuses (¶¶ 72-75, 77-78, 90-97); (iv) smaller agencies lacked the technical expertise necessary to transition to NDC and American failed to provide any support (¶¶ 85, 92-96, 111); (v) rather than adopting NDC technology, American's distribution strategy changes drove travel

agencies and corporate customers away from the Company beginning in April 2023 and throughout the Class Period (¶¶ 85-86, 90-91, 96-101); (vi) once the July 2023 Contracts went into effect, American dropped from being primary or secondary provider to the secondary or tertiary provider for numerous corporations (¶¶ 98-100, 110); (vii) in 2023, the Company cancelled or did not renew contracts with SMBs through agencies and would not offer them perquisites unless they booked directly with American rather than through agencies, but SMBs had difficulty managing their travel bookings directly through American, which resulted in American losing "so much share" of its SMBs' business, as many SMBs were unwilling to stop using agencies (¶¶ 79, 93-95); and (viii) during the October 19, 2023 State of the Airline meeting, May stated that corporate and agency bookings were down and below American's plan. (¶¶ 237, 255).

173. The statements were further false and misleading given Defendants' admissions during the May 29, 2024 Bernstein Conference, the 2Q 2024 Earnings Call on July 25, 2024, and as reported in a May 29, 2024 *Bloomberg* article, that the Company's modern retailing strategy caused problems for agencies, corporate customers, and other third party intermediaries, which caused American to cede market share "from an agency and a corporate perspective" and "contributed to lagging revenue over the past few quarters[.]" Defendant Isom further admitted during the 2Q 2024 Earnings Call that Defendants knew at least as early as 1Q 2024 that the Company's revenue was performing poorly when compared to peers as a result of its distribution strategy but, in a reckless gamble, hoped it would "reverse itself."

### K. April 25, 2024 Statements in American's 1Q 2024 Press Release and Investor Relations Update

174. On April 25, 2024 at 7:00 a.m. E.T., American issued a press release reporting the Company's financial and operational results for its first fiscal quarter ended March 31, 2024 (the

"1Q 2024 Press Release"). The same day, American filed an identical copy of the press release as an exhibit to a Form 8-K filed with the SEC, which was signed by Defendant May. In the 1Q 2024 Press Release, the Company reported a "[f]irst-quarter net loss of $312 million, or ($0.48) per diluted share."

175. In the 1Q 2024 Press Release, Defendant Isom was quoted as stating unequivocally that American would meet its guidance targets in 2024:

> "The American Airlines team continues to build a reliable, efficient and resilient airline," said American's CEO Robert Isom. "While we aren't satisfied with our first-quarter financial results, **we have a strong foundation in place, and we remain on track to deliver on our full-year financial targets.** Our team is running a fantastic operation, driving revenue through our commercial initiatives, efficiently managing costs, and producing free cash flow to further strengthen our balance sheet."

176. The 1Q 2024 Press Release included the following "[g]uidance and investor update[:]"

> **Based on present demand trends** and the current fuel price forecast and excluding the impact of special items, **the company expects its second-quarter 2024 adjusted earnings per diluted share to be between $1.15 and $1.45. The company continues to expect its full-year adjusted earnings per diluted share to be between $2.25 and $3.25**.

177. The 1Q 2024 Press Release also directed investors "to the company's investor update, furnished with this press release with the SEC on Form 8-K" "[f]or additional financial forecasting detail[.]" Indeed, as referenced in the 1Q 2024 Press Release, the Company filed an "Investor Relations Update" (the "1Q 2024 IR Update") as an exhibit to a Form 8-K filed with the SEC on April 25, 2024.

178. The 1Q 2024 IR Update provided the following additional guidance: (i) "TRASM - **Second-quarter total revenue per available seat mile (TRASM) is expected to be down approximately 1% to 3% versus the second quarter of 2023**[;]" (ii) "Adjusted operating margin - **Based on current assumptions, the Company expects an adjusted**

**operating margin of approximately 9.5% to 11.5% for the second quarter**[;]" (iii) "Adjusted EPS - **Based on the assumptions outlined above, the Company expects its second-quarter adjusted earnings per diluted share to be between $1.15 and $1.45** based on an expected share count of 722.5 million shares. **Based on current assumptions, the Company reaffirms its full-year adjusted earnings per diluted share guidance of between $2.25 and $3.25** using a share count of 723.6 million shares[;]" and (iv) "Free cash flow – "**Based on current assumptions, the Company reaffirms its full-year free cash flow guidance of approximately $2 billion**."

179. Both the 1Q 2024 Press Release and 1Q 2024 IR Update also directed investors to refer to risks factors described in American's Form 10-Q reporting financial and operational results for the first quarter ended March 31, 2024 (the "1Q 2024 Form 10-Q"), thus incorporating the 10-Q filing by reference. Several of the risk factors contained false or misleading statements, as discussed in Section V.L, *infra* ("April 25, 2024 Statements in American's 1Q 2024 Form 10-Q").

180. The statements identified in ¶¶ 175-176, 178 above was materially false, misleading and/or omitted material facts necessary to make the statement not false or misleading when made because American did not have a strong foundation in place given the Company's distribution strategy was then-driving customers away, which Defendant Isom would later admit on May 29, 2024, and as a result, American was not on track to deliver on its second quarter 2024 or full-year financial targets. The material falsity of Defendants' statements is supported by ample evidence, including testimony from various CWs confirming that: (i) corporate customers did not purchase tickets through American's NDC channels—with bookings dropping "much lower" than 15% after the July 2023 Contracts went into effect and, along with percentage of

share metrics, remaining "consistently down" (¶ 109)—because certain other services and information was not available through those channels, such as "duty-of-care data" and the benefit of a dedicated agent that could modify flight schedules or change tickets on behalf of corporate travelers (¶¶ 87-89, 93-95) (the latter of which was later corroborated by *The Wall Street Journal's* January 9, 2025 article (*see* ¶ 88)); (ii) American's relationships with travel agencies began deteriorating as early as January 2023 after the Company decided that existing agency contracts would not be renewed and uniformly imposed the July 2023 Contracts on agencies, which, when they went into effect, immediately resulted in larger agency bookings declining 15% compared to year-over-year levels and, along with percentage of share metrics, remaining "consistently down" (which Defendants knew based on data available to them) (¶¶ 72-75, 101-106, 108-109, 111-114); (iii) beginning in June 2023, TMCs and corporate customers moved to American's competitors given that the Company no longer offered certain incentives and other benefits, such as "waivers and favors" and special passenger statuses (¶¶ 72-75, 77-78, 90-97); (iv) smaller agencies lacked the technical expertise necessary to transition to NDC and American failed to provide any support (¶¶ 85, 92-96, 111); (v) rather than adopting NDC technology, American's distribution strategy changes drove travel agencies and corporate customers away from the Company beginning in April 2023 and throughout the Class Period (¶¶ 85-86, 90-91, 96-101); (vi) once the July 2023 Contracts went into effect, American dropped from being primary or secondary provider to the secondary or tertiary provider for numerous corporations (¶¶ 98-100, 110); (vii) in 2023, the Company cancelled or did not renew contracts with SMBs through agencies and would not offer them perquisites unless they booked directly with American rather than through agencies, but SMBs had difficulty managing their travel bookings directly through American, which resulted in American losing "so much share" of its SMBs'

business, as many SMBs were unwilling to stop using agencies (¶¶ 79, 93-95); and (viii) during the October 19, 2023 State of the Airline meeting, May stated that corporate and agency bookings were down and below American's plan. (¶¶ 237, 255).

181. The statements were further false and misleading given Defendants' admissions during the May 29, 2024 Bernstein Conference, the 2Q 2024 Earnings Call on July 25, 2024, and as reported in the 2Q 2024 Press Release and a May 29, 2024 *Bloomberg* article, that the Company's modern retailing strategy caused problems for agencies, corporate customers, and other third party intermediaries, which caused American to cede market share "from an agency and a corporate perspective[,]" "contributed to lagging revenue over the past few quarters[,]" and resulted in American lowering 2Q 2024 and FY 2024 guidance. Defendant Isom further admitted during the 2Q 2024 Earnings Call that Defendants knew at least as early as 1Q 2024 that the Company's revenue was performing poorly when compared to peers as a result of its distribution strategy but, in a reckless gamble, hoped it would "reverse itself."

### L. April 25, 2024 Statements in American's 1Q 2024 Form 10-Q

182. In addition to issuing a press release on April 25, 2024, American also reported its financial and operational results for its first quarter ended March 31, 2024 by filing a Form 10-Q with the SEC (the "1Q 2024 Form 10-Q") before the stock market opened for trading that day.

183. The 1Q 2024 Form 10-Q provided, *inter alia*, summary risk factors that "may affect [American's] business, results of operations and financial condition, or the trading price of our common stock or other securities." These risk factors contained materially incomplete and misleading disclosures concerning the Company's distribution system and framed risks as merely hypothetical, not actualized. One of the summary risk factors stated that "**[i]f we encounter problems with any** of our third-party regional operators or **third-party service**

**providers, our operations could be adversely affected by a resulting decline in revenue or negative public perception about our services**."

184. The 1Q 2024 Form 10-Q also contained a longer risk factors section under Part II, Item 1A. These risk factors contained materially incomplete and misleading disclosures and stated that:

> We have in the past instituted, and intend to institute in the future, changes to our business model designed to increase revenues and offset costs. These measures include … changes to our practices and contracts with providers of distribution systems to provide additional content flexibility….
>
> * * *
>
> We may introduce additional initiatives in the future; however, as time goes on, we expect that it will be more difficult to identify and implement additional initiatives. **We cannot assure that these measures or any future initiatives will be successful in increasing our revenues** or offsetting our costs. Additionally, **the implementation of these initiatives may create logistical challenges that could harm the operational performance of our airline or result in decreased demand**.

185. Also within the risk factors section, the 1Q 2024 Form 10-Q stated that American's "**inability to manage … third-party distribution costs, rights and functionality … could have a material adverse effect on [American's] business**":

> **To remain competitive, we will need to** manage successfully our distribution costs and rights, **increase our distribution flexibility, continue to migrate the distribution of tickets to our proprietary and other modern distribution channels**, and improve the functionality of our distribution channels, while maintaining an industry-competitive cost structure and a high level of customer satisfaction. Further, as distribution technology changes we will need to continue to update our technology by acquiring new technology from third parties, building the functionality ourselves, or a combination, which in any event will likely entail significant technological and commercial risk and involve potentially material investments. **These imperatives may affect our relationships with conventional travel agents, travel management companies, GDSs and OTAs**, including if consolidation of conventional travel agents, travel management companies, GDSs or OTAs continues, or should any of these parties seek to acquire other technology providers thereby potentially limiting our technology alternatives. **Any inability to manage our third-party distribution** costs, rights and **functionality at a competitive level or any material diminishment or**

**<u>disruption in the distribution of our tickets could have a material adverse effect on our business, results of operations and financial condition.</u>**

186. The statements identified in ¶¶ 183-185 above were each materially false, misleading and/or omitted material facts necessary to make the statements therein not false or misleading when made because the harms, posed as hypotheticals, were actualized: American's changes to its distribution system were disastrous for the Company's relationships with travel agents, TMCs, and corporations, thereby negatively impacting American's revenues demand for American's airfare and ancillary services. The material falsity of Defendants' statements is supported by ample evidence, including testimony from various CWs confirming that: (i) American's shift to NDC channels actually *reduced* its distribution flexibility because, on Raja's direction, American eliminated the ability to purchase basic economy rates on EDIFACT channels, making them exclusively available on NDC channels (¶¶ 64-65); (ii) corporate customers did not purchase tickets through American's NDC channels—with bookings dropping "much lower" than 15% after the July 2023 Contracts went into effect and, along with percentage of share metrics, remaining "consistently down" (¶ 109)—because certain other services and information was not available through those channels, such as "duty-of-care data" and the benefit of a dedicated agent that could modify flight schedules or change tickets on behalf of corporate travelers (¶¶ 87-89, 93-95) (the latter of which was later corroborated by *The Wall Street Journal's* January 9, 2025 article (*see* ¶ 88)); (iii) American's relationships with travel agencies began deteriorating as early as January 2023 after the Company decided that existing agency contracts would not be renewed and uniformly imposed the July 2023 Contracts on agencies, which, when they went into effect, immediately resulted in larger agency bookings declining 15% compared to year-over-year levels and, along with percentage of share metrics, remaining "consistently down" (which Defendants knew based on data available to them) (¶¶ 72-

75, 101-106, 108-109, 111-114); (iv) beginning in June 2023, TMCs and corporate customers moved to American's competitors given that the Company no longer offered certain incentives and other benefits, such as "waivers and favors" and special passenger statuses (¶¶ 72-75, 77-78, 90-97); (v) smaller agencies lacked the technical expertise necessary to transition to NDC and American failed to provide any support (¶¶ 85, 92-96, 111); (vi) rather than adopting NDC technology, American's distribution strategy changes drove travel agencies and corporate customers away from the Company beginning in April 2023 and throughout the Class Period (¶¶ 85-86, 90-91, 96-101); (vii) once the July 2023 Contracts went into effect, American dropped from being primary or secondary provider to the secondary or tertiary provider for numerous corporations (¶¶ 98-100, 110); (viii) in 2023, the Company cancelled or did not renew contracts with SMBs through agencies and would not offer them perquisites unless they booked directly with American rather than through agencies, but SMBs had difficulty managing their travel bookings directly through American, which resulted in American losing "so much share" of its SMBs' business, as many SMBs were unwilling to stop using agencies (¶¶ 79, 93-95); (ix) contrary to Defendants' statements suggesting harm to relationships with third parties was a mere possibility, as CW2 learned during an October 2023 meeting with Neil Geurin and Jay Creech, Raja directed American's NDC strategy so that the Company could eventually eliminate third parties from the distribution process entirely (¶ 62); and (x) during the October 19, 2023 State of the Airline meeting, May stated that corporate and agency bookings were down and below American's plan. (¶¶ 237, 255).

