## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| IN RE AMERICAN AIRLINES GROUP INC. SECURITIES LITIGATION | Master File No.: 4:24-cv-00673-O (Consolidated with 4:24-cv-00823-O) |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

{00660514;2 }

**TABLE OF CONTENTS**

STATEMENT OF FACTS ......................................................................................................... 2

    A.    AAL Implements the Disastrous NDC Distribution Strategy.................................. 2

    B.    Defendants Were Aware of the NDC Distribution Strategy Failures..................... 4

    C.    Defendants Revealed the Dismal Truth about the NDC Distribution
        Strategy ................................................................................................................. 5

ARGUMENT ........................................................................................................................... 6

I.      APPLICABLE STANDARDS ...................................................................................... 6

II.    THE FAC PROVIDES PROPER NOTICE OF THE ASSERTED CLAIMS ................... 6

III.   THE CW ALLEGATIONS ARE RELIABLE AND SUFFICIENTLY ALLEGED ......... 7

IV.   THE FAC ALLEGES ACTIONABLE MISSTATEMENTS ........................................ 10

    A.    The NDC Transition Statements Were False or Misleading (1, 7, 14, 15,
        18, 19, 24, 25, 26, 27, 37, 39, 40, 43) ................................................................ 10

    B.    The Corporate Travel Statements Were False or Misleading (1, 2, 6, 7, 11,
        12, 13, 15, 17, 23, 24, 35, 41, 42, 43) ................................................................ 13

    C.    The Risk Factors Are Actionable (3, 4, 5, 8, 9, 10, 20, 21, 22, 31, 32, 33).......... 14

    D.    The Financial Guidance is Actionable (16, 23, 28, 29, 30, 34, 36, 38) ............... 16

    E.    Defendants' Remaining Arguments Lack Merit................................................... 18

        1.    Statements 6, 7, 12, 13, and 14 Are Not Puffery .................................... 18

        2.    Defendants' Statements Are Not Inactionable Opinions (1, 6, 7, 11,
            12, 13, 14, 15, 18, 19, 23, 24, 25, 37, 39, 43) ......................................... 19

V.    THE FAC ALLEGES A STRONG INFERENCE OF SCIENTER ............................... 23

    A.    The Collective Allegations Support Defendants' Scienter .................................. 23

        1.    Defendants' Post-Class Period Admissions Support Scienter .................. 23

        2.    The Bain Investigation Supports Scienter................................................. 25

        3.    Defendants' Access to and Review of Data Support Scienter.................. 26

        4.    Defendant Raja's Evasive Answers Support Scienter ............................. 28

    B.    The FAC Alleges a Compelling Inference of Fraud............................................ 28

VI.   THE FAC ADEQUATELY ALLEGES LOSS CAUSATION ...................................... 29

CONCLUSION...................................................................................................................... 30

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Brooks v. United Dev. Funding III, L.P.*,
    2020 WL 6132230 (N.D. Tex., 2020)................................................................................30

*Carlton v. Cannon*,
    184 F. Supp. 3d 428 (S.D. Tex. 2016), *am. on den. of recons.*, 2016 WL
    3959164 (S.D. Tex. July 22, 2016).......................................................................15, 17, 18, 23

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin. Inc.*,
    70 F.4th 668 (3d Cir. 2023) ...............................................................................................10

*City of Pontiac Gen. Emples.' Ret. Sys. v. Dell Inc.*,
    2016 WL 6075540 (W.D. Tex. Sept. 16, 2016)..............................................................16, 30

*City of Warren Gen. Emps.' Ret. Sys. v. Teleperformance SE*,
    746 F. Supp. 3d 1395 (S.D. Fla. 2024) ...............................................................................28

*Edwards v. McDermot Int'l*,
    2021 WL 1421609 (S.D. Tex. Apr. 13, 2021) .......................................................................20

*Emps. Ret. Sys. v. Whole Foods Mkt., Inc.*,
    905 F.3d 892 (5th Cir. 2018) ..............................................................................................15

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*,
    565 F.3d 200 (5th Cir. 2009) ..............................................................................................28

*Fresno Cnty. Emps. Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. July 28, 2017)......................................................................20

*Ga. Firefighters' Pension Fund v. Andarko Petrol. Corp.*,
    514 F. Supp.3d 942 (S.D. Tex. 2021) ..................................................................................15

*Goldstein v. MCI WorldCom*,
    340 F.3d 238 (5th Cir. 2003) ..............................................................................................28

*Hall v. Rent-A-Center, Inc.*,
    2017 WL 6379334 (E.D. Tex. Dec. 14, 2017).......................................................................14

*Hall v. Rent-A-Center, Inc.*,
    2017 WL 6398742 (E.D. Tex. Oct. 19, 2017) .........................................................................7

*Holzwasser v. Staktek Holdings, Inc.*,
    2006 WL 897746 (W.D. Tex. Mar. 30, 2006) ......................................................................25

*In re Alamosa Holdings, Inc. Sec. Litig.*,
382 F. Supp. 2d 832 (N.D. Tex. 2005) ..................................................................................7

*In re Apache Corp. Sec. Litig.*,
2022 WL 4277350 (S.D. Tex. Sept. 15, 2022) *report and recommendation
adopted sub nom. Plymouth Cnty. Ret. Ass'n v. Apache Corp.*, 2022 WL
17324439 (S.D. Tex. Nov. 29, 2022)..............................................................................19, 20

*In re AppHarvest Sec. Litig.*,
684 F. Supp. 3d 201 (S.D.N.Y. 2023)..................................................................................10

*In re Blockbuster Inc. Sec Litig.*,
2004 WL 884308 (N.D. Tex. Apr. 26, 2004) ...................................................................16, 17

*In re BP p.l.c. Sec. Litig.*,
852 F. Supp. 2d 767 (S.D. Tex. 2012) .................................................................................10

*In re Capstead Mortg. Corp. Sec. Litig.*,
258 F. Supp. 2d 533 (N.D. Tex. Mar. 31, 2003).....................................................................7

*In re Lumen Techs. Inc. Sec. Litig.*,
2024 WL 4637293 (W.D. La. Sept. 30, 2024).....................................................................6, 7

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) .................................................................................9

*In re Mullen Auto. Sec. Litig.*,
2023 WL 8125447 (C.D. Cal. Sept. 28, 2023) .....................................................................17

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
307 F. Supp. 3d 583 (S.D. Tex. 2018)..................................................................................21

*In re QuantumScape Secs. Class Action Litig.*,
580 F. Supp. 3d 714 (N.D. Cal. 2022) .................................................................................19

*In re Splunk Inc. Sec. Litig.*,
592 F. Supp. 3d 919 (N.D. Cal. Mar. 21, 2022) ..................................................................28

*In re Venator Materials PLC Sec. Litig.*,
547 F. Supp. 3d 624 (S.D. Tex. 2021)..................................................................................25

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc*,
537 F.3d 527 (5th Cir. 2008) ................................................................................................9

*Jacobowitz v. Range Res. Corp.*,
596 F. Supp. 3d 659 (N.D. Tex. 2022) .................................................................................21

*Joyce v. Amazon.com, Inc.*,
  2023 WL 8370101 (W.D. Wash. Dec. 4, 2023) ........................................................................9

*Kaltman v. Key Energy Servs.*,
  447 F. Supp. 2d 648 (W.D. Tex. 2006).................................................................................18

*Lain v. Evans*,
  123 F. Supp. 2d 344 (N.D. Tex. 2000) .................................................................................16

*Linenweber v. Southwest Airlines Co.*,
  693 F. Supp. 3d 661 (N.D. Tex. 2023) .................................................................................29

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*,
  810 F.3d 951 (5th Cir. 2016) .................................................................................................9

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ....................................................................................... *passim*

*Macovski v. Groupon, Inc.*,
  553 F. Supp. 3d 460 (N.D. Ill. 2021) ...............................................................................11, 14

*Marcus v. J.C. Penney Co., Inc.*,
  2015 WL 5766870 (E.D. Tex. Sept. 29, 2015)..........................................................................9

*Masel v. Villarreal*,
  924 F.3d 734 (5th Cir. 2019) ...........................................................................................16, 23

*MicroCapital Fund LP v. Conn's Inc.*,
  2019 WL 3451153 (S.D. Tex. July 24, 2019)........................................................................9, 23

*Mulderrig v. Amyris*,
  492 F. Supp. 3d 999 (N.D. Cal. 2020) .................................................................................16

*Munl. Emps. Ret. Sys. of Michigan v. Pier 1 Imps., Inc.*,
  935 F.3d 424 (5th Cir. 2019) ...........................................................................................9, 27

*N. Port Firefighters' Pension—Loc. Option Plan v. Temple-Inland, Inc.*,
  936 F. Supp. 2d 722 (N.D. Tex. 2013) .................................................................................16

*Neiman v. Bulmahn*,
  854 F.3d 741 (5th Cir. 2017) ...............................................................................................29

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
  58 F.4th 195 (5th Cir. 2023) ......................................................................................... *passim*

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)............................................................................................................19

*Oscar Priv. Equity Invs. v. Holland*,
2004 WL 5244597 (N.D. Tex. June 10, 2004) ........................................................................22

*Owens v. Jastrow*,
789 F.3d 529 (5th Cir. 2015) ...........................................................................................6, 10, 28

*Plotkin v. IP Axess Inc.*,
407 F.3d 690 (5th Cir. 2005) ...........................................................................................10, 14, 29

*Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*,
777 F. App'x. 726 (5th Cir. 2019) .....................................................................................9

