**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| IN RE AMERICAN AIRLINES GROUP INC. SECURITIES LITIGATION | Master File No. 4:24-cv-00673-O |

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ...................................................................................................................... 2

    I.     THE COMPLAINT LACKS PARTICULARIZED ALLEGATIONS SHOWING A FALSE OR MISLEADING STATEMENT OF MATERIAL FACT ................................................................. 2

          A.    Plaintiffs' Falsity Arguments Turn On Unreliable CWs, Unsourced News Articles, And Hindsight Allegations ............................ 2

          B.    Plaintiffs' Arguments Disregard Defendants' Transparent Disclosure Of Corporate Revenue Metrics And The Trade-Offs Of American's Strategy ....................................................... 5

          C.    Plaintiffs Fail To Save Their Complaint From Its Other Legal Flaws ..................................................................................... 9

    II.    THE COMPLAINT DOES NOT ALLEGE SCIENTER ................................... 11

          A.    Plaintiffs Still Offer No Rational (Much Less Compelling) Theory Of Fraud ...................................................................... 11

          B.    Plaintiffs' "Knowledge Of Contrary Facts" Theory Confuses Seeing A Revenue Deviation And Knowing *Why* Such A Deviation Existed ................................................................... 12

          C.    The Innocent Inference Is Much Stronger ................................................ 14

    III.    THE COMPLAINT DOES NOT ALLEGE LOSS CAUSATION ...................... 15

    IV.    PLAINTIFFS' SECTION 20(A) CLAIM FAILS.............................................. 15

CONCLUSION.................................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alaska Elec. Pension Fund v. Flotek Indus. Inc.*,
 915 F.3d 975 (5th Cir. 2019) ...............................................................................................1

*Carlton v. Cannon*,
 184 F. Supp. 3d 428 (S.D. Tex. 2016) .............................................................................13, 14

*Fener v. Belo Corp.*,
 513 F. Supp. 2d 733 (N.D. Tex. 2007) ...................................................................................6

*Holbrook v. Trivago N.V.*,
 2019 WL 948809 (S.D.N.Y. Feb. 26, 2019), *aff'd, Shetty v. Trivago N.V.*, 796
 F. App'x 31 (2d Cir. 2019) ..................................................................................................14

*In re Blockbuster Inc. Securities Litigation*,
 2004 WL 884308 (N.D. Tex. Apr. 26, 2004) .........................................................................11

*In re BP p.l.c. Securities Litigation*,
 852 F. Supp. 2d 767 (S.D. Tex. 2012) ....................................................................................3

*In re Capstead Mortg. Corp. Sec. Litig.*,
 258 F. Supp. 2d 533 (N.D. Tex. 2003) ...................................................................................9

*Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
 537 F.3d 527 (5th Cir. 2008) ............................................................................................2, 4

*Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Diodes, Inc.*,
 810 F.3d 951 (5th Cir. 2016) ................................................................................................4

*Neiman v. Bulmahn*,
 854 F.3d 741 (5th Cir. 2017) ...................................................................................11, 12, 13

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
 58 F.4th 195 (5th Cir. 2023) ............................................................................................2, 11

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
 575 U.S. 175 (2015)..........................................................................................................9, 10

*Owens v. Jastrow*,
 789 F.3d 529 (5th Cir. 2015) .............................................................................................9, 12

*Plotkin v. IP Axess Inc.*,
 407 F.3d 690 (5th Cir. 2005) .................................................................................................5

*Reese v. Malone,*
    747 F.3d 557 (9th Cir. 2014) ..................................................................................14

*Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*,
    935 F.3d 424 (5th Cir. 2019) ..............................................................................3, 13

*Roberts v. Zuora, Inc.*,
    2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ........................................................3

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).........................................................................................12, 14

*Thornton v. Micrografx, Inc.*,
    878 F. Supp. 931 (N.D. Tex. 1995) .....................................................................5, 8

## STATUTES

15 U.S.C. § 78u-5(i)(1)(D) .......................................................................................11

## PRELIMINARY STATEMENT

Plaintiffs' opposition brief doubles down on their implausible theory of fraud. Plaintiffs do not dispute, and therefore concede, that Defendants had no motive to lie to investors. Plaintiffs also do not dispute, and therefore concede, that American proactively announced a mid-quarter change to its financial guidance despite having no obligation to do so. So Plaintiffs are left arguing that Defendants lied about their sales strategy for ten months, with zero upside, only to then disclose the "truth" voluntarily. That theory does not pass the common-sense test—much less establish the "strong" and "compelling" inference of fraudulent intent (i.e., scienter) that the federal securities laws require to state a claim. *Alaska Elec. Pension Fund v. Flotek Indus. Inc.*, 915 F.3d 975, 982 (5th Cir. 2019). On that ground alone, the complaint should be dismissed.

