IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| YAZZAN QAWASMI, ET AL., | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| v. | § | Civil Action No.  4:24-CV-00673-O |
| | § | |
| AMERICAN  AIRLINES  GROUP  INC, | § | |
| ET AL., | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendants American Airlines Group Inc. ("American"), Robert D. Isom ("Isom"), Devon E. May ("May"), and Vasu S. Raja's ("Raja") Motion to Dismiss (ECF No. 55), filed March 21, 2025; Plaintiffs' Opposition to Defendants' Motion to Dismiss (ECF No. 58), filed April 25, 2025; and Defendants' Reply (ECF No. 61), filed May 23, 2025. After considering the briefing and the relevant case law, the Court **GRANTS** Defendants' Motion. Specifically, the Court concludes that Plaintiffs failed to plausibly allege that Defendants materially misled investors and failed to establish a compelling inference of scienter. Accordingly, all of Plaintiffs' claims against Defendants are **DISMISSED with prejudice**.

## I.    BACKGROUND[1]

American is one of the United States' three largest providers of air transportation for passengers and cargo. American traditionally sold airfare and ancillary services to corporate customers through third party distributors who used global distributions systems ("GDSs"), which

---

[1] Unless otherwise cited, the Court's recitation of the facts is taken from Plaintiffs' Amended Complaint, documents attached to the complaint, and matters on which the Court may take judicial notice. *See* Pls.' Am. Compl., ECF No. 54; *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011). At this stage, these facts are taken as true and viewed in the light most favorable to the plaintiffs. *Sonnier v. State Farm Mut. Auto Ins.*, 509 F.3d 673, 675 (5th Cir. 2007).

1

are centralized platforms that act as middlemen between travel agencies and airlines.[2] These GDSs relied on Electronic Data Interchange for Administration, Commerce, and Transport ("EDIFACT"), a universal language for data sharing, to exchange information regarding airfare and ancillary services.[3]

Beginning in December 2022, American adopted several changes to its sales and distribution strategy designed to modernize its offerings and reduce costs.[4] American's new distribution strategy aimed to push corporate customers away from booking through EDIFACT channels to booking directly through American's website, mobile app, or a direct connection with the airline. All of this involved using New Distribution Capability ("NDC") technology.[5] Plaintiffs allege that immediately after introducing NDC in July 2023, American's bookings from larger agencies and corporate clients began to decline.[6]

According to the complaint, from the beginning of the Class Period,[7] American and the individual Defendants Robert D. Isom, Jr. (then-Chief Executive Officer, President, and a member of American's Board of Directors), Devon E. May (then-Executive Vice President and Chief Financial Officer), and Vasu S. Raja (then-Executive Vice President and Chief Commercial Officer) misled investors by concealing the negative effects resulting from the shift to NDC.

The complaint relies on information from two confidential witnesses ("CW1" and "CW2") who were employed by American for a portion of the Class Period. CW1 was employed at American from 2019 to January 2024 as a Travel Agency Account Manager.[8] During this time,

---

[2] Pls.' Am. Compl., ¶ 5, ECF No. 54.
[3] *Id.*
[4] *Id.* ¶ 6.
[5] *Id.*
[6] *Id.* ¶ 109.
[7] The parties identify the "Class Period" in their pleadings as being from July 20, 2023, through May 28, 2024.
[8] Pls.' Am. Compl. ¶ 34, No. 54.

CW1 managed accounts for two "very large" corporate travel agencies.[9] CW2 was an American employee for over three decades until leaving the Company on January 31, 2024.[10] During the Class Period, CW2 worked as a Retail Business Manager within American's Global Sales division managing small, medium, and large-sized travel agency accounts located in the Midwestern and Southern Region of the United States.[11]

According to the CWs, starting in 2023 and continuing into 2024, American's internal data showed that agencies, travel management companies, and corporations were not adopting NDC as quickly or as broadly as American anticipated which caused American's market share of corporate travel to decline.[12] Plaintiffs allege that Defendants attempted to conceal negative effects of American's changes to its distribution and sales strategy by issuing a series of material misstatements and omitting material facts  American's public statements. Throughout the Class Period Defendants maintained that that they were "encouraged" by "how quickly" clients' NDC "transition has happened[,]" purportedly because "incentives" targeted to travel agencies and travel managers were "helping them shift" to NDC; that business travel "demand is strong[,]" and "corporate travel is coming back[,]" enabling American to "hang on to [its business travel] share."[13]

In late May 2024, however, American announced Raja's termination and adjusted its 2024 financial guidance downward. Shortly after, *Bloomberg* published an article (the "*Bloomberg* article") linking Raja's dismissal to a critical review by the consulting firm Bain & Co. ("Bain").[14] Bain concluded that American's strategy had alienated corporate clients "over the past few

---

[9] *Id.*
[10] *Id.* ¶ 35.
[11] *Id.*
[12] *Id.* ¶ 101.
[13] *Id.* ¶¶150–151, 164, 189, 199.
[14] *Id.* ¶¶ 240–42.

quarters."[15] After these disclosures, American's stock price suffered the largest single-day drop since COVID-19's negative effects on travel.[16] In July 2024, American cut guidance again, once more blaming the NDC strategy.[17]

In July and August 2024, several of American's investors filed class action complaints alleging that American violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. The actions were consolidated, and Plaintiffs filed an amended complaint on January 21, 2025, and a further amended complaint on March 19, 2025. Plaintiffs claim that during the Class Period, Defendants hid that American's sales and distribution strategy was harming its business evidenced by fewer corporate bookings and lost market share.[18] Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), and the Motion is ripe for the Court's review.