187. The statements were further false and misleading given Defendants' admissions during the May 29, 2024 Bernstein Conference, the 2Q 2024 Earnings Call on July 25, 2024, and as reported in a May 29, 2024 *Bloomberg* article, that the Company's modern retailing strategy

caused problems for agencies, corporate customers, and other third party intermediaries, which caused American to cede market share "from an agency and a corporate perspective" and "contributed to lagging revenue over the past few quarters[.]" Defendant Isom further admitted during the 2Q 2024 Earnings Call that Defendants knew at least as early as 1Q 2024 that the Company's revenue was performing poorly when compared to peers as a result of its distribution strategy but, in a reckless gamble, hoped it would "reverse itself."

**M. April 25, 2024 Statements on CNBC's Squawk Box**

188. On April 25, 2024 at 7:30 a.m. E.T., Defendant Isom was interviewed by Phil LeBeau on CNBC's *Squawk Box* television program to discuss American's financial results for its first fiscal quarter ended March 31, 2024 (the "April 2024 CNBC Interview"). During the April 2024 CNBC Interview, Isom affirmed that American would hit its financial guidance metrics for the second fiscal quarter:

> **Phil LeBeau**
>
> Wider than expected loss. People look at the first quarter, but then they looked at the full year. You're reaffirming your guidance. You knew the first quarter would be rough. What do you think when you look out into the summer and then in the fall?
>
> **Robert Isom**
>
> [A]s I take a look out to the remainder of the year, though, we're in much better position, I think, in terms of dynamics in the industry and capacity. And so **we're going to be report-- projecting a strong second quarter and a full year that hits our original guidance.**"

189. During the April 2024 CNBC Interview, the host also asked Defendant Isom how American was performing with corporate travel bookings. In response, Isom stated "as I take a look out into the summer and the remainder of the year, **demand is strong across the board. Small businesses especially**, that has really fueled American over the last, since the pandemic.

**<u>Corporate travel is coming back as well. And I'm really pleased with what I see going forward</u>**."

190. The statements identified in ¶¶ 188-189 above were each materially false, misleading and/or omitted material facts necessary to make the statements therein not false or misleading when made because Defendant Isom had no reasonable basis to be pleased with what he was seeing with corporate and small business travel or to assert that he was seeing strong demand across the board. Instead, as Defendant Isom later admitted on May 29, 2024, the Company's distribution changes were then-driving customers away. As a result, American was not projecting strong second quarter or full year results that would hit the Company's original guidance. The material falsity of Defendants' statements is supported by ample evidence, including testimony from various CWs confirming that: (i) corporate customers did not purchase tickets through American's NDC channels—with bookings dropping "much lower" than 15% after the July 2023 Contracts went into effect and, along with percentage of share metrics, remaining "consistently down" (¶ 109)—because certain other services and information was not available through those channels, such as "duty-of-care data" and the benefit of a dedicated agent that could modify flight schedules or change tickets on behalf of corporate travelers (¶¶ 87-89, 93-95) (the latter of which was later corroborated by *The Wall Street Journal's* January 9, 2025 article (*see* ¶ 88)); (ii) American's relationships with travel agencies began deteriorating as early as January 2023 after the Company decided that existing agency contracts would not be renewed and uniformly imposed the July 2023 Contracts on agencies, which, when they went into effect, immediately resulted in larger agency bookings declining 15% compared to year-over-year levels and, along with percentage of share metrics, remaining "consistently down" (which Defendants knew based on data available to them) (¶¶ 72-75, 101-106, 108-109, 111-114); (iii)

beginning in June 2023, TMCs and corporate customers moved to American's competitors given that the Company no longer offered certain incentives and other benefits, such as "waivers and favors" and special passenger statuses (¶¶ 72-75, 77-78, 90-97); (iv) smaller agencies lacked the technical expertise necessary to transition to NDC and American failed to provide any support (¶¶ 85, 92-96, 111); (v) rather than adopting NDC technology, American's distribution strategy changes drove travel agencies and corporate customers away from the Company beginning in April 2023 and throughout the Class Period (¶¶ 85-86, 90-91, 96-101); (vi) once the July 2023 Contracts went into effect, American dropped from being primary or secondary provider to the secondary or tertiary provider for numerous corporations (¶¶ 98-100, 110); (vii) in 2023, the Company cancelled or did not renew contracts with SMBs through agencies and would not offer them perquisites unless they booked directly with American rather than through agencies, but SMBs had difficulty managing their travel bookings directly through American, which resulted in American losing "so much share" of its SMBs' business, as many SMBs were unwilling to stop using agencies (¶¶ 79, 93-95); and (viii) during the October 19, 2023 State of the Airline meeting, May stated that corporate and agency bookings were down and below American's plan. (¶¶ 237, 255).

191. The statements were further false and misleading given Defendants' admissions during the May 29, 2024 Bernstein Conference, the 2Q 2024 Earnings Call on July 25, 2024, and as reported in the 2Q 2024 Press Release and a May 29, 2024 Bloomberg article, that the Company's modern retailing strategy caused problems for agencies, corporate customers, and other third party intermediaries, which caused American to cede market share "from an agency and a corporate perspective[,]" "contributed to lagging revenue over the past few quarters[,]" and resulted in American lowering 2Q 2024 and FY 2024 guidance. Defendant Isom further admitted

during the 2Q 2024 Earnings Call that Defendants knew at least as early as 1Q 2024 that the Company's revenue was performing poorly when compared to peers as a result of its distribution strategy but, in a reckless gamble, hoped it would "reverse itself."

**N. April 25, 2024 Statements on American's 1Q 2024 Earnings Call**

192. On April 25, 2024, American held a call with investors and analysts to report the Company's financial and operational results for its first fiscal quarter of 2024 ended March 31, 2024 (the "1Q 2024 Earnings Call"). At the start of the 1Q 2024 Earnings Call, Scott Long, American's VP, Investor Relations & Corporate Development, stated that the call would statements subject to risks factors contained in American's 1Q 2024 Form 10-Q, thus incorporating the 10-Q filing by reference. Several of the risk factors contained false or misleading statements, as discussed in Section V.L, *supra* ("April 25, 2024 Statements in American's 1Q 2024 Form 10-Q").

193. During his prepared remarks on the 1Q 2024 Earnings Call, Defendant Isom affirmed that American "**remain[ed] on track to deliver [its] full-year EPS guidance, and we continue to expect to produce approximately $2 billion of free cash flow this year**." Defendant Isom also claimed that American's corporate travel business was only improving:

> We produced record first quarter revenues of $12.6 billion. **Business travel has continued to recover** with particular strength in small and medium-sized businesses. **Additionally, we have seen sequential improvement in the recovery of managed corporate travel** and domestic business revenue growth outpaced capacity growth in the first quarter.

194. Also, during his prepared remarks on the 1Q 2024 Earnings Call, Defendant Isom expressed to investors his conviction in American's distribution strategy:

> We see meaningful opportunities to improve upon our results, much of which will be captured as we progress through the year. First, **we continue to believe in the value that our distribution strategy provides to our customers and to American**. Engaging directly with our customers through modern Internet-based technology is where the industry is headed, and we're leading the way. That being

said, **there are near-term actions we can take to optimize our efforts in advance of hitting a steady state on this long-term strategic initiative, and those are underway**.

195. Following Defendant Isom's prepared remarks on the 1Q 2024 Earnings Call, Defendant May gave his prepared remarks as CFO, stating American's guidance for the second quarter:

> **We expect second quarter [Total Revenue per seat mile ("TRASM")] to be down 1% to 3% versus 2023** with unit revenues inflecting positive year-over-year in the third quarter…. **Based on our current demand assumptions** and fuel price forecast, **we expect to produce an adjusted operating margin of between 9.5% and 11.5% in the second quarter, and adjusted earnings per diluted share of between $1.15 and $1.45. . . . We remain on track to deliver full year adjusted earnings per diluted share of between $2.25 and $3.25, and we continue to anticipate producing approximately $2 billion of free cash flow in 2024.**

196. During the question-and-answer portion of the 1Q 2024 Earnings Call, the first analyst out of the gate, David Scott Vernon of Sanford C. Bernstein & Co., LLC, questioned how American planned to achieve significantly higher TRASM than the Company projected for 2Q 2024. In response, Defendant Raja expressed that management's confidence came, in no small part, from American's distribution strategy:

> **David Scott Vernon**
>
> So maybe to Vasu or Robert, when you look at the 2Q RASM guide, it's a little bit better, I think, than people were expecting but it's not quite sort of flat and level with peers. There's also a pretty big sequential ramp from sort of 1Q into 2Q when you look at the TRASM number. Can you guys kind of help us understand kind of what's embedded underneath that? What's driving the big sequential acceleration on top of capacity growth? And maybe why that unit revenue metric is not performing at the same rate as peers?
>
> **Vasu S. Raja**
>
> …**Q1 marks the end of really a year of transition of our distribution strategies in which we were really focused on actually creating the right long-term customer proposition, reducing a lot of the unnecessary expenses that**

> **went along with it**. All 3 of those conditions start to change as we go forward, **which is not just us guessing, you actually start to see it.**

197. During the 1Q 2024 Earnings Call, analyst Jamie Baker from JPMorgan Chase & Co. also asked about American's distribution strategy. In response. Defendant Raja downplayed the "risk to business revenues" the distribution strategy wrought, and instead boldly claimed that close to 100% of agency bookings would be made via NDC by the end of 2024:

> So, a lot of our transition has been undoing so many things that we've done which were not really creating value for the customer nor creating profit for American Airlines. And we've done that over the course of the last year. **We've reduced a lot of it and interestingly as you see it today, if maybe there were a more junior and maybe less jaundiced version of all of us, Jamie, we would have thought when we embarked on this thing that it would come at a real risk to business revenues. But if you just look at what we've reported today our business revenues are growing** at a greater rate than capacity. Unmanaged is on the higher end of that contract and corporates which would presumably be the most effective, are just slightly on the lower end of that. But we're doing it at 7% less in distribution expense. 60% of our customers are our AAdvantage customers and they produce two-thirds of our revenue.
>
> So what we've seen happen is **a lot of those customers are actually leaving the agency and coming to us directly on their own** and this is a really important thing because this is where we are. But where we go is a very different thing and there's really three things that we're focused on as we go and optimize our distribution strategy. The first is exactly what you pointed out with preferred agencies and **we actually pushed the release really because we were all pleasantly surprised how many people are taking it. The vast majority of our agencies are currently in an NDC transition**, roughly about the agencies that constitute about 30% to 40% of our revenue are already doing more than 30% of their bookings through NDC **and are on a path to be in some cases close to a 100 by the end of the year**. And there's even more agencies, **a lot of big agencies who are signing on for it** because they realize the customer utility and having a digital selling and servicing experience. And frankly, they see this as an opportunity to go compete against other agencies, which is great for customers.

198. During the 1Q 2024 Earnings Call, Defendants were also asked about American's revenues derived from premium content. Defendant Raja suggested that customer spend on premium content had increased through the modern distribution system, stating, "**But this growth in premium content is something which is really encouraging to us . . . and maybe if**

**anything more so through our direct channels**." Defendant Isom added: "**that's a critical component of our distribution strategy as well**."

199. Later in the 1Q 2024 Earnings Call, *Bloomberg* journalist Mary Schlangenstein asked how American's corporate travel volumes were compared to competitors. In response, Defendant Raja reassured that American's corporate travel volumes were increasing as well, and would continue to rise into the second fiscal quarter:

> **Mary Schlangenstein**
>
> Some of your competitors have reported that they saw a managed corporate travel volume increase in the first quarter of like 14%, 15%. I wanted to see if you can talk about the same type as a comparable number on that and what it may or may not say about your push for the direct bookings.
>
> **Vasu S. Raja**
>
> **[M]anaged corporates, contract and corporations are growing a little bit less than that, but still high -- in the mid- to high single digits. Very importantly, this is actually the great opportunity that we see because really, over the last year, we've done a number of things to just transition away from a lot of practices which weren't great for our customers**. It didn't give them cheaper fares. It didn't necessarily give them lower costs. **It actually created a more difficult servicing experience.** What we're finding now is that many of those customers, they want the same thing that everyone else has. **We can go deliver it a whole lot better with all the tools and the technology and the change we've pushed through in the last year**. **And despite all of that, we see that revenues are coming back very materially for us. Expenses are down, and we can see more opportunity to optimize it. And frankly, do better both for our corporate contract and corporate customers and our unmanaged customers as well**. **That's not sort of guesswork that's out there. We actually see it. We're rolling out things right now, and that's implicit in our guide for Q2 and for the year**.