*Pubs. Emps. Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*,
2018 WL 844420 (N.D. Ill. Feb. 12, 2018) ........................................................................18

*R2 Invs. LDC v. Phillips*,
401 F.3d 638 (5th Cir. 2005) ...........................................................................................25

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014), *overruled on other grounds by City of Dearborn
Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th
Cir. 2017) .........................................................................................................................23

*Rensin v. United States Cellular Corp.*,
755 F. Supp. 3d 1048 (N.D. Ill. 2024) ...............................................................................12, 20, 27

*Roberts v. Zuora, Inc.*,
2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) .....................................................................10

*Rosenzweig v. Azurix Corp.*,
332 F.3d 854 (5th Cir. 2003) ...........................................................................................21, 25

*Rougier v. Applied Optoelectronics, Inc.*,
2019 WL 6111516 (S.D. Tex. Mar. 27, 2019)....................................................................6, 7, 21

*S.E.C. v. Kornman*,
391 F. Supp. 2d 477 (N.D. Tex. 2005) ...............................................................................22

*SEC v. Verges*,
716 F. Supp. 3d 456 (N.D. Tex. 2024) ...............................................................................6

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
365 F.3d 353 (5th Cir. 2004) ...........................................................................................21

*Spitzberg v. Houston Am. Energy Corp.*,
758 F.3d 676 (5th Cir. 2014) ...........................................................................................19, 29

*Tarica v. McDermott Int'l, Inc.*,
   2000 WL 1346895 (E.D. La. Sept. 19, 2000) ...........................................................................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)...................................................................................................................23

*Thornton v. Micrografx, Inc.*,
   878 F. Supp. 931 (N.D. Tex. 1995) ....................................................................................14, 21

*Weston v. DocuSign*,
   669 F. Supp. 3d 849 (N.D. Cal. 2023) .....................................................................................18

*Williams v. WMX Techs, Inc.*,
   112 F.3d 175 (5th Cir. 1997) ......................................................................................................7

*Yoshikawa v. Exxon Mobil Corp.*,
   2022 WL 4677621 (N.D. Tex. Sept. 29, 2022)...........................................................................6

**Statutes**

Private Securities Litigation Reform Act of 1995 ........................................................................17

Securities Exchange Act of 1934.............................................................................................6, 30

**Rules**

Fed. R. Civ. P. 8......................................................................................................................2, 29

**Other Authorities**

*The Wall Street Journal* ....................................................................................................1, 24, 25

American Airlines Group ("AAL") is one of the nation's largest airlines and was run at all relevant times by Defendants Robert Isom (CEO), Devon May (CFO), and Vasu Raja (Chief Commercial Officer).[1] During the Class Period (July 20, 2023 through May 28, 2024), AAL launched a new distribution strategy, which sought to transition customers to a different ticketing technology, New Distribution Capability ("NDC"), in an effort to provide AAL with more control over the prices and presentation of its airfare. However, this strategy ultimately alienated corporate travelers and their travel agencies, managers, and travel management companies ("TMCs").

Indeed, CWs confirm that immediately after imposing NDC on customers in July 2023, AAL's bookings from larger agencies declined 15% year-over-year, and bookings from corporate clients dove "much lower." ¶109. As an example, a January 9, 2025 article in *The Wall Street Journal* (the "*WSJ* Article") reported Lockheed Martin slashed AAL spending by 30%. ¶100. Moreover, Class Period customer decline was not caused by any industry slowdown. ¶214. As internal reports and industry data demonstrated, upon implementing NDC, market share shifted from AAL to other carriers, with AAL's share "consistently down." ¶109.

Desperate to conceal such facts, Defendants repeatedly misrepresented: that they were "encouraged" by "how quickly" clients' NDC "transition has happened[,]" purportedly because "incentives" targeted to travel agencies and travel managers were "helping them shift" to NDC; that business travel "demand is strong[,]" and "corporate travel is coming back[,]" enabling AAL to "hang on to [business travel] share;" and that business travel success was "implicit in" AAL's

---

[1] "¶" refers to paragraphs in the First Amended Consolidated Complaint for Violations of the Federal Securities Laws (the "FAC"). ECF No. 54. "Motion" and "Br." refers to Defendants' motion to dismiss and supporting brief. ECF No. 55. "DX" refers to the Exhibits attached to the Appendix in Support of Defendants' Motion. ECF Nos. 55-2–55-8. Unless otherwise indicated, capitalized terms have the same meanings as in the FAC, internal quotation marks, citations, brackets, and footnotes are omitted, and all emphasis is added.

lofty guidance. ¶¶150–151, 164, 189, 199. As late as April 2024, Raja claimed business travel "revenues are coming back very materially for" AAL, which was not "guesswork" rather "[w]e actually see it." ¶199. The ruse unraveled in May 2024, when AAL slashed 2024 growth estimates, blaming the NDC strategy. Then, in July 2024, Isom disclosed that the NDC strategy's failures negatively impacted the first half of 2024's revenue by $750 million, with another estimated $750 million in the second half. Crucially, Isom admitted Defendants knew of the problems "in the first quarter" of 2024 but gambled that it would reverse itself and investors would be none the wiser.

Defendants' Motion challenges falsity, scienter, and loss causation. Their primary falsity argument—that allegations sourced from CWs and news reports should be discarded—falls flat. Each CW and news source alleged is sufficiently detailed and corroborated to be credited. Further, the FAC alleges "what" statements were false, "who" made them, "when," "where," and "why" each alleged statement is actionably misleading. Additionally, the allegations holistically support a strong, cogent, and compelling scienter inference. Crucially, Isom admitted that Defendants knew the allegedly concealed facts beginning in the "first quarter" of 2024, and Defendants' *post hac* interpretations of this statement are ripped out of context and textually implausible. Moreover, the connection between concealed information and the largest single-day stock drop in AAL history post-COVID amply alleges loss causation under Rule 8's low bar.

Accordingly, the Motion fails on each ground asserted and should be denied.

**STATEMENT OF FACTS**

A.      **AAL Implements the Disastrous NDC Distribution Strategy**

AAL's business travelers include "managed travel" customers who rely on in-house corporate travel departments, travel agencies, or TMCs to book their airfare. ¶¶39, 43. During the Class Period, AAL launched a new "modern retailing" distribution strategy, seeking to curb

bookings from traditional managed travel sales channels utilizing "EDIFACT" technology and promote bookings directly with AAL, or through channels using NDC technology. ¶¶5-6. Raja spearheaded AAL's new strategy, overseeing the following changes. ¶¶62, 64, 72. *First*, in April 2023, AAL removed 40% of its airfare from EDIFACT channels. ¶63. *Second*, AAL stopped offering certain contracts to SMBs through travel agencies, instead requiring them to book directly with AAL. ¶79. *Third*, in July 2023, AAL required agencies, TMCs, and corporations to enter new contracts that only paid incentives based on bookings volume made through NDC. ¶¶72-75.

According to the CWs (AAL employees during the Class Period), these changes damaged AAL's relationship with travel agencies, TMCs, corporations, and SMBs, many of whom were not prepared to transition to NDC technology. ¶¶9, 82-83, 85. For example, CW2 recounted that Aon plc, a major corporate customer, "did not want to spend the resources to do so." ¶86. AAL nevertheless downplayed the technological hurdles and failed to help customers transition. ¶¶84, 210. Customers also lost access to data and services formerly available in EDIFACT channels, including data needed for duty-of-care requirements, and the ability to change tickets on behalf of corporate travelers. ¶¶87-89. As a result, CW2 recalled, customers gave "a lot of pushback." ¶88.

When the July 2023 Contracts went into effect before the Class Period, corporate customers immediately slashed bookings with AAL. ¶¶90-91, 95, 97. According to CW2, agencies deprioritized AAL flights when presenting flight options to travelers, and bookings from larger agencies fell 15% on a year-over-year basis, with corporate bookings "much lower" than that, and bookings and "percentage of share metrics" stayed "consistently down." ¶¶98, 109–10. CW1 explained certain agencies had "control on share" and directed business away from AAL. ¶90. For example, CW2 recalled that Anthony Travel, a TMC that handles travel for universities, historically brought "a lot of revenue" to AAL but pulled back offering AAL's fares due to the

shift to NDC channels. ¶91. Large corporations likewise took their business to competitors and dropped AAL to their secondary or tertiary provider, causing AAL to lose corporate travel market share. ¶¶99-101, 110. For instance, according to CW1 and the *WSJ* Article, Lockheed Martin was "so pissed off" by the NDC distribution strategy that it designated AAL, once its mostly frequently-used vendor, as its "least-preferred," and cut its AAL spend by 30%. ¶¶99-100. AAL similarly lost significant share of SMBs' business, as SMBs refused to stop working with agencies. ¶95. Agencies, TMCs, and corporations also failed to meet AAL's goals for NDC bookings. ¶111. Most of CW2's agencies and TMCs did not make *any* bookings through NDC channels in 2023. ¶111.

### B.     Defendants Were Aware of the NDC Distribution Strategy Failures

Defendants knew of, or recklessly disregarded, the NDC distribution strategy's failures, including AAL's dwindling bookings, revenue, and corporate customer market share. Specifically, data was available to Defendants through AAL's SalesLink Insights platform, PRISM reports, and IATA reports which showed poor NDC adoption, and thus that AAL was losing revenue and thereby market share. ¶¶10, 101, 109, 112. The data included, *inter alia*, market share of ticket sales that each agency gave to specific airlines, each agency's bookings through NDC versus EDIFACT channels, and revenues derived from agencies, TMCs, and corporations. ¶¶108, 112-13, 251-53. Per CW2, agencies' split of bookings between EDIFACT and NDC was a "key" metric for the AAL sales team—a fact corroborated by Isom who admitted that, despite all of the steps taken to end EDIFACT sales, they still accounted for approximately $14 billion of AAL's $48.5 billion annual passenger air travel revenue in 2023. ¶¶42, 269.