Plaintiffs' other allegations fare no better. Their falsity theory strings together unreliable confidential witness ("CW") allegations (which they fail to rehabilitate), paraphrases of anonymous sources in post-class period news articles (which must be rejected under Fifth Circuit law), and mischaracterizations of Defendants' post-class period reflections (which amount to impermissible fraud-by-hindsight pleading). None of this shows that anything Defendants said during the class period was false or misleading. To the contrary, Plaintiffs' allegations and American's disclosures show that American told the public *what* it knew, *when* it knew it: American was shifting strategies and the shift had risks; the company saw encouraging signs, including reduced costs, even as booking growth in one area (via managed travel agencies) lagged competitors; and it expected managed bookings to improve as agencies adopted new technologies. That those hopes did not come to fruition is not fraud; it is a business strategy not going to plan.

Finally, Plaintiffs have no answer for the complaint's puzzle-pleading defects, nor to the fact that the statements they challenge are puffery, forward-looking, and subjective opinions, and thus not actionable as a matter of law. The Court should dismiss the case with prejudice.

1

<u>**ARGUMENT**</u>

**I.    THE COMPLAINT LACKS PARTICULARIZED ALLEGATIONS SHOWING A FALSE OR MISLEADING STATEMENT OF MATERIAL FACT**

**A.    Plaintiffs' Falsity Arguments Turn On Unreliable CWs, Unsourced News Articles, And Hindsight Allegations**

As American's motion explained, Plaintiffs' case turns on three kinds of allegations that fail *as a matter of law* under binding Fifth Circuit precedent—CWs whose testimony must be discounted; unsourced news articles that must be rejected; and impermissible hindsight allegations. ECF No. 55 ("Mot.") 11-13. Rather than address these flaws, Plaintiffs' opposition only reiterates them.

Unreliable CWs. Plaintiffs have no answer for the Fifth Circuit's directive that "courts *must* discount allegations from confidential sources." *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008) (emphasis added). "Such sources afford no basis for drawing the plausible competing inferences" of scienter required by the PSLRA, *id.*, nor for establishing "falsity," *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 207 n.8 (5th Cir. 2023). Plaintiffs nevertheless suggest the Court should credit their CWs in full because there is a "probability" that someone "in the position occupied by the source would possess the information alleged." *Id.* at 208 (citation omitted). That assertion not only ignores the law—it is factually wrong. As the complaint makes clear, Plaintiffs' two CWs—from among American's 130,000+ employees—(1) held low-level roles in one business unit, and would *not* have had company-wide information, (2) could not have known *any* facts about market share after leaving American in January 2024, well before the end of the class period, and (3) had no direct interaction with any Individual Defendant (or, for that matter, anyone on any rung close to them).

First, Plaintiffs point to no particularized facts establishing relevant first-hand knowledge. For example, Plaintiffs extrapolate from anecdotal allegations a sweeping assertion that

"Defendants knew that customers were not adopting NDC technology and instead, American was losing market share to competitors." ¶ 10. But CW1 handled only two agency accounts, and CW2 managed only certain unidentified accounts in the Midwestern and Southern region. ¶¶ 34-35. Their roles provided no insight into whether agencies generally "were not adopting NDC technology" or whether, as a firm, "American was losing market share to competitors." Nothing in the complaint or opposition shows these former employees were privy to pertinent company-wide information. *See* ¶ 102 (alleging only generically that some "American employees" could see unspecified "global data"). Indeed, even if the CWs knew of certain *managed* corporate data (a small slice of revenue, Mot. 4), they have no basis to say *anything* about revenues overall.

Second, the CWs have a timing problem. Both left American in January 2024, and their allegations primarily concern events in mid-2023. Plaintiffs' response is to *assume* that alleged observations in mid-2023 carry over to later parts of the class period (ending May 2024).[1] Opp. 10. But Plaintiffs cannot substitute speculation for *particularized* facts establishing falsity.

Third, Plaintiffs "do not relate any interaction" with Individual Defendants. *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*, 935 F.3d 424, 434 (5th Cir. 2019). Plaintiffs tie CW2 to "senior management" through "bi-weekly and quarterly reviews." Opp. 8. But that purported "senior management" was several rungs below Individual Defendants; the "reviews" covered only "the performance of [the limited] accounts" the CWs supported—not American as a whole. ¶ 35.