## II.    LEGAL STANDARDS

A "complaint will survive a Rule 12(b)(6) motion to dismiss if, accepting its factual allegations as true, the complaint plausibly states a claim for relief." *Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 956 (5th Cir. 2016). A plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court, in turn, must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). If there are well-pleaded factual allegations, the Court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief. *Id.*

---

[15] Pls.' Am. Compl. ¶ 238, No. 54.
[16] *Id.*
[17] *Id.* ¶¶ 220, 224.
[18] *Id.* ¶¶ 9, 292.

4

Where, as here, the complaint involves an allegation of fraud, Federal Rule of Civil Procedure 9(b) imposes a higher standard on the complainant, requiring that he plead with "particularity the circumstances constituting fraud." The heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA") also apply. The PSLRA enhances Rule 9(b)'s particularity requirement for pleading fraud in two ways. *Ind. Elec. Workers Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008). First plaintiffs must "specify each statement alleged to have been misleading, and the reason or reasons *why* the statement is misleading." *Id.* (citing 15 U.S.C. § 78u–4(b)(1)(B)) (emphasis added). Second, "for 'each act or omission alleged' to be false or misleading, plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind.'" *Id.* (citing 15 U.S.C. § 78u–4(b)(2)).

In considering a Rule 12(b)(6) motion to dismiss, a court must limit itself to the contents of the pleadings, with two exceptions. *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000). First, the Fifth Circuit allows the courts to consider documents attached to the motion to dismiss that are referenced in the complaint and central to the plaintiffs' claim. *Id.*; *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). Second, in securities cases, courts may take judicial notice of the contents of public disclosure documents that the law requires be filed with governmental agencies, such as the SEC, and that are actually filed with the agency. *Lovelace v. Software Spectrum. Inc.*, 78 F.3d 1015, 1018 n.1 (5th Cir. 1996). However, these documents may be considered only for the purpose of determining what statements they contain, not for proving the truth of their contents. *Id.*

## III.    ANALYSIS

The complaint alleges that Defendants violated Section 10(b) of the Securities Exchange Act (the "Act" or the "Exchange Act), 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, and that the individual Defendants violated Section 20(a) of the Act. To state a Section 10(b) and Rule 10b-5 claim, "a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter (a wrongful state of mind); (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) a causal connection between the material misrepresentation and the loss." *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 206 (5th Cir. 2023) (citation omitted).

Defendants contend that Plaintiffs fail to meet the elements of misrepresentation or omission, scienter, and loss causation. The Court analyzes each Statement[19] to determine (1) whether the statements were forward-looking and protected by the safe harbor; (2) whether the statements were material misstatements or omissions; and (3) if scienter was properly alleged. *Okla. Firefighters*, 58 F.4th at 207. Before turning to the statements themselves, the Court first considers the degree to which the assertions of the CWs, as anonymous sources, should be discounted.

**A. Section 10(b) and Rule 10b-5 Allegations**

1. <u>Discounting Confidential Witness Allegations</u>

Under the PSLRA's heightened pleading standard, courts must "weigh the strength of plaintiffs' favored inference in comparison to other possible inferences." *Ind. Elec. Workers*, 537 F.3d at 535. The ability to weigh such inferences is obstructed when the witness is anonymous, so courts *must* apply a discount to CW allegations. *Id.*; *see also Okla. Firefighters*, 58 F.4th at 207 n.8. However, "[d]iscount does not mean unfettered discretion to discard. The degree of

---

[19] The Court refers to the uncontested statement numbering used in Defendants' motion. *See* Def.'s Mot. Dismiss Ex. T, A1018-39, ECF No. 55-8.

discounting depends on the circumstances involved." *Okla. Firefighters*, 58 F.4th at 208. Courts may rely on assertions from confidential sources if the person is "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Owens v. Jastrow*, 789 F.3d 529, 542 n.11 (5th Cir. 2015) (quoting *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 352 (5th Cir. 2002)). To credit CW allegations there must be "'convincing detail' to the information they provide." *Okla. Firefighters*, 58 F.4th at 208 (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 712 (7th Cir. 2008)).

The complaint describes both CWs by title, responsibilities, tenure at American, and the information they would have been able to access. However, neither CW is described as being in a position where they would have interacted with the individual Defendants or as having any firsthand knowledge of companywide trends. Indeed, Plaintiffs acknowledge that the CWs were several reporting rungs removed from the individual Defendants during the Class Period.[20] The CWs need not "be a fly on every relevant wall–or directly deliver [to defendants] every relevant presentation–to plead allegations" that are credited. *Okla. Firefighters*, 58 F.4th at 216 n.18. However, the CWs must be in a position to know that the problems alleged effect the company as a whole and not only the individual slice to which they are privy. *See Ind. Elec. Workers*, 537 F.3d at 539; *see also Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc*, 810 F.3d 951, 958 (5th Cir. 2016).