200. The *Bloomberg* journalist further honed in on American's underperformance on corporate travel versus competitors, asking whether the Company was lagging because of pushback to American's modern distribution system. Defendant Isom, in answering, emphatically denied there being pushback, stating "**No, we don't think that is the case at all**[,]"

and "**we've seen great reception to what we're doing with . . . small and medium-sized businesses**" which Defendant Raja agreed with, adding: "**corporates are coming back**."

201. The statements identified in ¶¶ 193-200 above were each materially false, misleading and/or omitted material facts necessary to make the statements therein not false or misleading when made because Defendants had no reasonable basis to represent that they were seeing: (i) continued business travel recovery; (ii) improvement with managed corporate travel; (iii) customers leaving agencies in favor of booking directly; (iv) the vast majority of agencies transitioning to NDC or becoming preferred agencies; (v) encouraging growth in premium content; or (vi) great reception to its distribution strategy from SMBs. Defendants also were not focused on creating the right long-term customer propositions through the Company's distribution strategy and did not believe in the value of American's distribution strategy, so much so that the Company was planning to reverse the changes implemented as a part of said strategy. As a result, American's business revenues were not growing and the Company did not expect to meet its guidance for 2Q 2024 or the full-year. The material falsity of Defendants' statements is supported by ample evidence, including testimony from various CWs confirming that: (i) corporate customers did not purchase tickets through American's NDC channels—with bookings dropping "much lower" than 15% after the July 2023 Contracts went into effect and, along with percentage of share metrics, remaining "consistently down" (¶ 109)—because certain other services and information was not available through those channels, such as "duty-of-care data" and the benefit of a dedicated agent that could modify flight schedules or change tickets on behalf of corporate travelers (¶¶ 87-89, 93-95) (the latter of which was later corroborated by *The Wall Street Journal's* January 9, 2025 article (*see* ¶ 88)); (ii) American's relationships with travel agencies began deteriorating as early as January 2023 after the Company decided that existing

agency contracts would not be renewed and uniformly imposed the July 2023 Contracts on agencies, which, when they went into effect, immediately resulted in larger agency bookings declining 15% compared to year-over-year levels and, along with percentage of share metrics, remaining "consistently down" (which Defendants knew based on data available to them) (¶¶ 72-75, 101-106, 108-109, 111-114); (iii) beginning in June 2023, TMCs and corporate customers moved to American's competitors given that the Company no longer offered certain incentives and other benefits, such as "waivers and favors" and special passenger statuses (¶¶ 72-75, 77-78, 90-97); (iv) smaller agencies lacked the technical expertise necessary to transition to NDC and American failed to provide any support (¶¶ 85, 92-96, 111); (v) rather than adopting NDC technology, American's distribution strategy changes drove travel agencies and corporate customers away from the Company beginning in April 2023 and throughout the Class Period (¶¶ 85-86, 90-91, 96-101); (vi) once the July 2023 Contracts went into effect, American dropped from being primary or secondary provider to the secondary or tertiary provider for numerous corporations (¶¶ 98-100, 110); (vii) in 2023, the Company cancelled or did not renew contracts with SMBs through agencies and would not offer them perquisites unless they booked directly with American rather than through agencies, but SMBs had difficulty managing their travel bookings directly through American, which resulted in American losing "so much share" of its SMBs' business, as many SMBs were unwilling to stop using agencies (¶¶ 79, 93-95); and (viii) during the October 19, 2023 State of the Airline meeting, May stated that corporate and agency bookings were down and below American's plan. (¶¶ 237, 255).

202. The statements were further false and misleading given Defendants' admissions during the May 29, 2024 Bernstein Conference, the 2Q 2024 Earnings Call on July 25, 2024, and as reported in the 2Q 2024 Press Release and a May 29, 2024 Bloomberg article, that the

Company's modern retailing strategy caused problems for agencies, corporate customers, and other third party intermediaries, which caused American to cede market share "from an agency and a corporate perspective[,]" "contributed to lagging revenue over the past few quarters[,]" and resulted in American lowering 2Q 2024 and FY 2024 guidance. Defendant Isom further admitted during the 2Q 2024 Earnings Call that Defendants knew at least as early as 1Q 2024 that the Company's revenue was performing poorly when compared to peers as a result of its distribution strategy but, in a reckless gamble, hoped it would "reverse itself."

## VI. DEFENDANTS REVEALED THE TRUTH IN A SET OF DISCLOSURES MADE ON MAY 28, 2024 AND MAY 29, 2024

### A. Defendants' May 28, 2024 Announcements

203. On May 28, 2024, after the close of trading, American issued a press release announcing that "Vasu Raja, Executive Vice President and Chief Commercial Officer, will depart the airline in June." The release also explained that Stephen Johnson, Vice Chair of American's Board of Directors and Chief Strategy Officer, was assuming Raja's responsibilities "effective immediately[.]"

204. The Company concurrently filed a Form 8-K with the SEC confirming the same information as the press release, and also revealing updated guidance for American's second fiscal quarter of 2022. The Form 8-K, signed by Defendant May, specifically stated that for its second quarter of 2022, American was: (i) lowering its guidance for adjusted operating margin by a full percentage point; (ii) lowering its adjusted earnings per share guidance range by 13% and over 20% at the low and high ends, respectively; (iii) expecting TRASM to decline 100-400% more than previously guided; and (iv) reducing CASM-ex growth expectations by up to 200%:

| | Estimated 2Q 2024 | |
|---|---|---|
| | Current Guidance | Previous Guidance |
| Adjusted operating margin[1] | ~ 8.5% to 10.5% | ~ 9.5% to 11.5% |
| Adjusted nonoperating expense[1] | No change | ~ $350 |
| Adjusted earnings per diluted share[1] ($/share) | ~ $1.00 to $1.15 | ~ $1.15 to $1.45 |
| Available seat miles (vs. 2Q 2023) | No change | ~ +7% to +9% |
| TRASM[2] (vs. 2Q 2023) | ~ -5% to -6% | ~ -1% to -3% |
| CASM-ex[3] (vs. 2Q 2023) | Flat to +1% | ~ +1% to +3% |
| Average fuel price[4] (incl. taxes) ($/gallon) | ~ $2.70 to $2.80 | ~ $2.75 to $2.95 |

### B. Defendants' Presentation at the Bernstein Conference on May 29, 2024

205. On May 29, 2024 at 9:00 a.m. Eastern Time, before the stock market opened for trading, Bernstein hosted Isom for a presentation at Bernstein's 40th Annual Strategic Decisions Conference (the "2024 Bernstein Conference"). During the 2024 Bernstein Conference, Isom expanded on the announcements made the day prior. Pertinently, Isom confirmed that American was adjusting its guidance for the second quarter and revealed that the Company was slashing its growth estimates for the full year 2024, stating that "we now expect … our second quarter operating margin will be 1 percentage point lower than we originally anticipated" due to factors including "our performance within that environment[.]" Isom also disclosed that Defendants "expect[ed] to slow our rate of growth from just over 8% in the first half of the year to approximately 3.5% in the second half of the year." Defendants, however, punted on providing additional detail on the impact to full-year guidance, with Isom stating: "We'll refine our plans and be able to provide more of an updated view on our full year guidance as we progress and as we get to the July earnings and as we get to second quarter earnings."

206. Nevertheless, Defendant Isom elaborated that "domestic performance has worsened materially since we provided guidance in April for a few reasons[,]" naming the Company's shift towards NDC distribution as a key driver:

> First, we're seeing softness in customer bookings relative to our expectations that we believe is in part **due to the changes that we have made to our sales and distribution strategy**. To address this, we're evaluating our strategy holistically

> and piece by piece. We spent a lot of time listening to our agencies and our corporate customers, and we're hearing and we hear their feedback. We're taking some immediate actions to respond and adapt, and over the coming weeks, we'll be working to ensure that we're optimizing for our customers and American as we move forward.

207. Defendant Isom also confirmed that American was walking back the push to NDC bookings it had made during the Class Period because such changes materially impacted sales. Isom specifically linked Defendant Raja's separation from the Company as part of this reversal of course, stating, in relevant part:

> American is taking action to address our capacity and adjust our distribution strategy, and we're going to be very attentive to the marketplace as time goes forward. We're adapting our distribution strategy. While we all know that NDC, modern retailing, internet-based channels for selling our product is the future of airline distribution. **But we move[d] faster than we should have and we didn't execute well.**
>
> We regret that and the difficulty that it created for our agency and corporate communities. So we are going to modify our distribution strategy. Specifically, we need to work closely with our agencies and partners to ensure that the transition that we're making is not disruptive to our end customers.
>
> [. . .] [W]e know that our products are more easily understood and valued by customers when distributed through modern retailing technologies. But instead of removing content from agencies that are relying on legacy technology, we need to incent more to enhance and promote NDC. **We've used a lot of sticks. We've got to put some more carrots in place and make sure that our product is available wherever customers want to buy it.**
>
> Our agency and corporate relationships. We've made a lot of changes and we're reviewing everything on that front, including how we pay those agencies and how we solve problems that our mutual customers may have . . . **We need to make it easier to participate in our programs and the easier to do business with American Airlines.** For our end customers, that fly every day, we want to make sure that no customer that's out there traveling is made worse off from the changes that we make. And it's always been our priority to treat our customers in -- that they're flying in our seats as best as we possibly can.
>
> So you're going to see us make changes. . . . For example, next month, we were going to differentiate who earned Advantage Miles and who didn't, based on where they booked, that's off. We're not doing that because it would create confusion and disruption for our end customer, and we're going to make sure that we take care. We're listening to feedback. We're learning and adapting. We know

that NDC, modern retailing provides a better experience for the end customer. And we know that we will get there over time, but **we have to go about it differently. We're going to make it easier, we're going to execute better and we're going to do a lot more to try to bring people along with us.**

**To a degree our approach is driving customers away from American**, we're unequivocally committed to getting those customers back. So there was other parts to do. So before opening it up, David, further discussion, I'd just like to address for a minute some of the other news that you've seen. So yesterday, we announced that Vasu Raja will be leaving the company in June. And I've known Vasu for a long time.

He's admirers, creative thinking, his passion. He's been an innovator, a disruptor. He is a good friend, but sometimes we need to reset. And in this case, we do. We have to be better at executing those long-range plans. We have to be more attentive to the marketplace. We have to be more detail oriented, and we have to go forward as a team and really make it easy for American to do business with.

* * *

And **right now, that means taking a look at our sales and distribution strategy and what needs to be done.** That work is underway. And I'm really pleased with the team that we have that's out there taking this to task.

208. Immediately following Isom's prepared remarks at the Bernstein Conference, the Bernstein host analyst questioned Isom regarding whether American's reduced guidance for the second quarter was attributable to a broader market trend or Company-specific execution issues. In response, Defendant Isom admitted that American had "dug [itself] into a hole in the second quarter" in significant part by pushing NDC sales so aggressively:

**David Scott Vernon**

I think it is important to help investors understand kind of the state of the market and how much of this is consumer weakness versus how this is sort of self-inflicted pain and then we get into some of the strategic stuff. So you mentioned long term -- the full year guidance that was not noted in the call the update. So where does that stand. Is that on the table? Off the table?

**Robert D. Isom**

Look, where we stand right now. We know we've dug ourselves a hole in the second quarter. Our operating earnings are going to be off by a couple of hundred million dollars. We've got a lot of work to do to recoup that. There is absolutely

> marketplace dynamics that are involved as well. As I take a look at the work that we have ahead of us. I believe that second quarter this hold down is partially related to how we – it's partially related to the industry dynamics, more capacity than the demand is out there and softer pricing environment.
>
> The other piece is how we've executed in that, and I think that that's something that, that we can recover. So, **we've got work to do.** We'll talk more in second quarter as we produce those results. **We've got some work to do on building back from the hole we've created for ourselves**.

209. Further, in response to a question from the Bernstein host analyst, Defendant Isom admitted during the 2024 Bernstein Conference that American's sales execution issues experienced in the second quarter of 2022—including with respect to "close-in" bookings which are highly correlated with business travel—were a continuation of problems experienced earlier in the Class Period, all stemming from Defendants' promotion of NDC channels:

> **David Scott Vernon**
>
> And as we think about that -- the magnitude of the unit revenue missed kind of in the second quarter from April to here. Things seemingly got a lot worse, right? So as you think about that step down, was that some of the things we noticed in the first quarter in terms of managed corporate bookings being a little bit weaker, accelerating and getting worse? Or like is there any way you can help us understand how much of it is really just Southwest out there with $39 fares versus kind of shot ourselves in the foot and that got even worse.
>
> **Robert D. Isom**
>
> **Well, I'd just say this, we should have performed much more in line with our network peers in the first quarter**. And so I know that, that's an opportunity for us to recapture. But the marketplace has definitely gotten much more competitive and sale activity increased considerably after we produced -- we put forward our guidance and talked about our first quarter results. **I don't know if it's 50-50, 60-40.**
>
> Okay. But I'd tell you that a portion of this is marketplace. And I think that the dynamics in the industry get better from a capacity perspective as we move through the year. **And then I think the other large portion is how we've reacted in that marketplace. And the weakness that you've seen in American is I do believe something that speaks to close-in bookings, the highest premium customers that, unfortunately, we haven't made ourselves as available and easy to work with as we can.**

* * *

> **David Scott Vernon**
>
> Yes. And was it sort of yield driven or load factor driven just on year to end revenue basis[?]
>
> **Robert D. Isom**
>
> Well, I'd say there is a little bit of both. Well, little bit of both but those customers that are out there want to fly. And so we've seen loads remain very, very strong. But **there's work that we need to do to make sure that we're maximizing our ability to revenue manage off of that demand. And that's where it comes into American and our distribution strategy and making sure that we're taking full advantage of those that really are booking close-in.** And for us, that's a priority.