That agencies and corporations were not transitioning to NDC and that AAL was losing share of their bookings in 2023 was escalated to and discussed among management, which CW1 stated was apparent because Defendants responded to these findings by downplaying them as an

expected, intentional consequence of the NDC strategy. ¶¶112, 114, 235–36.

Defendants' public statements also discussed the NDC rollout in granular detail, which demonstrates that Defendants reviewed and monitored specific data they discussed and the attendant effects to AAL's business. This data included: NDC vs. EDIFACT booking rates, bookings and revenue for large corporations and SMBs, percent of business travel that was managed vs. unmanaged, and through which third parties customers were booking. ¶¶254-62.

### C.    Defendants Revealed the Dismal Truth about the NDC Distribution Strategy

On May 28, 2024, AAL disclosed Raja's termination and slashed its growth, margin, revenue, and other financial guidance for 2024. ¶¶203-04. The next day, Isom blamed AAL's NDC strategy as the key driver by relying on too many "sticks" and not enough "carrots." ¶¶ 206-07, 209. Isom tied Raja's firing to these failures. ¶207. That same day, *Bloomberg* published an article (the "*Bloomberg* Article") linking Raja's dismissal to a critical review by the consulting firm Bain & Co. ("Bain"), which AAL in all likelihood retained well before the end-of-Class Period disclosures. ¶¶240–42. Bain concluded that AAL's strategy had alienated corporate clients "over the past few quarters" (*i.e.*, starting in Q3 2023). ¶238. In response to these disclosures, AAL's stock price suffered the largest single-day drop since COVID-19 decimated global travel. ¶14. Within days, it became clear that AAL was significantly underperforming competitors. ¶¶214, 279, 284-92.

In July 2024, AAL cut guidance again, once more blaming the NDC strategy, disclosing it had a $750 million negative revenue impact in the first half of 2024, and that AAL assumed a similar impact in the second half. ¶¶218-20, 224. When asked whether AAL heard "frustration and displeasure" from corporate customers regarding the NDC strategy, Isom admitted "we identified a deviation in terms of our revenue performance versus some of our large peer networks in the first

quarter" and "[w]e thought that was going to reverse itself" but "[i]t didn't." ¶231.

## ARGUMENT

### I.    APPLICABLE STANDARDS

On a motion to dismiss, the Court "must . . . accept all factual allegations in the complaint as true [and] draw all reasonable inferences in the plaintiff's favor." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). To state a Section 10(b) claim, the FAC must allege: "(1) a material misrepresentation or omission; (2) scienter ('a wrongful state of mind'); (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) a 'causal connection between the material misrepresentation and the loss.'" *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 206 (5th Cir. 2023) ("*Six Flags*").

### II.    THE FAC PROVIDES PROPER NOTICE OF THE ASSERTED CLAIMS

Defendants argue that "puzzle pleading" is an independent basis for dismissal. Br. at 10-11. That is legal error. *Owens v. Jastrow*, 789 F.3d 529, 538 n.3 (5th Cir. 2015) (rejecting "a strict rule requiring outright dismissal for any … puzzle pleading" as it could "cause future plaintiffs to omit from complaints helpful information"). Moreover, the FAC sufficiently alleges "who, what, when, where, and how" by identifying the materially misleading statements or omissions (when and how they were made, and who made them), explaining falsity, and providing the bases for each Defendant's scienter. *SEC v. Verges*, 716 F. Supp. 3d 456, 465 (N.D. Tex. 2024); *see also Rougier v. Applied Optoelectronics, Inc.,* 2019 WL 6111516, at *9 (S.D. Tex. Mar. 27, 2019) (same). Nothing else is required. *In re Lumen Techs. Inc. Sec. Litig.*, 2024 WL 4637293, at *25 (W.D. La. Sept. 30, 2024) (no puzzle pleading where complaint "recite[d] several statements at a time," but "explain[ed] why that particular collection of statements [was] false or misleading, rather than relying on the Court to make the inference"); *Yoshikawa v. Exxon Mobil Corp.*, 2022

WL 4677621, at *14 (N.D. Tex. Sept. 29, 2022) (finding similar falsity allegations sufficient).[2]

Contrary to Defendants' assertions (Br. at 10-11), using "substantially the same set of alleged facts" to explain falsity does not render allegations inadequate where the facts "logically correspond with each alleged misstatement"—here, centering around AAL's NDC strategy. *Rougier*, 2019 WL 6111516, at *8. Further, Defendants' puzzle pleading claim is belied by their ability to identify and challenge the misstatements. *See In re Lumen Techs., Inc. Sec. Litig.* 2024 WL 4637293, at *26 (no puzzle pleading where defendants created appendices of misstatements).

## III.    THE CW ALLEGATIONS ARE RELIABLE AND SUFFICIENTLY ALLEGED

Courts lack "unfettered discretion to discard" CW allegations. *Six Flags*, 58 F.4th at 208. CWs are credited if the allegations "support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* CW descriptions should include specific "job descriptions, individual responsibilities, and [] employment dates." *Hall v. Rent-A-Center*, Inc., 2017 WL 6398742, at *23 (E.D. Tex. Oct. 19, 2017), *report and recommendation adopted sub nom. Hall v. Rent-A-Center*, 2017 WL 6379334 (E.D. Tex. Dec. 14, 2017). Further, CWs need not "be a fly on every relevant wall – or directly deliver [to defendants] every relevant presentation – to plead allegations" that are credited. *Six Flags*, 58 F.4th at 216 n.18; *see also Hall*, 2017 WL 6398742, at *29 n.9 (direct interactions between CWs and defendants unnecessary).

Here, the FAC allegations support the CWs' reliability. CW1 was a Travel Agency Account Manager out of one of AAL's hubs from 2019 through January 2024 and managed two

---

[2] Defendants' authority is distinguishable. *See Williams v. WMX Techs, Inc.*, 112 F.3d 175, 178 (5th Cir. 1997) (failure to plead with particularity); *In re Alamosa Holdings, Inc. Sec. Litig.*, 382 F. Supp. 2d 832, 856-57 (N.D. Tex. 2005) (failing to "identify[] the speaker, the precise statement, facts which indicate the statements were false or misleading when made, or that they were made with fraudulent intent"); *In re Capstead Mortg. Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 552 (N.D. Tex. Mar. 31, 2003) (allegations conclusory and not adequately supported).

"very large" corporate travel agencies based out of one of AAL's hub cities. ¶34. In this position, CW1 was familiar with: (i) weekly meetings of AAL's Revenue Management team, which discussed IATA data such as AAL's market share which CW1 tracked; (ii) the changes AAL implemented to drive NDC adoption; and (iii) customers' reactions to same. ¶¶79, 90, 93-95, 99, 112, 114. CW2 was a Retail Business Manager within AAL's Global Sales Division from before the Class Period through January 31, 2024. ¶35. CW2 was responsible for managing small, medium, and large agency accounts in the U.S. and Canada, which included addressing service issues, assisting with travelers' needs, providing training, and meeting with agencies to improve AAL's agency share and meet NDC goals. *Id.* The FAC also alleges CW2's reporting chain up to Defendant Raja. *Id.* CW2 interacted with senior management at bi-weekly and quarterly reviews. *Id*; ¶62. Like CW1, CW2 also tracked AAL's key share metrics, and additionally reviewed NDC booking metrics and revenue that AAL derived from third party booking partners through AAL's SalesLink Insights platform and PRISM reports. ¶¶102–04.

In their customer-facing roles, the CWs had access to the aforementioned internal data, reports, and meetings, and thereby had bases to know: AAL's data and performance metrics related to agency bookings, including revenues and AAL's market share (¶¶53, 102-04, 106-10, 114); AAL's distribution channels (¶67); how distribution strategy changes affected travel agencies (¶¶61, 64); AAL's general and contractual relationships with agencies and other third parties (¶¶71-72, 74-75, 77-79, 81); customer concerns related to the shift to NDC channels, including technological concerns and the availability of data and services through EDIFACT (¶¶85-89, 93); why customers shifted bookings away from AAL in 2023 (¶¶90-91, 95-99, 111); and that Raja wanted to eliminate third parties from AAL's distribution system entirely (¶62).