Both individually and collectively, these circumstances undermine Plaintiffs' allegations

---

[1] Plaintiffs point to cases purportedly holding that "a CW need not work at a company for the *entire* Class Period to be reliable." Opp. 9-10 & n.3. But in *In re BP p.l.c. Securities Litigation*, 852 F. Supp. 2d 767 (S.D. Tex. 2012), "all three confidential witnesses [were] alleged to have worked for BP in some capacity during the relevant … [p]eriod." *Id.* at 795-96. And in *Roberts v. Zuora, Inc.*, 2020 WL 2042244 (N.D. Cal. Apr. 28, 2020), none of the CWs worked at the company "during the *entire* Class Period," but collectively their employment covered the span. *Id.* at *11.

3

under Fifth Circuit law. In *Indiana Electrical*, for example, the plaintiff claimed a "project controls manager" had informed one defendant of "all the problems" associated with an internal software system meant to track construction progress for revenue purposes. 537 F.3d at 539. The court rejected those allegations because the complaint did not "support the probability that the source was in a position to know about 'all of the problems' related to [the software] or that these problems pervaded the company." *Id.* And in *Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Diodes, Inc.*, 810 F.3d 951 (5th Cir. 2016), the CW allegations "g[a]ve [the court] pause" because it was "unclear" whether the witnesses' "employment status at [one facility] conferred sufficient insights into" company-wide effects, and whether observations as to part of the company could "be imputed to the workforce beyond their departments." *Id.* at 958 n.2. So too here.[2]

News Articles. Plaintiffs' opposition leans on *Bloomberg News* and *Wall Street Journal* articles from May 2024 and January 2025. But those articles merely paraphrase anonymous sources without any indication of their position or knowledge base. And Plaintiffs do not claim to have investigated or otherwise confirmed those sources independently. Under Fifth Circuit law, those statements "get[] no weight because the PSLRA rejects such anonymous allegations unless the witness is 'described in the complaint with sufficient particularity.'" Mot. 13 (citation omitted). American made this point in its motion and Plaintiffs offer no persuasive response.

Post-Class Statements. Plaintiffs try to rehabilitate their CW allegations by claiming they are "corroborated" by Isom's supposed post-class period "admissions." Opp. 2. They are not. For starters, there is again a topical mismatch: the CWs' alleged knowledge is limited to managed

---

[2] Plaintiffs attempt to distinguish *Local 731* on the ground that it "involved entry-level factory floor workers, unlike the FAC's corporate-level, customer-facing CWs." Opp. 9 n.3. But they offer no reason for a blue collar-white collar distinction. What matters is the basis for the employee's allegations: if an employee has no visibility into company-wide effects, they cannot allege them.

travel, whereas Isom discussed "domestic performance" overall. For another, the time periods differ: the CWs left in January 2024, ¶¶ 34-35, and their allegations focus on the effect of a July 2023 travel-agency contract; in contrast, Isom discussed American's performance "in the first quarter [of 2024]," ¶ 209, and the later-discovered effects of the sales and distribution strategy during "the first 6 months of [2024]," ¶ 224—including the period "since [American] provided guidance in April [2024]," ¶ 206. Those statements in no way corroborated allegations about 2023.

Finally, Plaintiffs mischaracterize Isom's statements. In July 2024, Isom reflected on a revenue growth deviation (not a decline) that emerged in Q1 2024—a trend any investor could have observed based on publicly reported results for American and its competitors. But in later recalling the basic fact of a Q1 revenue deviation, Isom *did not* "admit" that American knew at that time the *cause(s)* of that deviation—much less that American had attributed the deviation to changes in its sales and distribution strategy (a determination made—and promptly disclosed—in Q2).[3] Plaintiffs do not have a single well-pled fact that American knew and failed to disclose the specific effects of its strategy in Q1 2024. And Defendants cannot be liable for securities fraud merely because, in providing real-time revenue metrics, they did not also disclose information only learned later. *Thornton v. Micrografx, Inc.*, 878 F. Supp. 931, 936-37 (N.D. Tex. 1995).[4]

### B.  Plaintiffs' Arguments Disregard Defendants' Transparent Disclosure Of Corporate Revenue Metrics And The Trade-Offs Of American's Strategy

---

[3] Raja's Q1 2024 statements about "guesswork," Opp. 13, addressed *all* corporate travel revenues, ¶199; he correctly stated that managed travel grew in the "mid-to high single digits" and at a slower rate than American's competitors, *id*. Only later did it become clear that, despite this growth, American was losing market share *because of changes to its distribution strategy* specifically.