Given that both CWs were only exposed to a limited part of American's business, any allegations that seek to extrapolate the CWs' limited firsthand knowledge to the entire enterprise are heavily discounted. Similarly, because the CWs left American in January 2024, they did not

---

[20] Pls.' Am. Compl. ¶¶ 34–35; Pls.' Resp. to Defs.' Mot. Dismiss 8, ECF No. 58.

have access to information regarding the alleged misstatements for the last four months of the Class Period. As such, the allegations are heavily discounted to the extent the complaint applies the CWs' allegations to the period following their departure from American.

Plaintiffs also rely on the allegations of an anonymous source in the May 2024 *Bloomberg* article. The only description of the source is "a person familiar with the matter."[21] Such a nondescript source falls well short of the Fifth Circuit requirement that unnamed sources be described "with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded." *ABC Arbitrage*, 291 F.3d at 353. Consequently, the Court heavily discounts the allegations from the unnamed source in the *Bloomberg* article.

### 2.  Non-Actionable Corporate Puffery

Turning to the Statements themselves, the Court finds that some of Defendants' Statements fall within the definition of corporate puffery. Statements are non-actionable puffery, if they are "of the vague and optimistic type that cannot support a securities fraud action . . . and contain no concrete factual or material misrepresentation." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) (quoting *Lain v. Evans,* 123 F. Supp. 2d 344, 348 (N.D. Tex. 2000)). Because analysts "rely on facts in determining the value of a security," such statements "are certainly not specific enough to perpetrate a fraud on the market." *Id.* (citations omitted). "[G]eneralized positive statements about a company's progress are not a basis for liability." *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001). A company is "under no duty to cast its business in a pejorative, rather than a positive, light." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003).

---

[21] Defs.' App. Supp. Mot. Dismiss Ex. R, A979, ECF No. 55-8.

Defendants argue that Statements 1,[22] 6, 7, 11, 12, 13, 14, 15, 18, 19, 23, 24, 25, 37, 39, and 43 are all opinion and corporate puffery statements that are not actionable.[23] Plaintiffs contend that these Statements contain "objectively verifiable statements[,]"[24] and that they were "false when made[,]"[25] and therefore cannot be opinion. The Court agrees with Defendants in part and Plaintiffs in part.

The Court finds that Statements 6, 13, 14, 18, 19, 23, 24, 25, 37, and 39 are non-actionable corporate puffery because they are "optimistic generalizations that would not convey to a reasonable investor [that] such aspirations are guaranteed or even likely." *Okla. Firefighters*, 58 F.4th at 220. Importantly, the Statements do not "convey precise information on which investors are likely to rely when valuing corporations[.]" *Id.* For example, Defendant Isom said that he "felt confident" "especially on a competitive basis against our peers[]" looking into 2024 and that he felt "comfortable" with the start of the NDC execution.[26] These are imprecise, positive statements about American's competitive strength and future prospects. *See Southland*, 365 F.3d at 372; *see also Thornton v. Micrografx*, 878 F. Supp. 931, 937 (N.D. Tex. 1995) (even "misguided optimism is not a cause of action" and "does not support an inference of fraud" (citation omitted)).

Conversely, Statements 7, 11, 12, 15, 43 are more than opinion because they contain sufficiently factual information. For example, in response to a question about the NDC rollout, Defendant Raja stated that the changes to American's sales and distribution system had "performed probably above what [American's] expectations are." Statement 7. Similarly, the other Statements provide a factual basis as to why the Defendants were "encouraged" by various signs relating to

---

[22] The statements made in Statement 1 are repeated in Statements 7 and 24. As such, the Court will not address Statement 1 on its own terms as it is a combination of statements made at different times.
[23] Defs.' Mot. Dismiss 15, 19–20, ECF No. 55.
[24] Pls.' Resp. to Defs.' Mot. Dismiss 18, ECF No. 58.
[25] *Id.* at 13.
[26] *See* Statements 13, 14.

customer behavior and revenue. *See e.g.*, Statements 11–12. These Statements are about American's actual performance beyond optimistic projections of American's future potential. *See Carlton v. Cannon,* 184 F. Supp. 3d 428, 493–94 (S.D. Tex. 2016) (finding that "seeing operational progress" and "we believe that we are turning . . . toward steady-state operations" were not puffery where "tethered" to "factual statements about current operations").

### 3.   Misrepresentation or Omission

The Court finds that the remaining Statements at issue do not meet the statutory definition of "material misrepresentation or omission." To allege a material misrepresentation or omission as the basis of a securities fraud claim with sufficient particularity under Rule 9(b) and the PSLRA, the complaint must, among other things, specify each allegedly misleading statement and explain why it is misleading—"the so-called 'particularity' requirement." *Lormand v. US Unwired*, 565 F.3d 228, 239 (5th Cir. 2009); 15 U.S.C. § 78u–4(b)(1). A misrepresentation is "material" if there is "a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision." *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). An omission is "material" if there is "a substantial likelihood that disclosure would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Id.* at 23–32.