210. During the 2024 Bernstein Conference, the host analyst asked about why American had not seen the results it wanted from shifting to NDC distribution. In response, Isom stated that the Company hadn't made its fares easily accessible outside of NDC channels, and that American would need to focus on "rebuilding relationships" with TMCs and corporate customers:

> **David Scott Vernon**
>
> So let's talk about the network distribution changes and stuff like that. Obviously, it seems like from the outset looking in and based on what you just said, you weren't getting the results you wanted from the steps you've taken. Can you, at a very high level and briefly summarize the changes that you made? And how long it's going to take to undo them.
>
> **Robert D. Isom**
>
> . . . In terms of the execution side of things. I'll tell you this, **we have to make sure our product is available for sale in all channels**. We're going to be making some changes very quick. So I think that, that is something that is immediately reversible. I believe that in terms of rebuilding relationships, I think our intermediaries and these are the TMCs and our corporate customers as well. I think that we're going to have to get out there and really get on the road and make sure that we move quickly. That's going to take a little bit of time.

**David Scott Vernon**

So that is going to require[] kind of rebuilding that corporate sales team and kind of getting more feet on the street? Or is it going to be more managed from the corporate office because I know you guys have made some changes to reduce expense in that area. That's supporting the distribution changes, just wondering like directionally, are we changing that back.

**Robert D. Isom**

No, what I would tell you is because we could take a little bit of both. And to that end, I believe that we have the resources to actually manage and to react quickly. **We have to -- for instance, we have to make sure that when we're putting new technology out and asking our travel management companies to come along with it. We need to make sure that we have the technical capability to help them get there as well. We need to adjust things that I talked about were fewer sticks and more carrots. We're not going to be taking away the ability for any customers to earn mileage**. And those are the kind of things that I think are going to have an impact very quickly and I do believe that getting our products out and available in all channels is something that we can do very, very quickly.

211. In response to a question from the host analyst, Defendant Isom further stated at the 2024 Bernstein Conference that the Company had revised downward its guidance because making American's fares exclusive to NDC channels had made American "difficult to do business with":

**David Scott Vernon**

Okay. So then -- last question on the sort of the near term and then we can talk some of the bigger picture issues around the industry dynamic. You've made the decision to part ways with [Vasu Raja]. Can you just talk about your goals, expectations, hopes, what kind of mandate the new person is going to have to come in. Someone that you want to come in and sort of redesign everything? Is there somebody wanted to implement what you've already -- adjust which you've already [ won ] like how do we think about the mandate that you're going to be giving whoever. What's the kind of person you want to commit to take that job and what's the mandate?

**Robert D. Isom**

Okay. Let me just start with this. First off, our strategy is the company strategy. Those are my strategies, okay? And so I'll leave any individuals aside from that. And I do believe that the strategy that we're pursuing that we laid out in Investor

> Day are the absolutely right ones. **Now one of the things that is very clear is that we've driven some customers away. We restricted some customers from actually [unintelligible] our product.** Those are kind of things that we have to be attentive to. **It's one thing to have a plan and that plan can be the greatest plan in the world. You can have the best people operating it, but execution is critical.**
>
> * * *
>
> That is something that does take technology. It does take modern retailing tools. But we can't be blind to that ultimate goal. We have to make sure we're reactive in the short run, and **we can never be difficult to do business with**.

212. Defendant Isom at the 2024 Bernstein Conference also confirmed, responding to a question from the host analyst, that while the Company's aggressive push towards NDC distribution had driven away, *inter alia*, business travelers from American, ironically, this market segment was particularly opportune for upselling premium fares and services, which the Company's peers were now outperforming in:

> **David Scott Vernon**
>
> That's a great segue into one of the bigger picture topics I want to dig into a little bit today around sort of premiumization segmentation and what that opportunity set looks like to you? I sort of view this as the industry capturing some of that numerous consumer surplus that has been out there as you were just selling kind of one ticket to everybody one price and not being able to discriminate as much. When you think about the kind of runway that American has specifically to go after that relative to peers who are enjoying a better sort of unit revenue performance as a result of that. What are the yardsticks or the benchmarks we can look at how much opportunity is for you to actively kind of close that gap.
>
> **Robert D. Isom**
>
> Yes. Well, just in terms of premium revenue. As I mentioned in my comments that we have been able to grow front cabin revenues at more or less the pace of more capacity growth. **Clearly, others are doing better than that, okay, and that should be the expectation for us as well. So that is, first and foremost, it's close-in bookings. It's business travel, and it's those that we want to do business with us and buy our premium product.**

213. Defendants' corrective disclosures in the May 28, 2024 announcements and the 2024 Bernstein conference, including Isom's admissions that the Company was experiencing reduced demand "**due to the changes that we have made to our sales and distribution strategy**[,]" which was "**driv[ing] customers away" from American** shocked the market and directly contradicted Defendants' Class Period assurances that demand for American's fares and services was strong and growing despite the Company's aggressive push towards NDC distribution.

214. Upon this news, American's stock dropped dramatically, falling from a closing price of $13.44 per share on May 28, 2024 to close at $11.62 per share on May 29, 2024. The decline of more than 13.5% was the stock's largest single-day drop since June 2020, when the COVID-19 pandemic decimated travel demand. Notably, one of American's competitors, United Airlines reaffirmed its guidance on the heels of American's May 28, 2024 announcement.

## VII. POST-CLASS PERIOD EVENTS

### A. Bloomberg Publishes a May 29, 2024 Expose on Defendant Raja's Termination

215. On May 29, 2024, *Bloomberg* published a bombshell report titled "American Air Fired Commercial Head After Sales Strategy Alienated Corporate Clients" (the "*Bloomberg* Article"), reporting that Raja had been dismissed from American "in the wake of a critical review from Bain & Co. that found [the Company's] new marketing strategy was alienating corporate clients, according to a person familiar with the matter." The *Bloomberg* Article further reported, in relevant part:

> Chief Executive Officer **Robert Isom fired veteran executive Vasu Raja** in recent days after receiving feedback in the report, which American commissioned from the consulting firm. It revealed concerns by travel advisers over a recent shift in the airline's sales approach, **which contributed to lagging revenue over the past few quarters**, said the person, who asked not to be identified discussing internal matters.

***

> The new system the CCO had overseen, dubbed "modern retailing," sought to push customers away from booking agencies in favor of buying directly through American's website or app. The airline's sales department was cut back as part of the switch.
>
> But the shift angered some corporate clients and travel management firms, including claims that its technology wasn't sufficiently developed. Raja had acknowledged recently that its growth in vital managed corporate travel volumes was trailing that at rivals United Airlines Holdings Inc. and Delta Air Lines Inc.
>
> American compounded its error, industry officials have said, by having previously declined requests from its longtime customers to slow down deployment of the system.

**B. American's 2Q 2024 Press Release on July 25, 2024**

216. On July 25, 2024, American issued a press release reporting high-level financial and operational results for its second fiscal quarter of 2024 (the "2Q 2024 Press Release"). The 2Q 2024 Press Release was later attached as an exhibit to a Form 8-K that American filed with the SEC that same day. In the 2Q 2024 Press Release, Defendant Isom was quoted as stating that American continued to experience financial fallout from its "prior sales and distribution strategy":

> "American has a fleet, network and product built to deliver results, **but during the second quarter, we did not perform to our initial expectations due to our prior sales and distribution strategy** and an imbalance of domestic supply and demand," said American's CEO Robert Isom. "We are taking this challenge head-on, with clear and decisive actions to deliver on a strategy that maximizes our revenue and profitability, and **importantly, one that makes it easy for customers to do business with American**. When we **return to the level of revenue generation we know we can achieve**, and we couple that with our operational reliability and best-in-class cost management, we will unlock significant value."

217. The 2Q 2024 Press Release also provided details on ways "American ha[d] taken swift and aggressive action" to walk back its push towards NDC distribution that harmed travel agencies:

> Since May, the airline has focused its near-term efforts in three areas:
>
> Ensuring content availability[:]
>
> - Restored content. **American has reinstated competitive fares in the distribution channel traditionally used by travel agencies and corporate managed travel programs**.
> - **Removed plans to differentiate mileage earn by channel**. Travelers continue to earn in the AAdvantage® program as usual, no matter where they book.
>
> Making it easy, attractive and rewarding to do business with American[:]
>
> - **Expanded availability of AAdvantage Business™ benefits to agencies**. Companies will earn AAdvantage® miles and travelers will earn Loyalty Points anywhere business travel is booked, including when booked through travel agencies.
> - Announced new features coming to AAdvantage Business™. Improvements will enhance the travel management and end-traveler experience.
>
> Strengthening relationships and **regaining the trust of partners**[:]
>
> - Listening to feedback. The company has conducted extensive outreach to customers to inform them of changes being made to address pain points.
> - Updating agreements. **American is renegotiating contracts with corporate customers and travel agencies.**
> - Improving support. The airline is adding account managers for corporate customers, has established a dedicated AAdvantage Business™ customer service team and is increasing sales support for agencies.

218. The 2Q 2024 Press Release further disclosed that American was lowering its full-year 2024 guidance, stating in relevant part:

> American has taken aggressive action to improve its revenue performance, however, **the company's previous sales and distribution strategy will continue to impact its revenue performance and earnings through the remainder of the year**. Accounting for these impacts and based on present demand trends, the current fuel price forecast and excluding the impact of special items, the company expects its third-quarter 2024 adjusted earnings per diluted share to be

> approximately breakeven. **The company now expects its full-year 2024 adjusted earnings per diluted share to be between $0.70 and $1.30**.

**C. American's 2Q 2024 Earnings Call on July 25, 2024**

219. On July 25, 2024, American also held a conference call to report its financial and operational results for its second fiscal quarter of 2024 (the "2Q 2024 Earnings Call"). At the outset of the call and during his prepared remarks, Defendant Isom "acknowledge[d] that [the Company's] current revenue performance is not where we want it to be" and explained that "[i]n May, we made a sizable adjustment to our revenue and earnings expectations for the second quarter, driven by an imbalance in domestic supply and demand and our prior sales and distribution strategy."

220. Isom identified the "2 key areas that are impacting [the Company's] results" as "[t]he softness in the domestic marketplace, and our sales and distribution strategy."

221. With respect to demand, American's abandoned sales and distribution strategy, Isom stated:

> In late May, I said **our sales and distribution strategy was not working, and we needed to make a change**. We're taking actions that will improve our performance but a reset will take some time, and we will continue to feel the impact of our prior sales and distribution strategy on revenue and earnings through the remainder of this year, **which is reflected in our updated full year guidance**.

222. Next, Isom outlined four key plans to "course-correct" the devasting impacts of the Company's prior strategy, all of which represented a complete about face to Defendants' steadfast Class Period actions: (1) "chang[ing] senior leadership," (2) "in June, reinstat[ing] fares in the distribution channel traditionally used by travel agencies and corporate managed travel programs," (3) "engag[ing] [American's] large TMC partners to put in place new incentive-based agreements to restore [American's] share in those channels[,]" and (4) "eliminat[ing] plans

to differentiate how customers earn miles based on where they book their travel, [thereby] removing another significant obstacle impacting booking behavior and business relationships."

223. Defendant May then provided an update with respect to the Company's full-year guidance in his prepared remarks, stating that full-year adjusted earnings per diluted share would decrease approximately **55.6%** to **69.2%** compared to American's falsely reported guidance range during the Class Period ($2.25 to $3.25), and full-year free cash flow would drop by **$1.5 billion**. Specifically, Defendant May stated, in pertinent part:

> Now I'd like to walk you through our outlook for the third quarter and provide an update on our full year guidance. . . . At the midpoint of our full year guidance, we now anticipate producing adjusted earnings per diluted share of approximately $1 and free cash flow of approximately $500 million.

224. During the question-and-answer portion of the call, analysts sought to understand the drivers of the Company's dismal financial outlook. In response, Defendant Isom blamed American's modern retailing strategy: "**A lot of our problem is caused by our sales and distribution strategy that we put in place in 2023. We think that it's had about 3 quarters of [a] billion dollars['] impact in the first 6 months of the year,** and we more or less assume that, that is going to be what happens in the back half."

225. During the call, a Raymond James analyst questioned whether American's pivot to building its corporate sales force back would impact the Company's prior cost cutting initiatives. Defendant May acknowledged that he "expect[ed] some amount of cost pressure as [American] rebuild[s] the sale staff," but Defendant Isom added, "**What we've got to focus on right now is regaining the share that we ceded from an agency and a corporate perspective when we get that back, which we will.**"

226. Returning the discussion back to the impacts of American's modern retailing strategy, a Melius Research LLC analyst questioned how the Company would win back its lost share of corporate travel. Defendant Isom responded:

> [T]he actions that we've taken so far have been really straightforward and that is making sure that American's content and product is available to any channel that wants to access it. That's done and that's just that alone has resulted in us winning back passenger share.
>
> Now the next steps to that are then going to be making sure that we reestablish productive relationships with the travel management companies and agencies. We're doing that. And I believe that, that will unlock further share growth. And then on top of that, as I mentioned in my comments, I've talked to dozens of corporations. And after getting content available and then also making sure that we have appropriate relationships or in agreements in place with travel management companies.
>
> The next is to make sure that we're doing everything that we can to have the right agreements in place with our corporate customers and to support them in a way that they feel valued. I know that we've started down that path and everything that we're doing is about winning back that share. I'll just be frank. **We over indexed on direct, and we've got to find a way to get -- to play in the richer pool of indirect revenue**. And that starts with having content, having relationships -- positive relationships with travel management companies and agencies and then supporting our corporate customers in the ways that they feel valued.