The CWs are also corroborated by other sources: (1) the *Bloomberg* Article confirming

AAL's NDC strategy was "alienating corporate customers" causing "lagging revenue over the past few quarters[;]" (2) the *WSJ* Article confirming that TMCs lost benefits in NDC channels and that Lockheed Martin downgraded AAL from preferred carrier status in response to the 2023 NDC strategy changes; and (3) Defendants' own admissions about the strategy's failures. ¶¶88, 99-100, 215, 238, 244-49. These sources support the CWs' reliability. *See Six Flags*, 58 F.4th at 209 n.11 (considering CW allegations with other "corroborative" "facts" and "sources"); *MicroCapital Fund LP v. Conn's Inc.*, 2019 WL 3451153, at *14 n.28 (S.D. Tex. July 24, 2019) (refusing to strike CW allegations where complaint alleged "sources which corroborate[d]" them).[3]

Contrary to Defendants' assertions, the *Bloomberg* Article is reliable because *Bloomberg* is a reputable news source and it is corroborated by AAL's contemporaneous press release, Defendants' post-Class Period admissions, the FAC's CWs, and the *WSJ* Article. ¶¶85-89, 96-100, 203, 207, 210, 215-16, 218, 224, 231; *see also Marcus v. J.C. Penney Co., Inc.*, 2015 WL 5766870, at *2 n.4 (E.D. Tex. Sept. 29, 2015) (citing *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000) for proposition that an article is reliable where corroborated by plaintiff's investigation); *Joyce v. Amazon.com, Inc.*, 2023 WL 8370101, at *7 (W.D. Wash. Dec. 4, 2023) ("adequate corroborating information" rendered sources reliable).[4]

Further, although Defendants seek to discredit the CWs for working at AAL for about six of the roughly ten-month Class Period (Br. at 8, 12), a CW need not work at a company for  the

---

[3] Defendants' cases are inapposite: *Munl. Emps. Ret. Sys. of Michigan v. Pier 1 Imps., Inc.*, 935 F.3d 424, 434 (5th Cir. 2019), lacked other corroborative sources including defendant admissions; *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 958 n.2 (5th Cir. 2016), involved entry-level factory floor workers, unlike the FAC's corporate-level, customer-facing CWs who reviewed relevant data; *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc*, 537 F.3d 527, 539 (5th Cir. 2008) discounted a sole, uncorroborated CW.
[4] *Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x. 726, 731 (5th Cir. 2019) involved new information about past facts, whereas Isom's admission supports that *Bloomberg* reported on "lagging revenue" that was known for "the past few quarters." ¶¶215, 231.

*entire* Class Period to be reliable.[5] *See In re BP p.l.c. Sec. Litig.*, 852 F. Supp. 2d 767, 795-96 (S.D. Tex. 2012) (crediting CWs even where only some allegations "plac[ed] them at [BP] during the relevant time period"); *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 262 (S.D.N.Y. 2023) (allegations "in one period" support inference of similar issues in "subsequent period"); *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *10-11 (N.D. Cal. Apr. 28, 2020) (CWs not "unreliable" although no CW employed "during the *entire* Class Period" or had "direct" defendant contact"). The CWs were employed during the critical NDC rollout and provided their personal observations of travel agencies and corporate bookings declining substantially in June 2023, and that bookings and percentage of share remained "consistently" down throughout their tenures. *See* ¶¶90, 95-96, 98-99, 109-11, 114. Their allegations about the negative reaction to the strategy and who knew of the strategy's impact between July 2023 and January 2024 support that similar conditions existed during the short window after the CWs left AAL, especially given that corroborating reports and admissions confirm that the CWs' observations held true the remainder of the Class Period. ¶¶215-16, 221, 224-31; *see Plotkin v. IP Axess Inc.*, 407 F.3d 690, 698 (5th Cir. 2005) (later-emerging facts can provide "inferences about an earlier situation"); *City of Warren Police & Fire Ret. Sys. v. Prudential Fin. Inc.*, 70 F.4th 668, 693 (3d Cir. 2023) ("later developments may allow a reasonable inference that prior statements were untrue or misleading when made"). Accordingly, the Court should consider the CW allegations.

## IV.    THE FAC ALLEGES ACTIONABLE MISSTATEMENTS

### A.    The NDC Transition Statements Were False or Misleading (1, 7, 14, 15, 18, 19, 24, 25, 26, 27, 37, 39, 40, 43)[6]

During the Class Period, Defendants falsely and misleadingly claimed that their customers'

---

[5] Defendants' authority (Br. at 20), *Owens*, 789 F.3d at 542 n.11, says *nothing* suggesting that facts observed by CWs cannot hold true past the CWs' tenures.

[6]  Plaintiffs refer to the same Statement numbering as in Defendants' brief, but recategorized.

transition to NDC distribution was going well, purportedly thanks to its incentives and benefits. Defendants claimed to be "really pleased" with the transition's execution, which was purportedly happening "quickly" in part because customers "prefer" NDC booking, claimed to be seeing "great response from agencies increasingly adopting" NDC and similar "great reception" from SMBs, and claimed there was "nothing … that would suggest that we're not on the right path[,]"—adding "the vast majority" of agencies were transitioning. Statements 1, 7, 14, 19, 24, 27, 40, 43.[7] Defendants said that all of AAL's financial incentives and initiatives for booking partners were "around helping them shift" in as "riskless as possible" fashion. Statements 18, 25. They also touted that the NDC transition enabled: "improved access" to AAL products; "better customer service;" AAL and booking partners to "grow together" and "all get a benefit;" "value … to our customers;" and "creating the right long-term customer proposition." Statements 15, 26, 37, 39. These statements were false when made because they misrepresented that AAL's distribution strategy was well-received by booking partners and customers; NDC adoption and rollout was swift; and AAL's NDC promotion efforts were successful. *See Macovski v. Groupon, Inc.*, 553 F. Supp. 3d 460, 476 (N.D. Ill. 2021) (touting "a narrative of improvement" rather than actual "adverse trends[,]" was misleading, particularly given the issues' importance).

In reality, by that time, customers were already rejecting AAL's push to NDC technology because AAL removed products like basic economy fares from traditional booking channels in April 2023, well before customers were ready or willing to transition to NDC because of the significant resources necessary to build NDC-capable infrastructure, and NDC channels deprived customers of necessary information and services. ¶¶63–64, 85–88. AAL also slashed incentives

---

[7] Statement 14 is not forward-looking (Br. at 29) but rather mixed insofar as Isom discussed the current state of AAL's NDC platform, which he could not have felt comfortable with as discussed in Section IV.E.2 *infra*. *See also* Section IV.D, *infra*.

for agencies, TMCs, and corporations in the July 2023 Contracts, which swiftly caused bookings from larger agencies to drop by 15% and corporate bookings to drop "much lower" than that, and booking and percentage of share metrics stayed "consistently down." ¶¶73–74, 109. Agencies also had begun deprioritizing AAL for travel. ¶98. Agencies, TMCs, and corporations were not meeting AAL's goals for bookings through NDC channels, many finding NDC too complicated, with most of CW2's agencies and TMCs not making *any* bookings through NDC channels in 2023. ¶¶96, 110-11. According to CW2, it was clear by April 2023 that the NDC distribution strategy was causing agencies and companies to book fewer overall flights with AAL, with some avoiding AAL entirely. ¶97. Data from AAL's SalesLink Insights platform, PRISM reports, and IATA showed each travel agency's market share of airline ticket sales, the share of bookings through NDC versus EDIFACT channels, and that revenue derived from travel agencies, TMCs, and corporations was declining because corporate customers were moving to competitors. ¶¶10, 101, 112. ¶¶251-53. AAL's NDC "sales approach" caused "lagging revenue" beginning in Q3 2023. ¶215.

Moreover, after the Class Period, Defendants admitted many of these undisclosed facts. AAL's reduced guidance as announced May 28–29, 2024 was "due to the changes … to our sales and distribution strategy[,]" on which Defendants had "move[d] faster than [they] should have and didn't execute well" by not making their "product … available where[] customers want to buy it." ¶¶206–07. The NDC strategy had made AAL "difficult to do business with[,]" "driving customers away from [AAL,]" because the "strategy was not working[.]" ¶¶207, 211, 221. Indeed, that AAL subsequently had to walk back changes to contracts, product availability, and "conduct[] extensive outreach to customers … to address [their] pain points" further demonstrates that the NDC Transition Statements were false or misleading when made. ¶217; *Rensin v. United States Cellular Corp.*, 755 F. Supp. 3d 1048, 1063-64 (N.D. Ill. 2024) (statement conveying being pleased with

strategy actionable where it omitted the same would be imminently abandoned).

**B.    The Corporate Travel Statements Were False or Misleading (1, 2, 6, 7, 11, 12, 13, 15, 17, 23, 24, 35, 41, 42, 43)**

Defendants reassured investors during the Class Period that business travel was performing well through the NDC transition. Defendants touted being "encouraged on business demand[,] repeatedly claiming that AAL's business travel demand was "durab[le,]" "remains strong" or "is strong[,]" that business travel was exhibiting "encourag[ing] … trends" with "strength among [SMBs,]" and that corporate travel revenue was "coming back" (*i.e.,* rising), "small business especially[.]" Statements 1, 6, 7, 15, 23, 35, 43. Defendants similarly claimed "steady improvement in business travel" "from both managed and unmanaged corporate customers," "perform[ing] better … among contracted corporations" and being "really encouraged" by their "revenue production" for AAL, and both "growth in premium" revenues and "growing" corporate revenues, the latter "coming back very materially[.]" Statements 11, 12, 41, 42. This revenue growth, per Defendants, meant improved "competitive basis against … peers" and purportedly enabled AAL to "hang on to [market] share." Statements 1, 13, 24. Raja boldly claimed that corporate revenue growth thanks to the NDC strategy was "not guesswork… We actually see it" which was purportedly "implicit in [AAL's] guid[ance] for Q2 and for [2024]." Statement 42.[8]

These statements were false when made. *First*, managed corporate customers' demand worsened because of the NDC strategy, which Defendants masked by discussing demand broadly instead of specifically addressing managed corporate travel.[9] Indeed, when Defendants made these

---

[8] Defendants cannot argue they were in the dark about "the cause" of a performance deviation with corporate business (Br. at 21-22), without rendering Raja's statement about "guesswork" and what he could "actually see" (¶199, Statement 42) misleading.