[4] *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 699 (5th Cir. 2005) involved a compelling "temporal[]" connection and stands in stark contrast. "[T]he fact that a business files for bankruptcy on 'Day Two,' may, under the right surrounding circumstances, provide grounds for inferring that the business was performing poorly on 'Day One.'" *Id.* at 698. But that is not the situation here.

5

Even taking the CW allegations at face value, Plaintiffs cannot escape the critical fact that Defendants told the public in real time about the progress of American's strategy.[5]

Transition from EDIFACT to NDC. It is undisputed that American told investors about its effort to transition travel agencies from EDIFACT to NDC, including incentivizing that shift by removing certain low-cost fares from EDIFACT. Mot. 13. It appears Plaintiffs no longer maintain that Defendants hid the fact of the transition. Instead, Plaintiffs lump together opinion statements made many months apart supposedly touting the success of that initiative. ECF No. 58 ("Opp.") 10-11. Those opinions are not actionable, as a matter of law, for reasons discussed *infra*. Plaintiffs also clip statements to create the misleading impression that American overhyped the strategy's success: for example, they suggest that "Defendants claimed to be 'really pleased' with the transition's execution, which was purportedly happening 'quickly' … ." *Id.* at 11 (quoting ¶¶ 141, 151 (Statements 14, 19)). But Isom stated he was "really pleased *with the start*" of execution, and the "quickly" remark came months later. *Id.* (emphasis added).

More fundamentally, Plaintiffs' arguments ignore that Defendants disclosed all the key metrics during every quarterly investor call—and Plaintiffs do not identify a single contemporaneous fact contradicting the information American shared publicly. The following *unchallenged* disclosures appear in Plaintiffs' complaint or documents incorporated therein:

- In the Q1 2023 earnings call (April 2023), American saw "a little over 60% going direct [and NDC]" and expected "about 10 … points larger" in Q2 2023. Ex. F at A299; *see* ¶ 255(ii).

- In the Q2 2023 earnings call (July 2023), American saw "roughly 70-75%" of revenues through direct and NDC. Ex. H at A416.

- In the Q3 2023 earnings call (October 2023), Isom presented a slide to investors stating that "78% of bookings were through the modern technology, which includes American's

---

[5] Plaintiff do not oppose American's request for judicial notice of various public SEC filings and earnings call transcripts. Those materials are properly before the court. *See Fener v. Belo Corp.*, 513 F. Supp. 2d 733, 737 n.2 (N.D. Tex. 2007); *see also* Mot. 3 n.1.

website, mobile app, and NDC direct bookings." ¶ 255(iv); *see also* Ex. J at A523.

- In the FY2023 earnings call (January 2024), Raja stated that "80% [of American's revenue was] coming through Internet-based technology. Within that, 65-plus percent is coming just strictly through our owned channels" and the rest through NDC bookings. ¶ 255(v).

- In the Q1 2024 earnings call (April 2024), American "displayed a slide to investors stating that 81% of bookings" were made using modern distribution technology. ¶ 255(vi). Raja also stated that "the agencies that constitute about 30% to 40% of our revenue are already doing more than 30% of their bookings through NDC." *Id.*

Defendants thus repeatedly told investors what Plaintiffs claim was concealed—including how much of American's business was coming from modern distribution channels (like NDC and direct bookings) versus legacy EDIFACT channels, and how those numbers evolved. American detailed these disclosures in its motion (at 16-17), and Plaintiffs failed to respond, Opp. 10-12.

Corporate Travel. Plaintiffs' arguments as to corporate travel are equally flawed. Plaintiffs challenge (at 13) generic optimism that American was "encouraged" on "business demand," but do not show how those statements—many of which are puffery or opinion, Mot. 15-16; *see also infra* 9, could be materially false or misleading. Plaintiffs' theory is that American did not disclose its *total* corporate market share was supposedly declining merely because *managed* bookings were not growing as quickly as competitors. But they offer no specific facts. Overall "corporate travel revenue *was* 'coming back,'" even if a small portion of American's business (managed travel) was not growing as quickly. Opp. 13 (quoting ¶ 189). Nor do CW allegations about a slice of business undermine confidence in the strategy, which anticipated rebalancing toward direct bookings. And American saw not just increased direct bookings, *supra* 6-7, but also decreases in costs from third-party bookings. *See, e.g.*, Ex. K at A546 ("selling expenses were 10% lower" Q1 2024). The CWs do not deny such benefits; rather, they offer no relevant insight at all.