A misleading statement must omit information in a manner that "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Ind. Elec. Workers*, 537 F.3d at 541 (citation omitted). Timing is also important—to be actionable, a statement must be "false when made." *Masel v. Villarreal*, 924 F.3d 734, 748 (5th Cir. 2019). For convenience, the Court groups the remaining Statements based, in part, on Plaintiffs' categorization and addresses them accordingly.

a. *The NDC Transition Statements (7, 15, 26, 27, 40, 43)*

Plaintiffs argue that the NDC Transitions Statements "were false when made because they misrepresented that [American's] distribution strategy was well-received by booking partners and customers; NDC adoption and rollout was swift; and [American's] NDC promotion efforts were successful."[27] To demonstrate the falsity of the Defendants' Statements, Plaintiffs almost exclusively rely on the allegations from the CWs. Of the six NDC Transition Statements identified above, five were made ostensibly after the CWs had departed American in 2024. Thus, these allegations are heavily discounted. *See* discussion *supra* Part III.A.1.

Statement 7, from July 2023, is the only NDC Transmission Statement made while the CWs were employed by American. In response to a question on corporate travel trends, Defendant Raja stated that "we're encouraged by . . . the durability of these customers' demand" and spoke generally about how well NDC's bookings were performing. Plaintiffs' contention that these representations are false or misleading is without merit.

Plaintiffs primarily rely on CW2's allegations that "it was clear by April 2023 that the NDC distribution strategy was causing agencies and companies to book fewer overall flights with" American.[28] Setting aside whether someone in CW2's position as a Retail Business Manager would be privy to such information, nothing in Statement 7 is contradicted by Plaintiffs' allegations. In Statement 7, Defendant Raja cited the revenue trends coming out of direct booking channels as the basis for his encouragement. Indeed, the data shows that, in Q2 2023, direct and NDC bookings were "70 to 75% of [American's] revenues[.]"[29] The percentage increased to roughly 80% the following quarter.[30] Those numbers alone provided Defendants with a reasonable

---

[27] Pls.' Resp. to Defs.' Mot. Dismiss 11, ECF No. 58.
[28] *Id*. at 12.
[29] Pls.' Am. Compl. ¶ 255.
[30] *Id.*

basis to be encouraged by corporate trends *at the time Statement 7 was made*, and Plaintiffs do not challenge this data. *See Masel,* 924 F.3d at 748. Because there is no contradiction between the factual information in Statement 7 and Plaintiffs' allegations, Statement 7 was not false or misleading.

The remaining NDC Transition Statements (Statements 15, 26, 27, 40, 43) were not false or misleading for similar reasons. The Statements are primarily positive remarks made about business travel trends and American's partnering with travel agencies, particularly small and midsized companies. The Statements were made across several months, from January to April 2024—all after the CWs' departure from American. To show the falsity of these Statements, Plaintiffs point to the (heavily discounted) CW2 allegations that the NDC rollout caused "bookings from larger agencies to drop by 15% and corporate bookings to drop 'much lower' than that and bookings and percentage of share metrics stayed 'consistently down.'"[31] But many of American's Statements were specifically about small and medium sized travel agencies, not the larger agencies mentioned by CW2. *See* Statements 15, 26 and 43.

Plaintiffs maintain that Defendants touted a narrative of optimism which was misleading[32] but do not contest any of Defendants' data supporting their optimism. The alleged false or misleading Statements touting the success of the NDC transition were often accompanied by a factual basis for American's optimism. *See, e.g.,* Statement 40 ("The vast majority of our agencies are currently in an NDC transition . . . the agencies that constitute about 30% to 40% of our revenue are already doing more than 30% of their bookings through NDC[.]"). As discussed above, Defendants were not obligated to cast their disclosed data in a pejorative rather than optimistic light. *See Nathenson*, 267 F.3d at 419.

---

[31] *Id.*
[32] *Id.* at 11.

Plaintiffs' appeal to post-Class Period statements[33] is unavailing because reporting "facts as they stood at the time" are not misleading even if "further information was discovered later." *Police & Fire Ret. Sys. v. Plains All Am. Pipeline L.P.*, 777 F. App'x 726, 731 (5th Cir. 2019). Because the Court heavily discounts the CWs' allegations as to American's business in 2024, Plaintiffs have not plausibly alleged that any of the NDC Transition Statements were false or misleading.