227. The same Melius analyst questioned whether American's network strategy would also require changes given the market's concern about the Company's liquidity. In response, Isom ruled out network changes and pinned American's poor financial results predominantly on its modern retailing strategy, stating in relevant part:

> Up until -- through 2023, we had been closing the margin gap with our top competitors. **The one thing that we did differently than others in 2023 is we put in place a new sales and distribution strategy. We've recognized that that's not working, and we're making immediate adjustments to that.** I've sized it for you in terms of the impact, which is large -- and that is -- I think it's had an impact of about $750 million in the first 6 months of the year, that is something that we know that we can reverse and get back on the track of where we had been, which was up until the first quarter of this year.

228. During the same earnings call, an Evercore analyst questioned whether Defendant Raja's removal allowed American to have more insight into the economy as it related to the Company's network planning. In response, Isom yet again emphasized that American's performance issues were caused by its modern retailing strategy, stating in relevant part:

> But I'm going to underscore again, **the biggest issue** that we've had in terms of disappointment was our misstep in our sales and distribution strategy. That would have accounted for a considerable amount of additional revenue, and it's something that we're going to make sure that we gain back.

229. When asked whether American was seeing demand softness during the 2Q 2024 Earnings Call, Defendant Isom conceded that American's modern retail strategy resulted in "missed" valuable premium revenue, stating in relevant part:

> But as you know, we've seen significant pressure in parts of our network that have been profitable and continue to be quite profitable, but just less so. So things like our short-haul international MCLA. We've seen some pressure in other places. **A lot of it, again, due to the fact that we've missed out on a pool of premium revenue and business traffic that we're going to win back**. As I take a look overall, I don't see a lot of variability in terms of impact throughout our system, other than what I've noted.

230. During the 2Q 2024 Earnings Call, in response to a question from *The Wall Street Journal*, Defendant Isom admitted that its airline partners pushed to reverse course on its aggressive modern retailing strategy, stating in relevant part:

> Look, our partners -- look, we go to market with them. And so the feedback that we're hearing from them is similar to what we're hearing from our customers, which is -- they want us back and available in every place that we can be sold. They want to participate in a richer mix of business. They want to certainly be attentive to the way our product is sold in the U.S. And so from that perspective, **they are encouraging us, number one, to get content back out. Second, to make sure that we have agreements in place that facilitate the sale of our product through travel management companies and agencies**, and that they want to have great relationships with corporates.

231. During the call, a *Bloomberg News* journalist sought to get more clarity about the feedback that American received from its partners. In response, Defendant Isom admitted that

American knew that its strategy was having a negative impact on its financial operations during 1Q 2024, stating in relevant part:

> **Mary Schlangenstein**
>
> I wanted to follow up just a little bit on Ali's first question. When you said that the feedback you got from your oneworld and other partner airlines was similar to what you're hearing from corporate customers. **Did you also hear from them from some frustration and displeasure at the results of your change in corporate strategy?**
>
> **Robert D. Isom**
>
> We're in communication with our partners constantly. And what they are interested in seeing us do is to take quick action when we see any type of issues. We've been alongside them. **As I've said, we identified a deviation in terms of our revenue performance versus some of our large network peers in the first quarter. We thought that was going to reverse itself.** It didn't. We identified that we needed to make a change. We were really quick and we've kept our partners in touch all along, and they know our plans and certainly are supportive.

232. The *Bloomberg News* journalist pressed Isom on how the "$1.5 billion impact" of American's aggressive corporate strategy would affect the Company's balance sheet, representing $750 million in the first half of 2024, and $750 in the second half, that Defendant Isom referred to earlier in the 2Q 2024 Earnings Call. In response, Isom acknowledged the impact was to revenue and reiterated American's complete reversal of its Class Period strategy in an attempt to assuage investors' concerns, stating in relevant part:

> It's revenue-based. And so -- but it's rich revenue. So absolutely positively has a big impact on contribution. As I said, we're taking steps immediately to reverse some of the reaction in terms of getting content at. We'll see the benefits of new agreements with travel management companies and agencies in the coming months. Work with corporations may take a little bit longer, but we're addressing that as quickly as we can. And so as I take a look at, we're going to try to get in a good spot to kick off 2025 but we'll have work to do. But all that said, I am confident that over time, we'll recapture our share.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

233. Numerous facts alleged herein support a strong inference that Defendants knew or recklessly disregarded that the statements set forth in Section V, *supra*, were materially false and/or misleading when made. The below facts further solidify the inference of scienter as to each Defendant. The scienter of the Individual Defendants and other senior executives is properly imputed to American, as each Individual Defendant was among the Company's senior management and was acting within the scope of their employment.

234. The Individual Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer and/or director of American and, thus, controlled the information disseminated to the investing public in the Company's press releases and SEC filings. As a result, each could falsify the information that reached investors about American's business and performance.

### A. Defendants Regularly Participated in Meetings Discussing American's Poor Performance Due to Distribution Strategy Changes

235. Numerous CWs confirmed that, throughout the Class Period, the Individual Defendants regularly participated in meetings discussing, and the Individual Defendants outright acknowledged, that: (i) travel agencies, TMCs, and corporations were not transitioning from booking through EDIFACT channels to booking through American's NDC channels as expected; and (ii) American was losing share of agency, TMC, and corporate bookings (made either through an in-house corporate travel department, or a TMC or travel agency) as these third parties shifted to booking with competitor airlines, to the detriment of the Company's revenues.

236. CW1 also stated that American's Revenue Management team held a weekly meeting to review raw data provided by IATA, which included the performance of each TMC by region. The regions covered included Domestic, APAC, LATAM, Atlantic Joint-Business, and

Pacific Joint-Business. CW1 recalled that these weekly revenue meetings were attended by American's Vice President of Revenue Management, Scott Chandler, as well as then-Managing Director of Commercial and Partner Analysis Tim Lyon. CW1 stated that it was clear from the IATA data presented at the weekly meetings that American was losing corporate market share in 2023 and "everyone knew" it. CW1 reiterated that "we saw share going down" but, in response, American's leadership said that it was expected. CW1 added that Defendant Raja's response was that corporate clients essentially had no choice but to use American because the Company's "network" was so extensive.

237. CW2 stated that American also held quarterly, Companywide "State of the Airline" meetings, held on the same days as American's earnings calls, at which Defendants Isom, May, and Raja presented about strategies and results and answered questions from Company staff. Specifically, CW2 explained, Defendant May's role at State of the Airline meetings was primarily to present the Company's financial results for the quarter, including details such as which routes had performed well or not, and metrics like net profit, whereas Defendant Raja would discuss and answer questions about operations and NDC distribution, and Isom would both present and act as a moderator. CW2 confirmed that at the State of the Airline meeting on October 19, 2023, held after that morning's 3Q 2023 Earnings Call, Defendant May stated that corporate and agency bookings were down and below American's plan. Thus, the Individual Defendants were clearly aware that American's NDC-focused distribution strategy was negatively impacting agency and corporate bookings (and thereby revenues), no later than *seven months* before these impacts were disclosed at the end of the Class Period in May 2024.

238. Thus, as evidenced by the foregoing, the Individual Defendants made false and misleading statements with scienter because they were aware that American's NDC-focused

distribution strategy was negatively affecting the Company's agency and corporate bookings and revenue, thereby also hurting American's share relative to that of competitors.

### B. Defendants' Hiring of Consulting Firm Amidst Changes to American's Distribution Strategy Strongly Supports Scienter

239. According to the May 29, 2024 *Bloomberg* Article, American "commissioned" Bain to perform a "critical review" of American's distribution strategy, which "revealed concerns by travel advisers over [the] recent shift in [American]'s sales approach, which contributed to lagging revenue over the **past few quarters**…." This led Defendant Isom to "fire[] … Vasu Raja … days after receiving feedback in the report…."

240. The same day, *The Wall Street Journal* similarly reported that American had hired Bain "in recent weeks … according to people familiar with the matter."

241. As a matter of necessity, there was a period of time well before May 28, 2024 (when the Company announced Raja's departure) when Defendants appreciated that modern retailing was negatively affecting the Company, such that they understood the need to search for and retain a consultant to perform a "critical review." American's engagement of Bain, a top three management consulting firm globally, to investigate issues with the Company's distribution over *several* quarters strongly suggests that the Individual Defendants were aware of the issues wrought by their aggressive push for NDC distribution—and the impacts on American's financial results—*well before* the impacts were revealed on May 28 and 29, 2024

242. This is especially true of Defendant Isom, who, per *Bloomberg*, personally received the Bain report, and would have needed to approve the "commissioning" of Bain as CEO and a Board member.

243. By May 28, 2024, Bain had already taken the time to perform its "critical review," and documented its analysis. Indeed, Bain provided its report "days" before Raja's

ouster was announced on May 28, 2024, and Bain's report was commissioned at least "weeks" before that, which strongly suggests, by the even the most conservative of timelines, that Defendants Isom and Raja were well aware that American's NDC distribution strategy was driving away travel agencies and corporate customers and thereby negatively affecting revenues before issuing the late-Class Period misstatements.

244. Analyst commentary further bolsters the inference that Defendants were aware of the negative impacts of American's NDC distribution strategy for several quarters. For instance, J.P. Morgan wrote in a May 28, 2024 report that Raja was "American's corporate architect" and that "we'd push back on the … thesis that he was simply the fall guy because of a missed quarter. For starters, airlines don't typically sack CCO's for missing a quarter … in fact, American stated it has begun a search for his replacement, and who would want to step into a role where dismissal is just a few missed revenue points away?"

**C. Defendants' Post-Class Period Admissions Support Scienter**

245. Defendants' admissions following the Class Period, detailing that their changes to American's distribution strategy and approach to corporate sales and travel agency relationships had been negatively impacting the Company's performance for several quarters, strongly support scienter.

246. During the Class Period, in American's April 25, 2024 1Q 2024 Press Release, Defendant Isom expressed disappointment with the Company's financial results but nevertheless, attempted to quell investor concerns that anything was amiss, stating in relevant part: "While we aren't satisfied with our first-quarter financial results, we have a strong foundation in place, and we remain on track to deliver on our full-year financial targets." However, after the Class Period during the 2024 Bernstein Conference on May 29, 2024 (only one month later), Defendants admitted that these results and "the softness in customer bookings" that continued into the

second fiscal quarter of 2024 were a direct result of "**changes that we have made to our sales and distribution strategy**." With respect to American's push for NDC implementation, Defendant Isom further admitted that "**we move[d] faster than we should have and we didn't execute well**" and that the approach was "**driving customers away from American**."

247. Also during the 2024 Bernstein Conference, when asked by the host analyst how far American's unit revenue was behind compared to peers, Isom additionally admitted that, looking back at first quarter 2024 results, it was clear that American "had a material drop off in terms of total overall revenue performance. You can see that. **Others were much more stable and our results [should] look a lot more like theirs.**" When asked which "benchmarks" Isom used to compare American's performance "relative to peers[,]" Isom admitted that "first and foremost, its close in bookings. **It's business travel**[,]" and that "[c]learly, **others are doing better**…." On the same call, Isom additionally stated that "we should have performed much more in line with our network peers in the first quarter… I know that's an opportunity for us to **recapture**[,]" citing the "competitive" nature of the marketplace. Thus, Isom through his admissions strongly implied that the Individual Defendants had been aware in the first quarter that the Company was losing share to competitors.

248. Defendant Isom also admitted at the 2024 Bernstein Conference that Defendant Raja was not solely responsible for American's distribution strategies that had hurt American's sales revenues and PSP, stating in relevant part during the Bernstein Conference that "**our strategy** is the company strategy. **Those are my strategies**, okay?" Thus, Defendant Isom admitted that both he and Defendant Raja were involved in the Company's disastrous distribution strategy changes.

249. Then, during the 2Q 2024 Earnings Call on July 25, 2024, Defendant Isom expounded on the disastrous impacts of American's approach, admitting that "[a] lot of our problem [was] caused by our sales and distribution strategy that we put in place in 2023. We think that it's had about 3 quarters of [a] billion dollars['] impact in the first 6 months of the year." During the call, Isom also admitted that "[u]p until -- through 2023, we had been closing the margin gap with our top competitors [and] [t]he one thing that we did differently than others in 2023 is we put in place a new sales and distribution strategy." Defendant Isom also admitted that American had "over indexed on direct" and "ceded [share] from an agency and a corporate perspective" to its competitors during the Class Period. Defendant Isom further admitted that American knew that these issues existed during the first quarter but nevertheless obscured the severity of impacts in hopes that the results would reverse, stating in relevant part: "**[W]e identified a deviation in terms of our revenue performance versus some of our large network peers in the first quarter. We thought that was going to reverse itself. It didn't.**"

250. These admissions, particularly in conjunction with American's decision to hire a consultant to review its distribution strategy as discussed in Section VIII.B, *supra*, support that Defendant Isom knew by, at latest, Q1 2024 that American's approach was driving away customers and tanking revenues, particularly when compared with Delta and United, but nevertheless, made a calculated decision to obscure how American's distribution strategy was performing in hopes the situation would right itself.