[9] Even assuming *arguendo* AAL's *total* business revenues were up 2% (Br. at 14), Defendants concede it was based on "particular success in *unmanaged* business" (Br. at 5), and it does not negate that Defendants misled investors by hiding AAL's *managed* business decline.

misstatements, the July 2023 Contracts were in effect and, according to CW2, caused larger agencies' bookings to decline 15% and bookings from corporate accounts declined "much lower" than that. ¶109.[10] Corporations were booking with competitors over AAL because, as CW2 put it, AAL's NDC strategy in 2023 "pissed off" corporations. ¶¶78, 99. IATA data presented at weekly Revenue Management team meetings showed that AAL was losing corporate market share in 2023 and according to CW1, "everyone knew" it. ¶114. *Second*, AAL was *losing* SMB share because such customers were being driven away by AAL's distribution strategy. ¶¶79, 92-95.

The FAC's falsity support is especially pronounced later in the Class Period, as Isom admitted to seeing declining revenue from "corporate customers" by Q1 2024 and the *Bloomberg* Article confirmed that AAL's distribution strategy negatively impacted revenue "*over the past few quarters,*" (*i.e.*, by Q3 2023). ¶¶215, 231. And contrary to Defendants' assertion (Br. at 20-21), they are not shielded from liability by reporting lagging revenue compared to competitors in April 2024—particularly when they concurrently touted revenue improvement (¶¶196-200). *Hall*, 2017 WL 6379334, at *8 (misstatements actionable where purported disclosures were "sparse" and "offset" by accompanying reassurances). Indeed, one month later, AAL cut growth estimates, including one key figure (TRASM) by *100-400%*. ¶204.[11] The temporal proximity between Defendants' conflicting statements supports falsity. *See Plotkin*, 407 F.3d at 698 (later-emerging facts support "inferences about an earlier situation"); *Macovski*, 553 F. Supp. 3d at 475 (similar).[12]

## C.    The Risk Factors Are Actionable (3, 4, 5, 8, 9, 10, 20, 21, 22, 31, 32, 33)

The risk factors, framed as hypothetical, future risks, are actionable because the risks had

---

[10] Defendants ask the Court to infer that the lost agency bookings converted to direct bookings with AAL, but the FAC alleges that travelers took their business to AAL's competitors, impacting AAL's overall business travel revenues and thereby market share. ¶¶98-99, 109-11.

[11] As explained at Section V.A.1, *infra,* Defendants knew the cause of the revenue deviation.

[12] Defendants' authority (Br. at 13) is thus inapposite. The *Thornton v. Micrografx, Inc.*, 878 F. Supp. 931, 936 (N.D. Tex. 1995) plaintiffs, unlike here, did not plead "*any facts*" showing falsity.

already materialized, and "[w]hen risks have already begun to materialize, it is no longer sufficient to generally warn of the possibility of these risks in the future." *Ga. Firefighters' Pension Fund v. Andarko Petrol. Corp.*, 514 F. Supp.3d 942, 953 (S.D. Tex. 2021).

Between July 2023 and April 2024, Defendants warned: (1) "encounter[ing] problems" with "third-party service providers" *could* result in a "decline in revenue or negative public perception about [AAL's] services;" (2) future initiatives "creat[ing] logistical challenges … *could* . . . result in decreased demand;" and (3) changes to "distribution flexibility" and "the functionality of distribution channels" "*may* affect [AAL's] relationship with conventional travel agents [and] travel management companies." Statements 3-5, 8-10, 20-22, 31-33. However, these risks had materialized by July 2023: AAL was already alienating third-party distributors with its NDC strategy, who were struggling with NDC technology and not receiving support from AAL, and, as a result, were booking less with AAL and more with competitors. ¶¶97-99, 110-11. Thus, the risk factors are actionable. *See Carlton v. Cannon*, 184 F. Supp. 3d 428, 492 (S.D. Tex. 2016), *am. on den. of recons.*, 2016 WL 3959164 (S.D. Tex. July 22, 2016) (defendant cannot "avoid liability for statements implying that [risks] were on the horizon even if a precipice was in sight").[13]

Moreover, managed business travel was indisputably material to AAL and thereby investors. Defendants' "5 to 7%" figure (Br. at 4) was a *pre-Class Period* low point, and they ignore Raja's contemporaneous statement that such revenue simply hadn't *yet* recovered to pre-pandemic levels (¶258(ii) ("The really critical word in that sentence is the word *yet*")), and that managed travel remained an important revenue source for American. *See* ¶258(vii) (explaining that as of end of FY2023, overall business revenue had recovered to 90% of 2019 levels, with

---

[13] Defendants' case, *Emps. Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 900-01 (5th Cir. 2018) is inapposite because it involved a mismatch between undisclosed facts and misstatements, whereas here, the statements referring to revenue and demand are directly tied to booking volume.

around 25% of that being in managed travel). That analysts frequently asked about managed travel belies any argument that it was immaterial to AAL's revenues and investors. *See* ¶¶199, 258.

### D.    The Financial Guidance is Actionable (16, 23, 28, 29, 30, 34, 36, 38)

Statements 23, 29-30, and 38 (from March and April 2024) are actionable because they are based on the underlying misrepresentations that "demand [was] strong"—indeed, "present demand trends," "current demand assumptions," and "current assumptions" purportedly underlaid AAL's projections. Statement 36 (from April 2024) is also actionable because it is premised on business travel "continu[ing] to recover" and there being "sequential improvement in the recovery of managed corporate travel." However, at that time, demand was not strong, and current assumptions did not support the projections because managed corporate travelers were booking with AAL less and moving to competitors. ¶¶98-99, 109-10; *City of Pontiac Gen. Empls. Ret. Sys. v. Dell Inc.*, 2016 WL 6075540, at *3–4 (W.D. Tex. Sept. 16, 2016) (revenue statements actionable where unreasonable, given lack of demand). Indeed, one month later, Defendants admitted the disastrous impact of the NDC distribution strategy on demand. ¶¶193-94, 197–200, 206–10, 245. Where, as here, financial projections depend on false underlying facts, the underlying fact is "independently actionable." *In re Blockbuster Inc. Sec Litig.*, 2004 WL 884308, at *7 (N.D. Tex. Apr. 26, 2004); *Mulderrig v. Amyris*, 492 F. Supp. 3d 999, 1021 (N.D. Cal. 2020) (projections actionable when "[d]efendants failed to disclose the material facts undermining those projections").[14] If courts accepted Defendants' argument (Br. at 21-22), a misrepresentation about any underlying fact

---

[14] Defendants' own authority (Br. at 21) accords. *See Masel v. Villarreal*, 924 F.3d 734, 750-51 (5th Cir. 2019) (statements about profits actionable where "present capabilities" misstated). Defendants' other cases do not say otherwise. *Six Flags*, 58 F.4th at 210-11, confirmed "mixed present/future statement[s are] ineligible for safe harbor protection." *N. Port Firefighters' Pension—Loc. Option Plan v. Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 759 (N.D. Tex. 2013), unlike here, involved *no* bases in present or past facts. The court in *Lain v. Evans*, 123 F. Supp. 2d 344, 349 n.4 (N.D. Tex. 2000) merely noted "without ruling[,]" that safe harbor "*may*" apply.

would be inactionable "merely because it affected a financial projection" and "a company would insulate itself from liability for virtually all" fraud. *Blockbuster*, 2004 WL 884308, at *7.

In addition, none of the financial guidance misstatements are protected by the PSLRA safe harbor, which applies only when "the statement is identified as forward-looking and is accompanied by meaningful cautionary statements[,]" *or* "it is immaterial," *or* "the plaintiff fails to plead that the forward-looking statement was made with actual knowledge that [it] was false or misleading." *Lormand*, 565 F.3d at 243. *First*, the safe harbor does not apply because Defendants failed to identify any meaningful cautionary language accompanying the misstatements. Defendants point to language in 2Q 2023 and 3Q 2023 SEC filings, which are insufficient because they predate the financial guidance misstatements (made between January and April 2024). ECF Nos. 55-3 & 55-4, Exs. G at A311-13; I at A425-26; *see also In re Mullen Auto. Sec. Litig.*, 2023 WL 8125447, at *11 (C.D. Cal. Sept. 28, 2023) ("SEC filings []predating" misstatements are not "*accompanying* cautionary language").[15] Defendants' other cautionary language, which likewise predates the misstatements, is insufficient for the additional reason that Plaintiffs allege those statements are themselves misleading. *Compare* Br. at 4-5 citing Ex. G at A393 *with* ¶120 (Statement 5); *see* Section IV.C, *supra*. Moreover, Defendants' summary of risks, which did not accompany the misstatements and were unattached to *individual* forward-looking statements, consists of "a boilerplate litany of" risk factors that are "generally applicable" to any business, wholly irrelevant to the false statements, or are themselves misleading, and as such, are not meaningful. *See e.g.*, Ex. G at A312-13; *Six Flags*, 58 F.4th at 211.

---

[15] Defendants' authority (Br. at 29) is inapposite. *See Carlton*, 184 F. Supp. 3d at 463-64 (cautionary language found meaningful where provided in the *same documents* as alleged misstatements); *Tarica v. McDermott Int'l, Inc.*, 2000 WL 1346895, at *11 (E.D. La. Sept. 19, 2000) (at issue was whether the cautionary statements were independently actionable, not whether they were meaningful and accompanied a forward-looking statement).

*Second*, the FAC adequately alleges actual knowledge of falsity, as discussed Section V, *infra*. *See Six Flags*, 58 F.4th at 214-16 (collective scienter allegations supported inference of "actual knowledge"); *Kaltman v. Key Energy Servs*., 447 F. Supp. 2d 648, 663 (W.D. Tex. 2006) (same). Critically, Isom admitted that Defendants had "identified a deviation in terms of [AAL]'s revenue performance versus some of our large network peers" *in Q1 2024* (¶231), when two misleading financial guidance statements were made and *before* the remainder of them. Yet, the Class Period guidance did not factor in such deviation. Accordingly, the statements are actionable.