Plaintiffs also overlook that American disclosed corporate revenues generally and told investors that *managed* corporate revenues specifically were growing more slowly than for peers. In January 2024, for example, American explained that it exited "Q4 with a 90% business

7

recovery." Ex. K at A552. The ratio of "unmanaged business versus managed business" was "3:1." *Id.* "[U]nmanaged business" had a 100%" recovery while "managed business [was] down further." *Id.* Then, on April 25, 2024, American explained that business-travel revenues were growing "close" to "double digits," "driven by unmanaged corporations." Ex. N at A830. And while managed business revenues were also growing, that growth was lower than American's peers—a "single digit[]" increase as opposed to a 14-15% increase in volume for competitors. *Id.* Plaintiffs offer *no* basis to think these disclosed metrics were false. Isom even speculated for investors that lagging managed growth may relate to some of the "changes that we've made" in connection with sales and distribution, among other things. Ex. N at A830. But American maintained belief in its strategy based on existing information—including increases in direct bookings while overall corporate revenue grew, and reductions in costs. *See supra* 6-7. Its failure to predict the future is not actionable. *See Thornton*, 878 F. Supp. at 936-37.[6]

Risk Factors. Plaintiffs hardly challenge the detailed disclosures of the risks inherent in American's strategy. Defendants repeatedly highlighted the potential downside associated with the shift to NDC and direct travel throughout 2023. Nothing in the opposition points to contradictory facts existing *at the time those disclosures where made*. Plaintiffs again invoke Defendants' purported post-class period "admissions," but those later-in-time statements focused on developments in *2024*. And anecdotal CW allegations about certain managed corporate bookings (comprising single-digit revenues) do not indicate materialization of an *overall* "decline in revenue" or "decreased demand" at the time of the risk warnings.

---

[6] Plaintiffs' opposition either ignores or misconstrues these disclosures. They claim American "hid[]" its "*managed* business decline," Opp. 13 n.9, but do not challenge metrics American disclosed as to growth in managed versus unmanaged. In truth, managed business *was* growing, which Plaintiffs implicitly concede elsewhere when they argue that American's calculation of managed business as 5-7% of overall revenues was a "*pre-Class Period* low point." *Id.* at 15.

Financial Guidance. As discussed *infra*, American's financial guidance is protected by the statutory safe harbor.

### C.      Plaintiffs Fail To Save Their Complaint From Its Other Legal Flaws

Beyond these threshold flaws, the complaint also runs headlong into multiple legal obstacles. Plaintiffs offer no viable response to any of them.

First, Plaintiffs' complaint relies on puzzle pleading, forcing the Court to connect the dots between a scattershot collection of alleged misrepresentations and a parade of repeated facts that allegedly make each false. Mot. 10-11. Plaintiffs respond that it is "legal error" to dismiss a complaint as puzzle pled. Opp. 6 (citing *Owens v. Jastrow*, 789 F.3d 529, 538 n.3 (5th Cir. 2015)). That is wrong. *Owens* said only that the presence of *some* puzzle pleading does not defeat an otherwise well-pled complaint. *See* 789 F.3d at 538 n.3 (questioning "outright dismissal for *any*" amount of "puzzle pleading"). It reaffirmed the PSLRA's and Rule 9's particularity requirements. *Id.* at 535. And it did not disturb those cases dismissing securities complaints where, as here, "no attempt is made to isolate statements and particularize their falsity." *Id.* at 538 (citation omitted); *see also In re Capstead Mortg. Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 552-53 (N.D. Tex. 2003).

Second, many alleged misstatements are non-actionable opinions. Statements 1, 6, 7, 11, 12, 13, and 14 describe the speakers' subjective sentiment of being "encouraged by," "confident" about, or "comfortable" with metrics like demand and revenue. Plaintiffs say that mere rhetorical indicia of opinions "offer[] no protection," Opp. 19, but the phrasing was not merely rhetorical: whether an executive is encouraged about an aspect of the business is a paradigmatic opinion because it incorporates a set of subjectively held assumptions, *see Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 193 (2015).

Plaintiffs' claim that the opinions are actionable under *Omnicare* is also wrong. They contend the opinions "omitted contrary data" based entirely on the unreliable CW allegations. Opp.