### b. The Corporate Travel Statements (2, 11, 12, 17, 35, 41, 42)

Plaintiffs argue that the Corporate Travel Statements were false or misleading when made for two reasons. First, that "Defendants masked" the worsened demand for managed corporate customers resulting from the NDC strategy "by discussing demand broadly instead of specifically addressing managed corporate travel."[34] Second, Plaintiffs argue that, contrary to American's assertions, it "was *losing* [small and medium-sized businesses] share because such customers were being driven away by [American]'s distribution strategy."[35] Defendants contend that the contents of the Corporate Travel Statements were simply true and that [American] "had a solid basis for optimism around the sales and distribution strategy."[36]

In support of their position, Plaintiffs again rely almost exclusively on the CWs' allegations. Statements 11 and 12 were made while the CWs were employed by American and are due some credit. Yet, none of Plaintiffs' allegations directly contradict Defendants' statements so as to make them false or misleading. Plaintiffs' complaint specifically alleges that Statements 11 and 12 were false or misleading because "Defendants were not seeing encouraging signs from managed corporate customers or confident in American's 2024 competitive standing against

---

[33] *Id.* at 12.
[34] *Id.* at 13.
[35] *Id.* at 14.
[36] Def.'s Mot. Dismiss 14, 19, ECF No. 55.

peers."[37] But as with the NDC Transition Statements, the fact that Defendants used positive adjectives in the context of disclosed data does not make those adjectives material. *See Heinze v. Tesco Corp.,* 971 F.3d 475, 480 (5th Cir. 2020) (finding that a reasonable shareholder would have relied on the actual quantity disclosed to assess its significance, rather than the adjective "significant") (citing *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 172 (3d Cir. 2014) (holding at the motion to dismiss stage that the adjective "spectacular" was a vague and general statement of optimism that was not misleading)).

Moreover, Defendants' disclosures provided a reasonable basis for their statements on how corporate travel was performing.[38] Plaintiffs have not alleged sufficient countervailing grounds for the Court to find Statements 11 and 12 to be false or misleading. *See Employees' Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 901 (5th Cir. 2018).

Statements 17, 35, 41, and 42 were also not false or misleading. Defendants represented that they were seeing "tremendous demand[,]" that "demand [was] strong across the board[,]" and that business travel "revenues are coming back very materially for" American. Statements 17, 35, and 42. Plaintiffs have not alleged any facts to show that overall demand was not strong. In fact, the data cited in Plaintiffs' complaint supports Defendants' assertions.[39]

Neither does Plaintiffs' argument that Defendants were masking the failures of corporate travel by not addressing managed corporate travel hold water. Plaintiffs' own complaint cites Defendants' statements that business travel revenues were being "driven by unmanaged corporations" and that managed corporate travel was growing less than that "in the mid to high

---

[37] Pls.' Am. Compl. ¶ 139

[38] *See* Defs.' App. Supp. Mot. Dismiss Ex. J, A979, ECF No. 55-4. (stating the unchallenged position that American's "total business revenues were up 2%").

[39] *See e.g.*, Defendant Isom's statement that "[d]omestic revenues from business travel ended the fourth quarter at approximately 90% of 2019 levels" and Defendant Raja's statement that "[w]e too exit Q4 with a 90% business recovery." Pls.' Am. Compl. ¶ 258(vii), ECF No. 54.

single digits."[40] These statements specifically address what Plaintiffs' claim was hidden. Again, American was not obligated to cast these figures in a pejorative light. *See Rosenzweig*, 332 F.3d at 869. The material elements of Defendants' statements are disclosed facts, not the adjectives describing them. *See Heinze*, 971 F.3d at 480. Thus, Defendants' disclosures provide the material metrics that a reasonable investor would have relied on in making an investment decision. *Id*.

Although Rule 12(b)(6) requires the Court to draw all reasonable inferences in favor of the plaintiff, the court does not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 550 (5th Cir. 2007). Plaintiffs have failed to allege a "plausible claim" with respect to the Corporate Travel Statements because they have provided no factual basis from which the court may draw an inference in their favor. *Iqbal*, 556 U.S. at 679.

### c. The Risk Factor Statements (3, 4, 5, 8, 9, 10, 20, 21, 22, 31, 32, 33)

Between July 2023 and April 2024, Defendants warned: (1) "encounter[ing] problems" with "third-party service providers" could result in a "decline in revenue or negative public perception about [American's] services;" (2) future initiatives "creat[ing] logistical challenges … could . . . result in decreased demand;" and (3) changes to "distribution flexibility" and "the functionality of distribution channels" "may affect [American's] relationship with conventional travel agents [and] travel management companies." Statements 3–5, 8–10, 20–22, 31–33. Plaintiffs contend that these Risk Factor Statements are actionable because Defendants framed the risks as hypothetical despite knowing that they had materialized.[41] Defendants again maintain that the

---

[40] *Id.* at ¶ 258(ix).
[41] Pls.' Resp. to Defs.' Mot. Dismiss 14–15, ECF No. 58.

Statements are true. Namely, Defendants argue that the allegations do not show a top-line decline in revenue or decreased demand and therefore do not show that the risks had actualized.[42]

The Court gives some credit to the CWs allegations surrounding Statements 3, 5, 8, 10 because they were made while the CWs were employed by American, and the CWs' positions would have given them access to information that *could* contradict these Statements. Statements 3, 5, 8, and 10 relate to potential disruptions between American and third-party service providers.[43] Critically, the Statements warned that such disruptions could affect revenue and demand.[44] Plaintiffs allege that such disruptions did occur.  But Plaintiffs have not alleged sufficient facts to show that overall revenue or demand had decreased in 2023[45] and therefore have not plausibly alleged that the harm, which Defendants acknowledged was a possibility, had actualized. Therefore, these Statements are not misleading.