### D. Defendants' Access to and Review of Data Demonstrating the Negative Impacts of NDC Distribution Changes Supports Scienter

251. Information from multiple CWs, as well as the Individual Defendants' own admissions, demonstrates that the Individual Defendants reviewed detailed data relating to corporate and agency bookings, market share, and NDC adoption. Thus, the Individual

Defendants knew or should have known that American's modern distribution strategy was hurting the company's bookings, revenue, and share, adding to the inference that their Class Period misstatements were made with scienter.

### 1. Defendants Received Detailed Reports Concerning American's Performance Compared to Competitors and NDC Adoption

252. According to CW1, Defendant Raja could "see the numbers" for business between American and agencies by way of reviewing data from reports issued by IATA. As CW1 explained, IATA published monthly reports providing very detailed airline industry data, including how much share a given agency represented "in any given cabin." CW1 also stated that IATA published preliminary results within a few weeks of a month's close, as well as final results six weeks following a given month's close. CW1 explained that IATA partnered with firms called Direct Data Solutions and ARC to provide reports on each travel agency's market share of airline ticket sales.

253. As such, Defendant Raja could observe metrics breaking down the share of bookings business between American's direct/NDC channels versus bookings through EDIFACT channels by way of reviewing data from reports issued by IATA.

254. CW2 confirmed that American measures the performance of its agency accounts through tracking financial performance, such as number of bookings, revenue, and share, and moreover that a key metric the Company tracked was the rate at which each agency, TMC, and corporation was utilizing modern distribution channels for bookings versus traditional distribution channels. According to CW2, American's management could see global data pertaining to *all* third parties on the SalesLink Insights platform, including granular details per agency, TMC, or corporation, and per route in American's network, such that American tracked certain financial metrics and whether they were on trend, how much share of bookings made

through the third-party distribution partners were going to the Company versus competitor airlines, and the rates that each agency, TMC, or corporation booked through NDC. Moreover, CW2 recounted that American also used the software PRISM to track share by revenue and percentage versus competitors and NDC usage. CW2 and peers in Sales monitored such metrics in SalesLink Insights and reports generated from PRISM "constantly" because the metrics determined CW2's and sales peers' quarterly bonuses. Thus, CW2 was able to observe that shortly after the Company pushed the July 2023 Contracts on agencies, TMCs, and corporations, bookings and share through these third parties dropped. Crucially, CW2 observed that bookings from larger agencies declined 15% year-over-year in July 2023, with corporate bookings "much lower" than that, and that these figures and share percentage remaining "consistently down" in PRISM through the end of CW2's tenure at the end of January 2024.

255. Not only did CW2 confirm that the Individual Defendants could review such negative metrics in PRISM, but Defendant May all but confirmed as much. Indeed, CW2 recalled that at the October 19, 2023 State of the Airline meeting, May explicitly noted that corporate and agency bookings were down below plan. It is likely that May obtained this information from PRISM—especially given, per CW2, he would have had access— and moreover, given that Defendant Raja was the primary driver of American's modern retailing strategy and Chief Commercial Officer, it is highly likely that he, like May, also reviewed PRISM data—PRISM, after all, contains commercial performance data.

**2. Defendants' Admitted Access to and Review of Metrics Concerning NDC Rollout and its Effects on Market Share, Revenues, and Third-Party Bookings Supports Scienter**

256. Prior to and throughout the Class Period, the Individual Defendants made numerous statements indicating that they regularly monitored data relating to the performance of American's NDC rollout. Thus, the Individual Defendants knew or should have known that

many agencies, TMCs, and corporations were not adopting NDC, and that Defendants' NDC strategy was negatively affecting American's revenues and market share, thus adding to a strong inference that their Class Period false and misleading statements were made with scienter.

257. Defendants spoke to investors and answered detailed questions about progress in the adoption of modern retailing and associated revenues on many occasions, including the following sampling of such statements:

i. On American's January 26, 2023 earnings call held to report the Company's fourth quarter and fiscal year 2022 results ("FY2022 Earnings Call"), Defendant Raja stated that "…roughly 60-ish percent of our revenues are coming direct to us through our .com and mobile app…."

ii. On American's first quarter 2023 earnings call on April 27, 2023 (the "1Q 2023 Earnings Call"), Defendant Raja stated that "by the end of this month, over 60% of our servicing transactions…"—*i.e.*, changes or modifications to existing bookings, such as adding baggage or meals—"…are coming digitally"—*i.e.* through direct and NDC channels. Raja stated on the same call that "we're seeing 10 to 15 points of transaction share shift out of travel agencies and into the direct channel…."

iii. On American's 2Q 2023 Earnings Call on July 20, 2023, Defendant Raja stated that "…we're currently in taking roughly 70% to 75% of our revenues going through our direct channels."

iv. On American's 3Q 2023 Earnings Call on October 19, 2023, Defendant Isom stated that "[i]n the third quarter, approximately 80% of our bookings came from our own channels and modern retailing technology...." Isom's comments were

accompanied by a slide presented to investors that stated, in fact, 78% of bookings were through the modern technology, which includes American's website, mobile app, and NDC direct bookings, and that the remainder of bookings were through legacy technology—*i.e.*, EDIFACT. Raja stated on the 3Q 2023 Earnings Call that "…right now, what we're in taking in terms of revenue is actually about 80% going through, as we call it, Internet-based distribution, of which about 70 of those 80 points is going through our true direct[ ]channels[, aa].com and [the American] app and the balance coming through new distribution technologies"—*i.e.*, NDC.

v. On American's FY2023 Earnings Call held January 25, 2024, Defendant Raja stated that "we're 80% coming through Internet-based technology. Within that, 65-plus percent is coming just strictly through our owned channels…"—*i.e.,* the Company's website and smartphone app. American also displayed a slide to investors confirming these same figures, noting the remaining 20% of fourth quarter 2023 bookings were through legacy distribution systems.

vi. On American's 1Q 2024 Earnings Call held April 25, 2024, Defendant Raja stated that "the agencies that constitute about 30% to 40% of our revenue are already doing more than 30% of their bookings through NDC…." During the call, Defendants also displayed a slide to investors stating that 81% of bookings in the first quarter of 2024 had been made through modern distribution technology.

258. As evidenced by the foregoing, the Individual Defendants—particularly Isom and Raja—regularly monitored whether or not agencies, TMCs, and corporations were switching

their bookings (and associated revenues) to modern distribution methods in response to the Company's changes.

259. The Individual Defendants not only tracked the adoption of modern retailing, but also admittedly monitored the effects that American's distribution strategy changes were having on the Company's business, including revenues and specifically revenues from corporate customers. Indeed, Defendant Raja stressed the importance of corporate travel on multiple occasions, stating on the FY2022 Earnings Call that "business travel is … 25% of our revenues…" and Defendant Isom stated at the March 14, 2023 J.P. Morgan Conference that "[f]or us, corporate travel is incredibly important."

260. Thus, prior to and throughout the Class Period, analysts repeatedly asked about how well corporate travel was recovering compared to levels prior to the COVID-19 pandemic, especially given American's changes to its distribution strategy, and the Individual Defendants regularly provided updates, indicating that they were closely tracking these metrics including by segment of corporate travel. These statements included:

i. On September 7, 2022 at a conference hosted by Cowen and Company, LLC, Defendant Isom stated that "our business revenue from a domestic perspective is above where it was in 2019, okay? So I think it's running 105% of where we were in 2019. That has been really pushed by small and medium-sized businesses. And so you see that, that has really outperformed corporates, what we used to think of as the big corporates," which were "about, in terms of revenue, 75% recovered."

ii. On October 20, 2022 on American's earnings call to report its third quarter 2022 results, Defendant Isom stated that "business revenue remain[s] incredibly strong … surpassing 2019 levels in the third quarter[,]" adding that "[d]emand for small-

and medium-sized businesses and customers traveling for a combination of business and leisure continue to outpace the recovery of managed corporate travel." On the same call, Defendant Raja stated that "contracted corporations are 80% recovered…" and that "unmanaged business is coming in at yield values where their gross yields are similar to the corporate contracted transactions that are not there[,]" adding "managed corporate hasn't come back yet… the really critical word in that sentence is the word yet."

iii. On the FY2022 Earnings Call held January 26, 2023, Defendant Raja stated that "non-contracted business is 100% recovered, contracted business is about 75% recovered."

iv. On May 25, 2023 at a conference hosted by Wolfe Research, Defendant May stated that "traditional corporate is still pretty consistent with what we talked about a month ago, blended travel continues to be a big component of our demand and leisure is really, really strong" and that overall corporate business recovery was "75% to 80% [of] where we were in 2019." May described that lower-than-historic corporate revenues had led Defendants to "guide[ ] unit revenue down 2% to down 4% for the quarter[.]" When asked by Wolfe's host analyst whether this would change, Defendant May confirmed that Defendants were monitoring and would continue to monitor the situation, stating "there's corporate strength in some businesses, there's weakness in some areas like tech. So we'll see how this develops over the next year or so. But one thing we found over the last couple of years is demand profiles continue to change, and we need to continue to adapt to any changes in demand."

v. On the 2Q 2023 Earnings Call held July 20, 2023, Defendant Raja stated that "total business revenues have really regained their 2019 composition in the system." Raja added that "[w]e've seen that those customers who … buy their travel centrally"—*i.e.,* through an agency or TMC— "has … recovered to 80% of historical levels" and that, comparatively, "unmanaged demand continues to grow in our system."

vi. On the 3Q 2023 Earnings Call held October 19, 2023, Defendant Raja stated that "[i]n the quarter, our total business revenues were up 2%" and Defendant Isom stated "we saw year-over-year growth in corporate … revenue with a return to more traditional seasonality trends. We remain encouraged by what we're seeing with demand and revenue from unmanaged business travel."

vii. On American's FY2023 Earnings Call held January 25, 2024, Defendant Isom stated that "[d]omestic revenues from business travel ended the fourth quarter at approximately 90% of 2019 levels." Defendant Raja stated on the same call that "[w]e too exit Q4 with a 90% business recovery. Within that unmanaged business versus managed businesses[,] almost a 3:1 ratio with unmanaged business 100% plus covered, managed business down further. The impact on managed business is really flat from traffic on higher yields."

viii. On March 12, 2024 at the 2024 J.P. Morgan Conference, Defendant Isom stated that "[w]e know that business travel is not all the way back yet."

ix. On American's 1Q 2024 Earnings Call held April 25, 2024, Defendant Isom stated that "[b]usiness travel has continued to recover with particular strength in small and medium-sized businesses. Additionally, we have seen sequential

improvement in the recovery of managed corporate travel and domestic business revenue growth outpaced capacity growth in the first quarter." Defendant Raja also spoke on the call, stating that "our business revenues are growing at a greater rate than capacity. Unmanaged is on the higher end of that contract in corporates which would presumably be the most effective, are just slightly on the lower end of that." When asked by an analyst, Raja clarified that "we see total business revenues, which is really a very important thing to look at grow similarly double-digit -- close or approaching double digits, exiting certainly Q1 double-digit rates of growth. It's really being driven by unmanaged corporations that continue to come back and come back to American Airlines. Managed corporates, contract and corporations are growing a little bit less than that, but still high -- in the mid- to high single digits."

261. The foregoing statements demonstrate that the Individual Defendants regularly reviewed detailed metrics concerning the revenue performance of corporate travel at American. Their consistent references to specific revenue recovery percentages and comparisons between managed and unmanaged corporate travel, including nuances by region within American's network, indicate a granular level of oversight. This detailed monitoring strongly supports the inference that Defendants knew or should have known that changes to American's distribution strategy negatively impacted the Company's corporate travel revenues and market share.

### 3. Defendants' Granular Review of Agency and Corporate Metrics Supports Scienter

262. The Individual Defendants' statements during the Class Period demonstrate that they monitored American's share of the corporate travel market. For instance, on the Company's 1Q 2023 Earnings Call held April 27, 2023, a *Wall Street Journal* journalist asked Defendant

Raja "we have heard companies and agencies sort of complaining about some of the changes American has made. … are you seeing any market share shift?" In response, Raja strongly suggested that Defendants were tracking American's market share granularly by agency, stating "from a given agency to another, we may see a little bit" of share shifting to competitors. Similarly, at the March 12, 2024 J.P. Morgan Conference, Defendant Isom stated "while you may have seen some changes to our sales force"—*i.e.*, changes made in furtherance of Defendants' new distribution strategies—"… we've been able to hang on to our share as well."

263. Similarly, during the 1Q 2024 Earnings Call, Raja indicated that he reviewed corporate-related metrics as granularly as by market, stating that "as corporates are coming back, they're coming in more disproportionately to coastal markets where we're relatively smaller in. As unmanaged business comes back, it comes back in the Heartland and the Sunbelt, where we are relatively larger in."

264. Read collectively, the statements and admissions in Section VIII.D indicate that the Individual Defendants regularly reviewed key metrics relating to the performance of American's corporate travel business, and the Individual Defendants knew or should have known that, due to their aggressive changes made to American's distribution strategy in furtherance of NDC and direct bookings, the Company was losing both revenue from and market share of corporate travel.