### E.       Defendants' Remaining Arguments Lack Merit

### 1.       Statements 6, 7, 12, 13, and 14 Are Not Puffery

Statements 6–7 and 12–14 are not puffery. A statement that is "objectively verifiable" is not puffery. *Carlton,* 184 F. Supp. 3d at 493; *see also Six Flags*, 58 F.4th at 220 ("parks are progressing nicely" not puffery). Here, the challenged statements related to business and customer demand; corporations' revenue (including "premium" revenue) production; margin comparisons; and NDC distribution performance (including shift of bookings to NDC channels). ¶¶10, 101, 112, 251-53. Such metrics are capable of objective verification through internal data available to Defendants. Defendants *concede*, for example, that Statements 11–12 concern revenue metrics. Br. at 14. Courts routinely find similar statements actionable. *Kaltman v. Key Energy Servs., Inc.*, 447 F. Supp. 2d 648, 660 (W.D. Tex. Aug. 11, 2006) ("pleased with the strength in activity levels," "exceptionally well positioned," and "strong operating leverage" not puffery); *Carlton,* 184 F. Supp. 3d at 493-94 ("well positioned to building progress" and "seeing operational progress" and "we believe that we are turning … toward steady-state operations" not puffery where "tethered" to "factual statements about current operations"); *Weston v. DocuSign*, 669 F. Supp. 3d 849, 880-81 (N.D. Cal. 2023) (statements of belief about customer demand not puffery); *Pubs. Emps. Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, 2018 WL 844420, at *3 (N.D. Ill. Feb. 12, 2018) (not

puffery where defendants made "repeated" statements they were "handling business" "successful[ly]"). Thus, Statements 6–7 and 12–14 are actionable.

### 2. Defendants' Statements Are Not Inactionable Opinions (1, 6, 7, 11, 12, 13, 14, 15, 18, 19, 23, 24, 25, 37, 39, 43)

Defendants' contention that their statements are inactionable opinions fails. *See* Br. at 15–16, 19. Defendants' misstatements, in context, were not opinions, but rather described then-observable data concerning demand, corporate bookings, revenue production, and NDC adoption. *See* Statements 1, 6-7, 11-12, 15, 18-19, 24, 39, 43; *In re QuantumScape Secs. Class Action Litig.*, 580 F. Supp. 3d 714, 739 (N.D. Cal. 2022) (statement that data "ma[d]e clear" company "c[ould] address" problems was not opinion). Defendants' use of language such as "we think" or "we feel" offers no protection. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 193 (2015) (such words can "preface nearly any conclusion" despite being "perfectly capable of misleading investors"); *see also e.g.,* Statements 13-14, 23-25, 37.

Alternatively, assuming *arguendo* any misstatements are opinions, they remain actionable because they omitted material facts and/or Defendants "did not hold the belief . . . professed[.]"*Omnicare*, 575 U.S. at 184-89. Here, Defendants' misstatements are actionable because they "did not fairly align" with the data available to them, as discussed Section V.A.3, *infra*. *Omnicare*, 575 U.S. at 189. The statements omitted contrary data, creating a misimpression that customer demand was strong, AAL's margins were improving relative to competitors, and customers were transitioning to NDC. *See Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 691 (5th Cir. 2014) (opinion actionable where a CW's account "directly conflict[ed] with defendants[]' [public] representations"); *see also In re Apache Corp. Sec. Litig.*, 2022 WL 4277350, at *6 (S.D. Tex. Sept. 15, 2022) *report and recommendation adopted sub nom. Plymouth Cnty. Ret. Ass'n v. Apache Corp.*, 2022 WL 17324439 (S.D. Tex. Nov. 29, 2022) (opinion

actionable where it omitted material facts); *Edwards v. McDermot Int'l*, 2021 WL 1421609, at \*8-9 (S.D. Tex. Apr. 13, 2021) (finding reassuring opinion statements actionable where they "omitted material facts"). Indeed, investors would not have understood from Defendants repeated statements of being "encouraged by" these business trends that AAL was actually "driving" these very "customers away[.]" ¶207.

Defendants' misstatements are also actionable because they could not have believed the "trends [they were] seeing in business demand" were encouraging or "fe[lt] really comfortable about demand" and "really good about" AAL's ability "to hang onto [market] share." Statements 15, 23, 24; *see also* Statements 1, 6-7, 11-13 (similar). Nor were Defendants "pleased with the start" of the NDC strategy's execution, encouraged by how quickly customers were adopting NDC, or helping agencies and travel managers transition to NDC. Statements 14, 18-19, 25. Rather, Defendants were aware when making these statements that managed corporate travel bookings and AAL's share had declined, as agencies, TMCs, corporations, and SMBs struggled transitioning to NDC technology, fled to competitors, and were not meeting AAL's NDC bookings goals. ¶¶95, 97-99, 109-11; *see also* Section V.A.3, *infra. Apache*, 2022 WL 4277350, at \*5 ("opinion statements are actionable if the speaker did not sincerely hold that opinion"); *Fresno Cnty. Emps. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 547 (S.D.N.Y. July 28, 2017) (similar). Thus, AAL was *losing* corporate travel share to customers, not catching up to them. ¶¶98-99, 109-10.

Indeed, when Isom was assuring that he was "very pleased with where we stand right now" and that he saw "nothing … in terms of customer behavior that would suggest we're not on the right path" on March 12, 2024 (Statement 24), he already knew internally that AAL's revenue was lagging compared to peers because of the NDC strategy. *See* ¶¶204-07, 209, 226, 231; *Rensin*, 755 F. Supp. 3d at 1063-64. Moreover, Isom later admitted AAL's NDC strategy caused it to "cede[]

share from an agency and a corporate perspective" to competitors. ¶¶245-46, 248. Raja also knew about the NDC distribution strategy's failures as he spearheaded the strategy and saw that "share [was] going down" because he could "see the numbers." ¶¶62, 64, 112, 114. Thus, Defendants' could not have possibly held the beliefs they professed.[16] *See Rougier*, 2019 WL 6111516, at *10 (opinion actionable where "[d]efendants did not actually hold the opinion they orally stated or that Defendants omitted material facts that conflicted with what a reasonable investor would take from the statement itself"). In sum, each of the statements is actionable.[17]

Defendants' argument—that AAL had a reasonable basis to be encouraged about the NDC strategy—is flawed because Defendants' statements address only the bookings AAL received, not those that were lost. Moreover, it is unsurprising that the *overall* percentage of direct bookings increased between Q2 2023 and Q3 2023 because AAL removed **40%** of airfares from traditional distribution channels and made them exclusively available on direct channels. *Compare* ¶63 *with* Br. at 16. Defendants' hypothesis that managed corporate customers were booking less in EDIFACT channels because they were transitioning to NDC channels ignores the FAC's allegations that customers were not booking through NDC and instead, booking with competitors (as Defendants later admitted). *See e.g.*, ¶¶91, 95-100, 107, 109-11, 206-07.

---

[16] The opinions at issue in Defendants' cases are inapt. *See Jacobowitz v. Range Res. Corp.*, 596 F. Supp. 3d 659, 676 (N.D. Tex. 2022) ("we believe we're in substantial compliance with applicable laws" inactionable as company disclosed it was subject to numerous legal actions, and since "substantial" did not convey "perfect, complete, or consistent" compliance); *see also In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 635 (S.D. Tex. 2018) (similar).

[17] Defendants' cases (Br. at 15) are distinguishable. The statements in *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 371 (5th Cir. 2004) and *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003) were not specific enough for "analysts [to] rely on" while here, they were: *e.g.,* J.P. Morgan paid attention to Defendants' statements because the analysts theorized that AAL's NDC strategy posed a "potential risk" to AAL—a theory that was later "vindicat[ed.]" ¶286. *Thornton*, 878 F. Supp. at 936-37, is also inapposite: Plaintiffs here allege "facts indicating that the Defendants' statements were false or … misleading[,]" which were absent in *Thornton.*

Similarly, Defendants' reliance on overall business travel recovery (¶258(iv) &(vii)) does not address whether: a) managed corporate travelers were adopting NDC distribution channels when Defendants claimed they were; or b) AAL was "able to hang on to [its market] share[.]" ¶164. Indeed, Defendants ignore that Raja conceded in January 2024 that managed corporate travel was slower to recover, noting an "*almost a 3:1 ratio with unmanaged business 100% plus [re]covered, managed business down further*," which is consistent with CW allegations that agencies, SMBs, and corporations were shifting share away from AAL. ¶¶90-91, 94-100, 258(vii). Similarly, that AAL saw "year-over-year growth in corporate" in 3Q 2023 (¶258(vi)) is irrelevant to how *managed* corporate travel reacted to the distribution strategy during that quarter.

Finally, Defendants concede managed business travel was showing "negative signs" throughout the Class Period but appear to argue their misstatements were immaterial because managed business is a "small slice" of revenue. Br. at 17. This ignores that managed travel bookings through EDIFACT constituted roughly 29% of AAL's 2023 air passenger revenue (even after Defendants removed 40% of fares from that channel in April 2023) (¶42) and that AAL's efforts to drive managed travel to direct bookings resulted in a negative $750 million impact in the first half of 2024, with the same expected impact in the back half. ¶¶223-24. Defendants' assertion that managed business travel was negligible is further belied by Isom's admission that AAL's failed NDC strategy was largely responsible for the Company's slashed May 2024 revenue guidance. ¶209 (AAL ceding market share to competitors due to NDC strategy contributed 40-60% to guidance reduction). Thus, it cannot be said "the facts are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *S.E.C. v. Kornman*, 391 F. Supp. 2d 477, 485 n.2 (N.D. Tex. 2005). This is particularly so given "materiality is usually a mixed question of law and fact properly left to a jury." *Oscar Priv. Equity*

*Invs. v. Holland*, 2004 WL 5244597, at *9 (N.D. Tex. June 10, 2004).