19. And *Omnicare* made clear that "a statement of opinion is not misleading just because external facts show the opinion to be incorrect." 575 U.S. at 188. Instead, opinions are misleading when they omit certain facts "about how the speaker has formed the opinion." *Id.* A reasonable investor expects only that an opinion "fairly aligns with the information in the issuer's possession at the time." *Id.* at 189. As discussed above, Defendants' statements were based on the facts they disclosed about the shift to NDC, which increased unmanaged corporate bookings and cut costs. Defendants did not omit any contradictory facts "in [their] possession" even if, as the CWs claim, a perfect hindsight analysis might call into question how "confident" Defendants should have been.

Plaintiffs also have no basis to assert Defendants "could not have believed" their opinions. Opp. 20-21. Much of this argument reiterates the allegation that some (unspecified) contrary data may have existed. As for the claim that Defendants' optimism was "flawed because Defendants' statements address only the bookings AAL received, not those that were lost," *id.* at 21, Plaintiffs miss the point. The very objective of American's strategy was to shift managed business and other indirect bookings (with higher costs) to NDC and direct bookings (with more tailored offerings, at lower cost). So it would come as no surprise if managed booking growth lagged. That *total* bookings and revenues increased while costs decreased gave Defendants cause for optimism.

Finally, Plaintiffs claim the financial projections—classic forward-looking statements— are outside the PSLRA's safe harbor because they are "based on underlying misrepresentations," Opp. 16,[7] and the cautionary language is misleading, *id.* at 17.[8] Neither claim works.

---

[7] Plaintiffs do not contest, and thus concede, that the risk disclosures are forward-looking and so subject to the PSLRA safe harbor. Opp. 14-15; *see* Mot. 29-30.

[8] Plaintiffs claim that Defendants' cautionary language "predate[s] the financial guidance misstatements" because it is contained in Q2 and Q3 2023 SEC filings. Opp. 17. But the Q4 2023 earnings call, when the first set of guidance statements were made, incorporated cautionary language in the "10-Q for the quarter ended September 30, 2023." Ex. K at A545. And the Q1 2024 10-Q contained similar risk disclosures. Ex. O at A838-41, 900-946.

First, the safe harbor protects any "assumptions underlying or relating to" other forward-looking statements. 15 U.S.C. § 78u-5(i)(1)(D). So Plaintiffs cannot void the safe harbor simply by alleging that the assumptions are unprotected present-tense statements. *In re Blockbuster Inc. Securities Litigation*, 2004 WL 884308 (N.D. Tex. Apr. 26, 2004) is not to the contrary, nor are Plaintiffs' "mixed statement" cases, Opp. 16 n.14. *Blockbuster* dealt with "misrepresentations and omissions … without reference to the protected forward-looking statements," 2004 WL 884308, at *7. Plaintiffs here challenge future-focused guidance based on allegedly "false underlying facts" directly connected to that guidance. Opp. 16. And "mixed present/future statements" are outside of the safe harbor only "with respect to the part of the statement that refers to the present." *Okla. Firefighters*, 58 F.4th at 210 (citation omitted). American's guidance was *wholly* forward-looking. *See* Mot. 21-22. Regardless, Plaintiffs identify no facts contradicting the underlying assumptions.

Second, Plaintiffs' claim that cautionary language is not "meaningful" when challenged, Opp. 17, is unsupported and conclusory. If the mere fact of challenging an accompanying risk disclosure were enough, any plaintiff could overcome—and thus gut altogether—the PSLRA's statutory protection with a bald assertion of inadequacy. That is not the law.

## II.    THE COMPLAINT DOES NOT ALLEGE SCIENTER

### A.    Plaintiffs Still Offer No Rational (Much Less Compelling) Theory Of Fraud

A securities-fraud claim requires intent to deceive investors. But executives are not presumed to lie for no reason. That is why the absence of an explanatory motive counts strongly against scienter. *See Okla. Firefighters*, 58 F.4th at 215. Here, because Plaintiffs offer no "clear motive for the alleged misstatements or omissions," they must point to "correspondingly greater" "circumstantial evidence of scienter." *Neiman v. Bulmahn*, 854 F.3d 741, 748 (5th Cir. 2017).