The remaining Risk Factor Statements (Statements 4, 9, 20–22, 31–33) are also not false or misleading. The Court heavily discounts the CWs' allegations as they relate to the remaining Risk Factor Statements because they either occurred after the CWs left American or contain information to which the CWs' would not have been privy. *See Ind. Elec.* 537 F.3d at 539. Even granting Plaintiffs' allegations that corporate travel dropped and stayed "consistently down" because of the NDC transition, the metrics disclosed by American do not support an overall "decline in revenue" or "decreased demand" at the time of the risk warnings. *See Whole Foods Mkt., Inc.*, 905 F.3d at 900–01 (holding that "it does not follow that Whole Foods' [pricing inaccuracy] issues rendered false the defendants' statements about Whole Foods decreasing its

---

[42] Defs.' Mot. Dismiss 18, 20, ECF No. 55.
[43] Pls.' Am. Compl. ¶¶ 97–99, 110–11
[44] Plaintiffs do not allege any facts relating to the "negative public perception" aspect of American's disclosures, so the Court does not address it here.
[45] *See* discussion *supra* at III.C.ii.

prices . . .". Plaintiffs have not plausibly alleged that the risks American contemplated had materialized and therefore, the Risk Factor Statements were not false or misleading.

### d. The Financial Guidance Statements (16, 28, 29, 30, 34, 36, 38)

The Financial Guidance Statements are not actionable because they fall within the PSLRA's safe harbor. *See Lormand*, 565 F.3d at 245. Under the safe harbor provision, a defendant is not liable for a statement if: (1) the statement is identified as forward-looking and "is accompanied by meaningful cautionary statements"; or (2) the statement is "immaterial"; or (3) the plaintiff fails to plead that the statement "was made with actual knowledge . . . that [it] was false or misleading." § 78u–5(c)(1)(A)–(B); *see also Southland*, 365 F.3d at 371. "Each statement that benefits from the safe harbor must be addressed individually." *Lormand*, 565 F.3d at 245. The statute defines "forward-looking" as:

> (A) a statement containing a projection of revenues, income . . . or other financial items; (B) a statement of the plans and objectives of management for future operations . . . ; (C) a statement of future economic performance . . . ; (D) any statement of the assumptions underlying or relating to [any of the above].

15 U.S.C. § 77z–2(h)(1). Each of the Financial Guidance Statements are clearly forward-looking because they contain projections of revenues and concern future economic performance.

Plaintiffs assert that the Financial Guidance Statements from March and April 2024 are actionable because they are based on the underlying misrepresentations that "demand [was] strong" and that faulty "current demand assumptions" purportedly underlaid American's projections.[46] In addition, Plaintiffs argues that Statement 36 from April 2024 is also actionable because it is premised on business travel "continu[ing] to recover" and there being "sequential improvement in the recovery of managed corporate travel."[47] Even if American's projections were

---

[46] Pls.' Resp. to Defs.' Mot. Dismiss 16, ECF No. 58.
[47] *Id*.

later found to be inaccurate, each of the Financial Guidance Statements was forward-looking and not actionable.

Plaintiffs have not plausibly alleged sufficient facts to support the inference that Defendants made the Financial Guidance Statements with actual knowledge that they were false or misleading. The Court finds that Plaintiffs have not plausibly alleged actual knowledge for the same reasons they have not plausibly alleged scienter, as discussed below. Therefore, The Financial Guidance Statements fall within the statutory safe harbor and are not actionable.

4. <u>Scienter</u>

Even if the various statements were material misrepresentations or omissions—which they are not—Plaintiffs still have not adequately alleged that Defendants possessed the requisite scienter. Under the heightened pleading requirement of the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." § 78u-4(b)(2). A complaint adequately pleads scienter by alleging facts that support that the defendant acted with an "intent to deceive, manipulate, or defraud or severe recklessness." *Lormand*, 565 F.3d at 251 (quotation marks and citation omitted).

In *Tellabs*, the Supreme Court explained the steps for examining scienter. First, the Court "accept[s] all factual allegations in the complaint as true." *Tellabs*, 551 U.S. at 322. The Court then considers the complaint's allegations in their entirety. *Id.* Third, a court must consider plausible inferences that both oppose and support a strong inference of scienter; the inference must be "cogent and compelling," not "merely 'reasonable' or 'permissible.'" *Id.* at 323–24; *Shaw*, 537 F.3d at 533. "Where there are competing inferences that establish or negate the scienter requirement, a tie favors the plaintiff on a motion to dismiss." *Spitzberg*, 758 F.3d at 686 (quotation marks and citation omitted).

As an initial matter, "[a]n important aspect of pleading scienter is establishing motive." While "absence of a pecuniary motive is not dispositive," *Okla. Firefighters*, 58 F.4th at 215, 218. Pecuniary motive is often a "critical" part of "a successful claim for securities fraud." *Mun. Employees' Ret. Sys. of Michigan v. Pier 1 Imports, Inc.*, 935 F.3d 424, 431 (5th Cir. 2019). Here, Plaintiffs have not alleged any pecuniary motive on the part of the Defendants. At most, Plaintiffs allege that Defendants' desire to save face is a cognizable motive.[48] But even this vague allegation is undercut by the fact that American adjusted its guidance earlier than necessary.[49] If American were attempting to save face, it is more plausible that they would have waited for the next quarter disclosures to come due, not act preemptively. When the defendant has no "particular reason to lie," that weighs heavily against any "inference of scienter." *Neiman v. Bulmahn*, 854 F.3d 741, 747 (5th Cir. 2017).