### E. Defendants' Evasive Answers to Analysts' and Journalists' Pointed Questions is Indicative of Scienter

265. Throughout the Class Period, analysts repeatedly questioned Defendants on the execution of American's shift to NDC distribution and whether it was having a negative effect on the Company's business. Certain of Defendants' highly evasive answers suggest that

Defendants were aware of issues with the NDC execution, but that Defendants wanted to avoid discussing it or otherwise downplay the significance of the NDC-related issues.

266. For example, on American's 3Q 2023 Earnings Call on October 19, 2023, Defendant Raja was asked plainly whether he had seen American's share of the corporate travel market shift due to the Company's push towards NDC distribution. Raja did not directly answer that question, but instead, while admitting "[i]t's another question, which I know is on people's minds" stated:

> We're shifting content bare products, schedules, things like that, out of legacy technology where we can't provide customers the kind of shopping and servicing experience they expect and we're putting it through technologies that can. And on that journey, we've certainly invited all of our retailers to come along with it, but that is a different world than what was there before. **And what we've seen before is really encouraging actually. In the quarter, our total business revenues were up 2%.**
>
> **We actually performed better year-over-year among contracted corporations than we had in a number of months prior to it.** But very importantly, our cost of sale is down 13%. So we're finding that we're able to generate more revenues through less cost of sale, which is very encouraging to us. And like I said, as we go forward, we intend to continue the momentum that we've got. We certainly invite any retailing partner to join us along the journey.
>
> And in fact, most recently, we launched a new business program called AAdvantage Business. And AAdvantage is very much the platform upon which we will build all of our commercial programs. But through that -- through AAdvantaged Business companies of all sizes can access our content in a way that's cheaper simpler, better servicing and in a way that is more awarding for travelers. We'll accelerate their status. **So, we're actually really encouraged by what we've seen, encouraged by its revenue production and look forward to continuing the momentum.**

267. Defendant Raja was also evasive during American's FY 2023 Earnings Call held on January 25, 2024 when BofA analyst Andrew George Didora asked what "growing pains" American experienced with its NDC roll out. Raja did not directly answer the question:

> Yeah. Hey, thanks for the question. Look, I'll answer it in this way. We have been similarly enthusiastic and even a little surprised at how quickly the transition has happened. It's not just that we're 80% coming through Internet-based technology.

> Within that 65-plus percent is coming just strictly through our owned channels, which is our greatest rate of growth. So first, I will say, strategically, we're going to distribute through the Internet. It's what our customers demand. That's how we give them the best fares and the lowest expenses and the best servicing.
>
> So at some point, the number becomes 100. And the real issue in 2024 is we want to just continue to transition as many of our retailing partners to use the Internet with us. So ultimately, it becomes 100. We're really encouraged by what we've seen there.

268. Defendant Raja's refusal to answer questions concerning whether American was losing market share or experiencing growing pains as a result of its American's distribution strategy changes and NDC roll out strongly implies that he knew that customers were reacting negatively to American's NDC execution, including by migrating share away from the Company to its competitors, but sought to obscure the significant impacts by providing evasive answers to analysts' questions.

### F. Defendants' Statements Concerned American's Primary Source of Revenue and Core Operation, Further Supporting Scienter

269. Defendants' scienter is further supported by the critical importance of American's sales and distribution to success of the Company's core operation.

270. American's core operation is providing scheduled air transportation to passengers. In 2023, according to American's FY2023 Form 10-K, the Company received nearly 92% of its $52.8 billion total operating revenues (i.e., $48.5 billion) from passenger air travel and ancillary services associated with such travel. Indeed, American characterized its "primary business activity" in its FY2023 Form 10-K as "the operation of a major network air carrier, providing scheduled air transportation for passengers[.]"

271. A significant portion of that revenue is derived from distribution to corporate customers. According to Defendant Isom's remarks during the 2Q 2024 Earnings Call, "[a]pproximately $14 billion of [the Company's] annual revenue [in 2023] was booked" through

"the distribution channel traditionally used by travel agencies and corporate managed travel programs" (i.e., EDIFACT). American's sales and distribution strategy—namely, its NDC implementation and corresponding changes to corporate and agency sales—were designed to push those bookings to direct and NDC channels to simultaneously increase revenues and cut the costs associated with managed travel. That strategy was therefore critically important to the Company's core operation.

272. Indeed, throughout the Class Period, American staked its sales and distribution strategy on driving corporate customers to its NDC and direct channels to cut costs and increase revenues. The Company also claimed that its customers *expected* a shopping and servicing experience that was only available through NDC and American's direct channels and as such, these changes were necessary. For instance, during American's Q3 2023 Earnings Call, Raja stated:

> We have made a number of changes with our selling and distribution strategy. The purpose of which is very simple. Our customers have been telling us for a very long time now that they want it so that anything that we offer them can be shopped, sold and serviced digitally. And we've been seeing that customer sentiment for a really long time. And that's what we're out to serve. And our strategy is this simple. In order to go make that happen, we need to distribute our product exclusively through the Internet.
>
> And that's what you're seeing from us. We're shifting content fare products, schedules, things like that, out of legacy technology where we can't provide customers the kind of shopping and servicing experience they expect and we're putting it through technologies that can. And on that journey, we've certainly invited all of our retailers to come along with it, but that is a different world than what was there before. And what we've seen before is really encouraging actually. In the quarter, our total business revenues were up 2%.
>
> We actually performed better year-over-year among contracted corporations than we had in a number of months prior to it. But very importantly, our cost of sale is down 13%. So we're finding that we're able to generate more revenues through less cost of sale, which is very encouraging to us.

273. During the same call, Raja represented that the vast majority of the Company's revenues were coming through the Company's NDC and direct channels and emphasized their importance to the Company's bookings, stating in relevant part:

> So what we saw as we were going through COVID, was already without American Airlines making any strategic changes, we went from about selling 50% direct to selling about 60% direct and right now, **what we're in taking in terms of revenue is actually about 80% going through, as we call it, Internet-based distribution, of which about 70 of those 80 points is going through our true direct[] channels[, ].com and app[,] and the balance coming through new distribution technologies. In fact, our Internet-based travel agency technologies is now a bigger source of bookings than any of the legacy global distribution systems are**.

274. Then, during the Company's FY 2023 Earnings Call, in response to an analyst's question about American's distribution strategy, Defendant Raja emphasized that American's direct bookings were the Company's greatest opportunity of growth, stating in relevant part:

> We have been similarly enthusiastic and even a little surprised at how quickly the transition has happened. It's not just that we're 80% coming through Internet-based technology. Within that, 65-plus percent is coming just strictly through our owned channels, which is our greatest rate of growth.

275. However, as discussed above in Section VIII.D, *supra*, Defendants had access to reports with detailed metrics showing that beginning as early as 3Q 2023, American was losing share to its competitors as a direct result of the Company's sales and distribution strategy. Moreover, Defendant Isom publicly admitted that Defendants knew during 1Q 2024 that American's performance was lagging as compared to its competitors but nevertheless, continued making rosy statements in hopes that the situation would right itself. Such information was directly at odds with Defendants' public statements, repeatedly exclaiming that they had "**seen … encouraging signs from managed and unmanaged corporate customers**[,]" were "**really pleased**" with NDC adoption and "**encouraged by the results so far**[,]" and "**demand is strong across the board**."

276. Moreover, that American's Class Period sales and distribution strategy ultimately caused a staggering $750 million loss of revenue in the first half of 2024 further bolsters that the mispresented information was readily apparent to Defendants. It strains credulity to suggest that Defendants were unaware of the negative impact of their distribution strategy shift when it caused such a substantial loss of revenue.

## IX. LOSS CAUSATION

277. At all relevant times, the market for American securities was open, well-developed, and efficient. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of American's securities and/or maintaining the artificial inflation in American's common stock price, by publicly issuing and endorsing materially false and/or misleading statements and omitting to disclose material facts necessary to make those statements, as set forth herein in Section V, *supra*, not materially false or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose materially adverse information and/or misrepresented the truth about the Company's business, operations, and prospects as alleged herein.

278. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and the other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made, or failed to correct, a series of materially false or misleading statements concerning the Company's shift in distribution strategy, which eroded American's market share and decimated revenues. Defendants' statements were materially and objectively misleading when made, as set forth *supra* at Section V, and had the cause and effect of creating in the market an unrealistically positive assessment of American's rollout of NDC distribution channels in lieu of traditional channels, including how well the

Company's sales via agencies and to corporate customers were performing as a result of the transition to NDC, thus causing American's securities to be overvalued and artificially inflated at all relevant times during the Class Period. The materially false or misleading statements made or endorsed by Defendants during the Class Period resulted in Plaintiffs and other members of the Class purchasing American's securities at artificially inflated prices, thus causing the damages complained of herein.

279. As a result of their purchases of American's securities during the Class Period at artificially inflated prices, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws, when the misrepresentations made to the market and the information alleged herein to have been concealed from the market were revealed. The timing and magnitude of the price declines in American's securities, the statements in Defendants' corrective disclosures, and the market's reaction negate any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors, or facts specific to the Company that were unrelated to Defendants' fraudulent conduct. This is supported by the stock chart in Figure 1, below, which demonstrates the clear divergence in the performance of American's common stock price from Delta Air Lines, Inc. (DAL) and United Airlines Holdings, Inc. (UAL) when the truth emerged in a series of partial disclosures on May 28, 2024 and May 29, 2024:

**Figure 1**




As shown by the foregoing, the price of American's common stock dropped to close 13.54% lower on May 29, 2024 while its two major competitors remained relatively steady. Moreover, it became clear within just two days—by May 31, 2024—that American's stock was significantly underperforming Delta's and United's stocks, strongly indicating that the drop in the Company's stock price was uniquely due to Defendants' disclosures on May 28 and 29, 2024, and not due to an industry-wide trend such as soft demand.

280. On the evening of May 28, 2024 and the morning of May 29, 2024 (*i.e.,* after the stock market closed for trading on the 28th and before it reopened on the 29th), Defendants revealed the truth that American had been "driving customers away from American" "due to the changes that [Defendants] made to [the Company's] sales and distribution strategy" in pursuit of

driving NDC distribution, particularly customers who booked via agencies and business travelers, which had hurt demand for American's fares and services. In disclosing the negative impacts of the Company's aggressive push towards NDC distribution, Defendant Isom explained that American had not been making its products "available wherever customers want to buy it"—*i.e.,* including legacy, non-NDC distribution channels—and that American had "move[d] faster than we should have" in pursuit of NDC distribution. The Company also conspicuously announced that Defendant Raja, the leader of American's NDC strategy, was to depart from the airline.

281. As a result, American announced it was slashing its guidance for its second fiscal quarter of 2024, including notably lowering its guidance for adjusted operating margin by a full percentage point, and slashing its expectations for second-half 2024 growth by over half from 8% to just 3.5%. American also announced that for the second quarter, it was: (i) lowering its adjusted earnings per share guidance range by 13% and over 20% at the low and high ends, respectively; (ii) expecting TRASM to decline 100-400% more than previously guided; and (iii) reducing CASM-ex growth expectations by up to 200%.

282. Upon these disclosures, American's share price fell $1.82 per share, or more than 13.54%, from its close at $13.44 per share on May 28, 2024 to close at $11.62 per share on May 29, 2024, thereby damaging investors.

283. Market analysts and industry media were surprised by Defendants' May 28 and 29, 2024 disclosures. Analysts from Jefferies wrote in a May 28, 2024 report—before Defendants' disclosures on May 29—that American was "trailblazing NDC, which will take some time to fine-tune and extract … value from[,]" noting that the Company was seeing "[near-term] corporate underperformance" compared to competitor airlines. Similarly, Evercore ISI

wrote in an analyst report published May 28, 2024 that "[g]iven the change in commercial leadership"—*i.e.*, Defendant Raja's departure—"we suspect the focus on lower cost distribution (deemphasizing corporate sales channels), including restructuring/layoffs of American's corporate sales organization may be continuing to play a role in softer relative trends."

284. Deutsche Bank analysts, writing in a May 28, 2024 report, suspected that given the Company announced that day that "Vasu Raja would be leaving American in June[,]" "some of the company's moves have been viewed as punitive by the travel agency community (particularly those tied to New Distribution Capability (NDC)-adoption) which responded by steering 'their' customers (including corporate) away from American."

285. In the same report, Deutsche Bank analysts commented on American's lowered guidance noting that the "year-over-year unit revenue (i.e., TRASM) decline of 5% to 6% versus its prior projected decline of 1% to 3%" (i.e., a "unit revenue miss of 3.5 percentage points (at the midpoints))" was "material as [the analysts] estimate[d] each point equates to about $150 million of top line." With respect to full year guidance, the report added "[w]e note the investor update did not include an affirmation of the company's full-year 2024 EPS guide of $2.25 to $3.25 which we are now below the low end by 7%." The report also distinguished American's performance from its competitors, stating "that a good portion of American's top-line weakness may be American-specific" and particularly given "United also filed an 8-K this evening reiterating its June quarter EPS guide of $3.75 to $4.25 which compares with our EPS estimate of $4.00."