## V.    THE FAC ALLEGES A STRONG INFERENCE OF SCIENTER

Scienter may be established through "severe recklessness" (*i.e.*, when "a danger of misleading buyers or sellers" was "either known to the defendant or [was] so obvious that the defendant must have been aware of it."). *Masel*, 924 F.3d at 747. Thus, contrary to Defendants' contention (Br. at 22-23), "absence of a pecuniary motive is not dispositive[.]" *Six Flags*, 58 F.4th at 218.[18] "The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Lormand*, 565 F.3d at 251 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007)). "[A] tie favors the plaintiff on a motion to dismiss." *Six Flags*, 58 F.4th at 214.

### A.    The Collective Allegations Support Defendants' Scienter

#### 1.    Defendants' Post-Class Period Admissions Support Scienter

Defendants' post-Class Period admissions support their scienter because they "are evidence that the defendants *actually knew earlier* that the course of action would turn out badly." *Lormand*, 565 F.3d at 254; *see also MicroCapital*, 2019 WL 3451153, at *16 (post-relevant period statements "contribute[d] to an inference of scienter"); *Carlton*, 184 F. Supp. 3d at 484 (one month gap between reassurances that issues were salvageable and contradictory admissions contributed to scienter); *Reese v. Malone*, 747 F.3d 557, 574 (9th Cir. 2014) ("Temporal proximity of an allegedly fraudulent statement or omission and a later disclosure" support scienter), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017).

---

[18] However, Defendants' attempts to obscure the truth about AAL's NDC strategy, in hopes conditions would improve, present a cognizable motive. *See Six Flags*, 58 F.4th at 215 (defendants were "motivated … to hide the true nature of" company), *id.* at 218 (defendants "may have lost their pecuniary motive but could still be plausibly motivated by a desire to save face").

Here, only *one month* after falsely claiming that AAL was "on track to deliver on our full-year financial targets[,]" Isom admitted that "softness in customer bookings[,]" continuing from Q1 into Q2 2024, was caused by "changes that we made to our sales and distribution strategy" that were "driving customers away[,]" particularly "business travel[.]" ¶¶206-07, 245-46. Moreover, when asked whether performance "got a lot worse" between Q1 and Q2 given the size of loss, Isom admitted that "we should have performed much more in line with our network peers in the first quarter" and that "weakness" was caused by loss of close-in corporate bookings because "we haven't made ourselves easy to work with[.]" ¶209.

Further, Isom's July 2024 admission that Defendants "identified" the problem by Q1 2024 (¶231) evidences that Defendants knew their misstatements dating back to January 2024 were false when made. Context shows why. In the same call, and before making this damning admission, Isom was asked by Alison Sider of *The Wall Street Journal* what feedback he received from partner airlines "[o]n the sales strategy, selling distribution." DX. S at A1011-12. Isom responded that "the feedback . . . is similar to what we're hearing from our customers," including: "to get content back out" to EDIFACT channels; to "have agreements in place" with TMCs and agencies; and to rebuild "relationships with corporates." *Id. **These are the same issues identified by the CWs and the WSJ Article**.* ¶¶64, 71–79, 88–100, 239. Later in the call, Isom was asked to follow-up on "Ali's first question," and his response to that question: "[w]hen you said that … [d]id you also hear from them [] some frustration and displeasure *at the results of your change in corporate strategy*?" ¶231. Isom responded by admitting that "we identified a deviation in terms of our revenue performance versus some of our large network peers in the first quarter. *We thought that was going to reverse itself. It didn't*," which was indisputably made in the context of a discussion about the NDC

strategy.[19] *Id*. Defendants' knowledge of the deviation's cause is further supported by Isom's admission that AAL was "in communication with [its] partners *constantly*." *Id.* As such, in context, it is obvious that Defendants identified a revenue deviation from AAL's competitors due to the NDC distribution strategy by Q1 2024,[20] and gambled that it would reverse itself, but it did not. Defendants' claim that Isom's admission is a "post-mortem" observation (Br. at 25) makes no sense and is undercut by their concession that Isom attributed slowing managed business growth in April 2024 to the "changes we've made" relating to NDC (Br. at 6). Obviously, Defendants must have understood that there was a problem in Q1 2024 if they thought it would "reverse itself."

Thus, Plaintiffs' "partial reliance" on post-Class Period facts "does not amount to fraud by hindsight." *Lormand*, 565 F.3d at 254. Defendants' cases are distinguishable. Br. at 25-26 (citing *Rosenzweig*, 332 F.3d at 867-68 (involving an admission that an asset "faced numerous problems *since* [its] acquisition" which did not establish scienter at the time of acquisition) and *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 644 (5th Cir. 2005) (knowledge of "worst case [cash] estimate" insufficient to show defendant knew company could not complete a tender offer and continue operations where report also indicated defendant believed additional cash would be available)).

### 2. The Bain Investigation Supports Scienter

That Defendants hired Bain to conduct a "critical review" of AAL's NDC strategy also supports scienter. Before the *Bloomberg* Article reported Bain's findings on May 29, 2024,

---

[19] Tellingly, Defendants ignore the italicized portion of the analyst's question. Moreover, that Isom stated "*we* identified a deviation" and "*we* thought that was going to reverse" implicates Defendant May. *See In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 665 (S.D. Tex. 2021) (scienter imputed to individual defendants "on the line together" during an earnings call).

[20] Defendants' knowledge of the NDC distribution strategy causing revenue deviation is as plausible as their lacking awareness, given the statement's context. Moreover, it is inappropriate to accept Defendants' competing interpretation on a motion to dismiss. *See Holzwasser v. Staktek Holdings, Inc.*, 2006 WL 897746, at *4 (W.D. Tex. Mar. 30, 2006) ("[T]he strong-inference pleading standard does not license the Court to resolve disputed facts at this stage of the case.").

Defendants recognized a revenue deviation, retained Bain, and Bain conducted its investigation and issued a report to AAL. ¶¶238-42. Thus, even by conservative estimates, Defendants knew the NDC strategy was driving customers away and negatively affecting AAL's revenues *before* issuing the late Class Period misstatements, ¶242, and likely much earlier given that the *Bloomberg* Article concerned lagging revenue over "the past few quarters[,]" and Defendants' data showed dwindling corporate and agency share in July 2023. ¶238; *See* Section V.A.3, *infra*.

Defendants do not offer any credible basis for the Court to disregard these allegations. Instead, they appear to suggest that Bain spontaneously conducted a critical review without being commissioned by AAL and ask the Court to make the leap that because a *journalist* used "found" and "revealed" to describe the review, Bain must have uncovered only new information. Br. at 24-25. Defendants also expect the Court to believe AAL coincidentally paid a consulting firm to poke around its business because there would have been no reason to hire Bain if Defendants already knew about the issues. Br. at 22-23. Not so. For example, AAL might have wanted Bain's resources and skills for an independent evaluation of the issue, or of Raja's role in it to justify his ouster—inferences that are at least equally as plausible.

### 3.    Defendants' Access to and Review of Data Support Scienter

Defendants' scienter is also supported by their access to and review of data from IATA, SalesLink Insights, and PRISM, which showed each travel agency's market share of airline ticket sales, the share of bookings through NDC versus EDIFACT channels, and revenues derived through agencies, TMCs, and corporations. ¶¶251-53. The data, according to CW2, showed larger agency bookings declined 15% year-over-year and corporate bookings "much lower" than that shortly after AAL forced the July 2023 Contracts onto agencies. ¶253. These bookings and share figures remained "consistently down" in PRISM throughout CW2's tenure (*i.e.*, end of January 2024). *Id.*; *see also* ¶¶90, 95, 99-100, 106-07 (describing bookings share shifting away from AAL).

Defendants also granularly discussed the NDC distribution strategy and associated revenues throughout the Class Period, bolstering that they reviewed this data. *See, e.g.*, ¶255(iv) (Isom and Raja touting 80% of bookings through NDC), ¶258 (Isom, May, and Raja highlighting SMB and corporate demand and revenues). Defendants' statements confirm that they monitored AAL's market share on a per-agency, regional, and corporate basis. *See e.g.*, ¶¶260-61 (discussing market share fluctuating "from a given agency to another[,]" purportedly rebounding business share in certain markets, and the ability to "hang on to our share"); *see also Rensin*, 755 F. Supp. 3d at 1065 (making misstatements while possessing contradictory data is "classic . . . scienter").[21]

While Defendants argue these allegations fail to satisfy the two requirements set forth in *Pier 1* for when "internal corporate reports can support a strong inference of scienter" (Br. at 26), the reports reveal data that Defendants monitored and directly contradicted their public statements.[22] *Compare e.g.,* ¶125 ("[W]e remain encouraged on business demand") *with* ¶253 (corporate bookings down even more than agency bookings). Regardless, those two prongs need only be satisfied for "internal corporate reports *alone* to support . . . scienter." *Six Flags*, 58 F.4th at 215-16 (original emphasis). Plaintiffs offer ample additional support for scienter. Further, while Defendants ask the Court to infer that their staff provided them data analysis (Br. at 27), it is at least equally as compelling that Defendant spoke in granular detail because they actually reviewed the data. ¶¶260-61. Regardless, Defendants fail to explain why reviewing staff-prepared analysis instead of raw data negates scienter.[23] It is at least equally likely that reviewing the data would

---

[21] Even assuming *arguendo* that Defendants' statements at ¶¶258-62 are true (Br. at 27), it does not follow that their misstatements were truthful, nor does it negate scienter.