This case is a perfect example. Plaintiffs concede that not a single Defendant had a financial incentive to lie about American's sales and distribution strategy. There are no suspiciously timed

11

stock sales alleged or pecuniary benefits *of any kind*. The fact "that Plaintiffs have not alleged that Defendants themselves profited from their alleged misstatements undercuts a motive allegation." *Id.* at 752. Plaintiffs generically assert that Defendants were motivated to hide the truth in the hope it would all blow over. Such a circular argument—that defendants lied to conceal the truth—could be invoked in *every* securities case. *See id.* at 747. But generic corporate motives applicable in virtually all cases "do[] not support a strong inference of scienter." *Owens*, 789 F.3d at 539.

Plaintiffs' theory makes particularly little sense because it does not explain why Defendants "revealed the truth" when they did—in a mid-quarter voluntary announcement. There is no "reason to lie" in April "that would have vanished" by May. *Neiman*, 854 F.3d at 747. Plaintiffs' theory appears to be that Defendants engaged in a "reckless gamble," Opp. 28, to conceal the negative impacts of American's strategy, only to call off that "gamble" a month later for no reason. That theory of fraud is not logical, much less "compelling." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). And it does not explain how American issued unchallenged and accurate guidance in earlier quarters, but not Q1 2024.

**B.      Plaintiffs' "Knowledge Of Contrary Facts" Theory Confuses Seeing A Revenue Deviation And Knowing *Why* Such A Deviation Existed**

Despite the absence of any motive, Plaintiffs argue they can show scienter because Defendants "knew earlier" that the sales and distribution strategy "would turn out badly." Opp. 23. This is unsupported—and, in fact, refuted—by Plaintiffs' own complaint. At most, Plaintiffs' allegations go to whether Defendants knew that American's corporate or managed revenue share generally was down; they do not explain that Defendants knew *why* they were down or that it would affect revenues generally. It is these latter "omissions" that Plaintiffs challenge.

To start, Plaintiffs argue that "Defendants' post-Class Period admissions support their scienter" given their timing and content. *Id.* at 23-24. But the timing of Defendants' "disclosures"

12

counts *against* scienter, because "it would have made little sense for [Defendants] to lie" in April "only … to disclose the tru[th]" in May. *Neiman*, 854 F.3d at 747.

The content of the "admissions" is no help either. Try as Plaintiffs might to twist Isom's words, he *never* said that American knew the *cause* of any emerging revenue deviation before Q2 2024. Instead, Isom said only that American had "identified" the existence of a revenue "deviation" in Q1 2024, which management "thought … was going to reverse itself." ¶ 248.

In *Pier 1* the Fifth Circuit distinguished knowledge of bare facts (high inventory) with knowing the facts' full implications (a risk of inventory markdowns). 935 F.3d at 432. Because the allegations indicated only the former, scienter was not pled. So too here: Defendants observed (and disclosed) the bare fact of a revenue deviation in Q1; but no well-pled facts suggest they also understood the drivers of that trend, which they promptly reported after analysis one quarter later.[9]

Consider an analogy. Imagine one summer a firm's IT department updates everyone's computer to new versions of Microsoft Word. Everything runs fine until the winter, when suddenly the computers slow to a crawl. A user would know the computer had slowed long before he knew *why*, and the cause might well require investigation. Here, American saw and disclosed that revenue was not growing as quickly as its peers in Q1 2024. But the reason became clear only months later as revenue materially worsened. That is all that Isom said in his post-class statements.

Plaintiffs' cases are not to the contrary. In *Carlton v. Cannon*, 184 F. Supp. 3d 428, 484 (S.D. Tex. 2016), a defendant disclosed certain problems facing a plant that he said "could be salvaged," but "[a] month later" the company's chief technology officer "concluded that the main problems … were already discernable … and were therefore structural … issues" that could not

---

[9] Plaintiffs' "data" allegations suffer the same problem. Besides the fact that Plaintiffs do not adequately allege Defendants accessed this data, Mot. 26-27, the data could have shown only the *impacts* of the distribution strategy, not that that those impacts were *caused* by the strategy.

be fixed. Yet the defendant did not disclose that information even after the CTO informed him directly. *Id.* The admission thus directly showed that the earlier statement was knowingly false when made, not just in hindsight. Or, in *Reese v. Malone*, 747 F.3d 557 (9th Cir. 2014), later admissions showed earlier scienter because of the "relatively constant, long-term nature of the information." *Id.* at 575. There was no reason to think anything changed between the misstatement and subsequent disclosure; here the "disclosure" itself identifies the intervening changes.