### a.   Post-Class Admissions and the Bain Report

Plaintiffs first argue that Defendants' post-Class Period statements regarding the decline in American's revenue prove that Defendants actually knew earlier of the problems that the NDC transition was causing.[50] Plaintiffs also point to Defendant Isom's "damning admission" that American had "identified" the problem by Q1 2024.[51] Defendants counter that Plaintiffs have misconstrued Isom's statements and that none of the Post-Class Period statements show knowledge that American's strategy was failing.[52] Defendants argue that the Fifth Circuit has rejected similar

---

[48] Pls.' Resp. to Defs.' Mot. Dismiss 23 n.18, ECF No. 58.
[49] The Court is not persuaded by Defendants' attempts to paint this as an extraordinary measure given that American had released similar voluntary guidance in the preceding years. *See* Pls.' Resp. to Defs.' Mot. Dismiss 19, ECF No. 58. Nevertheless, such a disclosure does cut against Plaintiffs' theory that American attempted to hide poor performance "in the hopes it would reverse itself." *Id*. at 24.
[50] Pls.' Resp. to Defs.' Mot. Dismiss 23–24, ECF No. 58.
[51] *Id.* at 24.
[52] Defs.' Mot. Dismiss 25, ECF No. 55.

attempts to establish scienter based on "*hindsight* assessment[s]" after "the alleged misrepresentations and omissions." *Rosenzweig*, 332 F.3d at 867–68.

The Court agrees with Defendants that Plaintiffs have misconstrued the post-Class Period statements. Plaintiffs' briefing states that Isom said, "Defendants 'identified' *the* problem by Q1 2024."[53] (emphasis added). But this is misleading. Isom's actual words were that "we identified *a* deviation in terms of our revenue performance."[54] (emphasis added). Knowing of a problem causing a deviation in revenue is not the same as knowing the underlying cause. *See Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175, 188 (5th Cir. 2019) ("Knowing that the accounting department was having problems is different from knowing what each of those specific problems were."). Moreover, taking Isom's "admission" together with Defendants' previous statements, American consistently acknowledged that a deviation in revenue performance started in January 2024.[55] By identifying and disclosing this deviation as early as Q1 2024, American was doing the opposite of what Plaintiffs allege. In other words, it does not make sense for American to hide that its strategy was failing but still acknowledge in its material performance metrics that it was losing the relevant market share to its competitors.

Moreover, the only binding precedent that Plaintiffs cite in support of their argument that hindsight analysis shows scienter is *Lormand*. But in *Lormand*, Plaintiffs presented other evidence in addition to the post-class period remarks, including internal emails "that all [told] the same story." *Lormand*, 565 F.3d at 254. Here, Plaintiffs have not offered any plausible corroborating evidence[56] to show that Defendants knew that the NDC transition was the cause of American's revenue deviation. Therefore, American's hindsight identification of the cause of the deviation in

---

[53] Pls.' Resp. to Defs.' Mot. Dismiss 24, ECF No. 58.
[54] Pls.' Am. Compl., ¶ 231.
[55] Defs.' Mot. Dismiss Ex. S, A996, ECF No. 55-8; Pls.' Am. Compl. ¶ 199, ECF No. 54.
[56] *See* discussion *infra* regarding the Bain report.

revenue relative to its peers does not allow for a "cogent and compelling" inference of scienter. *Tellabs*, 551 U.S. at 322.

Plaintiffs next argue that Defendants' hiring of Bain to conduct a "critical review" of American's NDC strategy also shows the necessary scienter. Relying on the *Bloomberg* article Plaintiffs' theory is that because American retained Bain prior to May 29, 2024, which means that "Defendants knew the NDC strategy was driving customers away and negatively affecting [American]'s revenues before issuing the late Class Period" statements.[57] Defendants respond that the *Bloomberg* article shows Defendants did not know of the issues prior to Bain's report because the wording demonstrates that Bain's "critical review" "found" and "revealed" the NDC strategy's underlying issues.

As discussed above, the Court heavily discounts the allegations based on the *Bloomberg* article because the anonymous source is not described with any particularity. *See Owens*, 789 F.3d at 542 n.11. But even crediting the anonymous allegations, the Bain report does not give rise to a compelling inference of scienter. The Court is not convinced by Defendants' arguments regarding the word choice used in the *Bloomberg* article denoting a discovery of new knowledge. However, under Plaintiffs' theory, Defendants knew from the beginning of the NDC transition that it was failing but then hired Bain sometime before the end of May 2024 to confirm what they already knew.[58] Plaintiffs' reading of the alleged facts may well be a permissible one, but it falls short of reasonable. The stronger inference is that Defendants did not know what was causing the deviation and commissioned Bain to discover the cause. *See Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951 (5th Cir. 2016) ("The court must consider plausible inferences supporting as well as opposing a strong inference of scienter.")