286. In a May 28, 2024 report, Bernstein analysts were surprised by the extent of American's guidance reduction, stating in relevant part: "[a] significant miss driven in part by close in bookings puts AAL's ability to reap the full value of a robust summer flying season in

greater doubt" and further attributed the "close in booking weakness … to loss of corporate travel share associated with recent distribution strategy changes (positive read across to DAL/UAL)." The same report surmised that the "[c]hange in leadership could mean rolling back distribution changes[.]" Then, in a report published after Defendant Isom's disclosures at the May 29 Bernstein Conference, Bernstein wrote that "the key culprit behind [American]'s unit revenue guide down" was its distribution strategy, which the Company would now have to "swiftly adjust" to make its fares and services "more easily accessible," including by walking back restrictive NDC "plans that would've hurt some customers' ability to gain miles based on where they booked…." Bernstein further wrote that American had revealed that it "particularly struggled … due to modernizing distribution strategy that reduced customer access to their products and hurt some relationships[.]"

287. *Bloomberg*, in an article originally published May 28, 2024 that was updated May 29, 2024, wrote that American "slashed profit and revenue expectations[,]" and that the issues disclosed by the Company "stemmed in part from a recent shift in the airline's sales strategy that sought to push customers away from booking agencies in favor of buying directly through American. The revelations — along with the abrupt departure of its chief commercial officer — sent the carrier's shares plunging the most in almost four years…." *Bloomberg* also noted that, given Vasu Raja had been a leader in the Company's move towards modern retailing, Defendant "Isom on Wednesday appeared to fault Raja for the carrier's recent stumble, saying 'we need to reset' in reference to the management change."

288. Writing in a May 29, 2024 report, J.P. Morgan analysts noted that the "[m]ore interesting" aspect of the Company's May 28 and 29, 2024 disclosures was "American's public capitulation regarding its corporate distribution strategy," which the analysts noted "has moved

to center stage with urgency." Though J.P. Morgan had previously hypothesized that the Company's distribution strategy posed a "*potential* risk," the analyst firm wrote in its May 29 report that "American's corporate capitulation is a bit of a vindication" of that theory, prompting J.P. Morgan to lower its price target for American's stock from $24 to $21 per share, a decline of 12.5%.

289. Likewise, analysts at Morningstar wrote in a May 29, 2024 report that the primary factor affecting American's slashed guidance and soft demand from agency and corporate buyers "at issue is American's aggressive moves to modernize the way it digitally sells and distributes its tickets," which the Company had "self-inflicted" but hoped to "reverse."

290. Susquehanna, in a May 30, 2024 report titled "Time for a Reset," noted that "Vasu Raja's departure comes as somewhat of a surprise," but that "importantly," American's distribution strategy was revealed to be "clearly not resonating with customers…." The report also attributed American's performance to "an execution issue," stating "2Q's TRASM update (now down fully ~5-6% Y/Y, or ~350bps below the mid-pt. of the prior guide) in our view looks like more of an execution issue, with competitor [United Airlines] recently noting that demand remains healthy." As a result, Susquehanna lowered its price target for American stock by over 13%, from $15 to $13 per share. Analysts at Citi similarly lowered their price target in a May 31, 2024 report, down 17.5% from $20 per share to $16.50, after "American Airlines' trim to its 2Q revenue per available seat mile or RASM guide sent very concerning signals on the carrier's underlying ticket revenue strategies" which included American's NDC distribution method.

291. Barclays wrote in a report published May 30, 2024 that its analysts found it "interesting that the airline is abandoning its 'modern retailing approach' and that the CCO has left. We suspect this was a relevant contributor to the revenue weakness." Barclays added that

"No other airline has followed this path. The evidence would seem to suggest the American innovation was not a success and that they are ready to evolve to a more consumer-friendly path." The report also distinguished American from its competitors, stating that "American's revenue guidance was very out of kilter with peers" and that "the issue was guidance not the reality of the travel market."

292. Morgan Stanley, writing in a June 3, 2024 report titled "Two Steps Back," contrasted American's poor results from that of competitors, noting that an "AAL specific" factor was how the Company had been "particularly pushing too hard on direct distribution, … ceding competitive corporate / dense route share to peers…" clarifying "a large part of the [demand] softness [was] specific to AAL." Morgan Stanley thus lowered its price target for American stock by 10%, from $20 per share to $18.

293. Thus, the damages suffered by Plaintiffs and the other Class members were a direct result of Defendants' fraudulent scheme to artificially inflate the price of American common stock and the subsequent declines in the value of American common stock when Defendants' prior misrepresentations were revealed.

## X. CLASS ACTION ALLEGATIONS

294. Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons that purchased or otherwise acquired American publicly traded securities between July 20, 2023 and May 28, 2024, inclusive, seeking to pursue remedies under the Exchange Act. Excluded from the Class are the Company and their subsidiaries and affiliates, and their respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

295. Because American's securities were actively traded on the Nasdaq, the members of the Class are so numerous that joinder of all Class members is impracticable. Indeed, American reported in its FY2023 Form 10-K that, as of February 16, 2024, there were approximately 54,000 record holders of its common stock; however, since many of the shares of its common stock were held by brokers and other institutions on behalf of stockholders, it is believed there are substantially more beneficial holders of American's common stock than record holders. Accordingly, while the exact number of Class members is unknown at this time and can only be ascertained through discovery, Plaintiffs believe that there are hundreds or thousands of Class members. Members of the Class may be identified from records maintained by American or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

296. Plaintiffs' claims are typical of those of the members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein. Moreover, Plaintiffs will fairly and adequately protect the interests of the Class and have retained competent counsel who are experienced in class action and securities litigation.

297. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

i. Whether Defendants violated the federal securities laws as alleged herein;

ii. Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the Company's business and operations;

iii. Whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

iv. Whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

v. Whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

vi. Whether the prices of American's securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

vii. Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

298. A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this Action as a class action.

## XI. PRESUMPTION OF RELIANCE

299. Plaintiffs are presumed to have relied on Defendants' misrepresentations and omissions under the fraud-on-the-market doctrine. At all times, the market for American's securities was an efficient market that promptly digested current information related to American from all publicly available sources and reflected such information in the prices of American's securities. Throughout the Class Period:

i. American's common stock was actively traded on the Nasdaq;

ii. The market price of American's securities reacted promptly to the dissemination of public information regarding the Company;

iii. American was followed by financial analysts, including those cited in this Complaint;

iv. American securities maintained a high average weekly trading volume during the Class Period;

v. As a regulated issuer, the Company filed with the SEC periodic public reports during the Class Period;

vi. The Company regularly communicated with public investors via established market communication mechanisms; and

vii. During the Class Period, American's common stock had over 656,000,000 shares outstanding, and its market capitalization was over 9,270,500,000 on April 25, 2024.

300. Throughout the Class Period, the Company was consistently followed by the market, including securities analysts. The market relies upon the Company's financial results and management to accurately present the Company's financial results. During this period, the Company and the Individual Defendants continued to pump materially false and misleading information into the marketplace regarding the Company and omitted material facts relevant to American's distribution strategy. This information was promptly reviewed and analyzed by analysts and institutional investors and assimilated into the price of American's securities.

301. As a result of the misconduct alleged herein, including Defendants' false and misleading statements and omissions, the market for American's securities was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies. Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which Defendants are responsible.

302. Plaintiffs and other Class members justifiably relied on the integrity of the market price for American's securities and were substantially damaged as a direct and proximate result

of their purchases of American's securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

303. Plaintiffs and the other Class members are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) because claims asserted in this Complaint against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

304. Had Plaintiffs and other members of the Class known of the material adverse information not disclosed by Defendants or otherwise been aware of the truth behind Defendants' material misstatements, they would not have purchased American's securities at artificially inflated prices.

## XII. NO STATUTORY SAFE HARBOR

305. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

306. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

307. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false

or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of the Company who knew that the statement was false when made.

**COUNT I**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

308. Plaintiffs reallege each allegation as if fully set forth herein.

309. This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against all Defendants named herein.

310. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of American's securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire American's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

311. During the Class Period, Defendants, by the use of means and instrumentalities of interstate commerce: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and the Class, all in an effort to maintain artificially high market prices for American's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants acted individually and in concert in a continuous course of conduct to conceal non-public, adverse material information about the Company's outlook and condition, as reflected in the misrepresentations and omissions set forth above.

312. During the Class Period, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. By virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, Defendants participated in the fraudulent scheme alleged herein.

313. The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them, or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

314. As a result of the foregoing, the market price of American's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants

during the Class Period, Plaintiffs and the other members of the Class purchased or otherwise acquired American's securities at artificially inflated prices and were damaged thereby.

315. Had Plaintiffs and the other members of the Class been aware that the market price of American's securities had been artificially and falsely inflated by the Company and the Individual Defendants' misleading statements and by the material adverse information which the Company and the Individual Defendants did not disclose, they would not have purchased American's securities at the artificially inflated prices that they did, or at all.

316. As a result of the wrongful conduct alleged herein, Plaintiffs and the other members of the Class have suffered damages in an amount to be established at trial. Plaintiffs and the Class's losses were proximately caused by Defendants' scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company. Plaintiff and other members of the Class purchased American's securities in reliance on the integrity of the market price of the securities, and Defendants manipulated the price of American's securities through their misconduct as described herein. Plaintiffs' and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of, among other things, Defendants' concealment of material facts related to American's distribution strategy.

317. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of American's securities during the Class Period.

**COUNT II**

**Violation of Section 20(a) of the Exchange Act**

318. Plaintiffs reallege each allegation as if fully set forth herein.

319. This claim is brought under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against the Individual Defendants.

320. American and the Individual Defendants are liable as primary violators of Section 10(b) of the Exchange Act and Rule 10b-5 as set forth herein.

321. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. Because of their positions, the Individual Defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

322. Specifically, the Individual Defendants, by reason of their status as senior executive officers and/or directors of the Company, directly or indirectly, controlled the conduct of the Company's business and their representations to Plaintiffs and the Class, within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants directly or indirectly controlled the content of the Company's SEC filings, press releases and interviews with various news sources cited herein related to Plaintiffs' and the Class's investments in American's securities within the meaning of Section 20(a) of the Exchange Act. Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

323. The Individual Defendants controlled and had the authority to control the content of the Company's SEC statements, press releases and other public statements. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance or could have prevented their issuance or caused them to be corrected.

324. The Individual Defendants knew or recklessly disregarded the fact that the Company's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Individual Defendants did not act in good faith.

325. By virtue of their high-level positions and their participation in and awareness of the Company's operations and public statements, the Individual Defendants were able to and did influence and control the Company's decision-making, including controlling the content and dissemination of the documents that Plaintiffs and the Class contend contained materially false and misleading information and on which Plaintiffs and the Class relied.

326. As set forth herein, the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are further liable pursuant to Section 20(a) of the Exchange Act.

327. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchase of American's securities.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs;

D. Granting Plaintiffs leave to amend this Complaint to conform to the evidence; and

E. Awarding such equitable/injunctive or other relief in Plaintiff's favor as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

In accordance with Fed. R. Civ. P. 38(b), Plaintiffs demand a jury trial of all issues involved, now, or in the future, in this action.

Dated: January 21, 2025

**CONDON TOBIN SLADEK THORNTON NERENBERG PLLC**

*/s/ Stuart L. Cochran*
Stuart L. Cochran
Texas Bar No.: 24027936
8080 Park Lane, Suite 700
Dallas, Texas 75231
Telephone: 214-265-3800
Facsimile: 214-691-6311
Email: scochran@condontobin.com

*Co-Liaison Counsel for Co-Lead Plaintiff Dominik Dumancic, Additional Plaintiff Richard Wilkinson, and the Class*

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (admitted *pro hac vice*)
(State of Connecticut Juris No. 435545)
Gregory M. Potrepka (admitted *pro hac vice*)
(State of Connecticut Juris No. 437326)
Morgan M. Embleton (admitted *pro hac vice*)
(State of Louisiana Juris No. 35769)
P. Cole von Richthofen (*pro hac vice* forthcoming)
(State of Connecticut Juris No. 444159)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (212) 992-4523
Fax: (212) 363-7171
Email: shopkins@zlk.com
Email: gpotrepka@zlk.com
Email: membleton@zlk.com
Email: cvrichthofen@zlk.com

Adam M. Apton (admitted *pro hac vice*)
(State of New York Juris No. 4759841)
33 Whitehall Street, 17th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Counsel for Co-Lead Plaintiff Dominik Dumancic and Additional Plaintiff Richard Wilkinson and Co-Lead Counsel for the Class*

**POMERANTZ LLP**
Jeremy A. Lieberman
(State of New York Juris No. 4161352)
Murielle J. Steven Walsh (*pro hac vice*)
(State of New York Juris No. 2837631)
Emily C. Finestone (*pro hac vice)*
(State of New York Juris No. 5394820)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
mjsteven@pomlaw.com
efinestone@pomlaw.com

*Counsel for Co-Lead Plaintiff Luis Vicente Davidoff Cracasso and Co-Lead Counsel for the Class*

**THE BRISCOE LAW FIRM, PLLC**
Willie C. Briscoe
State Bar Number 24001788
12700 Park Central Drive, Suite 520
Dallas, Texas 75251
Telephone: 972-521-6868
Facsimile: 281-254-7789
wbriscoe@thebriscoelawfirm.co

*Co-Liaison Counsel for Co-Lead Plaintiff Luis Vicente Davidoff Cracasso and the Class*

**CERTIFICATE OF SERVICE**

I, Stuart L. Cochran, hereby certify that this document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on this 21st day of January 2025.

*/s/ Stuart L. Cochran*
Stuart L. Cochran