[22] By contrast in *Pier 1*, the reports at issue only revealed "the existence of significant markdown risk (as opposed to merely high inventory)." 935 F.3d at 434.

[23] Defendants speculate that onerous data analysis would have been needed to apprise Defendants of their strategy's negative outcomes (Br. at 27), ignoring that Defendants frequently discussed

have alerted them to such a pervasive problem. ¶¶223-24.

### 4.    Defendant Raja's Evasive Answers Support Scienter

Raja's evasive answers to "pointed questions" about the NDC distribution strategy also supports his scienter. *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 947 (N.D. Cal. Mar. 21, 2022) (inference of scienter where, *inter alia*, defendants failed to disclose the issues even when asked "pointed questions" about them by analysts"); *City of Warren Gen. Emps. Ret. Sys. v. Teleperformance SE*, 746 F. Supp. 3d 1395, 1411 (S.D. Fla. 2024) ("'Directly nonresponsive' and 'evasive answers'" strongly support scienter). When asked whether AAL was losing corporate share or experiencing any "growing pains" due to the NDC distribution strategy in October 2023 and January 2024, respectively, Raja misleadingly spun the failing strategy in a positive light, saying he was "really encouraged" by it (when he had no basis to be) rather than directly answering the question. ¶¶264-65. The inference that Raja purposefully evaded the January 2024 question to avoid revealing that the NDC distribution strategy was failing is compelling considering Isom's later admission that Defendants knew by Q1 2024 that there were problems.[24]

### B.    The FAC Alleges a Compelling Inference of Fraud

Plaintiffs' scienter allegations, taken collectively, support a strong inference that Defendants knew or recklessly disregarded that AAL's NDC strategy immediately caused sales and market share losses due to customer dissatisfaction. Yet, Defendants concealed this information in a reckless gamble that once customers got used to NDC, the situation would (in

---

business travel and bookings metrics in detail, demonstrating they were regularly apprised of such information. ¶¶255–61. Their cases are distinguishable, as both *Owens v. Jastrow*, 789 F.3d 529, 544 (5th Cir. 2015) and *Goldstein v. MCI WorldCom*, 340 F.3d 238, 251, 254 (5th Cir. 2003) concerned only the discrete issue of whether ignoring GAAP was reckless.

[24] Defendants' authority, *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 212 (5th Cir. 2009) did not involve a defendant dodging pointed questions, nor does it support that Defendants are shielded from liability for their omissions absent a motive to lie.

their words) "reverse itself." This inference is at least as compelling as Defendants' opposing inference that they did not know of problems with AAL's NDC strategy until May 2024.

Moreover, Defendants' suggestion that AAL's May 2024 guidance change is evidence of non-fraud and was motivated by a desire to "promptly" inform investors (Br. at 23, 28-29) overlooks that AAL had a practice of updating guidance mid-Q2, and did so for the *fourth* year in a row in 2024.[25] *See* Plaintiffs' Appendix (AAL's mid-Q2 SEC filings, offered for proof of their existence).[26] Similarly, while Defendants suggest that they had no reason to lie, Defendants "conceal[ed] bad news" (*i.e.*, the distribution strategy failures) "in the hope that it w[ould] be overtaken by good news." *Six Flags*, 58 F. 4th at 215. That Defendants' gamble did not pay off "is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." *Id.*; *see also Spitzberg*, 758 F.3d at 685-86 (likening misleading investors to "embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing").

## VI.    THE FAC ADEQUATELY ALLEGES LOSS CAUSATION

Plaintiffs need only allege "a facially plausible causal relationship between the fraudulent statements … and plaintiff's economic loss," by alleging material misstatements "followed by the leaking out of relevant or related truth about the fraud that caused … the stock [drop] and plaintiff's economic loss[.]" *Lormand*, 565 F.3d at 258. Rule 8's notice pleading standard applies. *Id.* at 255.

---

[25] Unlike here where Defendants both monitored demand, market share, and revenue and knew but recklessly gambled that AAL's poor performance relative to peers would reverse (*see* Sections V.A.1,3, V.B), in *Neiman v. Bulmahn*, 854 F.3d 741, 748-49 (5th Cir. 2017), the plaintiff failed to allege that the defendant "actually read the reports or was otherwise made aware of the lower production" and *failed* to proffer a plausible reason why defendant would reveal the truth so soon after lying to investors. *Plotkin* is also off point. 407 F.3d at 698 (addressing whether "later-emerging facts" supported earlier statements' falsity, not whether Defendants had *scienter*).

[26] The Court may take judicial notice of AAL's SEC filings in resolving a motion to dismiss. *Linenweber v. Southwest Airlines Co.*, 693 F. Supp. 3d 661, 674 (N.D. Tex. 2023).

Plaintiffs allege that Isom revealed that AAL's May 2024 guidance cut was "due to the changes that we made to our sales and distribution strategy[,]" which had been "driving customers away from [AAL,]" impacting revenue on which the guidance was based. ¶¶206–07. Upon the news, AAL stock dropped over 13.5%, damaging investors. ¶¶ 214, 280. These revelations corrected Defendants' prior misstatements that, *inter alia*, AAL was seeing a positive impact from its NDC strategy and increasing demand from corporate travel, which purportedly supported AAL's financial guidance. Defendants (Br. at 30) cabin the negative impacts of AAL's distribution strategy to Q2 2024, ignoring that Isom admitted that AAL's "worsened" performance was "*due to the changes* that we have made to our sales and distribution strategy[,]" which had begun in Q2 2023 per the CWs—and indeed, the July 2023 Contracts had quickly resulted in corporate and large agency bookings dropping 15% or more. ¶¶69–77, 109, 206**.** Moreover, the *Bloomberg* Article confirmed the negative impacts of the NDC strategy had been felt "over the *past few quarters*" (*i.e.*, by Q3 2023) stating that AAL's financial woes "stemmed in part from a recent shift in … sales strategy[,]" *i.e.* in 2023. ¶215. Bernstein analysts recognized this on May 28, 2024, attributing AAL's "close in booking weakness … to loss of corporate travel share associated with recent distribution strategy changes[,]" *i.e.*, changes Defendants implemented in 2023. ¶284; *See also* ¶¶61–143 (detailing changes). Thus, the FAC more than adequately alleges loss causation.

## CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied in its entirety.[27]

Dated: April 25, 2025                              **THE BRISCOE LAW FIRM, PLLC**

                                                   */s/ Willie C. Briscoe*

---

[27]  Given "Plaintiffs have sufficiently alleged a Section 10(b) claim, the[ir] Section 20(a) claim likewise survives Defendants' motion to dismiss." *Dell,* 2016 WL 6075540, at *4. If the Court grants any part of Defendants' Motion, Plaintiffs respectfully request leave to amend. *See Brooks v. United Dev. Funding III, L.P.*, 2020 WL 6132230, at *2 (N.D. Tex., 2020).

Willie C. Briscoe
State Bar Number 24001788
12700 Park Central Drive, Suite 520
Dallas, Texas 75251
Telephone: 972-521-6868
Facsimile: 281-254-7789
wbriscoe@thebriscoelawfirm.com

*Co-Liaison Counsel for Co-Lead Plaintiff*
*Luis Vicente Davidoff Cracasso and the*
*Class*

**POMERANTZ LLP**
Jeremy A. Lieberman
(State of New York Juris No. 4161352)
Murielle J. Steven Walsh (*pro hac vice*)
(State of New York Juris No. 2837631)
Emily C. Finestone (*pro hac vice)*
(State of New York Juris No. 5394820)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
mjsteven@pomlaw.com
efinestone@pomlaw.com

*Counsel for Co-Lead Plaintiff Luis*
*Vicente Davidoff Cracasso and Co-Lead*
*Counsel for the Class*

**CONDON TOBIN SLADEK**
**THORNTON NERENBERG PLLC**
Stuart L. Cochran
Texas Bar No.: 24027936
8080 Park Lane, Suite 700
Dallas, Texas 75231
Telephone: 214-265-3800
Facsimile: 214-691-6311
Email: scochran@condontobin.com

*Co-Liaison Counsel for Co-Lead Plaintiff*
*Dominik Dumancic, Additional Plaintiff*
*Richard Wilkinson, and the Class*

{00660514;2 }                                    31

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (admitted *pro hac vice*)
(State of Connecticut Juris No. 435545)
Gregory M. Potrepka (admitted *pro hac vice*)
(State of Connecticut Juris No. 437326)
Morgan M. Embleton (admitted *pro hac vice*)
(State of Louisiana Juris No. 35769)
P. Cole von Richthofen (*pro hac vice* forthcoming)
(State of Connecticut Juris No. 444159)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (212) 992-4523
Fax: (212) 363-7171
Email: shopkins@zlk.com
Email: gpotrepka@zlk.com
Email: membleton@zlk.com
Email: cvrichthofen@zlk.com

*Counsel for Co-Lead Plaintiff Dominik*
*Dumancic and Additional Plaintiff Richard*
*Wilkinson and Co-Lead Counsel for*
*the Class*

## **CERTIFICATE OF SERVICE**

I, Willie C. Briscoe, hereby certify that this document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on this 25th day of April 2025.

*/s/ Willie C. Briscoe*
Willie C. Briscoe