Finally, at several points, Plaintiffs argue that Defendants' disclosures of certain internal data *strengthens* an inference of scienter. *See* Opp. 22, 27. They have it backwards. Executives do not commit fraud "by regularly provid[ing] updates," ¶ 258—including reporting that managed corporate booking were growing more slowly than other corporate bookings and lagging competitors. Such accurate disclosures count against a finding of scienter. *See Holbrook v. Trivago N.V.*, 2019 WL 948809, at *21 (S.D.N.Y. Feb. 26, 2019) (disclosures on subject of alleged fraud "inconsistent with a state of mind going toward deliberate illegal behavior" (internal quotation marks omitted)), *aff'd, Shetty v. Trivago N.V.*, 796 F. App'x 31 (2d Cir. 2019). And, disclosing *some* company data does not show that Individual Defendants had analyzed *all* company data.

### C.    The Innocent Inference Is Much Stronger

To avoid dismissal, a fraud complaint must support a "cogent" inference of scienter that is "at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 314. Viewing Plaintiffs' allegations holistically, the scale tips heavily in favor of the innocent (non-fraudulent) inference.

Here is Plaintiffs' theory: American debuted a new sales and distribution strategy in mid-2023. That strategy was an immediate failure apparent even to low-level employees, but Defendants stuck to it for roughly ten months and blindly hoped it would work. They hid the failings from the public for no reason and with no benefit. Then, Defendants commissioned an analysis from Bain to show what they already knew, before suddenly announcing in a voluntary

14

disclosure the strategy's challenges and that it was being rolled back in certain respects.

This story makes no sense. It does not explain why American repeatedly disclosed revenue metrics (including slower managed growth), why it hired Bain, or why it did not pivot earlier. And it does not explain why American purportedly came clean in an off-cycle disclosure.

The innocent inference, by contrast, explains everything. Defendants launched a new business strategy in mid-2023, when the industry was still recovering from COVID-19. The strategy showed early signs of success—growth in managed corporate bookings was slower, but overall corporate revenue and demand were increasing and costs were down. By Q1 2024, however, as the public was aware, American saw revenue deviate relative to peers. The cause of this new trend was obscured by signs of the sales and distribution strategy's initial successes, and the post-pandemic industry environment. But, according to Plaintiffs' allegations, once American saw signs of revenue materially worsening in Q2 and received Bain's report, it promptly updated investors in a mid-quarter disclosure and it revamped its strategy. That is not a story of fraud.

## III.    THE COMPLAINT DOES NOT ALLEGE LOSS CAUSATION

Plaintiffs cannot refute that Isom's May 28, 2024, remarks explicitly referred only to the period "since we provided guidance in April." ¶ 206. They thus did not contradict earlier (pre-April 2024) statements about prior periods. Plaintiffs try to get around this by arguing that Isom's comments, at a high level, pertained generally to a sales and distribution strategy that started in July 2023. Opp. 30. But just because the strategy overall was implemented then does not mean that its effects were immediately felt, or that Isom said as much in May 2024.

## IV.    PLAINTIFFS' SECTION 20(A) CLAIM FAILS

Plaintiffs' Section 20(a) claim fails because their primary claim fails. *See* Mot. 30.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the complaint with prejudice.

15

Dated: May 23, 2025                                  Respectfully submitted,

                                                     /s/ *Andrew B. Clubok*
                                                     **KELLY HART & HALLMAN LLP**
                                                     Dee J. Kelly, Jr.
                                                     State Bar No. 11217250
                                                     201 Main Street, Suite 2500
                                                     Fort Worth, TX 76102
                                                     Telephone: (817) 332-2500
                                                     Facsimile: (817) 878-9280
                                                     Email: dee.kelly@kellyhart.com

                                                     **LATHAM & WATKINS LLP**
                                                     Andrew B. Clubok (admitted *pro hac vice*)
                                                     Susan Engel (admitted *pro hac vice*)
                                                     Stephen P. Barry (admitted *pro hac vice*)
                                                     555 11th Street NW, Suite 1000
                                                     Washington, DC 20004
                                                     Telephone: (202) 637-2200
                                                     Facsimile: (202) 637-2201
                                                     Email: andrew.clubok@lw.com
                                                     Email: susan.engel@lw.com
                                                     Email: stephen.barry@lw.com

                                                     ATTORNEYS FOR DEFENDANTS


## CERTIFICATE OF SERVICE

I certify that on May 23, 2025, a true and correct copy of the foregoing document was

served on all counsel of record via the Court's ECF system.

                                                     /s/ *Andrew B. Clubok*
                                                     Andrew B. Clubok

16