---

[57] Pls.' Resp. to Defs.' Mot. Dismiss 26, ECF No. 58.
[58] *Id.* at 26.

Plaintiffs implicitly endorse this reading of the facts in their briefing. Plaintiffs stated that "Defendants recognized a revenue deviation, retained Bain, and Bain conducted its investigation and issued a report to [American]."[59] Plaintiffs essentially argue that American hired Bain to perform a "critical review" of a strategy which American already knew was failing and the specific reasons for that failure.[60] Taking the facts as pled, retaining Bain only makes sense if Defendants were attempting to discover the underlying cause of the deviation. As for when Defendants knew the results of Bain's investigation, Plaintiffs allege that Raja was fired "days after receiving feedback in the report."[61] Raja's termination was disclosed on May 28, 2024. Accepting the facts alleged as true, American would have received the results of Bain's report sometime in May 2024 whereas the latest alleged misstatement was made in April 2024. This timeline contradicts Plaintiffs' theory that Defendants were aware of Bain's conclusions when they made the later Class Period statements.[62] Therefore, Plaintiffs do not plausibly allege that the Bain report supports scienter, nor that Defendants knew the contents of the report when making the later Class Period statements.

### b. *Defendants' Access to Data*

Plaintiffs offer two final justifications to support their scienter allegations: (1) Defendants had access to and monitored internal data and that access and review alerted Defendants to pervasive problems with the NDC strategy; (2) Defendant Raja gave evasive answers to pointed questions about the NDC distribution strategy.[63] Both arguments rest on the assumptions that 1) American's internal data showed a pervasive problem with the NDC strategy, 2) that Defendants

---

[59] *Id.*
[60] *See generally* Pls.' Am. Compl. ¶¶ 115–202 (alleging that American knew as early as July 2023 that the NDC transition strategy was failing).
[61] *Id.* ¶ 238.
[62] Pls.' Resp. to Defs.' Mot. Dismiss 25–26, ECF No. 58.
[63] *Id.* at 26–28.

had direct knowledge of this data, and 3) Defendants intentionally misled the market as to the contents of that data. Plaintiffs have not plausibly alleged Defendants knew of a pervasive problem caused by the NDC transition. As discussed above, Plaintiffs have not challenged the top-line metrics that American disclosed, nor have they plausibly asserted that those metrics facially read as hiding an underlying problem. *See Pier 1*, 935 F.3d at 432 (holding that adequately alleging that defendants knew of bare facts that lead to certain risks is not enough to demonstrate scienter).

Furthermore, Plaintiffs make little attempt to distinguish Defendants' reliance on *Pier 1*. Defendants argue that Plaintiffs have not met the two requirements necessary to use internal corporate reports to show a strong inference of scienter, which are that: "(1) the complaint has corroborating details of the reports' contents, authors, and recipients; and (2) the reports are connected to the speaking executive in a persuasive way." *Pier 1*, 935 F.3d at 434. Plaintiffs have not alleged that any defendant *actually* accessed the data that Plaintiffs allege they "*could* observe."[64] (emphasis added). Nor have Plaintiffs pointed to any statements throughout the Class Period about corporate and managed travel data that shows that Defendants understood the underlying cause of the deviation they disclosed in Q1 2024.[65] Finally, Plaintiffs acknowledge that the CWs did not have contact with any of the Individual Defendants. Combined with the CWs' low-level positions within American, Plaintiffs have not supported their allegations that Defendants actually knew what the granular data showed, much less the risks the raw data might have exposed.

---

[64] Pls.' Am. Compl. ¶ 252.
[65] *See id.* ¶¶ 258–62.

Based on the Amended Complaint and the parties' briefing, Plaintiffs have not plausibly alleged facts that overcome the PSLRA's and Rule 9(b)'s heightened pleading requirements. Therefore, Count I brough under Section 10(b) and Rule 10b-5 is **DISMISSED with prejudice**.[66]

### B.  Section 20(a)

Plaintiffs also bring a claim under § 20(a). To state a claim under § 20(a), a plaintiff must plead: (1) a primary violation of the securities laws; and (2) that the defendants had an ability to control the specific circumstances or actions on which the primary violation is based. *Heck v. Triche*, 775 F.3d 265, 283 (5th Cir. 2014). In short, control person liability completely depends upon a primary violation. *See Southland*, 365 F.3d at 383; *Lovelace v. Software Spectrum*, 78 F.3d 1015, 1021 n.8 (5th Cir. 1996).

Here, as evidenced extensively above, Plaintiffs fail to plead a primary violation. Because of this, Count II, Plaintiffs' § 20(a) claim, fails and is thus **DISMISSED**.

## IV.    CONCLUSION

Accordingly, Defendants' Motion to Dismiss (ECF No. 55) is **GRANTED**, and all of Plaintiffs' claims are hereby **DISMISSED with prejudice**.

**SO ORDERED** on this **15th day** of **November 2025**.

Reed O'Connor

**CHIEF UNITED STATES DISTRICT JUDGE**

---

[66] Because the Court dismisses Plaintiffs' claims on the merits, it does not address Defendants' "Puzzle Pleading" argument.